FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

LJW/MJM: USAO2016R00493

2020 DEC 17  PM 4: 17

CLERK'S OFFICE
AT BALTIMORE

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

BY_____DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL NO. LO-19-0449** |
| v. | (RICO Conspiracy, 18 U.S.C. § 1962(d); Money Laundering Conspiracy, 18 U.S.C. § 1956(h); Narcotics Conspiracy, 21 U.S.C. § 846; Conspiracy to Commit Offenses Against the United States, 18 U.S.C. § 371; Obstructing an Official Proceeding, 18 U.S.C. § 1512(c)(2); Falsification of Record, 18 U.S.C. § 1519; Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 21 U.S.C. § 853, 18 U.S.C. § 982(a)(1), 18 U.S.C. § 1963, and 28 U.S.C. § 2461(c)) |
| KENNETH WENDELL RAVENELL, | |
| JOSHUA REINHARDT TREEM, and | |
| SEAN FRANCIS GORDON, | |
| Defendants. | |

## SUPERSEDING INDICTMENT

### COUNT ONE
### (RICO Conspiracy)

The Grand Jury for the District of Maryland charges that at all times relevant to this Superseding Indictment:

### THE DEFENDANT

1.    The Defendant, **KENNETH WENDELL RAVENELL**, was a lawyer admitted to the Bar of Maryland in 1985.

### THE ENTERPRISE

2.    "The Law Firm" was a close corporation formed under the laws of the State of Maryland.

      a.    The Law Firm operated principally in Baltimore, Maryland.

        b.      The Law Firm constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4).

        c.      The Law Firm engaged in, and its activities affected, interstate and foreign commerce.

        d.      **RAVENELL** joined The Law Firm in or about 2007.

        e.      In August 2014, federal law enforcement executed a search warrant at The Law Firm.

        f.      In September 2014, **RAVENELL** separated from The Law Firm.

<div align="center">RELEVANT PERSONS AND ENTITIES</div>

3.      R.B., along with others, operated a multi-state illegal narcotics trafficking organization and was an associate of **RAVENELL** at all times relevant to this Superseding Indictment.

        a.      R.B. formally became a client of **RAVENELL** at The Law Firm in or about February 2011.

        b.      In April 2014, a federal grand jury sitting in Baltimore indicted R.B. and two others on a charge of conspiracy to distribute marijuana and cocaine.

        c.      **RAVENELL** ceased to represent R.B. in October 2014.

4.      L.H. operated a multi-state illegal narcotics trafficking organization and was an associate or client of **RAVENELL** at The Law Firm in 2013 and 2014.

        a.      In April 2013, L.H. was charged in a federal criminal complaint with conspiracy to distribute marijuana and arrested.

b.     L.H. formally became a client of **RAVENELL** at The Law Firm in or about June 2013.

c.     **RAVENELL** formally withdrew from his representation of L.H. on November 13, 2014.

d.     A.B. was an associate of L.H.

5.     S.G. was a private investigator hired by **RAVENELL** to work on both the R.B. and L.H. matters.

## LAWFUL PURPOSES OF THE ENTERPRISE

6.     The Law Firm was formed for the following legitimate and lawful purposes, among others: engaging in the practice of law, providing legal services deemed proper and valid, and carrying on any lawful business in connection with the practice of law and the provision of legal services.

## UNLAWFUL PURPOSES OF THE DEFENDANT

7.     The purposes of **RAVENELL** included violating the legitimate purposes of The Law Firm in order to enrich himself and Individual 1 through illegal conduct that was apart from any lawful legal services **RAVENELL** was providing to clients. **RAVENELL** and Individual 1 received monies, including the proceeds of narcotics trafficking, from individuals involved in the trafficking of narcotics and their associates in exchange for **RAVENELL** committing and promising to commit the following criminal acts:

      a.     Providing information and instructions to members of the conspiracy on how to evade law enforcement in order to continue narcotics trafficking that **RAVENELL** had learned through his work at The Law Firm;

      b.     Laundering money that had been generated from narcotics trafficking by members of the conspiracy through The Law Firm; and

      c.     Abusing his position as a member of the Bar of Maryland and The Law Firm to obstruct justice in order to protect members of the conspiracy.

<div align="center">THE CHARGE</div>

8.     Beginning at least by August 31, 2009, and continuing through in or about September 2014, in the District of Maryland and elsewhere, the defendant,

<div align="center">**KENNETH WENDELL RAVENELL**,</div>

being a person employed by and associated with The Law Firm, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with co-conspirators R.B., J.B., J.C., D.W., L.H., J.B., H.B., Ra.B., D.M., M.L., A.B., D.L., N.S., A.G., K.R., S.G., and other persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate and agree to violate Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, consisting of multiple acts indictable under:

    a.  18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant);

    b.  18 U.S.C. § 1956 (relating to the laundering of monetary instruments);

    c.  18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity);

<div align="center">4</div>

and multiple offenses involving narcotics trafficking in violation of:

      d.  21 U.S.C. § 841(a) (possession with intent to distribute and distribution of controlled dangerous substances); and

      e.  21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribute controlled dangerous substances).

<div align="center">MEANS AND METHODS OF THE CONSPIRACY</div>

Among the means and methods by which members of the conspiracy pursued their illegal purposes were the following:

<div align="center">**Facilitating Drug Trafficking Activities**</div>

9.    **RAVENELL** assisted and protected co-conspirators in their narcotics trafficking by providing information and instructions to co-conspirators that he obtained while employed by The Law Firm so that co-conspirators could evade law enforcement when they trafficked in narcotics.

10.    **RAVENELL** served as an intermediary between arrested members of the conspiracy and members of the conspiracy who were not yet arrested in order to facilitate the unlawful activities of his co-conspirators, including conveying information from arrested members about monies owed on the street from narcotics sales and the collection and retention of other assets of the co-conspirators.

## Money Laundering

11.    **RAVENELL** received substantial cash payments derived from drug sales as compensation for laundering money and for protection he provided to his co-conspirators.

12.    **RAVENELL** concealed these payments by routinely failing to create receipts or documentation of the payments he received.

13.    **RAVENELL** instructed members of the conspiracy to create and become involved in businesses that could be used to launder money.

14.    **RAVENELL** directed members of the conspiracy to use businesses and other entities and individuals to send the proceeds of narcotics transactions to The Law Firm, using wire transfers, checks, credit card payments, PayPal and other means. **RAVENELL** in turn used these funds to pay for the legal fees he charged, thus enriching himself, and to make various payments on R.B.'s behalf to third parties to promote the distribution of narcotics and conceal funds that were derived from narcotics proceeds

15.    Between 2011 and 2014, The Law Firm documented receipt of a total of $1,908,375.91 in payments related to four separate R.B.-related matters, each having separate accounting files and ledgers at the firm.  According to The Law Firm's records, none of the payments came directly from R.B. and all of the money that The Law Firm recorded it received came from third-party payors, including other individuals involved in the sale of narcotics and entities and individuals that were used by R.B. to launder money, and credit cards belonging to associates of R.B.  They were accounted for by The Law Firm as follows:

| The Law Firm File Names | Deposits |
|---|---|
| [R.B.] Criminal Matter (712-001) | $1,236,766.34 |
| [R.B.] Business Ventures Matter (712-003) | $300,409.57 |
| [R.B.] Hotel Project Matter (712-004) | $170,600.00 |
| [R.B.] Overtown Reborn Matter (712-006) | $200,600.00 |
| **Total** | **$1,908,375.91** |

a.   **R.B. Criminal Matter**. According to The Law Firm's records, $1,236,766.34 was received by The Law Firm in multiple transactions over a number of years that was credited to R.B. "Criminal Matter." According to The Law Firm's records, the $1,236,766.34 was disbursed in the following manner:

    i. Only $534,333 was retained by The Law Firm as legal fees;

    ii. $464,786.70 went, in the form of checks and wires, to lawyers and law firms that would not accept drug proceeds from drug dealers, and for related services, to benefit R.B.;

    iii. $215,100 went to other third parties, that were not labeled as lawyers and law firms, for the benefit of R.B.; and

    iv. $17,000 was transferred to R.B. "Business Ventures."

b.   **R.B. Business Ventures**. According to The Law Firm's records, $300,409.57 was credited to the R.B. "Business Ventures Matter" and the following amounts were disbursed:

    i. Only $98,329.49 was retained by The Law Firm as legal fees; and

    ii. $197,944 passed through The Law Firm bank accounts to other R.B.-related entities and business endeavors and to third parties for R.B.'s benefit.

c.   **R.B. Hotel Matter.** According to The Law Firm's records, of the $170,600 that was entered in the R.B. "Hotel Matter," the entire sum was disbursed by The Law Firm for R.B.-related investments, and The Law Firm did not keep any funds as legal fees. In addition, $90,600 was transferred to the Overtown Reborn Matter account.

d.     **Overtown Reborn Matter.**  According to The Law Firm's records, of the

$200,600 that was credited in the Overtown Reborn matter, the 200,000 passed through The Law

Firm to entities controlled by or associated with R.B.  The Law Firm did not keep any legal fees

from these funds.

### Obstructing Justice

16.     **RAVENELL** abused his position as a member of the Bar of Maryland and as a

lawyer with The Law Firm to protect co-conspirators and obstruct official proceedings, including,

for example, by doing the following:

a.     **RAVENELL** lied to members of law enforcement in order to protect

members of the conspiracy.

b.     **RAVENELL** obtained access to incarcerated individuals, whom he did not

represent, and dispatched private investigators, including S.G., to interview incarcerated

individuals and civilian witnesses,  so that **RAVENELL** and others at his direction could attempt

to improperly influence their testimony, attempt to cause them to execute false affidavits and

witness statements which **RAVENELL** knew to be false, and attempt to cause witnesses to

withhold testimony from official proceedings, namely, a federal grand jury investigation of R.B.

and later criminal case against R.B. in the United States District Court for the District of Maryland.

### OVERT ACTS

In furtherance of the conspiracy, **RAVENELL** and other members of the conspiracy

committed the following overt acts, among others, in the District of Maryland and elsewhere:

17.     On August 31, 2009, J.C. gave N.S. a large sum of narcotics proceeds, in cash, in a suitcase to transport from BWI to California, through Salt Lake City, Utah. Law enforcement seized the suitcase at BWI and discovered $85,000 in cash inside of it. N.S.'s name was called over the intercom in the boarding area. N.S. left BWI in a panic and called a member of the conspiracy who instructed her to call **RAVENELL**. N.S. then called and met with **RAVENELL** and told him that her luggage had been seized and had a large sum of cash in it. **RAVENELL** called the law enforcement officer who had seized N.S.'s luggage and lied to him about the circumstances surrounding the suitcase. Specifically, **RAVENELL** told the officer that he had no idea why N.S.'s luggage had been seized, that it was "just luggage" or words to that effect, and that N.S. had become ill at the airport and thought that she could send her luggage to California and have someone pick it up.

18.     On February 2, 2011, based on **RAVENELL's** instructions, an account was opened for R.B. in the fictitious name of "Robert Smith" with an account number ending in 6606

19.     Also on February 11, 2011, a counter deposit in the amount of $8,000 was made in the "Robert Smith" account ending in account number 6606.

20.     On February 23, 2011, **RAVENELL** deposited a check in the amount of $8,000 and made payable to "Kenneth Ravenel" [sic.] drawn on the "Robert Smith" account ending in account number 6606 into an account controlled by **RAVENELL** and not an account controlled by The Law Firm.

21.     On or about September 12, 2011, during a meeting with R.B. in Arizona, **RAVENELL** conducted counter-surveillance in the parking lot of the restaurant where they were meeting. R.B. had just given **RAVENELL** several thousand dollars in narcotics proceeds, which

9

was stored at the hotel where **RAVENELL** and R.B. were staying, and **RAVENELL** did not want to lead law enforcement back to the hotel.

22.     In late 2011, **RAVENELL** went to dinner at a restaurant with R.B., H.B. and J.C. After dinner, the four men went into the parking lot of the restaurant.  J.C. took a Louis Vuitton shoe bag out of the trunk of the car that he and H.B. had driven to the restaurant.  J.C. then gave the bag to **RAVENELL**.  It contained $50,000 in cash from narcotics sales.


**J.C. Met with RAVENELL on Multiple Occasions to Deliver Narcotics Proceeds**

23.     J.C. met with **RAVENELL** on numerous occasions to deliver narcotics proceeds, in cash, to him.  J.C. did this before **RAVENELL** represented J.C. in any criminal matter. **RAVENELL** and J.C. communicated via text message in order to meet.  For example,

        a.     On December 23, 2012, at 8:06 p.m., J.C. texted **RAVENELL,** "here," to indicate he was at a location where the two had arranged to meet so that J.C. could give **RAVENELL** narcotics proceeds.  Three minutes later, **RAVENELL** texted J.C. in response, "Ok. 2 mins," indicating **RAVENELL** was two minutes away from their agreed upon location.

        b.     On January 23, 2013, at 8:32 p.m., J.C. texted **RAVENELL,** "Here," indicating J.C. had arrived at their agreed upon location.   One minute later, **RAVENELL** texted J.C., "5 mins," indicating **RAVENELL** was five minutes away.

        c.     On February 17, 2013, at 5:29 p.m., **RAVENELL** texted J.C., "Are u at the bar yet?" which was a location where they had arranged to meet.  One minute later, J.C. texted **RAVENELL**, in response, "On my way."

d.      On March 24, 2013, at 5:18 p.m., **RAVENELL** texted J.C., "R u there yet?" referring to a pre-arranged meeting location. Seven minutes later J.C. texted **RAVENELL**, in response, "No." Eleven minutes later, **RAVENELL** texted J.C., "Leaving Baltimore now."

## RAVENELL Met with J.C. After J.C.'s Arrest to Obtain Information on Narcotics Proceeds

24.      In April 2013, J.C. was arrested on federal narcotics charges. **RAVENELL** entered his appearance to represent J.C. In May or June of 2013, **RAVENELL** visited J.C. in jail. **RAVENELL** asked J.C. to provide him with information on money that was still "on the street" or words to that effect. J.C. understood that **RAVENELL** was asking for information on outstanding narcotics debts owed to R.B. J.C. wrote the names of all the narcotics dealers who still owed money to R.B. and the amounts they owed him, which totaled several hundred thousand dollars, in a notebook that **RAVENELL** had with him.

## RAVENELL Laundered Cash from R.B. Through Individual 1's Restaurant

25.      In March 2013, **RAVENELL** took R.B. to a restaurant owned by Individual 1 as part of an attempt to persuade R.B. to invest in Individual 1's restaurant. This investment would be another way in which R.B. could funnel narcotics proceeds to **RAVENELL** since **RAVENELL** provided financial support to Individual 1.

26.      On April 8, 2013, **RAVENELL** emailed K.R. and stated, "[K.R.], please provide the attached to [R.B.] right away." Attached to the email was an investment/lease agreement/letter of intent for an investment of $150,000 in Individual 1's restaurant.

11

27.     On May 20, 2013, R.B.'s sister, at R.B.'s direction, wrote a check to Individual 1 in the amount of $9,000. **RAVENELL** had previously told R.B. to provide the money to Individual 1, instead of **RAVENELL**.

28.     R.B. ultimately declined to invest in the restaurant. **RAVENELL** told R.B. that **RAVENELL** would instead invest some of the cash that R.B. paid to **RAVENELL** in Individual 1's restaurant.

29.     On June 20, 2013, the agreement **RAVENELL** previously sent to R.B. was changed to make **RAVENELL** the party to the agreement, instead of R.B. The agreement reflected the fact that $19,000 had already been invested in the restaurant by **RAVENELL**. **RAVENELL** had provided that money, in cash, to Individual 1.

### False Memorandum of Interview of J.G.

30.     R.B. and his co-conspirators used J.G.'s company to ship large, wholesale quantities of marijuana from Arizona to various destinations on the East Coast for further distribution. In April 2013, law enforcement executed searches of co-conspirator's residences in Maryland. During these searches, investigators recovered black plastic shipping containers. These containers had been used to ship 100-pound quantities of marijuana from Arizona to Maryland as part of the narcotics distribution activities of J.C., J.B., H.B. and R.B.

31.     **RAVENELL** and R.B. discussed that J.G. was a threat to R.B. because he could provide incriminating information about R.B. and other members of the conspiracy if he were called as a witness in a proceeding against R.B.

32.     On May 3, 2013, a private investigator met with J.G. in Arizona at **RAVENELL's** direction. Prior to the arrival of **RAVENELL's** private investigator, and unbeknownst to him,

J.G. was interviewed by law enforcement and was shown a photographic lineup. During the interview with law enforcement, J.G. identified R.B. and other co-conspirators and provided incriminating information about R.B. and his narcotics trafficking organization. **RAVENELL's** private investigator misled J.G. into believing that the investigator was another law enforcement officer. J.G. reiterated what he had previously told law enforcement about R.B., and told the private investigator that he had identified R.B. in a photo lineup that was previously shown to him by law enforcement.

33.    A memorandum dated May 5, 2013, and addressed to "Kenneth Ravenell" was created that falsely documented the private investigator's interview of J.G. and was maintained by **RAVENELL** in his R.B.-related files at The Law Firm. The memorandum stated: "[J.G.] told [a detective] he could not identify [R.B.]. [A detective] then specifically pointed to a photo of a black male subject with a scar on his face in one of the photo arrays and asked if [J.G.] could identify this person. [J.G.] confirmed he could not identify the individual who had a scar on his face in the photo lineup." The memorandum contained additional false information.

### Attempts to Procure a False Witness Statement from D.W.

34.    On August 5, 2013, **RAVENELL** and S.G. traveled to a detention center where D.W. was being held. D.W. had trafficked narcotics and laundered money for R.B. and other members of the narcotics trafficking organization. D.W. had been federally charged with conspiracy to distribute and possess with intent to distribute marijuana, and his charges were pending in the District of Maryland. **RAVENELL** did not ask for permission from D.W.'s lawyer to meet with D.W. or to discuss issues related to D.W.'s pending federal case. **RAVENELL** and S.G. attempted to interview D.W. on August 5, 2013, but he declined to be interviewed.

35.     On or about May 29, 2014, **RAVENELL** sent S.G. to visit D.W at a prison facility near Houston, Texas. When he met with D.W., S.G. asked D.W. to make a false written statement that D.W. had not been involved in trafficking narcotics with R.B.  D.W. refused to sign a false statement and told S.G. that he and **RAVENELL** should contact D.W.'s lawyer.  S.G. then questioned whether D.W. was "snitching," and D.W. terminated the interview.

### A.B. Gave RAVENELL Narcotics Proceeds to Represent L.H.

36.     In 2014, A.B., L.H.'s girlfriend at the time, met with **RAVENELL** at a restaurant in Washington, D.C., where she gave **RAVENELL** $21,000 in narcotics proceeds, in cash, and the two had previously discussed the fact that cash provided by A.B. was narcotics proceeds.

37.     A.B. subsequently gave **RAVENELL** narcotics proceeds, in cash, in the amounts of $15,000 and $10,000.  **RAVENELL** did not provide receipts to A.B. for these payments.  As a result, A.B. recorded the payments on the visor of her vehicle as "Rav – 21 15 10."

### RAVENELL Attempted to Collect Narcotics Proceeds for R.B. in Atlanta

38.     On July 11, 2014, **RAVENELL** booked a Southwest Airlines flight from Baltimore to Atlanta, Georgia, for July 12, 2014, with a return flight from Atlanta to Baltimore on the same day.  The purpose of the trip was for **RAVENELL** to meet with A.G., to discuss narcotics proceeds that R.B. had previously given A.G.

39.     On July 22, 2014, **RAVENELL** visited R.B. in jail and reported that the associate, with whom **RAVENELL** had spoken prior to his arrival in Atlanta, failed to show up at the Four Seasons Hotel, where **RAVENELL** had arranged to meet him.

18 U.S.C. § 1962(d)

14

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 3, 9-15, 17-29 and 36-39 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

2. Beginning at least by August 31, 2009, and continuing through on or about August 15, 2017, in the District of Maryland and elsewhere, the defendant,

### KENNETH WENDELL RAVENELL,

did knowingly, intentionally, and unlawfully, combine, conspire, confederate, and agree with one or more persons known and unknown to the Grand Jury to:

a. conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, the felonious distribution of controlled substances punishable under Title 21, United States Code, Chapter 13, with the intent to promote the carrying on of such specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b. conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, the felonious distribution of controlled substances punishable under Title 21, United States Code, Chapter 13, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and while conducting and attempting to conduct such financial transactions knew the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

15

          c.      engage, attempt to engage, and cause others to engage in monetary transactions, in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000, and was derived from specified unlawful activity, that is, the felonious distribution of controlled substances punishable under Title 21, United States Code, Chapter 13, in violation of 18 U.S.C. § 1957(a).

18 U.S.C. § 1956(h)

## COUNT THREE
### (Narcotics Conspiracy)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 3 and 9-39 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

2. Beginning at least by August 31, 2009, and continuing through on or about August 15, 2017, in the District of Maryland and elsewhere, the defendant,

### KENNETH WENDELL RAVENELL,

did knowingly, willfully and unlawfully combine, conspire, confederate and agree with one or more persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute one thousand (1000) kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A)(vii).

21 U.S.C. § 846

17

## COUNT FOUR
### (Conspiracy to Commit Offenses Against the United States)

The Grand Jury for the District of Maryland further charges that:

1.    Paragraphs 3-4 and 9-39 of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

### THE DEFENDANTS

2.    Defendant **KENNETH WENDELL RAVENELL** was a lawyer admitted to the Bar of Maryland in 1985.

3.    Defendant **JOSHUA REINHARDT TREEM** was a lawyer admitted to the Bar of Maryland in 1972.

4.    **RAVENELL** and **TREEM** practiced law at the same law firm in the 1990s and early 2000s.

5.    Defendant **SEAN FRANCIS GORDON** was a private investigator.

6.    **RAVENELL** worked with **GORDON** as part of his association with R.B. and L.H. Later, **TREEM** and **RAVENELL** worked with **GORDON** pursuant to **TREEM's** representation of **RAVENELL**.

7.    On or about January 21, 2016, **TREEM** began representing **RAVENELL** in connection with a federal criminal investigation conducted by the U.S. Department of Justice and an investigation by a federal grand jury sitting in Baltimore of **RAVENELL**.  **GORDON** was also retained to work with **TREEM** and **RAVENELL** in connection with that investigation.  **TREEM** continued representing **RAVENELL** through on or about June 18, 2019.

OBJECT OF THE CONSPIRACY

8.    It was the object of the conspiracy to create false records and documents with the intent to impede, obstruct or influence investigations within the jurisdiction of the U.S. Department of Justice and to obstruct, influence and impede official proceedings, including grand jury investigations and federal criminal cases in United States District Court in Baltimore, Maryland, in order to protect members of the conspiracy.

THE CHARGE

9.    Beginning no later than May 5, 2013, and continuing through at least December 11, 2018, in the District of Maryland and elsewhere, the defendants,

**KENNETH WENDELL RAVENELL,**
**JOSHUA REINHARDT TREEM, and**
**SEAN FRANCIS GORDON,**

did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is, to:

a.    knowingly conceal, cover up, falsify and make false entries in a record and document with the intent to impede, obstruct and influence the investigation and proper administration of a matter within the jurisdiction of a department or agency of the United States and in contemplation of such a matter, namely criminal investigations conducted by the United States Department of Justice into R.B. and **RAVENELL**, in violation of 18 U.S.C. § 1519; and

b.    corruptly obstruct, influence, or impede any official proceeding, and attempt to do so, namely a federal grand jury investigation and criminal prosecution of R.B. and a

19

federal grand jury investigation and a foreseeable criminal prosecution of **RAVENELL,** in violation of 18 U.S.C. § 1512(c)(2).

### MEANS AND METHODS OF THE CONSPIRACY

Among the means and methods by which members of the conspiracy pursued their illegal purposes were the following:

10.     **RAVENELL** obtained access to incarcerated individuals, whom he did not represent, and dispatched private investigators, including **GORDON**, to interview incarcerated individuals and civilian witnesses,  so that **RAVENELL** and others at his direction could attempt to improperly influence their testimony, attempt to cause them to execute false affidavits and witness statements which **RAVENELL** knew to be false, and attempt to cause witnesses to withhold testimony from official proceedings, namely, a federal grand jury investigation of R.B. and later criminal case against R.B. in the District of Maryland.

11.     **TREEM** and **GORDON**, at **RAVENELL's** direction, met with R.B., who they knew was a potential witness in a federal criminal investigation by the U.S. Department of Justice and a federal grand jury sitting in Baltimore of **RAVENELL** and a foreseeable criminal prosecution of **RAVENELL** in the United States District Court for the District of Maryland, and presented R.B. with a document, prepared by **RAVENELL**, containing false statements exculpating **RAVENELL**.  Despite the fact that R.B. told **TREEM** and **GORDON** that these statements were false, **TREEM** and **GORDON** urged R.B. to sign the document, which he did.

12.     **RAVENELL, TREEM** and **GORDON** prepared false documents, including an affidavit on behalf of **GORDON** that referenced, as an exhibit, the document containing false exculpatory statements that **TREEM** and **GORDON** had urged R.B. to sign, and a letter to a

United States District Court Judge on behalf of **TREEM**, relating to their interview of R.B. These documents were fraudulently prepared to undermine and impeach R.B.'s credibility in the event he were called by the Government to testify in a criminal trial of **RAVENELL** and to provide false evidence of a prior consistent statement by **GORDON** or **TREEM** in the event either one were to be questioned as part of an investigation being conducted by the U.S. Department of Justice of **RAVENELL** or called to testify in an official proceeding, including before the grand jury investigating **RAVENELL** or a trial of **RAVENELL** if he were indicted by a federal grand jury.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its objects and purposes, members of the conspiracy committed the following overt acts, among others, in the District of Maryland and elsewhere:

13.     In May 2013, **RAVENELL** caused the creation of a false witness interview report of J.G. to protect R.B. as described in paragraphs 30-33 of Count One.

14.     On August 5, 2013, **RAVENELL** and **GORDON** traveled to a detention center where D.W. was being held to attempt to meet with D.W. as described in paragraph 34 of Count One.

15.     On or about May 29, 2014, **RAVENELL** sent S.G. to visit D.W. at a prison facility near Houston, Texas, as described in paragraph 35 of Count One.

### TREEM and GORDON's Interview of R.B. on September 9, 2017

16.     On September 9, 2017, **TREEM** and **GORDON** traveled from Baltimore, Maryland, to Phoenix, Arizona, to meet with R.B. at the Towers Jail, where R.B. was being held

21

on state criminal charges. At that time, **RAVENELL**, **TREEM** and **GORDON** knew that **RAVENELL** was under investigation by the U.S. Department of Justice and a federal grand jury sitting in Baltimore and could be charged with federal crimes.

17. **RAVENELL**, **TREEM** and **GORDON** knew R.B. had information about **RAVENELL's** conduct.

18. **RAVENELL, TREEM** and **GORDON** knew that R.B. could be a potential witness in the investigation of **RAVENELL** being conducted by the U.S. Department of Justice and the grand jury and in a federal criminal prosecution of **RAVENELL**. They also knew that **TREEM** and **GORDON** could also be potential witnesses in a trial of **RAVENELL** because they could testify about what happened during a meeting with R.B. if R.B. were to testify against **RAVENELL**.

19. Early in the meeting, **TREEM** told R.B., "so not surprising to you **[RAVENELL]**'s given us a list of things we've got to ask you," to which R.B. responded, "Oh, absolutely." As he spoke to R.B., **TREEM** had in front of him a document that contained 53 statements which were, in effect, false denials about **RAVENELL's** involvement in criminal conduct. The document was titled "KWR's Combined Notes." Before visiting R.B., **RAVENELL** had prepared this list based on witness statements that had been turned over to R.B.'s lawyer, in R.B.'s criminal case, and that R.B.'s lawyer, in turn, provided to **RAVENELL** and **TREEM**. **RAVENELL** had written out the list long-hand and then **TREEM** caused it to be typed before he left for Arizona.

20. **TREEM** began questioning R.B. starting with the fourth numbered statement on the KWR's Combined Notes, which read, "He told me he was no longer involved in narcotics activities after his February 2011 arrest." R.B. and **TREEM** discussed the topic, at length. In response to **TREEM's** questions, R.B. said **RAVENELL** "want[ed] to make sure that what I was

doing was on the up and up and the way I was paying my bills was on the up and up," and told **TREEM** that **RAVENELL** had "shown up" at an event that R.B. put on, "to see how the money flowed and how people pay and how much cans of cash we was handling and was the shit really real."

21.     **TREEM** then explained to R.B. what he, **TREEM**, thought was the focus of the investigation by the U.S. Department of Justice and the grand jury into **RAVENELL**:

> Okay. Because, you know, what's going on is they think that he, that he knew that you were paying him with tainted money, with narcotics money and -- number one. And number two, that you were -- that he was kind of acting as your -- as the house counsel for your organization. That he was -- you know, like in the "Godfather," he was the consigliere. I'm telling you that's their view. That's their view. I'm not making this up. And, you know, that you were running -- or, you know, that he was your bank, you know.
>
> So you were depositing all this money from whatever source it was, whether it was from the events that you were running or from the narcotics, you were putting that money into the trust account up there and then you were telling him where to send it and what to do with it. And to the extent that there was any legitimate money from the events, it doesn't clean the bad money, it's all comingled and it's all forfeitable, and **[RAVENELL]** knew it or should have known it.

22.     R.B. then asked **TREEM** to explain what **TREEM** thought was the basis for the U.S. Department of Justice and grand jury investigation and **TREEM** offered the following:

> Based upon the fact that they think that LOC was just set up as a front to hide -- in fact to launder the narcotics money. That my -- and I don't know enough about it, but I think their theory is that whatever money was actually made through the LOC events that narcotics money was put into that kitty and so it would look as if were – LOC would -- the events were cleaning the narcotics money … If you sold $100 worth of tickets, you know, you'd put $300 in because all -- because a lot of it was cash … And so it would look as if you actually sold 300 tickets -- $300 worth of tickets and you only sold 1, but that money goes out and it came from the narcotics.

23.     In response, R.B. said, "Okay.  I see where you're going," to which **TREEM** said,

"So that – I'm pretty sure that's what [the Government's] theory is."

24.     **TREEM**, **GORDON** and R.B. then discussed at length how **RAVENELL** tracked R.B.'s business income and expenses and how money was wired to The Law Firm at R.B.'s direction.

25.     **TREEM** then asked R.B. if R.B. was "deliberately trying to make sure," that **RAVENELL** did not know that money R.B. was giving **RAVENELL** was drug money, to which R.B. responded, "Yeah," and **TREEM** then asked, "did you do anything in particular that you can think of where you just didn't tell him?"  In response, R.B. said, "Actually let me back up … I have let me go through a little bit – I should do it this way so I can--" to which **TREEM** said, "Yeah, go through what you got." In response to **TREEM's** invitation to "go through what you got," R.B. told **TREEM,** "I know what **[RAVENELL]** wants, that's no problem, man," and "He know who I am, he know what -- he -- we've known each other over two decades," and "All right. So I know this formula, that's not a problem, all right. You will leave here with the information that you came seeking."

26.     **TREEM**, **GORDON** and R.B. then had a lengthy discussion about R.B.'s investment in the MGM Casino, which, according to R.B., was made through Attorney 1 and Attorney 2 at The Law Firm, and was managed by **RAVENELL** because R.B. had signed a power of attorney giving **RAVENELL** control over the investment.  Early in the discussion about R.B.'s MGM Casino investment, R.B. told **TREEM**, "So what I'm telling you is that whatever **[RAVENELL]** needs that's fine, that's not a problem. Like we can go through this whole questioning and then we're going to do the song and dance, that's not a problem, all right, period," to which **TREEM** responded, "All right."

27.     R.B. then expressed the view that **RAVENELL** could begin giving R.B. money from R.B.'s MGM Casino investment because, "Ain't nobody fucking investigating

[RAVENELL] no more," to which **GORDON** responded, "We wouldn't be here if that was the case."

28.     **GORDON** then asked R.B. to explain Attorney 1 and Attorney 2's role in the MGM Casino investment, which R.B. did.

29.     **TREEM** then asked R.B. to explain R.B.'s investment in the MGM Casino, which R.B. did.

30.     After doing so, R.B. asked **TREEM**, "None of this is going to be turned over to the government?" **TREEM** responded, "I don't mean to laugh, but yeah, none of this is going to be turned over. This is between you, me, and **[GORDON]** – you know, and that's where it's going to stay."

31.     **TREEM** then told R.B., "given what I've already heard I suspect if you're willing I'm going to want to come back." R.B. responded, "That's fine man, I'm good."

32.     R.B. then commented, "But for **[RAVENELL]** to send you here he absolutely has to have unequivocal trust in you," to which **TREEM** responded, "Well, I think he does and I trust him." **TREEM** then told R.B. a story about the very first criminal trial **RAVENELL** had, which was with **TREEM**. He also amended his earlier statement about where the information R.B. was sharing would go, telling R.B., "This isn't going anywhere except maybe, you know, I'm going to be talking to **[RAVENELL]** later so I'm going to talk to him about this." Concerned, R.B. asked, "Yeah, but on the phone?" **TREEM** responded, "No, no, … I will not talk to him about this on the phone." **TREEM** then asked, "Not even on my cell phone?" to which R.B. responded "no," and **TREEM** agreed saying, "I got it, I got it. That's fine."

33.     **TREEM** and **GORDON** and R.B. then had a discussion about **RAVENELL's** laptop computer, which R.B. told them had R.B.'s "financial[s]" on it. After some discussion,

25

R.B. said that the laptop computer should be thrown away or his financial information removed from it. **TREEM** responded, "Well, I think the problem is it's under subpoena … I have some questions but I will look at it … Maybe there's a way to – well, I'll look at it. I'll see – we'll make sure it covers what we have."

34.     R.B. then complained about being forced to take a plea offer in his criminal case. R.B. then told **TREEM**, "I just gave up. I just say fuck it. At least I know with this **[RAVENELL]** is protected and he knows what's coming at him and he know how to deal with it. And if **[RAVENELL]** is free my investment is good and that's the way I'm looking at it." **TREEM** then asked R.B., "So you need to know if your investment is good?" to which R.B. responded, "Yeah, I mean, I got a phone call from [Person A] that tells me my investment is good and that if I stood strong that a few million dollars was coming my way."

35.     In response, **TREEM** asked, "and that call was from who?" to which R.B. responded, "[Person A]." **TREEM** then commented, "Oh, [Person A]. I know that's [Person A]. Okay. All right."

36.     Later, R.B. told **TREEM** that in addition to his investment in the MGM Casino, R.B.'s escrow account at The Law Firm still had $9,000 in it and that R.B. was thinking of asking his lawyer to "draw up some paperwork and send to [The Law Firm] and demand my motherfucking money." **TREEM** told R.B. that **TREEM** "should stay out of that," but that **TREEM** would "make sure that **[RAVENELL]** (indiscernible)." R.B. then asked **TREEM**, "But, I mean, you can play in the back, though, and help me out," to which **TREEM** responded, "Absolutely, I mean, yeah, for sure, I know that. Yeah, I will." **GORDON** asked R.B. how he "[got] that figure," to which R.B. responded that The Law Firm's attorney told R.B.'s lawyer. R.B.

asked **TREEM** to "reach out" to The Law Firm's lawyer and **TREEM** told R.B., "I'll ask her. I will see her next week."

37.    Eventually, the conversation returned to the KWR's Combined Notes. R.B. asked **TREEM**, "You want me to just read it man, and answer every question?" **TREEM** agreed to that approach telling R.B., "Absolutely, that's probably easier." R.B. proceeded to go through many but not all the items on the KWR's Combined Notes, reading a numbered statement and adopting it using, in almost all cases, a single word like "yes," "no," or "correct." On three occasions, **TREEM** asked follow-up questions to R.B.'s one word answers. Neither **TREEM** nor **GORDON** recorded which statements R.B. adopted.

38.    After R.B. finished with the KWR's Combined Notes, the conversation returned to R.B.'s MGM Casino investment. R.B. asked **TREEM** if he could "bluff" Attorney 1 and Attorney 2 into paying R.B. what he was owed on the deal by threatening to go public with R.B.'s involvement in it. **TREEM** responded, "Okay. All right. But, yeah, no, except I don't want -- the only people I want to know whom I want to know that I'm here today is you, **[GORDON]**, me and **[RAVENELL]**."

39.    **TREEM** then promised to do a number of things for R.B. to help him recoup his investment in the MGM Casino and any remaining money in his escrow account at The Law Firm:

> I don't know, but the first thing that comes to mind is -- and I'll talk to **[RAVENELL]** on Monday and we'll sit down and kind of go over this, but just what comes to mind immediately is that if there is a power of attorney out there in which you have given other people authority to do something on your behalf, you can revoke that, it's not irrevocable. And so then the power is yours and then it's -- at least you have control over what you want to do in terms of how to get your money back, you don't have to go through anyone else ... So that's kind of number one, because then if then -- if then there is someone else, another attorney that you want to get involved in this to go knock on [Attorney 1's] door and say, you know, that money that you're holding one, the escrow account, you know, that's a bar grievance

27

issue. They have no right to that money, that's number one. But number two, where's his money?

40.    **TREEM** continued, "But, you know -- but the other thing because, you want to get -- I mean, **[RAVENELL]** is holding that [power of] attorney for you, you don't want him to have it … I mean, that's not good for you, that's not [good for] him … So I'm going to talk to him. I'm going to talk to him about that and find out, you know, what – if there's a document out there I'd like to see it. He needs to get off of that."

41.    **TREEM** next promised to reach out to a lawyer representing The Law Firm to try and enlist her in helping R.B.:

> But, you know, I'll see what I can do about talking to [Attorney for The Law Firm]. The problem is [Attorney for The Law Firm] works as counsel for the firm in this case but nothing else, you know. If the firm has got some deal on the side and this -- that's not unrelated to this particular piece of -- you know, this case involving you and the investigation of **[RAVENELL]** and whatever, that's the limit of her representation of this firm. My guess is, knowing her fairly well, she's going to say it ain't none of my business and [Attorney 1] and [Attorney 2] are fucking [R.B.] out of his money that's their problem and I'm not retained for that.

42.    In response, R.B. asked **TREEM**, "So then how do I go about getting my money," and **TREEM** told him, "Then I think what you do is you find someone who is going to make it their problem," referring to a lawyer.

43.    **TREEM** then promised to think about whether he knew "anybody who can maybe pick this up," referring to finding a lawyer for R.B.

44.    R.B. asked **TREEM** and **GORDON**, "I mean how much motherfucking money does [Attorney 1] want to which **TREEM** responded, "He wants a lot," and **GORDON** stated, "Yeah, he wants it all," and **TREEM** then said "He wants it all.  This stuff he got from [] isn't enough."

45.     Later in the conversation, R.B. asked **GORDON** and **TREEM** whether **RAVENELL** had obtained an interest in the MGM Casino, to which **GORDON** replied, "I don't know," and **TREEM** replied, "I don't think he's carrying any interests." R.B. responded, "So it's just [Attorney 1] and them?" to which **TREEM** replied, "I think so. I don't think he's got anything to do with them anymore."

46.     **TREEM** then volunteered that he could go to the press to help R.B. recoup his MGM Casino investment. **TREEM** told R.B., "So you know, throwing [Attorney 1] in the briar patch—I can deal with that. That's [Attorney 1's] money [now] you know, [but] I know people at the press, you know. I know the television people to call, I know the people I can go talk to, you know, I can spin it my way, I'm not worried about any of that."

47.     R.B. asked in response, "So [Attorney 1] has just fucked me?" **TREEM** said, "you're just another fuckee. A fuckee in a long line of fuckees, you know, [Attorney 1] doesn't care."

48.     Before they left, **TREEM** took back the KWR's Combined Notes from R.B. There were no check marks on it when he took it back and R.B. had not signed it.

49.     During the course of the interview, **TREEM** took handwritten notes including that

a.      R.B. knew that **RAVENELL** had a ledger on his computer, that **RAVENELL** was taking care of R.B.'s investments, and that **RAVENELL** maintained R.B.'s finances on his laptop.

b.      "Feds do not have it," referring to the laptop computer, and also, "info delete."

c.      "told [R.B.] not to have conversation with anyone else."

d.      "KWR – record of all [R.B.'s] financial records on KWR's laptop."

29

**TREEM and GORDON's Interview of R.B. on September 10, 2017**

50.    On September 10, 2017, **TREEM** and **GORDON** returned to the Towers Jail at approximately 9:16 a.m., to continue meeting with R.B.

51.    **TREEM** told R.B. that he "got a text from **[RAVENELL]** and we're going to meet tomorrow at 4."

52.    At the outset of the meeting, R.B. asked if he could speak to **GORDON** privately. **TREEM** briefly left the room.  R.B. asked **GORDON**, "I can talk freely in front of [**TREEM**] all the way?"  **GORDON** responded, "Yeah.  Yeah.  You know, this is all privileged info."  R.B. responded, "All right, cool.  All right, he can come back in."

53.    Thereafter, **TREEM** reentered the room.

54.    **TREEM** began by handing R.B. the KWR's Combined Notes that they had gone over the previous day.  Now, the document had hand-written check marks next to each of the numbered items including ones R.B. had not adopted.  .

55.    **TREEM** then told R.B., "Okay. So we went over all this stuff yesterday, I'm not going to bother with that today. Can you sign this for me, just to show **[RAVENELL]** that you went over it?" R.B. did not, however, sign the document at this time. Instead, R.B. said to **TREEM** and **GORDON**, "There's a couple of things that I want to go through."

56.    Before going any further, R.B. asked **TREEM**, "I want to make sure everything I discuss with you is kept—" and understanding what R.B. meant without even letting him finish, **TREEM** said, "It is … Yeah, I mean, it's easy – I mean, not easy on me, it's easy to do that, but I have to do that."  **TREEM** told R.B., "This is my work product, this conversation … The notes are my work product … They are privileged.   They're mine.   No one is getting them.

**[RAVENELL]**'s not getting this." In response, R.B. told **TREEM**, "That makes me a lot more comfortable."

57.   **TREEM** then repeated what he said on the previous day about helping R.B. recover

his MGM Casino investment and escrowed funds at The Law Firm.

> But having said that, just so you – we talked about this yesterday but I just
> want to make sure, I mean, I'm going to -- with your permission I'm going
> to tell **[RAVENELL]** what you're interested in, what you need and I'm
> prepared to talk to [R.B.'s then-Attorney] about that too, all right. But I'm
> **[RAVENELL]**'s lawyer, you know, and so my obligations in terms of
> representations are to him. I will -- I told you yesterday that I'll find out
> what I can about the investments and make sure -- … Right, right, and the
> power of attorney and your escrowed money, I'll find out what I can about
> that. And I will either get that to you directly or probably through [R.B.'s
> then-Attorney] is probably the better way to do it.

58.   R.B. then told **TREEM** and **GORDON** that R.B. would never cooperate with the

Government. R.B. then told them that **RAVENELL** had a "blueprint of my financials," that R.B.

"can't get to those financials without **[RAVENELL]**" and that **RAVENELL** was "in a unique

position as far as my money is concerned because without him I can't get my money from [Attorney

1] and them. So it's really -- he's in the power seat." **TREEM** responded, "Except that he's not in

the power seat until this cloud disappears."

59.   R.B. then told **TREEM** and **GORDON,**

> All right, so here's what I'm saying to you. And I want to go deep into this,
> okay, because I want you to clearly understand my position, all right?… My
> only position here is my money, that's it. **[RAVENELL]** can get anything
> he want from me that's not a problem. It's been that way since I've been
> incarcerated. I made sure [R.B.'s previous Attorney] – make sure [R.B.'s
> previous Attorney] took care of (indiscernible) situation, all of that shit, you
> know what I'm saying to you. So that's not a problem. My concern is my
> money.
>
> Now the information I gave you yesterday – is the information if called to
> testify I will testify to on the stand.

In response **TREEM** said, "I understand."

60.   R.B. then told **TREEM**,

> Here's the real situation, alright. The real situation is this: **[RAVENELL]** knew my whole business operation, period, from A to Z, from nuts [to bolts]. **[RAVENELL]** knew that LOC was used to launder money. **[RAVENELL]** knew I was still involved in narcotics. I paid **[RAVENELL]** millions of dollars in cash. **[RAVENELL]** shared all that money between [Attorney 1 and Attorney 2], now [Attorney 1 and Attorney 2] is riding off in the sunset and he got a headache and nobody is making sure I get my money.
>
> [Attorney 1 and Attorney 2] is aware of this whole situation. **[RAVENELL]** don't make no move without them knowing as I've been told by him that they're partners and they need to know everything that's involved.

61.   **TREEM** interrupted R.B. and asked him, "You mean partners now?"   R.B.

responded:

> Were. I'm talking about back when I was in their firm. I used to deliver book bags of cash to that office. [J.C.] delivered millions of dollars to **[RAVENELL]**. So what I'm saying is that I'm going to be the good soldier like I'm supposed to be, but I need **[RAVENELL]** to put his nuts on the line for me and make sure I get my fucking money. Like I've told you, I got two kids in college. I got one that's coming home that doesn't want to go to college. I'm not asking for no handout. I'm just asking for my money. How the fuck is **[RAVENELL]** going to let [Attorney 1] and them run off with every fucking thing and fuck him like that? That's like crazy to me that **[RAVENELL's]** allowing them to do that. It's one thing for me to take a dump because I am who I am and I am what I am, but how is he going to let them run off with everything.

62.   R.B. then told **TREEM**, "Now **[RAVENELL]** keeps a chart of all my investments,

all the players that's involved, the how's and the where's. He needs to make sure all of that vanish

off his laptop." **TREEM** responded:

> Well, he can't do that. I can't have him I can't advise him to delete stuff off his laptop. I can't do that. I told you, [R.B.], yesterday there's a subpoena out for that stuff. I can't delete that and he can't either.

63.   R.B. then told **TREEM** that R.B. had spoken to [Person A] and that "[Person A]

related to me that my investments were safe, just chill, wait until the fog clear. And that

**[RAVENELL]** was willing to throw me a few m's to stay the way I am. I mean, I was going to stay the way I am regardless, but you put it on the table I want it. My sole and only goal in this is to make sure my kids get their money." **TREEM** responded, "Okay. I want to make sure what you're telling me, you're telling me that [Person A] told you that **[RAVENELL]** is willing to throw you a few m's – to take care of your kids?" **TREEM** asked R.B. when he had spoken to Person A, and R.B. said it was approximately two years ago when they were both at the Supermax jail.

64.    **TREEM** wrote down on his notepad, "KWR **[RAVENELL]** knows all about drug dealing, LOC and laundering. [R.B.] delivered millions in cash, so did [J.C.]." **TREEM** further wrote a note to himself, "JRT – different from yesterday." **TREEM** underlined this notation four times.

65.    **TREEM** also noted, "assuming its on laptop" referring to R.B.'s financial records and "wants [] with investments to vanish" and "JRT – won't happen, can't happen." **TREEM** noted what R.B. told him about [Person A] writing, "[Person A] says investment safe. KWR **[RAVENELL]** willing to throw him a few 'ms' to take care of 'kids'" and that R.B. had talked to Person A at Supermax approximately 2 years ago.

66.    The conversation then returned to R.B.'s MGM Casino investment. **TREEM** subsequently had the following exchange with R.B.:

R.B.:       So [Attorney 1 and Attorney 2] just want to run off in the sunset with our fucking money?

**TREEM**:   Well, you're banking on—assuming that—I have no reason to doubt you, [R.B.], but you know if they know what—given what you say [Attorney 1 and Attorney 2] know, you know, they're going to let **[RAVENELL]** take the fall for them. Because what you're telling me, so I make sure I understand this, you're telling me that **[RAVENELL]** knew that you were using LOC to launder your narcotics money and that [Attorney 1 and Attorney 2] knew it too.

R.B.:       Absolutely.

**TREEM**:     And that, you know, cash—balances of cash were delivered to them at the firm.

R.B.:          Absolutely.

**TREEM**:     And there was really no question about, you know, where this was all coming from --

R.B.:          Absolutely.

**TREEM**:     -- at least commingled.

R.B.:          Right.

**TREEM**:     And so I'm giving you credit for that being accurate and truthful.  If that's so, I mean [Attorney 1 and Attorney 2] aren't on the receiving end of anything yet so they're very happy to let **[RAVENELL]** take the fall.

R.B.:          Motherfuckers.

**TREEM**:     Because for them to be in trouble, **[RAVENELL's]** got to be in trouble.  And so he's the one who is on – whose neck is out there. And to the extent that [Attorney 1 and Attorney 2] have some exposure right now they're very happy to have **[RAVENELL]** be the target because either way they win.  If **[RAVENELL]** is charged and is convicted, you know, then the question is at that point, you know, how long does all that take and maybe the statute of limitations has run on everything.  And if—you know if—otherwise, you know, you're the only out maybe at that point is **[RAVENELL]** makes some deal which sends him (indiscernible) they are and [Attorney 1 and Attorney 2] have all the defenses that they need, look at this he's trying to roll over to save his ass.  So—but, you know, if what you're telling me is—which today is somewhat different than what you said yesterday.

67.     Referencing the KWR's Combined Notes, which R.B. still had not signed, R.B.

told **TREEM**, "I mean, this—I'm ready—this is for the [witness] stand, okay."  **TREEM**

responded,

> Well, okay.  But, you know, I can't, I can't—I don't know where this is all going … And I don't know whether, you know, assuming **[RAVENELL]** is charged, I have no idea sitting here today what I'm going to need or who I'm going to need to defend to put on the witness stand to defend **[RAVENELL]**.

68.  **TREEM** next told R.B.,

> All right.  I can't put you on the witness stand if you're going to lie, and if I know you're going to lie I can't do that, because that get me in a lot of trouble if that comes out.

69.  **TREEM** then told R.B. that he thought they should stop the interview and

that **TREEM** "need[ed] to go kind of sit in my office and close the door and kind of play

all this out," because "I got to think about this."  **TREEM** continued:

> But, you know, I wrote down what you said and I take you at your word that at no point will you become [the Government's] bitch, I got that and that's fine. But how -- what your value to me is in terms of my representation of **[RAVENELL]** I got to think about that. And I don't want to do anything that's going to screw up what you want to do in terms of trying to get the money that's owed to you back in your pocket for the benefit of your kids. I understand that's your goal and I get that. And, you know, if that doesn't conflict with anything I got to do for my client I'm happy to -- regardless, I'm happy to do what I told you I would do, all right. I will see what I can do about finding out where -- what exists out there and I will let [R.B.'s then-Attorney] know all that. But in terms of what we said here yesterday and today I'm not telling him anything.

70.  **TREEM** took notes on this portion of the conversation.  **TREEM** wrote "[R.B.]

wants to go after [The Law Firm] [] atty?"  **TREEM** also noted, "JRT → said to stop" and that,

"saying [] different from yesterday."  **TREEM** further wrote in his notes "[R.B.] prepared to testify

about [what] he **[RAVENELL]** needs [him] to."  **TREEM** wrote, "can't call [R.B.] if you are

going to lie."  **TREEM** also noted, "[Attorney 1] and [Attorney 2] walking away – knows what

KWR **[RAVENELL]** doing with [R.B.]."  **TREEM** then wrote, "no they don't" and "KWR

**[RAVENELL]** being used by them" and "can't do anything until investigation is over."

71.  **TREEM** then repeated that **TREEM** was not going to tell R.B.'s lawyer about

what they had talked about because doing so would not "help" **RAVENELL**.

72.  **TREEM** again told R.B. that he would help R.B. find a lawyer to recoup his

investment from Attorney 1 and Attorney 2.  In his handwritten notes, **TREEM** recorded, "atty to

go after [Attorney 1] & [Attorney 2] independent of KWR" and "that if KWR is person who knows then he can't do anything [] until after his investigation is over."

73.     As the interview concluded, R.B. asked **TREEM**, "Can I have a conversation with [**GORDON**] real quick?" **TREEM** said, "Yeah, of course you can have a conversation with [**GORDON**]. Can you do me a favor?" R.B. responded, "Yes, sir."

74.     Before he left the room **TREEM** asked, "Can you sign that for me that you saw it?" **TREEM** pointed at the KWR's Combined Notes, which R.B. still had not signed. **TREEM** then left the room.

75.     R.B. said to **GORDON**, "I should never have had that conversation with [**TREEM**]." **GORDON** said, **"[TREEM]** wasn't going to put you on the stand anyway. It's more – you know, the situation is this isn't—I'll go back—this isn't a situation of like calling you as a witness." R.B. responded, "Okay."

76.     **GORDON** said, "This is a situation of–," and R.B. said, "covering his bases?" **GORDON** said, "Talk to everyone, find out what their status is, you know. Just like you sent me to Houston to talk to people, this is kind of the same version." **GORDON's** statement about "Houston" was in reference to **GORDON** going to meet with D.W. in an attempt to obtain a false witness statement from him, which R.B., **GORDON**, and **RAVENELL** knew to be false. R.B. said, "Okay."

77.     **GORDON** said, "Not like they're going to put – they can't put you on [the witness stand] anyway, attorney/client privilege and all this other shit, okay. So it's not that kind of situation, okay."

78.     R.B. said, "I'm like, yo, I'm willing to testify to all of this" as R.B. picked up and pointed at the KWR's Combined Notes. **GORDON** responded, "I know." R.B. asked, "so he just

36

want me to sign saying I seen it?" **GORDON** responded, "Yeah, you saw it." R.B. signed the front page of the two-sided document and later signed the second page of the document.

79.     R.B. then asked **GORDON**, "How the fuck do I get my money? Listen, tell **[RAVENELL]** to go get some of that motherfucking money that he got buried and give me my fucking money and get me out of the way." **GORDON** responded, "I can on Tuesday."

80.     **TREEM** reentered the room and said to R.B., "Good to see you, man. Take care of yourself." R.B. said, "Any help you can give me I would really appreciate it." **TREEM** said, "Yeah, I hear you. Alright." **TREEM** picked up the KWR's Combined Notes from the table. **TREEM** said, "Maybe there may be a way I can kind of finesse this." Before leaving with **GORDON** and the document, **TREEM** told R.B., "We'll be back in touch ... you take care of yourself." **TREEM** then gave R.B. a "high-five." The meeting concluded.

## **False GORDON Affidavit**

81.     On September 11, 2017, **TREEM** had a conference call with **RAVENELL**. On that same day, **TREEM** drafted an affidavit for **GORDON** regarding "K. **RAVENELL's** Combined Notes."

82.     On September 13, 2017, **TREEM** and **RAVENELL** had a conference call regarding the affidavit for **GORDON**.

83.     On September 14, 2017, **GORDON** arrived at **TREEM's** law firm at approximately 10:10 a.m. to execute the affidavit. The affidavit contained nine numbered paragraphs. The first five (5) paragraphs asserted the following;

> I, Sean Gordon, hereby declare and affirm under penalties of perjury:
> 1. I am over the age of eighteen (18) and am competent to testify to the facts and matters contained in this Affidavit, and do so with personal knowledge.

37

2. On September 9, 2017, I accompanied Joshua R. Treem, attorney for Kenneth W. Ravenell, to interview [R.B.] at Towers Jail in Phoenix, Arizona on September 9, 2017 and September 10, 2017.

3. It was my understanding that [R.B.] had previously consented to the meeting and had directed his attorney, [R.B.'s Attorney 2], to advise Joshua R. Treem.

4. At some point prior to the interview, Mr. Treem had received a document entitled "KWR's Combined Notes" which were hand written notes of Mr. Ravenell which for clarity and understanding had been typed by Mr. Treem's assistant.

5. On September 9, 2017, we met with [R.B.] at Towers Jail beginning at 10:30 a.m. local time. During the course of the interview, [R.B.] was given the document attached as Exhibit 1 to review.

84. In paragraph number six (6) **TREEM** wrote and **GORDON** affirmed the following false statement:

6. [R.B.] read each of the entries, numbered 1-53, out loud and acknowledged the truthfulness and accuracy of each one separately and individually.

In truth and fact, R.B. did not read "each of the entries, numbered 1-53, out loud" and "acknowledge[] the truthfulness and accuracy of each one separately and individually." R.B. never read or acknowledged the truthfulness of the following entries:

23. He did not pay me to report law enforcement activities to him. He simply paid me to represent him.
24. I did not bring him a list of people who owed him drug money from Castle
25. He never asked me to get a list of people who owed him drug money from Castle.
26. He knew that I would never agree to get a list of people who owed him drug money from Castle or anyone else.

85. In paragraph number seven (7), **TREEM** wrote and **GORDON** affirmed the following false statement:

7. At no time did [R.B.] express any hesitancy, disapproval, or disagreement with the statements or make any changes.

In truth and fact, R.B. did express "hesitancy, disapproval [and] disagreement" with the statements contained in the KWR's Combined Notes. As described in detail in paragraphs 59-80 of this Count.

86.     In paragraph eight (8), **TREEM** wrote and **GORDON** affirmed the following false statement:

> 8. The [check] markings on the Exhibit were made by Mr. Treem subsequent to [R.B.] acknowledging the accuracy of the entries, to record that [R.B.] had read all the entries. All of the other handwriting was made by Mr. Treem prior to [R.B.] reading and acknowledging the accuracy of entries 1 through 53.

In truth and fact, R.B. acknowledged the accuracy of only some of the entries on the first day of the interview as described in paragraphs 37 and 84 of this Count but denied their accuracy on the second day of the interview as described in detail in paragraphs 59-80 of this Count.

87.     In paragraph nine (9), **TREEM** wrote and **GORDON** affirmed the following false statement:

> 9. We met with [R.B.] again on September 10, 2017. During our visit we asked him to review Exhibit 1 and, if he had no changes to make, to sign and date the statement, which he did in my presence.

In truth and fact, neither **TREEM** nor **GORDON** asked R.B. "to review Exhibit 1," which was the KWR's Combined Notes, and, "if he had no changes to make, to sign and date the statement." Further, R.B. told both **TREEM** and **GORDON** that the statements in the KWR's Combined Notes were untrue during an extended conversation that occurred before R.B. signed the document, as described in detail in paragraphs 59-80 of this Count.

88.     On September 14, 2017, **GORDON** signed the false affidavit, which was thereafter maintained in **TREEM's** files at the law firm where **TREEM** was a partner at that time.

**False Letter to a U.S. District Court Judge**

89.    On January 18, 2018, **TREEM** began drafting a letter to the United States District Court Judge who presided over R.B.'s criminal case in the United States District Court for the District of Maryland (the "U.S. District Judge"). The U.S. District Judge to whom the letter was addressed was actively presiding over related cases involving R.B.'s co-conspirators. **TREEM** drafted the letter for 1.5 hours on January 18, 2018. That same day, **TREEM** and **GORDON** exchanged emails and **TREEM** and **RAVENELL** communicated by phone.

90.    On January 19, 2018, **RAVENELL** met with **TREEM**.

91.    On January 29, 2018, **TREEM** and **RAVENELL** communicated by phone.

92.    On January 30, 2018, **TREEM** further edited the letter to the U.S. District Judge.

93.    On February 6, 2018, an employee of **TREEM's** firm had a "conference" with **TREEM** "re letter to Judge [];" and then that employee "revise[d] letter based off latest edits."

94.    On February 7, 2018, an employee of **TREEM**'s firm had a "Conference" with **TREEM** "re letter to to [sic.] Judge []" and then "[made] revisions to letter."

95.    On February 8, 2018, an employee of **TREEM**'s firm had a "Conference" with **TREEM** "re letter to Judge []; and then made "edits to letter" and then had a "telephone call to S. Gordon."

96.    On February 8, 2018, **TREEM** further edited the false letter for one hour and had a telephone call with **RAVENELL**.

97.    On February 8, 2018, at 2:38 p.m., **TREEM** called R.B.'s then-Attorney and left a voicemail. In the voicemail, **TREEM** stated that he was aware R.B. had entered a guilty plea to state charges and wanted to know "what the circumstances were or weren't."

40

98.     On February 9, 2018, **TREEM** caused to be emailed an *ex parte* letter dated February 8, 2018, to the U.S. District Judge that included false and misleading representations. **TREEM** chose to send the letter on his own initiative, and it was not in response to any order of the Court.

99.     In the first paragraph of the letter, **TREEM** wrote, "For approximately the past 18 months I have been representing **[RAVENELL]**, who has been under investigation by the United States Attorney's Office ("USAO") . . . I am writing in that capacity and as an officer to this Court, to bring to your attention recent actions by [R.B.] that I believe constitute criminal conduct."

100.     In the last paragraph of the letter, **TREEM** wrote, "I have no knowledge whether R.B. is currently or may become a government witness[.]" **TREEM** also stated, "**[RAVENELL]** believes a record needs to be made of these events regardless of the consequences, should he be charged and should [R.B.] appear as a government witness. As his counsel I concur."

101.     In the fourth paragraph of the letter, in reference to the meeting **TREEM** and **GORDON** had with R.B. on September 9, 2017, **TREEM** made the following false statement:

> We presented [R.B.] with a document we had prepared with a number of statements, and asked [R.B.] to review and to acknowledge the accuracy or inaccuracy of each.  He indicated he wanted to consider the request overnight.

In truth and fact, [R.B.] did not ask to review the document overnight, as **TREEM** knew from the notes he took during the first day of the interview.  **TREEM** started to question R.B. about the statements in the KWR's Combined Notes approximately 10 minutes into their meeting and **TREEM**, **GORDON** and R.B. proceeded to have a lengthy discussion about the KWR's Combined Notes.  As summarized above, in truth and fact:

a.     **TREEM** asked R.B. if, after R.B.'s arrest in 2011, **RAVENELL** knew that R.B. was still selling narcotics;

41

b.      R.B. told **TREEM** and **GORDON** that **RAVENELL** attended events R.B. sponsored;

c.      **TREEM** told R.B. that the Government's theory of prosecution of **RAVENELL** was that **RAVENELL** knew R.B. was paying him with narcotics money and using LOC Marketing to launder narcotics money;

d.      R.B. told **TREEM** that R.B. knew that **RAVENELL** wanted R.B. to adopt the exculpatory statements contained in the KWR's Combined Notes and that R.B. was willing to do that;

e.      Ultimately, R.B. read out loud many but not all of the 53 items on the KWR's Combined Notes and adopted some of them, almost always, with a single word like "correct" or "yes or no";

f.      As R.B. was reading through the items, **TREEM** stopped him to ask follow-up questions on at least three occasions.

106.   In the fifth paragraph, **TREEM** then falsely stated:

> The following day when we returned to continue our visit, [R.B.] stated that the statements were accurate.  He acknowledged the accuracy of the individual statements and signed the document.

In truth and fact, on the second day of the interview, R.B. did not state that "the statements were accurate" and did not "acknowledge the accuracy of the statements."

a.      As quoted above, R.B. told **TREEM** and **GORDON** that **RAVENELL** knew R.B. was selling narcotics and paying **RAVENELL** with narcotics proceeds.

b.      As summarized above, **TREEM's** own handwritten notes from the interview reflect that **TREEM** recognized what R.B. was saying on the second day of the interview contradicted what he had said on the first day.

c.      **TREEM** himself acknowledged that R.B. would be "lying" if **TREEM**

called him as a witness in a trial of **RAVENELL** and asked him to make the statements contained

in the KWR's Combined Notes.

107.    In that same paragraph, **TREEM** also falsely stated,

> [R.B.] then began to complain about not having access to money that he
> claimed was owed to him that he wanted for his family. [R.B.] asserted that
> some was being held by [Attorney 1 and Attorney 2], and some was an
> interest in a business venture. He wanted **[RAVENELL]** to get the money
> for him.    At that point, concerned that these statements sounded
> extortionate, we reminded [R.B.] that we represented **[RAVENELL]** and if
> he had any complaints about money he believed he was owed, he would
> need to raise those with his counsel, not us.  We ended the meeting and
> returned to Baltimore later that day.

In truth and fact, **TREEM** and **GORDON** discussed R.B.'s investment in the MGM Casino at

length on the first day of the interview.  Far from treating R.B.'s statements about the investment

and the remaining money in his escrow account as extortionate, **TREEM** and **GORDON** actively

engaged in a discussion about these topics with R.B., including, but not limited to, the following:

a.      **TREEM** asked R.B. to outline the specifics of his investment;

b.      **TREEM** promised to ask The Law Firm's lawyer about money left in

R.B.'s escrow account at The Law Firm when **TREEM** saw her the following week;

c.      **TREEM** questioned R.B. at length about a power of attorney R.B. said he

signed giving **RAVENELL** control over R.B.'s investments and told R.B. he was going to help

R.B. revoke or change the power of attorney to remove **RAVENELL** from it;

d.      **TREEM** promised to think about potential lawyers that R.B. could hire to

sue The Law Firm; and

e.      **TREEM** promised to go to journalists he knew in an effort to embarrass

Attorney 1 and Attorney 2.

43

108.    Approximately ten months later, on December 11, 2018, **TREEM** called the attorney of record for R.B. at that time and left a voicemail.  In the voicemail, **TREEM** said he was looking to find R.B. because "[**TREEM**] wanted to try to reach out to [R.B.]."  **TREEM** further stated he was calling to ask for the attorney's permission to meet with R.B.  These attempts to meet with R.B. further indicate that **TREEM** did not believe R.B. was trying to extort **RAVENELL**.

18 U.S.C. § 371

## COUNT FIVE
### (Obstructing an Official Proceeding)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 9-39 of Count One and Paragraphs 4, 6 and 10-108 of Count Four are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

2.      Beginning no later than September 9, 2017, and continuing through at least December 11, 2018, in the District of Maryland and elsewhere, the defendants,

### KENNETH WENDELL RAVENELL,
### JOSHUA REINHARDT TREEM, and
### SEAN FRANCIS GORDON,

did corruptly attempt to obstruct and impede a federal grand jury investigation of **RAVENELL,** an official proceeding, and a foreseeable criminal prosecution of **RAVENELL** in the United States District Court for the District of Maryland, by creating false and fictitious records of **TREEM's** and **GORDON**'s meeting with, R.B. These documents, a set of false exculpatory statements titled "KWR's Combined Notes," which **TREEM** and **GORDON** encouraged R.B. to sign, a false affidavit dated September 14, 2017, signed by **GORDON,** and a letter to a United States District Court Judge in the District of Maryland dated February 8, 2018, signed by **TREEM,** were all fraudulently prepared to be used to undermine and impeach R.B.'s credibility if he were to be called in an official proceeding to give testimony against **RAVENELL,** and to provide false evidence of a prior consistent statement by **GORDON** and **TREEM** in the event either one of them were to be called to testify in an official proceeding.

18 U.S.C. § 1512(c)(2)
18 U.S.C. § 2

## COUNT SIX
### (Falsification of Record)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 16 through 88 of Count Four are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

2. Beginning no later than September 9, 2017, and continuing through at least September 14, 2017, in the District of Maryland and elsewhere, the defendants,

### KENNETH WENDELL RAVENELL,
### JOSHUA REINHARDT TREEM, and
### SEAN FRANCIS GORDON,

did knowingly conceal, cover up, falsify and make false entries in an affidavit signed by **GORDON** on September 14, 2017, a record and document, with the intent to impede, obstruct and influence the investigation and proper administration of a federal criminal investigation of **RAVENELL**, a matter that the defendants knew was within the jurisdiction of the United States Department of Justice, a department and agency of the United States, and in contemplation of a federal criminal prosecution of **RAVENELL**, a matter the defendants knew was within the jurisdiction of the United States Department of Justice, a department and agency of the United States.

18 U.S.C. § 1519
18 U.S.C. § 2

## COUNT SEVEN
### (Falsification of Record)

The Grand Jury for the District of Maryland further charges that:

1.    Paragraphs 16-80 and 89-108 of Count Four are hereby realleged and incorporated

by reference herein as though fully set forth in this Count of the Superseding Indictment.

2.    Between at the latest September 9, 2017, and continuing through at least February

8, 2018, in the District of Maryland and elsewhere, the defendants,

### KENNETH WENDELL RAVENELL, and
### JOSHUA REINHARDT TREEM

did knowingly conceal, cover up, falsify and make false entries in a letter to a United States District

Court Judge dated February 8, 2018, and signed by **TREEM**, a record and document, with the

intent to impede, obstruct and influence the investigation and proper administration of a federal

criminal investigation of **RAVENELL**, a matter that the defendants knew was within the

jurisdiction of the United States Department of Justice, a department and agency of the United

States, and in contemplation of a federal criminal prosecution of **RAVENELL**, a matter the

defendants knew was within the jurisdiction of the United States Department of Justice, a

department and agency of the United States.

18 U.S.C. § 1519
18 U.S.C. § 2

47

**FORFEITURE**

The Grand Jury for the District of Maryland further charges that:

1.       Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the Defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 and Title 21, United States Code, Section 853, in the event of the Defendant's convictions under Counts One through Three of this Superseding Indictment.

**RICO Forfeiture**

2.       Pursuant to Title 18, United States Code, Section 1963(a)(1), (2), and (3), upon conviction of the offense alleged in Count One, the Defendant,

**KENNETH WENDELL RAVENELL**,

shall forfeit to the United States of America, (i) any interest the Defendant acquired or maintained as a result of the commission of the offense alleged in Count One of the Superseding Indictment; (ii) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant has established, operated, controlled, conducted, or participated in the conduct of, in committing the offense alleged in Count Six of the Superseding Indictment; and (iii) any property, constituting or derived from, any proceeds which the Defendant obtained, directly and indirectly, from the racketeering activity alleged in Count Six of this Superseding Indictment.

3.       The property to be forfeited includes, but is not limited to, the following:

a.       any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such violation; and

48

**Money Laundering Forfeiture**

4.      Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of the offense alleged in Count Two, the Defendant,

**KENNETH WENDELL RAVENELL**,

shall forfeit to the United States of America, all property real or personal, involved in such offense, and all property traceable to such property, that each of them, respectively, obtained.

5.      The property to be forfeited includes, but is not limited to, the following:

a.      a sum of money equal to the value of any property involved in the money laundering offense for which each Defendant is convicted;

b.      all property constituting the subject matter of the money laundering offense for which each Defendant has been convicted; and

c.      all property used to commit or facilitate the commission of the money laundering offense for which each Defendant has been convicted.

**Narcotics Forfeiture**

6.      Pursuant to Title 21, United States Code, Section 853(a), upon conviction of an offense in violation of the Controlled Substances Act, as alleged in Count Three, the Defendant,

**KENNETH WENDELL RAVENELL**,

shall forfeit to the United States of America, all property real or personal, involved in such offense, and all property traceable to such property, that each of them, respectively, obtained.

7.      The property to be forfeited includes, but is not limited to, the following:

d.      any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such violation; and

49

e.      any property used, or intended to be used, in any manner or part, to commit,

or facilitate the commission of, such violation.

### Substitute Assets

8.      Pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United

States Code, Section 853(p), if any of the property described above as being subject to forfeiture,

as a result of any act or omission by the Defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been comingled with other property which cannot be subdivided
without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the Defendant up to

the value of the property charged with forfeiture in the paragraphs above.

21 U.S.C. § 853
18 U.S.C. § 982(a)(1)
18 U.S.C. § 1963
28 U.S.C. § 2461(c)

*Robert K. Hur/ljrw/mjm*

Robert K. Hur
United States Attorney

A TRUE BILL:

# SIGNATURE REDACTED

Date: 12/17/2020

Foreperson

50