# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CR-449** |
| | ) | |
| **KENNETH W. RAVENELL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## [REDACTED] MOTION AND MEMORANDUM TO DISMISS SUPERSEDING INDICTMENT BASED UPON IMPROPER RECORDING OF DEFENSE WITNESS INTERVIEW AND ALTERNATIVELY TO SUPPRESS RECORDING

This prosecution of the defendants for obstruction of justice constitutes a direct threat to the adversarial system of criminal justice. It is based upon the false premise that defense lawyers and investigators must record and reveal statements adverse to their client in their documentation of witness interviews or in an ex parte letter to a district judge, and it arises from the government's unlawful and secret recording of a privileged witness interview conducted by a defendant's counsel and retained investigator.

The Constitution guarantees the defense an  equal right to conduct an investigation and interview witnesses without interference or monitoring by the government. The government's egregious misconduct is therefore deeply offensive to a fair adversarial process, and requires dismissal of the superseding indictment. *See, e.g., United States v. Levy*, 577 F.2d 200, 210 (3d Cir. 1978) (ordering dismissal of indictment where defense strategy disclosed by government informant implanted in

defense camp); *United States v. Linder*, 2013 WL 812382, at *52 (N.D. Ill. Mar. 5, 2013) (granting motion to dismiss indictment based upon government's substantial interference in defense's equal access to witnesses). In the alternative, the Court should exclude the video recording of R.B.'s interview from the government's case-in-chief, and disqualify the prosecutors who have had access to the video recording from representing the government in this case because of their exposure to and use of the patently unlawful video surveillance of the defense's interview of a key witness. *See Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995); *State v. Martinez*, 220 A.2d 498, 525-26 (N.J. Super. A.D. 2019).

## FACTUAL BACKGROUND

A. <u>Relevant Facts Before the Meeting with R.B. in September 2017</u>.

Kenneth W. Ravenell is a lawyer who has been a licensed member of the Maryland Bar since 1985, Count 4 ¶ 2, Joshua Treem is a lawyer admitted to the Maryland Bar in 1972, *id.* ¶ 3, and Sean F. Gordon is a defense investigator who worked for Mr. Treem when Mr. Treem represented Mr. Ravenell, *id.* ¶¶ 5-6.

In January 2016, Mr. Treem was engaged to represent Mr. Ravenell "in connection with a federal criminal investigation conducted by the U.S. Department of Justice and an investigation by a federal grand jury sitting in Baltimore of Ravenell." *Id.* ¶7. Mr. Treem continued to represent Mr. Ravenell through June 18, 2019, *id.*, so at all times pertinent to Counts Four through Seven, Mr. Treem served as Mr. Ravenell's counsel.

Before making arrangements to meet with R.B. in Arizona in September 2017, R.B. placed a call to Mr. Treem on or about April 10, 2017, ████████████ ███████████████████████████████████████, and left the following voicemail message:

> Mr. Treem, this is [R.B.] . . . you need to come see me immediately. . . .
> it's a lot of information that I have that is [] exculpatory to your client.

Exhibit 1A (transcript) and 1B (recording from JT legal file).

This voicemail was not the first time R.B. expressed that Mr. Ravenell was innocent of any wrongdoing. In 2015, R.B. sent letters to Mr. Ravenell and Mr. Ravenell's former counsel, Larry Nathans, explicitly stating that Mr. Ravenell had committed no crimes and had the highest ethical standards, and offering to provide a statement to that effect. *See* R.B. Letter to Ravenell, attached as Exhibit 2 (from JT legal file), at BGLHC-3392 ("You have not done nothing wrong period, nothing illegal period.").

Mr. Treem knew of R.B.'s exculpatory statements, and thus had a duty to interview R.B. in the course of his representation of Mr. Ravenell. Based on such statements, it appeared R.B. would be a cooperative witness who would provide truthful exculpatory information in support of Mr. Ravenell. Neither Mr. Treem nor Mr. Gordon had any reason to believe then, or now, that such statements constitute "false exculpatory statements."

B. The Meetings with R.B. on September 9-10, 2017

After properly obtaining the consent of R.B.'s lawyer as required, Mr. Treem

3

made arrangements to fly from Baltimore to Arizona in order to meet with R.B. on September 9 and 10, 2017. Mr. Treem brought Mr. Gordon to serve as a witness to the interview. Mr. Treem also took with him a two-page type-written list of statements to review and confirm or deny with R.B. Count Four ¶ 19.

Unbeknownst to Mr. Treem and Mr. Gordon, a month earlier, ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

The meeting on September 9 lasted approximately three hours.[1] It was conversational in tone. There were no threats or intimidation, there were no offers of anything of value. A review of the videotape and the transcript shows nothing out of the ordinary from what would be expected in an attorney's interview of a witness.

About halfway into the interview, Mr. Treem turned to the two-page list of affirmative statements that he had brought to the interview. KWR Combined Notes, Ex. 5. After Mr. Treem asked a couple of questions based on the list, R.B. suggested he just take the list from Mr. Treem and read it out loud himself, "and answer every question." Ex. 3A at 88; Count 4 ¶ 37. Mr. Treem agreed and R.B. then took the list from Mr. Treem and began reading from the top, responding to each statement in a

---

[1] The entire transcript of the videotaped meetings from September 9 and 10, 2017, are filed as Sealed Exhibits 3A (transcript), 3B (recording), 4A (transcript), and 4B (recording) respectively.

manner that confirmed each statement was true. Neither Mr. Treem nor Mr. Gordon offered anything to R.B. to obtain R.B.'s agreement to the statements on the list. *See generally* Exh. 3A, 3B, 4A, 4B.

From the videotape, if not from the transcript, it is apparent that R.B. possessed the single copy of the list and that Mr. Treem and Mr. Gordon, sitting across the table, are unable to follow along as R.B. reads from the list. Exhibit 3B. After answering statement No. 22, the discussion digressed into more detail, consuming over five pages of transcript. Exhibit 3A at 91-97. Then R.B. returned to the list, but rather than resuming at No. 23, he picked up at No. 27. *Id.* at 97. At that point, it does not appear from the video recording that R.B. realized that he was skipping four items. *See* Exhibit 3B. Nor is there any indication on the video that Mr. Treem or Mr. Gordon knew that R.B. skipped four items on the list, as the videotape makes clear that R.B. alone was the one in a position to see and read what was on the list.[2] R.B. proceeded to answer the remaining statements on the list one by one. Exhibit 3A at 98-100.

On September 9, 2017, R.B. stated unequivocally that Mr. Ravenell was not aware that money provided by R.B. was derived from the sale of drugs:

> Mr. Treem:   Did you ever, subsequent to 2011, did you ever have any conversation at all that you can think of in which you would have given [Mr. Ravenell] any sense that, you know, a lot of money that he was dealing with that he was getting from you was at least in part drug money?

---

[2] The government alleges that the Gordon Declaration falsely states that R.B. read and affirmed all 53 statements, when only 49 were read and affirmed. Count 4 ¶¶ 37, 84, 86.

R.B.: No.

Mr. Treem: Okay.   And so, I mean, would be correct to kind of assume that you were deliberately trying to make sure he didn't know?

R.B.: Yeah.

Exhibit 3A at 28-29; Count 4 ¶ 25.

R.B. also readily agreed that Mr. Ravenell ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ █ ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ █ █████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ █ ████████████

████████████████████████████████████████████████████

███████████████████████████████████████████. *See*

*id.* at 88-100. After additional discussion, Mr. Treem and Mr. Gordon left for the day.

They returned the next day, September 10. Again, ██████████████████

████████████████ Before getting into any substantive discussion, Mr. Treem brought

out the KWR Combined notes and asked R.B. to sign it:

Mr. Treem: ██████████████████████████████████████



Exhibit 4A at 5. R.B. then wanted assurances that no one else would get the notes

from their meeting. Mr. Treem assured R.B. that his notes, including the KWR

Combined Notes, were his work product and would be kept confidential. *Id.* at 6.

> After further discussion, R.B. changed his story:

> All right, so here's what I'm saying to you. And I want to go deep into this, okay, because I want you to clearly understand my position, all right? My only position here is my money, that's it.  Ken can get anything he want from me that's not a problem... My concern is my money.

> Now, the information I gave you yesterday…is the information if called to testify I will testify to on the stand…

> Here's the real of the situation, all right. The real of the situation is this, Ken knew my whole business operation, period, from A to Z, from nuts (indiscernible). Ken knew that LOC was used to launder money. Ken knew I was still involved in drugs. I paid Ken millions of dollars in cash. Ken shared all that money between [Attorney 1] and [Attorney 2], now [Attorney 1] and [Attorney 2] is riding off in the sunset and he got a headache and nobody is making sure I get my money….

> I'm talking about back when I was in their firm. I used to deliver book bags of cash to that office. Castle delivered millions of dollars to Ken. So what I'm saying is that I'm going to be the good soldier like I'm supposed to be, but I need Ken to put his nuts on the line for me and make sure I get my fucking money. Like I've told you, I got two kids in college…. I'm not asking for no handout, I'm just asking for my money.

Exhibit 4A at 13-15; Count 4 ¶¶ 59-60. R.B. also stated that he wanted and expected

Mr. Ravenell to destroy evidence:

> Now, Ken keeps a chart of all my investments, all the players that's
> involved, the how's and the where's. He needs to make sure all of that
> vanish off his laptop.

*Id.* at 15; Count 4 ¶ 62.

Mr. Treem responded in no uncertain terms that Mr. Ravenell could not

destroy evidence:

> Well, he can't do that.   I can't have him – I can't advise him to delete
> stuff off his laptop. I can't do that.   I told you R.[], yesterday there's a
> subpoena out for that stuff I can't delete that and he can't either …. But
> I can't – I'm not going to do that.   I can't do that.

*Id.* After acknowledging that R.B.'s statements on September 10 were different from

what he had said the day before, and in response to R.B.'s statement that he remained

willing to testify to the exculpatory statements on the list, Mr. Treem told R.B.:

> I can't put you on the witness stand if you're going to lie, and if I know
> you're going to lie I can't do that, because that gets me in a lot of trouble
> if that comes out…. My thought is that maybe we shouldn't talk any
> more today….[] And I need to go kind of sit in my office and close the
> door and kind of play all this out….[] Because I got to think about this.

*Id.* at 20-21; Count 4 ¶ 68. Although at the start of the meeting on September 10, R.B.

had said he would sign the KWR Combined Notes, Ex. 4A at 5, he did not do so at

that time. Before leaving the meeting, Mr. Treem asked R.B. to sign the KWR

Combined Notes, which R.B. did. *Id.* at 24; Exhibit 5.

The KWR Combined Notes identify exculpatory statements made by R.B. on

September 9 that Mr. Treem and Mr. Gordon witnessed. R.B.'s signature established

8

what R.B. had affirmed on that day. Of course, the government's secret recording also, unbeknownst to Mr. Treem and Mr. Gordon, had already accomplished the goal of recording R.B.'s exculpatory statements on September 9, 2017. By secretly recording R.B.'s interview, in other words, the government documented R.B.'s exculpatory statements—and created *Brady* material—that would necessarily have to be disclosed to the defense team representing Mr. Ravenell.[3]

During both days with Mr. Treem and Mr. Gordon, R.B. claimed that he was owed money, either from investments he allegedly made or from the Law Firm which was holding money that he claimed belonged to him. On the first day, R.B. did not link his claims that he was owed money to exculpatory information about Mr. Ravenell or exculpatory testimony he was willing to give. But on September 10, R.B. demanded that Mr. Ravenell secure money R.B. allegedly was owed in return for that testimony. Exhibit 4A at 13-15.

## **ARGUMENT**

### I.    **The Government Violated the Constitution By Interfering in a Defense Investigation of a Critical Witness.**

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The

---

[3] Over two years after the interview, in response to Mr. Ravenell's counsel's repeated requests for exculpatory information, the government insisted that it had "complied with [its] *Brady* obligations." *See* Dec. 3, 2019, Letter to Defense Counsel at 3, attached as Exhibit 6. The government did not produce R.B.'s exculpatory statements until February 2, 2021.

Constitution therefore guarantees "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, [because that] is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Likewise, the Constitution imposes on counsel a duty to investigate and interview witnesses because the provision of effective legal assistance is contingent upon a thorough factual investigation. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).

### A.    The Government Violated the Due Process Right to Equal Access to Witnesses

The Due Process Clause prohibits the government from interfering with a defendant's access to witnesses. *See United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) ("Improper intimidation of a witness may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to 'substantial government interference with a defense witness' free and unhampered choice to testify.'") (citation omitted).[4] Accordingly, "the right of the defense to have access to witnesses in a criminal case should be unfettered and free of government intervention." *United States v. Ebrahimi*, 137 F. Supp. 3d 886, 887 (E.D. Va. 2015) (citation omitted); *accord United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (agreeing that prosecutor's suggestion that witness invoke Fifth Amendment

---

[4] *See also United States v. Valenzuela–Bernal*, 458 U.S. 858, 871-72 (1982) (government's deportation of witness with material and favorable testimony can violate Fifth and Sixth Amendments). The premise underlying this right is that "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact." *Dennis v. United States*, 384 U.S. 855, 873 (1966).

"violated the defendant's due process right to present his defense witnesses freely").

As explained by the D.C. Circuit:

> [N]othing in the law [] gives the prosecutor the right to interfere with the preparation of the defense by effectively denying defense counsel access to [] witnesses except in his presence.

> Presumably the prosecutor, in interviewing the witnesses, was unencumbered by the presence of defense counsel, and there seems to be no reason why defense counsel should not have an equal opportunity to determine, through interviews with the witnesses, what they know about the case and what they will testify to.

*Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966). Put simply, "[a] witness is not the exclusive property of either the government or a defendant; a defendant is entitled to have access to any prospective witness, although in the end the witness may refuse to be interviewed." *United States v. Walton*, 602 F.2d 1176, 1179-80 (4th Cir. 1979).[5]

The government's secret recording of the defense's interview of R.B. interfered with the "legitimate need for confidentiality in the conduct of attorneys' interviews,

---

[5] *Accord United States v. Carrigan*, 804 F.2d 599, 603 (10th Cir. 1986) ("[W]itnesses in a criminal prosecution belong to no one, and[,] subject to the witness[es'] right to refuse to be interviewed, both sides have the right to interview witnesses before trial."); *United States v. Scott*, 518 F.2d 261, 268 (6th Cir. 1975) (stating a "defendant is entitled to have access to any prospective witness although such right of access may not lead to an actual interview"); *Byrnes v. United States*, 327 F.2d 825, 832 (9th Cir. 1964) ("It is true that any defendant has the right to attempt to interview any witness he desires."). In sum, "because witnesses 'belong' neither to the defense nor to the prosecution, both must have equal access to witnesses before trial. If the prosecution impermissibly interferes with the defense's access to a witness during a criminal trial, that conduct violates due process insofar as it undermines the fundamental fairness of the proceeding." *United States v. Bryant*, 655 F.3d 232, 238 (3d Cir. 2011) (citations omitted).

with the goals of maximizing unhampered access to information and insuring the presentation of the best possible case at trial." *IBM Corp. v. Edelstein*, 526 F.2d 37, 42 (2d Cir. 1975). It also violated the defendant's "equal right" and "equal opportunity" to interview witnesses free from government interference that "elemental fairness and due process required that he have." *Gregory*, 369 F.2d at 188. As such, the government's secret recording of the defense's interview of a key witness violated the Due Process Clause and "undermine[d] the fundamental fairness of the proceeding." *Bryant*, 655 F.3d at 238.[6]

## B. The Government Violated the Right to Counsel of Choice

Additionally, the government used its impermissible pre-indictment recording of R.B.'s witness interview to initiate a criminal obstruction investigation that necessarily resulted in the denial of the right to counsel of choice. The right to counsel of one's choosing is considered "the root meaning of the [Sixth Amendment] constitutional guarantee." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006); *accord Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice"). Violation of the right constitutes a structural error that is not subject to "an ineffectiveness or prejudice inquiry." *Gonzalez-Lopez*, 548 U.S. at 148.

---

[6] The government's monitoring of privileged defense witness interviews would also risk creating a conflict of interest in every criminal case, as well as chill defense witness interviews. *See United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984) ("What could be more of a conflict than concern over getting oneself into trouble with criminal law enforcement authorities?").

"[T]he government's pre-indictment conduct [can be] of a kind that would have post-indictment effects of Sixth Amendment significance." *United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008); *accord In re Grand Jury Proceedings (Goodman) v. United States*, 33 F.3d 1060, 1062 (9th Cir. 1994) ("The Sixth Amendment can apply when the government's conduct occurs pre-indictment."). For example, when the government impermissibly seizes assets prior to indictment, the "pernicious effects of [] pre-indictment interference [may] continue[] into the post-indictment period, effectively hobbling defendants' Sixth Amendment rights to retain counsel of choice with funds to which they had a right." *United States v. Rosen*, 487 F. Supp. 2d 721, 734 (E.D. Va. 2007).

The government's misconduct did not merely deprive a defendant of the funds to hire counsel of his choice; it created a non-waivable conflict arising from the government's criminal investigation into the attorney's documentation of the interview it wrongfully recorded. By illicitly creating a video recording of defense counsel's interview of a witness and then using that recording to conduct a criminal investigation of the attorney and obtain search warrants of the defendants' legal files, the government "act[ed] prior to indictment so as to impair [Mr. Ravenell's] relationship with counsel post-indictment, [so that] the pre-indictment actions ripen[ed] into cognizable Sixth Amendment deprivations upon indictment." *Stein*, 541 F.3d at 153. As such, the government used its unlawful recording to deprive a defendant of the counsel of his choosing, without any pre-existing justification for

13

such an intrusion other than the government's desire to spy on the defense's interview of a key witness. *See Mannhalt v. Reed*, 847 F.2d 576, 581 (9th Cir. 1988) ("[W]hen an attorney accused of crimes similar or related to those of his client, an actual conflict exists because the potential for diminished effectiveness in representation is so great."); *see also United States v. Merlino*, 349 F.3d 144, 151 (3d Cir. 2003) ("An attorney who faces criminal or disciplinary charges for his or her actions in a case will not be able to pursue the client's interests free from concern for his or her own.").

## II.    R.B.'s Interview Is Privileged Work Product.

Mr. Treem and Mr. Gordon interviewed R.B. because R.B. was a fact witness who stated that he had "exculpatory information" about their client, Mr. Ravenell. Their interview thus constitutes privileged work product prepared "during the case's investigation or defense." See Fed. R. Crim. P. 16(b)(2) (information not subject to disclosure). Moreover, the crime-fraud exception to the work product doctrine is inapplicable because the interview was conducted pursuant to the defendants' constitutional obligation to investigate the case, not to commit or further any crime or fraud.

The work product doctrine protects the confidentiality of documents prepared or information obtained by an attorney or an attorney's agent in anticipation of litigation. *United States v. Nobles*, 422 U.S. 225, 238-39 (1975). This doctrine plays a "vital" role in "the proper functioning of the criminal justice system," *id.* at 238, and assures that attorneys "work with a certain degree of privacy, free from unnecessary

14

intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). Work product "is reflected, of course, in interviews, statements, memoranda," and other materials created by a lawyer or those acting at his direction. *Id.* at 511.

As the Supreme Court has explained, "[p]roper preparation of a client's case demands that [a lawyer] assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman*, 329 U.S. at 511. And "the attorney-client privilege and the work-product doctrine jointly support the Sixth Amendment's guarantee of effective assistance of counsel." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019).

"There are exceptions to the rule, but simply stated, an attorney is not required to divulge, by discovery or otherwise, facts developed by his efforts in preparation of the case or opinions he has formed about any phase of the litigation, even if they have been reduced to writing." *In re Doe*, 662 F.2d 1073, 1077 (4th Cir. 1981). In particular, "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." *Upjohn Co. v. United States*, 449 U.S. 383, 399–400 (1981) (citation omitted). Accordingly, "*Upjohn* and *Hickman* make clear that a lawyer's recollection of a witness interview constitutes opinion work product entitled to heightened protections." *In re Grand Jury Subpoena*, 870 F.3d 312, 317 (4th Cir. 2017). Unfiled

drafts of witness declarations likewise constitute work product. *See Huguely v. Clarke*, 2021 WL 537238, at *3 n.1 (W.D. Va. Feb. 15, 2021) (collecting cases and finding party did not "waive[] work-product protection for the earlier declaration by submitting and relying upon a final version in the habeas proceedings").

In a recent case involving prosecutors who secretly recorded a defense lawyer's interview of a witness, a state court held that prosecutors' "confidential intercept conducted in the attorney misconduct investigation and in the narcotics case, coupled with the disclosure to the [drug prosecutor] of [the witness's] recorded interview [by the attorney misconduct prosecutor], infringed upon the criminal defendant's constitutional rights." *State v. Martinez*, 220 A.2d 498, 525-26 (N.J. Super. A.D. 2019). In *Martinez*, the prosecutors justified the surveillance on the ground that they suspected that the defense attorney would offer a bribe for favorable testimony from the witness, who had agreed to record the interview. But the court concluded that the recording of the interview nonetheless violated the constitutional rights of the defendant and the work product privilege.

Furthermore, the court in *Martinez* determined that the secret recording impermissibly disclosed privileged defense work-product even though the witness could have reported back to the prosecutors the contents of his meeting. *Id.* at 520. As the court explained, "[t]he unlimited ability of the prosecutor to play back the verbatim recording – repeatedly – also is a vast improvement over [and thus different from] notating a witness's mere recollection of what was asked and said." *Id.* at 521.

16

In addition, the court noted that

> [t]he witness's awareness that government agents may be listening to the interview at that very moment could easily have a chilling effect on the witness. The witness may be afraid that his or her taped performance during the interview will be evaluated by the prosecutor's office, and that he or she might forfeit sentencing benefits if he or she does something to displease the prosecutor. This 'observer effect' might cause the witness to be less open and forthcoming with the defense lawyer.

*Id.* The court also determined that "a taped recording of the interview could reveal the tenor of the discussion," and other "intangibles about a witness [that] can be of great tactical value to an experienced trial attorney." *Id.* Accordingly, the prosecutor's secret taping of the defense's witness interview in this case violated the "right to interview an adverse party's witnesses (the witness willing) in private, without the presence or consent of opposing counsel and without a transcript being made." *Int'l Bus. Machines Corp. v. Edelstein*, 526 F.2d 37, 42 (2d Cir. 1975); *see also United States v. Ebrahimi*, 137 F. Supp. 3d 886, 888 (E.D. Va. 2015) (citing *IBM v. Edelstein*, 526 F.2d at 42).

In this case, the government's interference was even more egregious because Mr. Treem and Mr. Gordon – based on R.B.'s previous exculpatory statements about Mr. Ravenell – had no reason to anticipate that R.B. would request a bribe in exchange for such true statements. Moreover, the government obtained much more than attorney notes and memoranda. Its verbatim recording of the R.B. witness interview documented defense counsel's opinion work product expressed through his

17

questions and understanding of the government's theory of guilt. See Exhibit 3A at 17-19; Count 4 ¶¶ 21-22.

The questions posed by the defense and the interactions with R.B. likewise "have the capacity to give the prosecutor an unfair advantage at [a subsequent] trial. The defense attorney's interview may as well have been conducted with the [] prosecutor[s] hiding in the closet." *Martinez*, 220 A.3d at 521. And there is no doubt that "[i]f the roles were reversed and the defense had surreptitiously recorded a prosecutor's pretrial interview of an anticipated trial witness, the [government] would surely be sounding the alarm, and contending its work product had been unfairly obtained." *Id.* at 521-22.

To be sure, the work product doctrine does not protect from disclosure an attorney's effort to "have witnesses testify falsely on his client's behalf, to have documents altered or destroyed and to bribe witnesses with cash payments." *In re Doe*, 662 F.2d at 1080. But the government had no preexisting reason to believe that Mr. Treem would engage in such conduct, and like in *Martinez*, the interview recording confirms nothing of the kind by the defendants. [7] It reflects a legal

---

[7] When R.B. suggested that evidence should be destroyed, Mr. Treem said he could do no such thing. Exhibit 4A at 15. When R.B. said the exculpatory statements he provided on September 9, 2017, were not true but that he would testify to such statements at a trial, Mr. Treem said that he could not put him on the witness stand to lie and give false testimony. *Id.* at 20-21. When R.B. made clear that his only concern was money, and contradicted the exculpatory statements he made on the first day of the interview, Mr. Treem concluded the interview. *Id.* at 21, 23.

As R.B. said at the conclusion of the second day after he had contradicted statements from the first day, " ███████████████████████████████████

interview of a fact witness, and the documentation of exculpatory statements that would potentially be admissible at a trial pursuant to Federal Rule of Evidence 613. *See* Motion to Dismiss Based on 18 U.S.C. § 1515(c) (filed separately).

Accordingly, because the government does not allege that the defendants committed obstruction in their interview of R.B. – by offering to bribe him for favorable testimony, or suggesting he should lie on the witness stand, or otherwise seeking to threaten him to prevent him from testifying truthfully – the interview of R.B. does not fall within the crime-fraud exception to the protection afforded by the work-product doctrine. *See, e.g., Pritchard-Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 283 n.5 (8th Cir. 1984) (fact that fraud allegedly followed privileged communication does not satisfy crime-fraud exception; crime or fraud must be objective of communication); *see also In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (noting the attorney-client communication or work product must be "for the purpose of committing or furthering a crime or fraud" for exception to apply); *In Re Grand Jury Investigation*, 352 F. App'x 805, 809 (4th Cir. 2009) ("The crime-fraud exception is limited to those communications and documents in furtherance of future or ongoing criminal or fraudulent conduct.").

---

██████████████████████████████ *Id.* at 28 (emphasis added). The witness interview itself, in other words, reveals no effort to have R.B. testify falsely, or to bribe him with cash payments, or to have evidence destroyed.

III.   **The Government's Egregious and Unjustified Violation of the Due Process Right to Equal Access to Witnesses Warrants Dismissal of the Superseding Indictment, And Alternatively Exclusion of the Interview Recording.**

The government's unjustified and flagrant violation of the defense's due process and fair trial right to conduct a defense interview free of government surveillance, as well as its disregard of the work product doctrine, amounts to a severe violation of the Due Process Clause. *See Gregory*, 369 F.2d at 188. If the government were permitted to use such a recording of a confidential defense interview simply to gain an unfair advantage at trial, it would violate a defendant's basic right to investigate his case, to present witnesses, and to a fair trial because such conduct impairs the "ability [of defense counsel] to act independently of the Government and to oppose it in adversary litigation." *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979).

If that were not bad enough, the impact of the government's impermissible conduct in this case goes far beyond simply denying Mr. Ravenell a fair trial. By using the improperly obtained video recording to prosecute Mr. Ravenell's defense counsel and investigator for their legitimate efforts to document exculpatory statements that R.B. *actually said*, the government has engaged in conduct that poses an existential threat to the adversarial system of justice. Indeed, if such conduct is judicially-approved, it will undoubtedly become part of the government's playbook in other criminal cases.

The indictment itself unapologetically asserts that the defendants' documentation of R.B.'s witness interview was "*fraudulently* prepared to be used to

20

*undermine and impeach R.B.'s credibility.*" Count 5. But presenting exculpatory statements to R.B., in light of his prior statements exculpating Mr. Ravenell, is exactly what Mr. Treem was required to do as a defense lawyer. Likewise, after R.B. changed his story, undermining R.B.'s credibility at a trial based upon prior exculpatory statements *R.B. actually made* that are inconsistent with his expected trial testimony constitutes neither fraud nor misconduct, and is precisely what a good defense lawyer bound by his role in the adversarial system was required to do. *See* Fed. R. Evid. 613; Motion to Dismiss based on 18 U.S.C. § 1515(c) (filed separately). As the Supreme Court has explained:

> In our system a defense lawyer characteristically opposes the designated representatives of the State. The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness. But it posits that a defense lawyer best serves the public, not by acting on behalf of the State or in concert with it, but rather by advancing "the undivided interests of his client."

*Polk Cty. v. Dodson*, 454 U.S. 312, 318-19 (1981) (citation omitted).

The government's use of its unlawfully-obtained recording to prosecute the defendants for obstruction based on entirely lawful conduct smacks of a prosecution unfettered by or unfamiliar with rules of law or evidence, and shocks the conscience. *See Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct by executive branch that "shocks the conscience" by employment of "methods too close to the rack and the screw to permit of constitutional differentiation" warrants dismissal of criminal charges). It thus constitutes an abuse of prosecutorial power so foreign to a fair judicial process that dismissal of all charges is required.

Gross misconduct arising from government surveillance of privileged communications may require that convictions to be vacated. *See Black v. United States*, 385 U.S. 26, 27-29 (1966) (vacating conviction because accused's hotel room was monitored during grand jury investigation); *O'Brien v. United States*, 386 U.S. 345, 346 (1967) (a listening device was planted in the business establishment of an acquaintance of accused after indictment). And prosecutorial misconduct that constitutes a severe violation of a defendant's due process rights can require dismissal of an indictment. *See United States v. Schell*, 775 F.2d 559, 566 (4th Cir. 1985) (ordering dismissal of indictments against defendants where their former defense counsel became an AUSA and prosecuted others for involvement in the same drug conspiracy in which defendants were convicted); *cf. California v. Trombetta*, 467 U.S. 479, 486–87 (1984) (noting that dismissal of the indictment can be appropriate when the government loses exculpatory evidence thereby denying defendant's access).

Given the severity of the government's intentional misconduct, and the absence of any legitimate purpose for its violation of the defendants' due process rights to interview witnesses and gather evidence that may "undermine and impeach" the credibility of a witness, this Court should exercise its authority to dismiss the superseding indictment in its entirety. *See United States v. Levy*, 577 F.2d 200, 210 (3d Cir. 1978) (ordering dismissal of indictment where defense strategy disclosed by government informant implanted in defense camp); *United States v. Linder*, 2013 WL 812382, at *52 (N.D. Ill. Mar. 5, 2013) (granting motion to dismiss indictment based

upon government's substantial interference in defense's equal access to witnesses); *United States v. Marshank*, 777 F. Supp. 1507, 1522-23 (N.D. Cal. 1991) (granting motion to dismiss indictment based upon pervasive and prejudicial preindictment intrusion into attorney-client relationship determined to be "outrageous"); *United States v. Orman*, 417 F. Supp. 1126, 1138 (D. Colo. 1976) (granting motion to dismiss indictment because of "surreptitiously listening" by law enforcement of privileged attorney-client communications).

In this virtually unprecedented case, the government used a secret and illegitimate recording of the defense's privileged interview of R.B. to obtain privileged opinion work product and defense strategy, obtain search warrants for attorney legal files, and publicly charge two extremely experienced and well-known attorneys as well as an experienced criminal defense investigator with felony obstruction of justice charges. In other words, the government's conduct does not amount to a modest or unintentional intrusion into the defense's trial strategy; it constitutes a direct assault on the defense function. *Cf. United States v. Brugman*, 655 F.2d 540, 545 (4th Cir. 1981) (distinguishing cases finding constitutional violation because "the attorney/client relationship [] was neither invaded by government eavesdropping nor by a government informant masquerading as a codefendant."). Because of the wholesale disclosure of the defense trial strategy arising from the government's intentional violation of the constitutional protection to equal access to witnesses, "the only appropriate remedy is the dismissal of the indictment." *Levy*, 577 F.2d at 210.

Alternatively, the interview of R.B. must be excluded from the government's case-in-chief, along with the results of any search warrant based in any substantive part on the interview and the defense's documentation of the interview. *See Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) ("[E]vidence obtained through an intentional and improper intrusion into a defendant's relationship with his attorney, as well as any 'fruits of [the prosecution's] transgression,' must be suppressed in proceedings against him.") (citation omitted). In addition, the Court should disqualify any prosecutor who has had access to the unlawfully obtained recording of R.B.'s interview. *See id.* (noting that court may "require retrial by a new prosecutor").

## CONCLUSION

For all of the foregoing reasons, the defendants respectfully request that the Court dismiss the pending charges against them, and alternatively to exclude the government's surreptitious recording of the interview of R.B. on September 9 and 10, 2017, suppress all evidence that is the fruit of that unlawful recording by the government, and disqualify any prosecutor who has been exposed to the unlawfully obtained recording of the privileged witness interview of R.B. by the defense.

Respectfully submitted,

KENNETH RAVENELL

/s/ Peter H. White
Peter H. White
Aislinn Affinito
McKenzie Haynes
Admitted Pro Hac Vice
SCHULTE ROTH & ZABEL LLP

24

901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
pete.white@srz.com
aislinn.affinito@srz.com
mckenzie.haynes@srz.com

/s/ Lucius T. Outlaw
Lucius T. Outlaw III, Bar No. 20677
Outlaw PLLC
1351 Juniper St. NW
Washington, DC 20012
(202) 997-3452
loutlaw3@outlawpllc.com


JOSHUA R. TREEM

/s/ Robert P. Trout
Robert P. Trout, Bar No. 01669
Schertler Onorato Mead & Sears, LLP
901 New York Ave., N.W., Suite 500
Washington, D.C. 20001
Tel.: (202) 675-4410
Facsimile: (202) 628-4177
rtrout@schertlerlaw.com

Daniel Goldstein, Bar No. 01036
131 Rte 9A
Spofford, NH 03462
Telephone: (410) 218-8537
dan@gold-stein.com


SEAN F. GORDON

/s/ Geremy C. Kamens
Geremy C. Kamens
Admitted Pro Hac Vice
Office of the Federal Public Defender
1650 King St., Suite 500
Alexandria, Virginia 22314
Telephone: 703-600-0800

25

Facsimile: 703-600-0880
Geremy_Kamens@fd.org

/s/ Rebecca S. LeGrand
Rebecca S. LeGrand
Bar No. 18351
LeGrand Law PLLC
1100 H St. NW, Suite 1220
Washington, DC 20005
Telephone: 202-587-5725
Facsimile: 202-795-2838
rebecca@legrandpllc.com

26