**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Crim. No. LO-19-449** |
| | * | |
| **KENNETH W. RAVENELL,** | * | **FILED UNDER SEAL** |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**POSITION BY THE UNITED STATES IN RESPONSE TO
DEFENSE PRIVILEGE REVIEW OBJECTIONS**

This United States, by and through the undersigned counsel, submits this Position in Response to Defense Privilege Review Objections.   This filing is being made by the Filter Team in the above-captioned case, which consists of the undersigned Assistant United States Attorneys, who are all employees of the Southern Division (Greenbelt) of the United States Attorney's Office for the District of Maryland, and are supervised by Assistant United States Attorney Thomas P. Windom, Chief of the Southern Division.

**This filing is being made under seal and shall only be made available to this Court, the Filter Team, and Defendant Kenneth Ravenell.   This filing shall not be made available to any other parties, including other counsel for the United States (the "Prosecution Team") or any other defendant in this matter.**

# Table of Contents

I.   Introduction ................................................................................................................... 1

II.   Background ................................................................................................................... 3

   A.   Procedural History of Privilege Dispute Over the Laptop ................................. 4

      1.   The Original Search Warrant Litigation. ...................................................... 4

      2.   Ravenell Voluntarily Produces the Laptop to the United States ................. 5

      3.   The Instant Privilege Disputes ..................................................................... 6

   B.   Factual Background ............................................................................................ 7

      1.   The Byrd DTO ............................................................................................. 8

      2.   Ravenell Used His Attorney Status to Protect DTO Operations ................. 9

      3.   Ravenell Knowingly Received Drug Proceeds as Compensation ............... 13

      4.   Ravenell Oversaw the Byrd DTO's Finances and Laundered Its Proceeds .............. 17

      5.   Ravenell Obstructed Justice for the DTO .................................................... 26

      6.   Ravenell Obstructed the Investigation into Himself .................................... 28

III.   Legal Framework:   Relevant Privileges and Exceptions .................................... 36

   A.   The Attorney-Client Privilege ........................................................................... 36

   B.   The Work-Product Privilege ............................................................................. 37

   C.   Fact Work Product vs. Opinion Work Product .................................................. 39

   D.   The Crime-Fraud Exception ............................................................................... 40

IV.   Argument .................................................................................................................... 41

   A.   Ravenell Cannot Claim Privilege Over the Work of Others ............................. 41

   B.   Financial Documents are Not Covered by the Work-Product Privilege .................. 43

   C.   Billing Records Are Not Covered by the Work-Product Privilege .................... 47

   D.   This Court Has Previously Deemed Many Similar or Identical Documents to be Subject to the Crime-Fraud Exception ................................................................ 49

   E.   The Disputed Documents Are Not Privileged Because They Are Covered By the Crime-Fraud Exception ................................................................................... 52

V.   Conclusion ................................................................................................................. 53

Appendix – Index of exhibits ................................................................................... 54

## I.      Introduction

Pursuant to this Court's February 19, 2020, Order, the Filter Team respectfully submits this Position in Response to "Privilege Review Objections" submitted by counsel for Defendant Kenneth Ravenell ("Defendant" or "Ravenell") on April 17, 2020, and March 19, 2021 (Exhibit A; Exhibit B).    The Defendant claims that certain documents located on a laptop produced to the government by Ravenell (hereinafter "the Laptop") are protected by the work-product and attorney-client privileges.    As set forth below, the Defendant's objections are without merit.

As the proponent of the attorney-client and work-product privileges, the Defendant bears the burden of establishing that they apply.    He has failed altogether to make such a showing and has, instead, made generalized and conclusory privilege claims that are demonstrably meritless on the face of the documents.    Moreover, to the extent this Court concludes that some of these documents *are* privileged, any privilege has been vitiated by the crime-fraud exception, given the Defendant's involvement in long-running narcotics trafficking and money-laundering conspiracies.    As the facts set forth below make clear, the Defendant—an experienced criminal defense lawyer—abused his position as an attorney for self-gain and to obstruct justice, and his conduct readily falls within the crime-fraud exception.    Notably, this Court has already concluded that documents similar—and in some cases, completely identical—to the documents at issue here were disclosable to the Prosecution Team under the crime-fraud exception.    Accordingly, and for the reasons set forth below, the Filter Team requests that this Court issue an Order allowing the Filter Team to provide certain disputed documents to the Prosecution Team.

Rather than submitting the entire (voluminous) set of documents from the Laptop for this Court's review, the Filter Team has provided a smaller set of documents for review by the Court, along with an explanation for why these documents are not protected by any privilege.    The

1

documents that the Filter Team seeks to produce to the Prosecution Team at this time are grouped into two categories: (1) financial statements, including tax information and financial summaries ("Financial Statements"); and (2) billing documents, including legal and investigative bills ("Billing Documents") (collectively, the "Disputed Documents").   Copies of these Disputed Documents are attached to this filing as exhibits, along with spreadsheets that include descriptions of the Disputed Documents, associated metadata, the asserted privilege objection by the defense, and the government's response to those objections.   Exhibit G is a spreadsheet summarizing the Financial Statements and Exhibits G1 through G24 are the underlying Financial Statements themselves, grouped into topic/subject categories.   Exhibit H is a spreadsheet summarizing the Billing Documents and Exhibits H25 though H82 are the underlying Billing Documents, organized by the party reflected on the bill.

Two other points involving the Disputed Documents bear mention at the outset.   First, some of the Disputed Documents, or documents similar thereto, appear numerous times on the Laptop.   Therefore, the Filter Team has indicated on Exhibits G and H any identical duplicates (based on an MD-5 hash comparison), or near-identical duplicates, which the Filter Team also believes should be produced to the Prosecution Team because they are not privileged.   These duplicate and/or similar documents have not been provided as exhibits, but should the Court wish to review them, the Filter Team can provide them to the Court.   Second, as explained below, some of the Disputed Documents are identical or similar to documents the Court has already found to be subject to the crime-fraud exception or otherwise not privileged.   Where such documents exist, the Filter Team has provided a copy of the document previously deemed not privileged by Magistrate Judge Timothy Sullivan and listed the document by Bates Number on Exhibit G or Exhibit H, as appropriate.

2

To aid the Court in its analysis, the Filter Team has endeavored to provide as thorough a factual background and summary of the relevant law in this filing as appropriate.   However, the Filter Team anticipates making additional filings that would, like this filing, address additional discrete categories of documents from the Laptop.   While the arguments relevant to the additional filings may supplement those in this filing, the Filter Team believes that any additional sets of documents will be limited in scope and number, and the Filter Team does not anticipate providing substantial additional information concerning the underlying facts or law relevant to additional privilege disputes.   The Filter Team, therefore, respectfully requests that the Court rule on only this set of Disputed Documents at this time.

## II.    Background

Since at least 2011, the United States has been investigating a cross-country drug trafficking organization ("DTO") run by Richard Byrd, a former client of Ravenell.   Byrd was ultimately convicted of conspiracy to distribute and possess with intent to distribute cocaine and marijuana, and conspiracy to launder money, and is currently serving a 26-year sentence.   *See* Crim. No. RDB-14-cr-186.   The government's investigation of Byrd, however, ultimately expanded to include an investigation of Ravenell himself for conspiring with Byrd and others to continue the operations of the DTO, including by evading law enforcement, laundering DTO proceeds, and obstructing investigations into the DTO.   On September 18, 2019, a grand jury sitting in Maryland charged Ravenell with racketeering conspiracy, money laundering conspiracy, and narcotics conspiracy.   On December 17, 2020, a grand jury sitting in Maryland returned a superseding indictment charging Ravenell again with racketeering conspiracy, money laundering conspiracy, and narcotics conspiracy, and adding charges against him and his co-defendants for obstructing an official proceeding, falsifying records, and for conspiring to do the same.

This filing arises out of a privilege dispute over documents obtained from the Laptop that the United States obtained in the course of the investigation.    The relevant procedural history of this dispute, as well as the factual background of Ravenell's role in the scheme, are set forth below.

### A.    Procedural History of Privilege Dispute Over the Laptop

1.    The Original Search Warrant Litigation.

On August 26, 2014, the Honorable Timothy J. Sullivan, United States Magistrate Judge for the District of Maryland, issued two warrants authorizing searches of Murphy, Falcon, Murphy, Ravenell & Koch (the "Murphy Firm" or "MFM Firm") and Leyden Law LLC (the "Leyden Firm") (collectively, the "Search Warrants").    The Search Warrants subsequently became the subject of litigation by the MFM Firm, the Leyden Firm, and Richard Byrd, over "whether documents seized from the two law firms [could] be produced to [the prosecution team]."    *See* Report & Recommendation, *In re Search Warrants Issued on Aug. 26, 2014*, Misc. Nos. 14-mj-1884-RAJ, 14-mj-1885-RAJ (attached hereto as Exhibit F1).    Given the sensitive nature of the searches, they were conducted by a team of law enforcement agents not otherwise assigned to the investigation pursuant to the protocol described in the Search Warrants.    The privilege-related litigation arising from the Search Warrants was handled by a team from the Criminal Division of the Department of Justice that was not assigned to the investigation.[1]

On November 2, 2016, Magistrate Judge Sullivan issued a Report and Recommendation, accompanied by a Sealed Memorandum, finding that the government had made a *prima facie* showing that the crime-fraud exception did, in fact, vitiate any privilege applicable to certain documents under dispute between the parties.    *See* Exhibit F1; Sealed Mem., *In re Search*

---

[1] Thereafter, the current Filter Team (undersigned counsel) was assigned to litigation pertaining to the Laptop, which relates to the Search Warrants in the manner described below.

*Warrants Issued on Aug. 26, 2014* (attached hereto as Exhibit F2).   In particular, Judge Sullivan concluded based on his *in camera* review that the government had proffered sufficient evidence to conclude that Ravenell was a knowing participant in Byrd's effort to commit money laundering, in violation of 18 U.S.C. § 1956, and obstruction of justice, in violation of 18 U.S.C. § 1519.

On November 17, 2016, Judge Sullivan filed a letter order with attachments under seal, amending his Report and Recommendation submitted on November 2, 2016 as to certain documents.   *See* Letter Order (ECF 44), *In re Search Warrants Issued on Aug. 26, 2014*, Misc. Nos. 14-mj-1884-RAJ, 14-mj-1885-RAJ (attached hereto as Exhibit F3).

On November 22, 2016, Judge Sullivan notified the Honorable Raymond Jackson, United States District Judge for the Eastern District of Virginia, that the parties had "informed [his] chambers that they will not be filing objections to the Report and Recommendation submitted on November 2, 2016 and amended on November 17, 2016."   *See* Letter Order (ECF 46), *In re Search Warrants Issued on Aug. 26, 2014*, Misc. Nos. 14-mj-1884-RAJ, 14-mj-1885-RAJ (attached hereto as Exhibit F4).   Accordingly, on February 2, 2017, this Court issued an Order adopting the Report and Recommendation.   *See* Order (ECF 47), *In re Search Warrants Issued on Aug. 26, 2014*, Misc. Nos. 14-mj-1884-RAJ, 14-mj-1885-RAJ (attached hereto as Exhibit F5).[2]

2.   <u>Ravenell Voluntarily Produces the Laptop to the United States</u>

At the time the Search Warrants were executed, Ravenell was out of the country and in possession of the Laptop, which was his work computer.   Upon returning to the United States, Ravenell transferred possession of the Laptop to his attorney.   Ravenell's counsel ultimately provided the Laptop to the United States on February 1, 2018.   As set forth in the Court's prior

---

[2]  The Filter Team sought, and was granted, a limited unsealing of the documents referenced in this paragraph.   The documents were provided to counsel for Ravenell via email on June 25, 2021.

Order denying the Defendant's Second Motion to Suppress, "Ravenell freely and voluntarily consented" to provide the Laptop to the United States.   *See* Order Denying Second Motion to Suppress (Under Seal), Crim. No. LO-19-449 (Aug. 12, 2020) (ECF 138) at 12.

While the government maintained that no search protocols were required for their review of the Laptop, the government nevertheless, in an abundance of caution, notified the Court that it intended to search the Laptop pursuant to the practices and procedures outlined in Attachment B to the relevant Search Warrant.   *See* Motion (ECF 48), *In re Search Warrants Issued on Aug. 26, 2014*, Misc. Nos. 14-mj-1884-RAJ, 14-mj-1885-RAJ.   The parties later jointly sought to modify those procedures.   On February 19, 2020, this Court, issued an Order Modifying Search Warrant Practices and Procedures for the Laptop, which included a paragraph that defined the "Filter Attorneys" as attorneys "assigned to the Southern Division of the U.S. Attorney's Office for the District of Maryland and not assigned to the instant prosecution . . . ."

### 3.   The Instant Privilege Disputes

Since the February 19, 2020 Order was entered, the Filter Team has engaged with Ravenell's counsel in an effort to resolve any remaining privilege disputes over documents on the Laptop.   Specifically, and following the procedures in the February 19, 2020 Order, the Filter Team produced to Ravenell's counsel two sets of documents that the Filter Team believed constituted materials that should be disclosed to the Prosecution Team because the documents were non-privileged or fell outside the attorney-client privilege due to a waiver or an exception to the privilege.   Ravenell's counsel did not object to the production of certain documents, which were thereafter provided to the Prosecution Team.   However, Ravenell's counsel did object to a

number of other documents, as reflected in Exhibits A and B.  The Filter Team has worked to narrow the documents at issue, and those Disputed Documents are now subject to this litigation.[3]

## B.    Factual Background

The following statement of facts provides the Filter Team's understanding of relevant evidence and supplements Judge Sullivan's findings.  Specifically, it establishes that Ravenell was not just aware of, but an essential participant in, the racketeering, drug trafficking, money laundering, and obstruction conspiracies that sustained the operation of Byrd's DTO. Accordingly, this Court should likewise conclude that the crime-fraud exception defeats any privilege claim that Ravenell may have over the Disputed Documents.

Ravenell is an attorney who was admitted to the bar in 1985 and practiced law in Maryland for decades.   While he was practicing law, however, Ravenell also became a principal member of an ongoing, large-scale DTO that was being operated by Richard Byrd (identified in the Superseding Indictment as R.B.).   While Ravenell also represented Byrd and other DTO members in legal proceedings, Ravenell simultaneously used his position as an attorney to directly further the DTO's illicit activities.   In exchange for millions of dollars in drug proceeds, Ravenell: (1) advised DTO members on how to avoid law enforcement and to launder drug proceeds; (2) helped incarcerated DTO members collect drug debts, managed the DTO's finances, and

---

[3] In addition to raising privilege objections, Ravenell has also argued that certain Disputed Documents are outside the scope of the Search Warrant that was executed at Ravenell's law firm in August 2014.   The Court has already considered—and squarely rejected—Ravenell's argument that documents from the Laptop fall outside the scope of the warrant because Ravenell freely and voluntarily consented to the search and seizure of items from the Laptop.  *See* Order Denying Second Motion to Suppress (Under Seal), Crim. No. LO-19-449 (Aug. 12, 2020) (ECF 138).   To the extent Ravenell persists in these arguments, the Filter Team understands that the Prosecution Team intends to seek leave of the Court to have such disputes litigated by the Prosecution Team with respect to any documents that this Court deems not privileged or where the sole defense objection pertained to scope.

laundered DTO proceeds through his law firm's bank accounts; and (3) obstructed justice to thwart investigations into the DTO's drug trafficking activities.   And, when Ravenell himself became the subject of the government's investigation, Ravenell conspired with his codefendants to obstruct justice by tampering with at least one potential witness—his former client, Byrd—and by making false declarations to the United States District Judge presiding over Byrd's criminal case.[4]

### 1.   The Byrd DTO

Byrd operated a large, complex DTO that trafficked narcotics across the United States. Aug. 26, 2014, Phillips Aff. ¶ 14 (attached hereto as Exhibit C).   Byrd obtained multi-thousand-pound quantities of marijuana and kilogram quantities of cocaine from sources of supply in Texas, Arizona, and California, and distributed the substances in Baltimore and other East Coat locations. *See id.* ¶¶ 14–15.   Byrd then laundered drug proceeds through various businesses, individuals, and financial institutions.   *Id.* ¶ 14.   By 2014, the government had identified $20 million in drug proceeds that had been generated by the Byrd DTO.   *Id.* ¶ 15.   Byrd also had no legitimate source of income that was untainted by drug proceeds.   *Id.* ¶ 29.   Byrd did not file any tax returns for the years 2009 through 2012.   *Id.* ¶ 29.   Nor were any tax returns filed on behalf of Byrd's purported entertainment business, DB Entertainment, which did not even have a federal taxpayer identification number prior to 2014.   *Id.*   In short, Byrd was a career drug dealer.   And, as Judge Sullivan found, Ravenell knew that "the vast majority, if not all," of Byrd's income was derived from drug trafficking and not legitimate business activities.   Sealed Mem. 4.

---

[4] Except as otherwise noted herein, the factual background is derived from the Superseding Indictment (the "SS Indictment"), the affidavit in support of the warrant to search Ravenell's law firm (the "Phillips Aff."), Judge Sullivan's Sealed Memorandum (the "Sealed Mem."), and information made available to the Filter Team by the Prosecution Team, including Rule 16 discovery materials ("DM"), internal law enforcement reports ("LER"), and grand jury testimony ("GJT").   The factual background specifically indicates where information comes from the Disputed Documents themselves.

Ravenell first represented Byrd in 1995, when Byrd was convicted of possession with intent to manufacture and distribute controlled substances in Baltimore City Circuit Court. *Id.* ¶ 15. Ravenell also represented Byrd in connection with multiple arrests and convictions in the 1990s and the early 2000s. DM. But Byrd had no arrests between 2003 and February 2011. *Id.* There is no evidence that Ravenell provided any legal services—litigation-related or otherwise— to Byrd during that period of time. *Id.* To the contrary, Ravenell joined the law firm Murphy Falcon Murphy ("MFM") in 2007, SS Indictment 2, and Byrd did not become an MFM client until February 17, 2011, when Byrd was arrested on state charges in Arizona in connection with a sting operation involving the purchase of a large amount of marijuana. Phillips Aff. ¶¶ 16–17.

Even though Ravenell did not provide any legal services to Byrd between 2003 and 2011, Ravenell and Byrd remained in frequent contact. In various phones that were seized in connection with Byrd's arrest in Arizona in 2011, investigators found records of numerous calls between Ravenell and Byrd from 2008, 2010, and early 2011. DM. All of the calls were short in duration—consistent with the calls being made to arrange meetings rather than engage in substantive conversations. *Id.* There was no legitimate reason for Ravenell to be communicating so extensively with Byrd, a known drug dealer who was not a client of Ravenell's law firm. In truth, during this period—between 2003 and 2011, when Byrd successfully avoided arrest— Ravenell used his status and experience as a criminal defense attorney to protect Byrd and his DTO.

2. <u>Ravenell Used His Attorney Status to Protect DTO Operations</u>

First, Ravenell used information that he learned representing other clients to advise DTO members on how to avoid law enforcement. A DTO member testified that Ravenell told him, "If you don't tell me everything, I can't tell you how best to protect yourself." GJT. Ravenell advised the DTO to store drugs, money, and firearms separately; to move money using private instead of public airlines; to use intermediaries to transport drugs and money; to use aliases when

9

traveling and conducting DTO business; to check vehicles for tracking devices; and to conduct counter-surveillance.   Ravenell also advised DTO members to conduct drug meetings face-to-face; to leave phones behind when conducting drug transactions; to change phones regularly; to destroy phones when coconspirators were charged; and to never take photographs with other DTO members.   *Id.*

The fact that Byrd avoided arrest between 2003 and 2011 is itself evidence that Ravenell provided this advice.   But there is other, more direct evidence that Ravenell provided—and that Byrd, among others, exploited—Ravenell's advice for avoiding law enforcement.   One example was Ravenell's advice to use aliases.   For instance, Byrd used an alias to open a bank account and to send money to Ravenell.   On February 2, 2011, an account was opened on Byrd's behalf in the fictitious name of "Robert Smith."   SS Indictment 9.   On February 11, 2011, someone made a deposit of $8,000 to the account.   SS Indictment 9.   Then, on February 23, 2011, Ravenell deposited an $8,000 check into his personal account—and not a law firm account—that was drawn on the "Robert Smith" account for "Legal Services."   SS Indictment 9; DM.   If the money were from a legitimate source and the payment were for legitimate defense work, there would have been no reason for Byrd to use an alias or for Ravenell to deposit the check to his personal account, rather than any MFM account.   But no "Robert Smith" was ever an MFM client.   DM.

Under Ravenell's guidance, Byrd also used aliases to conduct drug-related travel.   And not only was Ravenell aware that Byrd was doing so, Ravenell even used his law firm credit card to *book* the travel for Byrd.   Between September 2011 and September 2013 (after Byrd's arrest for drug trafficking), MFM spent more than $27,000 to purchase 63 flights for Byrd and other DTO members to travel to or from Baltimore, Atlanta, Houston, Phoenix, Los Angeles, and other locations of drug trafficking activity.   DM.   Bank records confirm these transactions.   Phillips

Aff. ¶ 61.   According to a DTO member's testimony, Ravenell told a DTO member that, because Ravenell used his law firm's credit card to book the trips, it would be more difficult for law enforcement to track DTO members as they conducted drug trafficking operations.   GJT.   Travel records also show that MFM booked hotels under aliases used by Byrd.   Consistent with these records, agents who searched Ravenell's law firm office in 2014 located a Louisiana driver's license bearing Byrd's photo and one of Byrd's alias names, Ebunolouwa Akinola, as well as a prepaid American Express card with the same alias name.   DM.   The card previously had been loaded with $9,703.96 but had a remaining balance of only $2.97.   *Id.*

A DTO member also testified that Ravenell provided the DTO with information about law enforcement tools before the tools were used in any government investigation that involved the DTO.   GJT.   Independent evidence corroborates this testimony.   One example relates to Jerome Castle, who was the DTO's second-in-command and the leader of its Baltimore operations.   GJT. Castle collected and distributed narcotics on the East Coast and then collected drug proceeds and shipped them back to the West Coast.   GJT.   During a search of a residence used by Castle, officers seized a paper copy of an email that Ravenell sent on November 15, 2012, summarizing how cell-site simulators are used.   DM.   And, on September 3, 2013, Ravenell sent an email asking Kimberly Reid—a courier and administrative assistant to Byrd—to send Byrd an article describing the government's use of a phone database to target drug dealers, and asked Reid to have Byrd call Ravenell.   DM.   There were no legitimate case-related reasons for Ravenell to provide information about these law enforcement techniques to DTO members.   This was, evidently, prospective advice.

Ravenell also protected DTO operations by lying to federal agents on behalf of DTO members.   For example, on August 31, 2009, Castle directed N.S., another DTO courier, to

transport a suitcase containing a large amount of drug proceeds from the Baltimore-Washington International Airport ("BWI") to California.   SS Indictment 9.   At BWI, law enforcement seized the suitcase and discovered $85,000 in cash inside.   *Id.*   When N.S.'s name was called over the intercom in the boarding area, N.S. left BWI in a panic and called another DTO member, who instructed her to call Ravenell.   *Id.*   N.S. called Ravenell and met with him.   N.S. told Ravenell that her luggage had been seized and that it had a large sum of cash in it.   *Id.*   Ravenell then called the officer who had seized N.S.'s luggage and falsely told the officer that he had no idea why N.S.'s luggage had been seized and that it was "just luggage."   *Id.*   Ravenell also falsely told the officer that N.S. left the airport because she had become ill and thought that she could just send her luggage to California to have someone pick it up.   *Id.*

Ravenell further used his status to protect the DTO by providing information to DTO members about coconspirators' criminal cases to help DTO members identify who was potentially cooperating against them.   GJT.   For example, during a recorded phone call that Byrd placed on March 8, 2011, from a detention facility in Maricopa County, Arizona, Byrd asked Ravenell to make sure that his girlfriend was not cooperating.   Ravenell told Byrd that he already spoke with Byrd's girlfriend and that she was "fine," meaning that she was not working with investigators, although Ravenell also acknowledged the possibility that Byrd's girlfriend was not giving him "accurate information."   DM.   A DTO member also testified that Ravenell agreed to pass drug-related messages between DTO members so that DTO members would not have to use jail phones. GJT.   And, when DTO members were arrested, Ravenell told uncharged DTO members that he would secure representation by attorneys who would ensure that charged DTO members did not cooperate against uncharged DTO members.   GJT; *see also* Sealed Mem. 4.   Ravenell even used

MFM funds to pay for DTO members to be represented by attorneys who made explicit in their retainer agreements that they would not represent cooperating witnesses.   DM.[5]

For example, when one DTO member was arrested in Phoenix, Arizona, Ravenell arranged for an attorney to represent her.   GJT.   The DTO member testified that Ravenell told her that the attorney would be under his supervision and could not do anything without getting Ravenell's approval.   GJT.   When DTO member Thurston Lindsey was arrested on state drug trafficking charges in Arizona, Byrd paid for Lindsey to be represented by local attorneys Brian Russo and Beth Garcia.   Phillips Aff. ¶ 137.   Russo and Garcia told Lindsey not to worry about their fees because someone else would pay for them.   Phillips Aff. ¶ 137.   And when Russo and Garcia visited Lindsey in jail, each asked Lindsey what he told police.   Both Russo and Garcia were, in turn, in telephone contact with Ravenell.   Phillips Aff. ¶ 137.   Through Ravenell, Byrd also paid for attorneys to represent Jerome Castle, H.B. (a DTO member), and James Bowie (an attorney who also represented DTO members) when each was arrested.   Phillips Aff. ¶ 138.

### 3.   Ravenell Knowingly Received Drug Proceeds as Compensation

In exchange for Ravenell's unlawful services to the DTO, the DTO paid Ravenell significant amounts of cash.   SS Indictment 6.   A DTO member testified that the purpose of these payments was to protect the DTO.   GJT.   Ravenell himself acknowledged that the purpose of the payments was "to keep the empire safe."   GJT.

Multiple DTO members testified to delivering large sums of U.S. currency to Ravenell during face-to-face meetings—even before they were ever charged criminally and would have had any reason to pay Ravenell.   GJT.   One DTO member testified that he frequently gave Ravenell

---

[5] Large drug operations often provide legal representation for members who are arrested.   This practice is intended by drug traffickers to access information from the criminal cases filed against coconspirators and prevent cooperation with law enforcement.   Coconspirators were instructed to contact Ravenell if they were contacted by law enforcement in any way.   Phillips Aff. ¶ 136.

anywhere from $5,000 to $60,000 at a time but that, on a few occasions, he gave Ravenell as much as $100,000 or $200,000 in cash.   GJT.   On another occasion, around December 31, 2011, a DTO member delivered a bag containing $300,000 to Ravenell at a hotel in Las Vegas.   GJT.   Another DTO member testified that he periodically gave Ravenell book bags containing between $50,000 and $100,000 in cash.   GJT.

One of the DTO members who delivered cash drug proceeds to Ravenell personally was Jerome Castle.   SS Indictment 10.   The search of a cellphone later seized from Castle revealed that Ravenell and Castle communicated via text message to arrange these meetings, some of which occurred in December 2012 and January, February, and March 2013.   *Id.*   Castle was not a Ravenell client until April 2013.   Nonetheless, a drug ledger seized from Castle's residence in April 2013 revealed that Castle had given Ravenell $39,000 in cash during a recent, prior two-month period.   DM.

DTO members delivered these cash payments to Ravenell during meetings at his law firm, at hotels, and in restaurant parking lots.   *See* SS Indictment; GJT.   Indeed, an MFM employee testified to sometimes seeing a DTO member carrying small duffel bags into meetings with Ravenell in his office.   GJT.   A DTO member who delivered money to Ravenell at his MFM office described counting stacks of cash wrapped in rubber bands on Ravenell's desk.   GJT. Other times, the DTO member gave the cash to Ravenell while sitting inside Ravenell's vehicle. GJT.   On one occasion in late 2011, Ravenell went to a Baltimore restaurant with Byrd, Jerome Castle, and H.B.   SS Indictment 10.   After dinner, the four men went into the parking lot of the restaurant.   *Id.*   Castle removed a Louis Vuitton shoe bag from the trunk of the car that Castle and H.B. had driven to the restaurant.   *Id.*   Castle then gave the bag to Ravenell, *id.*, who accepted

the bag without acting surprised or looking inside, GJT.   The bag contained $50,000 in drug proceeds.   SS Indictment 10.

Multiple DTO members testified that they paid Ravenell using drug proceeds.   These DTO members also testified that Ravenell *knew* the cash constituted drug proceeds.   GJT.   Critically, these DTO members testified that they explicitly *told* Ravenell that the cash came from drug trafficking operations.   GJT.   Ravenell also acknowledged as much.   Following Byrd's Arizona arrest and the seizure of more than $1 million from the DTO, Ravenell told several DTO members that he did not realize the DTO was doing that "well" and trafficking such large quantities of drugs.   GJT.[6]   Accordingly, Ravenell demanded even more cash for his illicit services to the DTO.   GJT.   One DTO member testified that, over a three-year period, he delivered more than $1 million to Ravenell.   GJT.   Another DTO member testified that, during a year in which the DTO earned approximately $10 million in net profit, Ravenell received approximately $3 million in drug proceeds.   GJT.

In addition to witness testimony, Ravenell's guilty knowledge is established by law enforcement surveillance.   For example, on or about September 12, 2011, Ravenell traveled to

---

[6] For example, during the execution of a search warrant at Byrd's Arizona residence on March 7, 2011, officers seized a money counter and $749,000 in cash.   Phillips Aff. ¶ 19.   Byrd was also present in April 2011 when law enforcement executed a search warrant at his sister's Maryland residence and seized $40,000 in U.S. currency and money orders, in addition to bank statements, documents, and computers.   Phillips Aff. ¶ 20.   Again, Byrd was present during a July 2012 search at his brother's residence in Arizona, where officers seized 1.5 pounds of marijuana and $373,000 in U.S. currency.   Phillips Aff. ¶ 21.   And, in April 2013, officers executed multiple search and seizures warrants in connection with large freight shipments that Byrd was sending from Arizona to relatives and customers in Maryland.   Phillips Aff. ¶ 22.   Officers recovered 340 pounds of marijuana, 11 kilograms of cocaine, a cocaine press, 11 firearms, body armor, and $56,000 in U.S. currency.   Phillips Aff. ¶ 23.   In the criminal and civil proceedings that resulted from these seizures, DTO members, including Byrd, were represented by a team of attorneys that was led by Ravenell and included Brian Russo, Jean-Jacques ("J") Cabou, and Beth Garcia. Phillips Aff. ¶¶ 16, 18, 24, 28.

Arizona to meet with Byrd.   SS Indictment 9.   Byrd had given Ravenell several thousand dollars in drug proceeds, which were stored at a hotel.   *Id.* at 9–10.   Byrd and Ravenell then met at a restaurant, where officers overheard Ravenell and Byrd discussing Byrd's belief that they were being surveilled by law enforcement.   LER.   At one point, officers saw Ravenell leave the restaurant and walk around the parking lot looking at cars and conducting countersurveillance to ensure that law enforcement would not follow Ravenell back to the hotel.   SS Indictment at 9–10.

Because the cash he received represented drug proceeds, Ravenell told a Byrd DTO member that he would spend the cash, rather than deposit it into a bank account.   GJT.   For the same reason, Ravenell instructed the DTO member to commit drug transactions to memory, rather than recording them in a ledger or journal.   If the transactions—especially with Ravenell—were recorded in a ledger and later discovered by investigators, Ravenell told the DTO member there was a risk they would "get Needlemaned."   GJT.[7]   Consistent with this advice, Ravenell never provided any DTO member with receipts reflecting the provision of services in exchange for the cash he received.   SS Indictment 6, 14; *see also* GJT.

Ravenell even knowingly accepted drug proceeds in exchange for services that he provided to another DTO, which was led by Leonaldo Harris—who ran his own multi-state narcotics trafficking operation.   SS Indictment 2.   Harris was arrested on drug trafficking charges in April 2013 that involved the possession and distribution of approximately 1,000 kilograms or more of marijuana.   *United states v. Leonaldo Harris, et. al.*, Crim. No. PWG-13-202, Plea Agreement

---

[7] In 2011, Baltimore defense lawyer Stanley Needleman was convicted of tax evasion and transaction structuring to avoid reporting large cash receipts and deposits from clients who retained Needleman to represent them on felony drug charges.   When officers executed a search warrant at Needleman's home, they found two safes containing cash totaling $1,153,660, and ledgers in Needleman's handwriting that chronicled the legal fees paid by hundreds of his clients over the course of five years.

Statement of Facts (ECF 613-1).[8]   Ravenell began representing Harris in June 2013.   SS Indictment at 2–3.   To pay for Ravenell's representation Harris directed his girlfriend, A.B., to collect outstanding drug debts that were still owed to Harris.   GJT.   A.B. subsequently collected a total of $200,000 in drug proceeds and delivered the proceeds to Ravenell during meetings at various locations.   GJT.   For example, in 2014, A.B. delivered cash payments of $21,000, $15,000, and $10,000 to Ravenell.   SS Indictment 14.   A.B. had previously told Ravenell that the cash represented drug proceeds.   *Id.*   And, because Ravenell never provided receipts for the payments, A.B. recorded them on the visor of her car.   *Id.*

4.   <u>Ravenell Oversaw the Byrd DTO's Finances and Laundered Its Proceeds</u>

While Ravenell knew that the large amounts of cash he received were drug proceeds because DTO members told him as much, Ravenell also knew the cash represented drug proceeds because he began to function as the DTO's chief financial officer.   Multiple DTO witnesses testified that Ravenell knew everything about the DTO's cashflow, including how much cash was generated, who generated it, where the cash came from, and how much was collected.   GJT. Ravenell kept track of this information by maintaining the DTO's financial records on his personal laptop.   GJT.   Consistent with this anticipated testimony, and as further described below, there are numerous financial records pertaining to DTO operations on Ravenell's Laptop.

In addition to maintaining the DTO's financial records, Ravenell personally assisted in the collection of drug proceeds, including from Jerome Castle and A.G.   In April 2013, Castle was arrested on federal narcotics charges, and Ravenell entered his appearance as counsel for Castle. SS Indictment 11.   In May or June of 2013, Ravenell visited Castle in jail, *id.*, which is confirmed

---

[8] According to a draft motion that Ravenell prepared in connection with his representation of Leonaldo Harris that was found on the Laptop (FILTER_KR_00008057), some of the marijuana that was at issue in Leonaldo Harris' case involved marijuana that was shipped and searched by YRC Worldwide, a transportation services company.

by jail records, DM.   Ravenell asked Castle to provide Ravenell with information on money that was still "on the street," which Castle understood was a request for information concerning outstanding drug debts owed to Byrd.   SS Indictment 11.   Ravenell did this at Byrd's request. GJT.   In a notebook that Ravenell brought to the jail, Castle wrote the names of all the drug dealers who still owed money to Byrd and the amounts that they owed, which totaled several hundred thousand dollars.   SS Indictment 11.   Ravenell later delivered this list to Byrd.   GJT.

On July 11, 2014, Ravenell booked a flight from Baltimore to Atlanta for the next day.   SS Indictment 14.   The purpose of the trip was for Ravenell to meet with A.G. to discuss drug proceeds that Byrd had previously given to A.G.   *Id.*   On July 22, 2014, Ravenell visited Byrd in jail and reported that A.G. failed to show up at the Four Seasons Hotel in Atlanta, where Ravenell had planned to meet him.   *Id.*   Bank records confirm that this trip occurred.   DM.

Not only did Ravenell help the DTO *collect* drug proceeds, Ravenell eventually became integral to the DTO's ability to *use* its proceeds.   Ravenell had generally advised the DTO to launder its drug proceeds through side businesses to legitimize the money.   GJT; *see also* SS Indictment 6; Sealed Mem. 3.   Following Byrd's 2011 arrest in Arizona, however, the need for the DTO to launder its proceeds became especially acute for Ravenell, personally.   By that point, Ravenell was beginning to provide legal services for Byrd and other DTO members in connection with pending criminal charges.   Even though Ravenell was willing to accept cash payments himself, Ravenell told DTO members that his law firm, and the other lawyers he retained for DTO members, could not.   GJT.   Accordingly, Ravenell directed DTO members to deposit cash proceeds into ostensibly legitimate business bank accounts and then use wire transfers, checks, credit cards, and PayPal to transfer the money to MFM.   GJT; *see also* SS Indictment 6.   Ravenell then used these funds to pay for his legal fees and then to make various payments on Byrd's behalf

18

to third parties both (a) to promote drug trafficking and (b) to conceal funds that were derived from drug proceeds.   *Id.*

Between 2011 and 2014, Ravenell's firm documented receiving nearly $2 million in connection with matters involving Byrd.   SS Indictment 6.   Consistent with anticipated witness testimony, none of the payments came from Byrd.   *Id.*   Instead, all of the money came from third-parties, including others involved in drug trafficking, entities and individuals used by Byrd to launder money, and credit cards belonging to Byrd associates.   *Id.*   The firm's use of funds, moreover, revealed that Ravenell allowed MFM to function as the DTO's checking account.[9] Indeed, Ravenell's firm kept less than half of the funds that it received on Byrd's behalf.

Of the $1.2 million that MFM received for Byrd's criminal case, the firm kept only $534,000.   *Id.* at 7.   MFM disbursed $465,000 to lawyers and law firms who represented Byrd and other DTO members but who would not accept drug proceeds.   *Id.*[10]   MFM, with Ravenell's approval, then transferred another $215,000 to various third parties for Byrd's benefit.   *Id.*   The law firm also credited another $671,000 in receipts to Byrd's business ventures but retained only $98,000 in legal fees.   *Id.*   The remaining $573,000 was transmitted to various Byrd-related entities and third parties.   *Id.*   In other words, Ravenell allowed Byrd and his associates to use MFM as a pass-through entity and money-laundering machine.   *See* Sealed Mem. 2.   And an MFM witness testified that it was unusual for client funds to be transmitted to third parties, and that MFM did not do this for any other client.   GJT.

---

[9] The R.B. file at MFM contained no retainer agreement, in violation of MFM policy.   GJT. Every other client file seized from MFM contained a retainer agreement.   DM.

[10] Ravenell also created—or authorized the creation of—a fake client file in the name of Jerome Castle's father, which Ravenell then used to pay attorneys for other DTO members.   DM; GJT.

a.      *Ravenell and Byrd Used LOC Marketing to Launder Proceeds*

Ravenell also helped Byrd disguise the source of drug proceeds by laundering them through various businesses even before the funds reached MFM.   The primary business that Ravenell and the Byrd DTO used to launder drug proceeds was LOC Marketing LLC, which was nominally owned by Lamont Wanzer.   LOC Marketing was a Washington, D.C.-based entertainment and promotion business that organized events, including music concerts.   Phillips Aff. ¶ 32.   But the events broke even, at best, and LOC Marketing never turned a meaningful profit.   GJT; *see also* Phillips Aff. ¶¶ 94, 129.   Accordingly, Ravenell and Byrd decided to use LOC Marketing as a vehicle for money laundering.   GJT; Sealed Mem. 2–3.   Drug money was used both to provide "seed" funding for the events and to add to event revenues to make it appear as though the events had been profitable.   GJT.   In exchange for further drug proceeds, LOC Marketing also provided Byrd with an equity "stake" in the business.   GJT.   After depositing drug proceeds into LOC Marketing accounts, DTO members then wired money from LOC Marketing to MFM on DTO members' behalf.   A DTO member testified that LOC funds were transferred to MFM at the direction of Ravenell himself, who would call Reid—who began functioning as LOC's administrator after Byrd's "equity" injection—multiple times per week to make these requests. GJT; *see also* Phillips Aff. ¶ 40.   Ravenell never provided Reid with itemized receipts reflecting that any services were provided to LOC Marketing.   GJT.

A DTO witness testified that more than 50% of the money that was deposited into LOC accounts came from drug trafficking operations.   GJT.   As Wanzer later reported, legitimate activity was blended with illegitimate activity "[a]ll the time."   Phillips Aff. ¶ 132.   Indeed, after Byrd "invested" in LOC Marketing, bank records show that its cash deposits increased dramatically.   Prior to Byrd's involvement, between 2009 and 2011 a total of $80,000 in cash was deposited into LOC accounts.   DM.   In 2012 alone, however, immediately after Byrd began

20

using the business to launder money, $1.3 million in cash was deposited into LOC accounts.   DM. Between April 2012 and July 2013, there were more than $2.2 million in cash deposits to LOC accounts.   Phillips Aff. ¶ 35.   And, between May and June 2013, LOC Marketing wired approximately $631,000 directly to MFM.   Phillips Aff. ¶ 37.   As Wanzer later explained, "The whole way this thing was supposed to go was [Ravenell] had to be paid."   Phillips Aff. ¶ 129.

LOC Marketing also sent money to MFM and Byrd *indirectly*.   During another five-month period between February and July 2013, when the DTO experienced cashflow problems, *see* GJT, LOC Marketing wired a total of $281,000 to Bank of America accounts owned by J.L., the mother of Byrd's child, and A.L., who is J.L.'s mother.   Phillips Aff. ¶ 38.   A.L.'s account also received multiple additional unexplained cash deposits.   Phillips Aff. ¶ 59.   Then, during that same five-month period, the accounts owned by A.L. and J.L. were used to pay for more than $500,000 in charges on an American Express card that was, in turn, used to pay MFM and to pay for Byrd's investments.   Phillips Aff. ¶¶ 59–60.   As Wanzer later explained, "Every time it was a cash deposit, there's a counter credit, and then a wire would go out to whatever . . . .   The main one's was [Ravenell] and that credit card."   Phillips Aff. ¶ 131.   Ravenell, who was copied on emails discussing the credit card payments, was aware of the existence and purpose of these transactions.   DM.

A DTO witness testified that Ravenell knew that money being deposited into LOC Marketing bank accounts was derived from drug proceeds.   GJT.   That was why Ravenell advised DTO members to exclude Byrd's name from any LOC documents.   GJT.   For the same reason, Ravenell suggested using Dunbar Armored Services to pick up drug proceeds near the dates of LOC Marketing events to make the cash appear legitimate and sourced to the events. GJT.   But any legitimate revenue derived from a promotional event would have been deposited

through an armored car service the night of the event, not several weeks or months after the event. Phillips Aff. ¶ 81.   And, in a consensually recorded conversation, Reid, LOC's administrator, acknowledged that deposits were being made even when there were "no parties going on." Phillips Aff. ¶ 64.

In March or April 2013, Reid gave all of LOC Marketing's books and records to Ravenell. Phillips Aff. ¶ 122.   This is corroborated by a June 2013 email in which Ravenell asked his administrative assistant to email and print "all of the Byrd ledgers from beginning to now."   DM. Critically, LOC Marketing's records showed that, within minutes of cash deposits to LOC accounts, wire transfers were sent to Ravenell and his firm.   Phillips Aff. ¶ 131.   The records also reflected multiple sequential cash deposits of $9,000, which was patent structuring.   Phillips Aff. ¶ 131.   An email that Ravenell sent himself revealed that Ravenell was plainly aware of the red flags within LOC's books and records.   DM.   In or around March 2013, Ravenell hired an accountant to trace money coming into LOC's bank accounts and assist Byrd with preparing his personal and business tax records, but the accountant declined to prepare the returns because there was insufficient documentation.   GJT.   Then, in July 2013, Ravenell hired Edward Leyden, a tax and accounting attorney, to address what Leyden told DTO members was LOC's income "sourcing problem."   Phillips Aff. ¶ 30.   In August 2013, Ravenell sent Leyden to Houston to meet with Byrd, Reid, Wanzer, and James Bowie.   Phillips Aff. ¶ 86 n.9.   The purpose of the meeting was to discuss the large cash deposits and how to justify them.   *Id.*   The fact that Ravenell hired Leyden—who had no prior experience with this work—to identify legitimate sources for LOC Marketing's cash deposits itself is evidence of Ravenell's guilty knowledge.   As Judge Sullivan concluded, this was an effort "to clean up" LOC's accounting records in order to thwart the government's investigation into the source of the deposited funds.   Sealed Mem. 3.

Issues that arose during Leyden's work for LOC Marketing further demonstrate Ravenell's consciousness of guilt.   When Leyden was reviewing the LOC Marketing bank records to try to "source" cash deposits to events, Leyden discovered a suspicious transaction on or about October 17, 2012, when MFM wired $110,000 to LOC Marketing.   GJT.   Leyden asked Ravenell why MFM was wiring such a large amount of money *to* LOC.   GJT.   Ravenell responded, "I know about it, don't worry about it," and refused to provide any further explanation.   GJT.   When Wanzer told Leyden (during a consensually recorded phone call) that his business and personal accounts at Bank of America had been shut down because Byrd had been using the LOC accounts to move large amounts of U.S. currency, Leyden cut Wanzer off, telling him not to discuss the issue on the phone and that Leyden would discuss it with Ravenell.   Phillips Aff. ¶¶ 75–79.

> b.    *Ravenell Obstructed LOC's Response to Grand Jury Subpoena*

In March 2014, LOC Marketing received a federal grand jury subpoena from the District of Maryland.   Phillips Aff. ¶ 82.   Ravenell, who represented Byrd, not LOC Marketing, called Leyden and engaged him to respond to the subpoena on behalf of LOC.   GJT.   Trial testimony will establish that, although Leyden told Ravenell that he had never responded to a criminal grand jury subpoena, Ravenell told Leyden that he did not care.   GJT.   Ravenell's only instruction to Leyden was, "Make sure you let me see those documents before you produce them."   GJT. Leyden discussed the subpoena during a meeting with Wanzer on March 24, 2014.   Phillips Aff. ¶ 84.   Leyden agreed to represent LOC even though (a) Leyden acknowledged the conflict with Ravenell and MFM (because MFM represented Byrd), (b) Ravenell or Byrd would pay Leyden's fees, and (c) Ravenell told Leyden he would work for MFM in the future.   Phillips Aff. ¶¶ 85, 95.

On March 31, 2014, Wanzer brought Leyden copies of the subpoenaed records with handwritten notations indicating that certain large cash deposits were questionable and possibly drug proceeds.   Phillips Aff. ¶ 96.   On April 17, 2014, Ravenell called Wanzer to tell him that he

23

(Ravenell) had been helping Leyden review the LOC Marketing documents to "make sure you guys are good."  Phillips Aff. ¶ 107.  But when Leyden produced the responsive records to the government on May 1, 2014, 20 pages of records that Wanzer had marked up were removed from the production.  Phillips Aff. ¶ 109.  As Judge Sullivan concluded, Ravenell and Leyden withheld Wanzer's annotations from the subpoena response to conceal evidence of the unlawful source of funds deposited into LOC Marketing's accounts.  Sealed Mem. 3.

And, not only did Ravenell help Leyden remove LOC Marketing documents from the production, but Ravenell later told another DTO member that he was not concerned about the possibility that Wanzer might proffer with the government because he did not believe that Wanzer would tell the full truth about the money deposited into LOC accounts.  GJT.  But Wanzer told Leyden, "[Ravenell] is cool.  He's kinda running the . . . he's kinda understanding the [operation]."  Phillips Aff. ¶ 133.  He said Ravenell "has to know" where "everything is." Phillips Aff. ¶ 133.

On June 17, 2014, Ravenell called Wanzer to discuss the government's investigation.   As Judge Sullivan concluded, Ravenell tried to convince Wanzer that the money laundered through LOC Marketing came from a legitimate source.  Sealed Mem. 4.  Ravenell told Wanzer that he was not sure "whether the government can prove that the money came from drugs, versus that the money came from, you know the shows and stuff you guys did."  Phillips Aff. ¶ 112.  Wanzer explained, however, that he was concerned because (1) large amounts of cash were deposited long after LOC's events and (2) the same amount was wired out of LOC accounts within 15 or 20 minutes.  Phillips Aff. ¶ 113.  Ravenell asked, "Where was the money going?"  Wanzer said, "[S]ome of it went to you."  Ravenell said, "Right."  Wanzer added, "A lot of times it went to

[A.L. and J.L.'s] credit card."   Again, Ravenell responded, "Right."   Phillips Aff. ¶ 115. Ravenell was not surprised by this information.

Ravenell also acknowledged that, "if you don't have a track record that the cash was made, then you got a, then you got a problem."   Phillips Aff. ¶ 116.   Ravenell added, "[I]f you're paying out all that money it would be the worst kind of money laundering where you take all the money and give it to somebody else."   Wanzer insisted, "But we didn't make anything. . . . We didn't really get paid nothing."   Ravenell agreed, "Right, cause [Byrd]'s holding on to it.   He's controlling all the money."   Wanzer added, "Or it went out.   Or it was wired."   Again, Ravenell was not surprised; he agreed, "Right, right."   Phillips Aff. ¶ 118.

Finally, not only did Ravenell perform money laundering services for Byrd, but Ravenell even advertised this illegal service.   Once Byrd was arrested and detained on federal charges, Ravenell met with a DTO member who was Byrd's planned successor.   Ravenell confirmed that the successor had access to a large supply of drugs.   Ravenell then instructed the successor on operational security and the economics of shipping drugs across the United States.   Ravenell told the successor that he could "wash money" through his law firm the same way he did for Byrd. Ravenell also said that he would notify the successor if the government was investigating him and that he would protect the DTO's drug business.   In exchange, Ravenell asked for between $200,000 and $300,000, as an entry fee, and said that he would charge additional fees along the way as services were rendered.   Lastly, as an endorsement, Ravenell bragged that Byrd would agree Ravenell "get[s] the job done."   GJT.[11]

---

[11] Once MFM was searched in August 2014, the DTO member cut ties with Ravenell.   GJT.

5.      Ravenell Obstructed Justice for the DTO

As Ravenell and other DTO members perceived that federal investigators were closing in on the organization, Ravenell obstructed and attempted to obstruct justice on the DTO's behalf.

DTO members testified that, after their federal indictments in 2014, Ravenell flew to Houston, Texas, to search for a DTO ledger.   GJT.   Ravenell believed the ledger contained information that needed to be destroyed: an accounting of illegal business transactions, including payments to Ravenell.   GJT.   Ravenell searched for the ledger but could not find it.   GJT.   This testimony was corroborated by a June 29, 2014, email that Ravenell later sent Milun Chun, an MFM associate attorney, stating, "[S]till did not locate the book.   Any other idea?"   DM.   A DTO member also testified that, when DTO members were arrested, Ravenell advised uncharged DTO members to destroy their phones.   GJT.

Ravenell also conspired with the members of Byrd's DTO to obstruct justice by "neutralizing" witnesses.   For example, when Ravenell learned through discovery in Jerome Castle's criminal case that law enforcement had observed Castle engage in money drops, Ravenell became concerned that officers had seen *him* receive cash from Castle.   GJT.   Ravenell told a DTO member that they "gotta find a way to neutralize Castle."   GJT.   Ravenell eventually withdrew from representing Castle.   DM.   After he had withdrawn, however, Ravenell twice went with a private investigator—Ravenell's co-defendant, Sean Gordon—to visit Castle in jail to persuade him to accept a lengthy, non-cooperation plea so that he would not testify against other DTO members.   GJT.   Jail records confirm that Ravenell visited Castle twice after having withdrawn from representing him.   DM.

Jeff Gilbert was another witness whom Ravenell attempted to "neutralize" on behalf of Byrd's DTO.   Byrd and other DTO members used Gilbert's company to ship large, wholesale quantities of marijuana from Arizona to various destinations on the East Coast for further

distribution.  SS Indictment 12.  During the execution of search warrants in Maryland in April 2013, law enforcement recovered black plastic shipping containers that had been used by Byrd's DTO to ship 100-pound quantities from Arizona to Maryland.  *Id.*  Ravenell and Byrd discussed how Gilbert was a threat to Byrd because Gilbert could provide incriminating information about Byrd and other members of the conspiracy if he were called as a witness in a proceeding against Byrd.  *Id.*  Ravenell then dispatched a private investigator to meet with Gilbert in Arizona.  *Id.*

Unbeknownst to Ravenell and the investigator, however, Gilbert was interviewed by law enforcement before the investigator met with him.  SS Indictment 12–13.  Gilbert was shown a photographic lineup, positively identified Byrd, and provided incriminating information about Byrd and the DTO.  *Id.* at 13.  On May 3, 2013, when Ravenell's private investigator met with Gilbert, the investigator misled Gilbert into believing that he was also with law enforcement.  *Id.* Gilbert reiterated what he had already told law enforcement about Byrd and that he (Gilbert) had identified Byrd in a photo lineup.  *Id.*  But in a memorandum dated May 5, 2013, addressed to Ravenell, and stored in the Byrd file at Ravenell's office, the investigator falsely described the interview with Gilbert.  *Id.*  Specifically, the memorandum falsely stated that Gilbert told the investigator that he (Gilbert) could not identify Byrd and that Gilbert was unable to identify Byrd in a photo array that the investigator provided.  *Id.*

D.W. was yet another DTO witness whom Ravenell attempted to neutralize on Byrd's behalf.  On August 5, 2013, Ravenell and Sean Gordon traveled to a detention center where D.W. was being held.  SS Indictment 13.  The visit is confirmed by detention center records.  DM. D.W. had trafficked narcotics and laundered money for Byrd and other DTO members and had been federally charged with marijuana trafficking conspiracy in the District of Maryland.  SS Indictment 13.  Even though D.W. was already represented by an attorney, Ravenell did not seek

permission from the attorney to meet with D.W. or to discuss D.W.'s pending charges before Ravenell and Gordon attempted to interview D.W.  *Id.*  D.W. refused the interview anyway.  *Id.* Nonetheless, on or about May 29, 2014, Ravenell sent Gordon to visit D.W. again.  *Id.* at 14. When he met with D.W., Gordon asked D.W. to make a false written statement indicating that D.W. had not been involved in trafficking narcotics with Byrd.  *Id.*  D.W. refused to sign the false statement and told Gordon that Gordon and Ravenell should contact D.W.'s lawyer.  *Id.* After Gordon questioned whether D.W. was "snitching," D.W. ended the interview.  *Id.*

6.     Ravenell Obstructed the Investigation into Himself

After law enforcement searched Ravenell's office in August 2014, Ravenell withdrew from representing Byrd, who obtained new defense counsel.  Ravenell separated from MFM in September 2014.  SS Indictment 2.  Nonetheless, in October 2014, Ravenell dispatched Sean Gordon to meet with Byrd.  GJT.  Byrd's counsel was not aware of the visit.  GJT.  Gordon told Byrd that Gordon and Ravenell were concerned that Byrd's new counsel had a good relationship with the government and would try to convince Byrd to cooperate.  GJT.  Gordon told Byrd that "we need someone who is going to be a team player, and make sure we get someone who is going to protect everybody."  GJT.

This meeting was itself evidence of Ravenell's consciousness of guilt.  But Ravenell took additional steps to protect himself (and—by extension—Gordon, too).  Recognizing that he was a target of the government's investigation, on January 21, 2016, Ravenell retained Joshua Treem, a defense attorney—and, ultimately, Ravenell's codefendant—to represent him.  SS Indictment 18.  In November 2016, Byrd pleaded guilty to federal drug trafficking and money laundering charges.  Ravenell understood that Byrd was, therefore, a potential witness against him before the grand jury and in any subsequent criminal prosecution against Ravenell.  *Id.* at 20.  Accordingly,

28

just as Ravenell had dispatched private investigators like Gordon to "neutralize" witnesses against Byrd, Ravenell dispatched Treem and Gordon to "neutralize" Byrd as a witness against himself.

### a. Ravenell's Defense Team Tampers with Byrd's Testimony

Treem and Gordon traveled to Phoenix, Arizona, to meet with Byrd, who was being held there on state charges.    SS Indictment 22.    In advance of the meeting, Ravenell prepared a list of 53 exculpatory statements concerning Ravenell's involvement in the DTO's criminal conduct.    *Id.* Ravenell prepared the list, titled "KWR's Combined Notes," based on witness statements that had been turned over to Byrd's lawyer in connection with Byrd's criminal case and that were subsequently given to Ravenell and Treem by Byrd's lawyer.    *Id.*    Ravenell's goal was to use Treem and Gordon to convince Byrd to adopt the exculpatory statements in order to later impeach Byrd's testimony in the event Byrd were called as a witness against Ravenell.    *Id.* at 21.    This was the same strategy that Ravenell and Byrd had deployed against other DTO witnesses.

Among the statements in "KWR's Combined Notes" were the following false denials:

- "[Ravenell] was not part of [Byrd's] DTO."

- "[Ravenell] did not serve as [Byrd's] house counsel."

- "[Byrd] told me he was no longer involved in drug trafficking activities after his February 2011 arrest."

- "[Byrd] worked hard to keep [Ravenell] unaware of his drug and money laundering activities because he knew [Ravenell] would not approve."

- "[Byrd] never told [Ravenell] he was using LOC to launder money."

- "[Byrd] did not pay [Ravenell] to report law enforcement activities to him."

- "[Ravenell] did not bring [Byrd] a list of people who owed him drug money from Castle."

- "[Byrd] did not give [Ravenell] hundreds of thousands of dollars."

- "[Byrd], Castle, and [Ravenell] never had a meeting where we discussed [Byrd]'s DTO and [Ravenell] commented that [he] did not know [Byrd] and the members of his DTO were making so much money."

- "[Byrd] and Castle have not given [Ravenell] millions of dollars in cash."

- "[Byrd] and Castle never talked openly in front of [Ravenell] about collecting drug money."

- "[Ravenell] never told [Byrd] to legitimize any money.  [Ravenell] told [Byrd] [Ravenell] would only accept money derived from reputable sources, clean money."

- "[A]fter [Byrd]'s 2011 arrest, [ Byrd] put a hold on his drug operation and tried to do more events."

- "[Byrd] did not want [James] Bowie to tell [Ravenell] about [Byrd]'s losses in the entertainment business or that the feds were watching him."

KWR Combined Notes 1–2 (attached hereto as Exhibit D).

On September 9, 2017, Treem and Gordon met with Byrd.  Unbeknownst to Treem and Gordon, the meeting was audio and video-recorded.  Treem and Gordon began the meeting with Byrd by explaining that Ravenell had given them a list of items to discuss with Byrd.  Byrd was not surprised.  SS Indictment 22.  The first item Treem raised was Ravenell's false statement that, after Byrd's February 2011 arrest, Byrd told Ravenell that he was no longer involved in narcotics. *Id.*  Treem, Gordon, and Byrd then discussed how Ravenell tracked Byrd's business income and expenses, and how money was wired to MFM at Byrd's direction.  *Id.* at 24.  Treem, Gordon, and Byrd also discussed the Laptop, which Byrd said had his "financials" on it.  *Id.* at 25.  Byrd said the Laptop should be thrown away or his financial information should be removed from it. *Id.* at 25–26.

Eventually, Byrd told Treem and Gordon, "I know what [Ravenell] wants, that's no problem.  He know who I am, he knows what—he—we've known each other over two decades. . . . So I know this formula, that's not a problem, all right.  You will leave here with the information that you came seeking."  SS Indictment 24.   Byrd added, "So what I'm telling you is that

30

whatever Ravenell needs that's fine, that's not a problem.  Like we can go through this whole questioning and then we're going to do the song a dance, that's not a problem." *Id.*  Byrd then proceeded to review many—but not all—of the statements on "KWR's Combined Notes" and indicated that he was adopting them. *Id.* at 27.  Neither Treem nor Gordon recorded which particular statements Byrd adopted. *Id.*  Treem did, however, take handwritten notes from the meeting.  According to Treem's notes, Byrd stated that Ravenell maintained Byrd's finances on his computer, that "Feds do not have it," and "info delete." *Id.* at 29.

Treem and Gordon continued their meeting with Byrd the next day, September 10, 2017.  SS Indictment 30.  Treem advised Byrd that he was in touch with Ravenell and planned to meet Ravenell the next day. *Id.*  Treem then asked Byrd to sign "KWR's Combined Notes" "just to show [Ravenell] that you went over it." *Id.*  Before signing it, however, Byrd told Treem and Gordon, "There's just a couple of things that I want to go through." *Id.*  Byrd explained that, although he would never cooperate with the government, Ravenell had a "blueprint" of Byrd's financials, that Byrd "can't get to those financials without [Ravenell]," and that Ravenell was "in a unique position as far as my money is concerned because without him I can't get my money." *Id.* at 31.  Byrd continued, "My only position here is my money, that's it.  [Ravenell] can get anything he want from me that's not a problem.  It's been that way since I've been incarcerated. . . . My concern is my money." *Id.*

After providing this context, Byrd told Treem and Gordon that the testimony that Ravenell wanted Byrd to provide was false.  Byrd explained, "Now the information I gave you yesterday— is the information if called to testify I will testify to on the stand."  SS Indictment 31.  Byrd clarified, however, that this testimony would be untrue:

> Here's the real situation, alright.  The real situation is this:
> [Ravenell] knew my whole business operation, period, from A to Z,

> from nuts [to bolts].   [Ravenell] knew that LOC was used to launder money.   [Ravenell] knew I was still involved in narcotics.   I paid [Ravenell] millions of dollars in cash.
>
>     . . . .
>
> I used to deliver book bags of cash to that office.   [Castle] delivered millions of dollars to [Ravenell].   So what I'm saying is that I'm going to be the good soldier like I'm supposed to be, but I need [Ravenell] to put his nuts on the line for me and make sure I get my fucking money.   Like I've told you, I got two kids in college.   I got one that's coming home that doesn't want to go to college.   I'm not asking for no handout.   I'm just asking for my money.

*Id.* at 32.

Byrd then told Treem, "Now [Ravenell] keeps a chart of all my investments, all the players that's involved, the how's and the where's.   He needs to make sure all of that vanish off his laptop." SS Indictment 32.   Treem responded by reminding Byrd that Treem could not advise Ravenell to delete the materials from the Laptop because it was under subpoena.   *Id.*   On his notepad, Treem wrote, "[Ravenell] knows all about drug dealing, LOC and laundering.   [Byrd] delivered millions in cash, so did [Castle]."   *Id.* at 33.   Treem also wrote a note to himself: "JRT – different from yesterday," and underlined the notation four times.   *Id.*   Referring to Byrd's financial records, Treem wrote, "assuming it's on laptop," and that Byrd "wants [ ] with investments to vanish" and "JRT – won't happen, can't happen."   *Id.*   Treem added, "[Ravenell] willing to throw him a few 'ms' to take care of 'kids.'"   *Id.*

Treem then asked Byrd to confirm what he was saying in the following exchange:

> TREEM:      [S]o I make sure I understand this, you're telling me that [Ravenell] knew that you were using LOC to launder your narcotics money . . . .
>
> BYRD:       Absolutely.
>
> TREEM:      And there was really no question about, you know, where this was all coming from --

BYRD:           Absolutely.

TREEM:          -- at least comingled.

BYRD:           Right.

SS Indictment 33–34.   Although Treem acknowledged that what Byrd said was "somewhat different what [Byrd] said yesterday," Treem told Byrd he was "giving [Byrd] credit for that being accurate and truthful.  *Id.* at 34.   Byrd maintained, "I mean, this—I'm ready—this is for the [witness] stand, okay."  *Id.*   But Treem insisted, "I can't put you on the witness stand if you're going to lie, and if I know you're going to lie I can't do that, because that get me in a lot of trouble if that comes out."  *Id.* at 35.

At that point, Treem ended the interview "to go kind of sit in my office and close the door and kind of play all this out."  *Id.*   Treem added that he was not going to tell Byrd's lawyer about what Byrd said because it would not "help" Ravenell.  *Id.*   Byrd had effectively told Treem that he would be willing to perjure himself for Ravenell—by agreeing to Ravenell's false denials—but that Ravenell would have to help Byrd recoup drug proceeds that were still controlled by MFM. In his notes, Treem wrote, "JRT → said to stop" when Byrd was "saying [] different from yesterday."  *Id.*   Treem also wrote, "[Byrd] prepared to testify about [what Ravenell] needs [him] to," and that he could not call Byrd "if you are going to lie."  *Id.*

As the interview ended, Byrd asked to speak with Gordon privately.   Before leaving the room, Treem asked Byrd, referring to "KWR's Combined Notes," "Can you sign that for me that you saw it?"  SS Indictment 36.   After Treem left, Byrd told Gordon, "I should never have had that conversation with [Treem]."  *Id.*   Gordon tried to reassure Byrd, stating, "This is a situation of . . . [t]alk to everyone, find out what their status is, you know.   Just like you sent me to Houston to talk to people, this is kind of the same version."  *Id.*   In doing so, Gordon effectively admitted that he and Treem were trying to "neutralize" Byrd—the same way they had tried to obtain a false

33

statement from D.W. after D.W. was arrested in Texas. *See id.* at 13. But Byrd told Gordon that he was "willing to testify to all of this." *Id.* at 36. Accordingly, Gordon asked Byrd to sign "KWR's Combined Notes" just to acknowledge "you saw it." *Id.* at 36–37. After signing it, Byrd told Gordon, "[T]ell [Ravenell] to go get some of that motherfucking money that he got buried and give me my fucking money and get me out of the way." *Id.* Gordon replied, "I can on Tuesday." *Id.*

### b. *Ravenell's Defense Team Falsified a Sworn Affidavit*

The next day, September 11, 2017, Treem held a conference call with Ravenell and drafted a false affidavit for Gordon concerning their meeting with Byrd and "K. Ravenell's Combined Notes." SS Indictment 37. Two days later, September 13, 2017, Treem and Ravenell held another conference call regarding the Gordon affidavit. *Id.* On September 14, 2017, the next day, Gordon went to Treem's law firm to execute the affidavit. *Id.* The affidavit contained the following false statements regarding the meeting:

- "Byrd read each of the entries . . . out loud and acknowledged the truthfulness and accuracy of each one separately and individually," *id.* at 38, which was false because Byrd did not read or acknowledge all 53 statements;

- "At no time did [Byrd] express any hesitancy, disapproval or disagreement with the statements or make any changes," *id.*, which was false because Byrd told Gordon and Treem that many of the statements were untrue; and

- "[W]e asked [Byrd] . . . if he had no changes to make, to sign and date the statement," *id.* at 39, which was false because Gordon asked Byrd to sign the statement only to acknowledge that "[he] saw it," and neither Gordon nor Treem asked Byrd whether he wanted to make any changes.

Treem thereafter maintained the false affidavit in his files at his law firm. *Id.*

### c. *Ravenell Directed Treem to Falsify a Letter to a Federal Judge*

A few months later, on January 18, 2018, Treem began drafting an *ex parte* letter to the United States District Judge who had presided over Byrd's criminal case. SS Indictment 40. The

letter was not a response to any order from the Court.  *Id.* at 41.  That day, Treem spent approximately 1.5 hours drafting the letter.  Treem also exchanged emails with Gordon and communicated with Ravenell by phone.  *Id.* at 40.  Ravenell met with Treem on January 19, and again communicated with Treem by phone on January 29, 2018.  *Id.*  Treem continued editing the letter on January 30; and on February 6 and February 7, Treem met with a law firm employee to discuss further revisions to the letter.  *Id.*  On February 8, Treem again discussed revisions to the letter with a law firm employee, who subsequently called Gordon.  The same day, Treem spent an hour editing the letter and spoke again with Ravenell by phone.  *Id.*

On February 9, 2018, Treem emailed the *ex parte* letter to the District Judge.  Treem explained that he was writing in his capacity as Ravenell's attorney to "bring to the Court's attention recent actions by [Byrd] that I believe constitute criminal conduct."  SS Indictment 41.  Treem wrote that Ravenell "believes a record needs to be made of these events regardless of the consequences, should he be charged and should [Byrd] appear as a government witness" and that, "[a]s his counsel I concur."  *Id.*  Treem's letter, however, included several statements concerning Byrd's meeting with Treem and Gordon that were obviously false when compared to the video recording of the meeting—and with Treem's own notes.  For example, Treem falsely wrote that he and Gordon asked Byrd to consider the accuracy of "each" statement in KWR's Combined Notes, and that Byrd had asked to "consider the request overnight."  *Id.*  Treem also wrote that, when he returned the following day, Byrd "stated that the statements were accurate."  *Id.* at 42.  That representation, too, was patently false.

## III.   Legal Framework:   Relevant Privileges and Exceptions

### A.      The Attorney-Client Privilege

The Fourth Circuit "has adopted the classic test to determine whether the attorney-client privilege applies to certain communications or documents."  *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 339 (4th Cir. 2005).   Under that test, the privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.*   As with other privileges, "[t]he burden is on the proponent of the attorney-client privilege to demonstrate its applicability."  *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).   It is well established that the attorney-client "privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."  *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981).

As the Fourth Circuit has long held, "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege" and "[a]ny voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter."  *Id.*   "Because the attorney-client privilege exists for the benefit of the client, the client holds the privilege."  *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005).   As the holder of the privilege, the client "can waive [the privilege] either expressly, or through conduct."  *Hawkins v. Stables*, 148 F.3d 379, 384 (4th Cir. 1998) (internal

citations omitted).[12]   The attorney-client privilege may be pieced by a showing of crime-fraud, as "[t]he crime-fraud exception to the attorney-client privilege provides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or fraud."   *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989).

Although the individual claiming privilege bears that burden, the government bears some burden with respect to documents claimed to be crime-fraud.   "In order to overcome the privilege, the government must make a *prima facie* showing that the communications sought fall within the crime-fraud exception."   *Id.*   With respect to the attorney-client privilege, the attorney does not need to "be aware of the illegality involved" for a crime-fraud finding, "it is enough that the communication furthered, or was intended by the client to further, that illegality."   *United States v. Cohn*, 303 F. Supp. 2d 672, 682 (D. Md. 2003).

### B.   The Work-Product Privilege

The work-product privilege protects an attorney's work done in preparation for litigation. *In re Grand Jury Proc. #5*, 401 F.3d at 250.   The Supreme Court first recognized this privilege (also called the "work-product doctrine") in 1947 in *Hickman v. Taylor*, 329 U.S. 495 (1947).   In 1975, the Supreme Court held in *United States v. Nobles*, 422 U.S. 225 (1975), that the privilege applies in criminal cases and explained that "the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system."   *Nobles*, 422 U.S. at 238.

"To establish the applicability of the work product privilege, [the proponent] must show, as to each document, that the work product in question was: (1) prepared by, or under the direction of, an attorney and (2) was prepared in anticipation of litigation."   *Rambus, Inc. v. Infineon Techs.*

---

[12] As the Defendant's objections make clear, the current privilege dispute largely centers on the work-product, rather than attorney-client, privilege, in part because Byrd and many of his co-conspirators have waived any attorney-client privilege.   *See* Exhibit E (Byrd's privilege waivers).

*AG*, 220 F.R.D. 264, 272 (E.D. Va. 2004).   "[T]he party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine."   *United States v. Frostman*, 221 F. Supp. 3d 718, 726 (E.D. Va. 2016) (quoting *Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 232 (4th Cir. 2011)).   In addition, "[t]he fact that defendant anticipated litigation with plaintiff does not make all documents thereafter generated by or for its attorneys subject to work product immunity," and "[a] party claiming work product immunity must still establish the underlying nexus between the preparation of the document and the specific litigation."   *Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 418 (D. Md. 2005) (quoting *Burton*, 175 F.R.D. at 328).   As the Fifth Circuit has noted, "[l]ike the attorney-client privilege, the work-product doctrine protects only the [attorney's work product] and not the underlying facts."   *Adams v. Mem'l Hermann*, 973 F.3d 343, 350 (5th Cir. 2020) (internal citations omitted).

To determine whether a particular document was prepared in anticipation of litigation, the Fourth Circuit (along with the majority of others) applies "the 'because of' test."   *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co*., 967 F.2d 980, 984 (4th Cir. 1992). The inquiry is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation."   *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 133-34 (D.D.C. 2012) (emphasis added).   "The document must be prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim" and "**materials prepared in the ordinary course of business** or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation."   *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984 (emphasis added).

38

"Because the work product privilege protects not just the attorney-client relationship but the interests of attorneys to their own work product, the attorney, as well as the client, hold the privilege." *In re Grand Jury Proc. #5*, 401 F.3d at 250 (internal citations omitted). "[T]he ability to protect work product normally extends to both clients and attorneys, and the attorney or the client, expressly or by conduct, can waive or forfeit it, but only as to himself." *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 294 (4th Cir. 2004) (internal citations omitted).

### C.    Fact Work Product vs. Opinion Work Product

The work-product "privilege encompasses both 'fact' work product and 'opinion' work product." *In re Grand Jury Proc. #5*, 401 F.3d at 250. As the Fourth Circuit has explained, "[n]ot all work product is treated equally," and courts "afford greater protection to opinion work product than to fact work product." *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017). Specifically, the Fourth Circuit has explained the relevant standards as follows:

> Fact work product, which consists of documents prepared by an attorney that do not contain the attorney's mental impressions, 'can be discovered upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship.' Opinion work product, which does contain the fruit of an attorney's mental processes, is 'more scrupulously protected as it represents the actual thoughts and impressions of the attorney.'

*In re Grand Jury Proc. #5*, 401 F.3d at 250 (internal citations omitted). "To be entitled to protection for opinion work product, the party asserting the privilege must show a real, rather than speculative, concern that the work product will reveal counsel's thought processes in relation to pending or anticipated litigation." *In re Initial Pub. Offering Sec. Litig.*, 249 F.R.D. 457, 460 (S.D.N.Y. 2008) (internal quotation marks omitted).

### D.       The Crime-Fraud Exception

The Fourth Circuit has "recognized the crime-fraud exception in the context of attorney-client privilege and in the context of the work product doctrine." *In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d at 348.   "[T]he party invoking the crime-fraud exception must make a *prima facie* showing that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *In re Grand Jury Proc. #5*, 401 F.3d at 251.   This showing requires that the government show that the allegedly privileged materials "(i) were made for an unlawful purpose or to further an illegal scheme and (ii) reflect an ongoing or future unlawful or illegal scheme or activity." *United States v. Lentz*, 419 F. Supp. 2d 820, 831 (E.D. Va. 2005).   "Importantly, the purported crime or fraud need not be proved either by a preponderance or beyond a reasonable doubt." *Id.*   "Rather, the proof 'must be such as to subject the opposing party to the risk of non-persuasion [i]f the evidence as to the disputed fact is left unrebutted.'" *Id.* (citations omitted).

In the context of the work-product privilege, the proponent of the crime-fraud exception is similarly required to make a *prima facie* showing of the crime or fraud and that the documents have a close relationship to the scheme or crime.   With respect to *fact* work product, nothing more is required; the attorney need not know he is furthering the fraud.   *In re Grand Jury Proc. #5*, 401 F.3d at 252 ("Because fact work product enjoys less protection than opinion work product, it may be discovered upon *prima facie* evidence of a crime or fraud as to the client only and thus even when the attorney is unaware of the crime or fraud.").   "A court may also order fact work product produced, without invoking the crime-fraud exception, if the party opposing the privilege demonstrates a substantial need for the material and an inability to secure the substantial equivalent

40

of the materials elsewhere without undue hardship." *In re Grand Jury Proceedings*, 33 F.3d at 348; *In re Grand Jury Proc. #5*, 401 F.3d at 252 ("[T]he discovery of facts furnished to an attorney does not implicate the same concerns as does invading the necessary privacy of an attorney's opinion work product, an invasion only justified if the attorney himself knows of the fraud.").

To establish the crime-fraud exception with respect to *opinion* work product, the Fourth Circuit has required that the government make a *prima facie* showing of both (1) the underlying crime/fraud; and (2) that the attorney in question was aware of or a knowing participant in the criminal conduct. *In re Grand Jury Proc. #5*, 401 F.3d at 252; *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017) ("A party seeking to compel the production of opinion work product under the crime-fraud exception must demonstrate attorney knowledge of or participation in the client's crime or fraud, but no such showing is necessary to discover fact-work-product privileged materials related to a client's crime or fraud.").  As the Fourth Circuit has stated, "[t]he fraud exception to the rule against compulsory disclosure of a lawyer's opinion work product *must apply in proceedings against a suspected lawyer equally or even more readily* than in a proceeding to obtain the information for use against a client who utilized fraudulent practices to obtain the lawyer's service." *In re Doe*, 662 F.2d 1073 (4th Cir. 1981) (emphasis added).

## IV.   Argument

### A.    Ravenell Cannot Claim Privilege Over the Work of Others

As an initial matter, various documents over which Ravenell has claimed work-product privilege, including billing records, were authored by someone else.  Ravenell has generally asserted, without any support, that some of these documents "reflect not just Mr. Ravenell's work product, but the work product of several other attorneys who either represented Mr. Byrd directly, or who shared their work product as part of a joint defense, common interest, *Kovel*, or other similar agreement."   April 17, 2020 letter from P. White to Filter Team (Exhibit A).   To date,

41

Ravenell has not provided any information to specify individuals with whom Ravenell may have had a joint defense or common interest, much less explain the scope of such an agreement, or otherwise explained how Ravenell is in a position to assert work-product claims on behalf of other individuals.   Absent a very specific legal relationship between Ravenell and these individuals, he simply lacks standing to assert claims over their work product.   *See Exobox Techs. Corp. v. Tsambis*, No. 2:14-CV-501-RFB-VCF, 2014 WL 4987903, at *5 (D. Nev. Oct. 7, 2014) (observing that "[i]t is axiomatic that standing requires the party requesting relief to have a personal legal interest in the subject matter of the dispute," and concluding individual lacked standing to assert attorney-client "privilege on his co-conspirators' behalf"); *Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 440 (E.D. Va. 2018) (concluding only party with "personal right or privilege in the information sought" has standing to challenge subpoena).

To the extent Ravenell is relying upon some type of joint defense or common interest privilege, he has failed to make any showing whatsoever that those doctrines would be relevant here.   "The joint defense privilege, an extension of the attorney-client privilege, protects communications between parties who share a common interest in litigation."   *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005).   "To invoke the privilege, the party must show that there is a shared common interest about a legal matter," and "[c]onclusory claims that a common interest in litigation exists are not sufficient to establish the joint defense privilege in the absence of a showing that the parties were pursuing a common legal strategy."   *United States v. Elbaz*, 396 F. Supp. 3d 583, 598 (D. Md. 2019) (internal citations omitted).   Moreover, "the joint defense or common interest rule presupposes the existence of an otherwise valid privilege, and the rule applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine."   *In re Grand Jury*

*Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990).[13]   Here, Ravenell

has not only failed to proffer any facts about the scope of his purported common interest, but he

has also failed to explain how these document reflect a "common legal strategy" or how they can

be divorced from his role in the drug trafficking and money laundering conspiracies at issue.

### B.    Financial Documents are Not Covered by the Work-Product Privilege

Several of the Disputed Documents appear to be financial statements, lists of contracts and

payments, sets of bank records, and other documents relating to various transfers of funds and

other financial aspects of Richard Byrd's drug trafficking organization.   At the outset, it is not

clear what, if any, role Ravenell had in drafting or creating many of these documents, much less

how they would reflect his thoughts or mental impressions, such that they could be considered his

work product.[14]   Nor is it clear from Ravenell's generalized, boilerplate work-product privilege

assertions how exactly these documents constitute work product.   Thus, as to these financial

documents, the defendant has failed to make even a threshold showing that the work-product

privilege applies.   *See In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*,

33 F.3d at 352 ("[P]arty asserting a privilege bears the burden of establishing that privilege.").

Even assuming these documents were prepared under the direction of Ravenell (something

that is not clear from their face), there is nothing to suggest these documents were "prepared in

anticipation of litigation."   *See Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 272 (E.D.

---

[13] As set forth below, because any joint defense or common interest privilege depends on the existence of valid underlying privilege over the documents in dispute, these doctrines are inapplicable where, as here, the proponent of the privilege has failed to make any showing whatsoever that the documents are, in fact, privileged in the first place.

[14] For example, many of these documents on their face appear to be groups of financial records compiled or collected by other individuals, but Ravenell has not identified (i) who the individuals are who drafted the documents; (ii) what their relationship was to Ravenell; or (iii) how the "work" reflected in these documents was done at his direction or under his control.

Va. 2004).[15]   The financial records largely appear to have been prepared in the ordinary course of business and merely memorialize financial transactions of Byrd, LOC Marketing, and DB Entertainment.   At the outset, there is nothing on the face of these documents to suggest that they were prepared in anticipation of litigation, as opposed to some other (legitimate or otherwise) business purpose, much less how these documents can be linked to specific then-pending or anticipated charges against Byrd.   Rather, many of them appear to be finance documents that are summary in nature.   The Fourth Circuit has repeatedly explained that "[m]aterials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes do not constitute documents prepared in anticipation of litigation protected by work product privilege."   *Solis*, 644 F.3d at 232 (internal quotation marks omitted); *see also United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 31 (1st Cir. 2009) (concluding work-product privilege is "not a privilege designed to help the lawyer prepare corporate documents or other materials prepared in the ordinary course of business").[16]   While the government addresses each of these documents and its specific response to Ravenell's claims of privilege over these financial documents in Exhibit G, a few general arguments bear mention here.

---

[15] Byrd was arrested on state charges in February 2011.   Accordingly, any Laptop documents prepared before then were not created "in anticipation of litigation."

[16] Here, Ravenell has made no showing that there was *any* legal purpose for the creation of these documents.   Even if he had, where a document was "prepared both for litigation and business purposes," the analysis of "[w]hether there is work product protection turns on whether the material would have been prepared irrespective of the expected litigation."   *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (internal quotation marks omitted). "Indeed, even where '[t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of the [document,]' or that 'such documents might [also] help in preparation for litigation,' work product protection is not available for documents 'that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation.'"   *Id.* (quoting *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998)).

*First*, several documents appear to pertain to the preparation of income taxes (*e.g.*, FILTER_KR_00000290 (File Name: "BARSKY'S SPREADSHEET FOR TAXES.xlsx."); FILTER_KR_00000244 (File Name: TAX INFO FROM BYRD AND BOWIE.pdf")). As multiple Courts of Appeals have concluded, "the work product privilege is aimed at protecting work done *for litigation*, not in preparing financial statements," and thus income tax materials and related financial documents are not entitled to work-product protection. *See United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 31–32 (1st Cir. 2009) (rejecting claim of work-product privilege over tax work papers, which "were prepared to support financial filings and gain auditor approval"); *see also United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) (concluding "papers generated by an attorney who prepares a tax return are not within the work product privilege"). As the Seventh Circuit has explained, such documents are not privileged even where an individual may contemplate litigation relating to financial matters—that is, "a dual-purpose document—a document prepared for use in preparing tax returns *and* for use in litigation—is not privileged; otherwise, people in or contemplating litigation would be able to invoke, in effect, an accountant's privilege, provided that they used their lawyer to fill out their tax returns." *United States v. Frederick*, 182 F.3d 496, 501–02 (7th Cir. 1999).

*Second*, both the tax-related documents and many of the other financial documents appear to largely be compilations of previously-existing financial information (*e.g.*, FILTER_KR_00000207; FILTER_KR_00000198) or event expenses from third parties (*e.g.*, FILTER_KR_00000274; FILTER_KR_00000275). It is well-settled that "[a]n attorney may not be used to insulate records an individual previously has prepared for his business." *See In re Grand Jury Proc.*, 601 F.2d 162, 171 (5th Cir. 1979). Thus, even if Ravenell requested that Byrd (or one of his co-conspirators) provide these documents, they are "not attorney work product, nor

45

are they protected by the attorney-client privilege." *Id.*   Similarly, a set of documents is not entitled to work-product protection merely because Ravenell asked that it be compiled or sent to him.   In other words, "[j]ust as every document prepared by an attorney is not entitled to work product protection, not every compilation by an attorney is protected either," and "compilations that merely reflect information, which is already or may be available to an adversary, or has no implications for the adversary process, are not entitled to protection." *Shapiro v. U.S. Dep't of Just.*, 969 F. Supp. 2d 18, 32 (D.D.C. 2013).   Put differently, the relevant inquiry is the same for spreadsheets, financial analyses, and compilations of documents as it is for any other document: does the document actually "reveal or provide insights into the "mental processes of the attorney" in the analysis and preparation of a client's case."   *Id.*

*Finally*, these financial documents and summaries would, at most, be fact—rather than opinion—work product and are thus entitled to substantially less protection.   "This is because the documents themselves convey no legal impressions or opinions," and, at *most*, were documents Ravenell and his team "later used to form legal opinions."   *See Fed. Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 19 (D.D.C. 2016), *aff'd*, 892 F.3d 1264 (D.C. Cir. 2018).   In *Boehringer*, the court concluded that the "charts, graphs, and spreadsheets do not reflect [an attorney's] assessments of the viability of success of […] litigation or settlement strategy" and, therefore, were fact work product, not opinion, because "the facts contained in these documents did no more than equip [the attorney] to make those assessments." *Id.*   The court explicitly noted that even if these documents, which were prepared at the direction of counsel, "were used for that purpose later, it does not affect their classification under the work-product doctrine."   *Id.*

### C.       Billing Records Are Not Covered by the Work-Product Privilege

Ravenell has also blanketly claimed that the work-product privilege applies to certain billing records, without offering any explanation as to how the privilege would apply to documents that do not contain confidential information.   This argument entirely ignores the well-settled law that "[t]ypically, the attorney-client privilege does not extend to billing records and expense reports."  *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999); *see In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d at 353-54 ("Billing records, expense reports, and travel records of counsel are not generally privileged as attorney-client communications.   The attorney-client privilege normally does not extend to the payment of attorney's fees and expenses.").   Similarly, because "the work product privilege does not shield every document created in the course of a client representation," the "work product privilege usually does not extend to payment records, where no such attorney work product is revealed." *Baker v. Borgwarner Morse Tec, Inc.*, No. 3:11-CV-00505, 2012 WL 13026649, at *1 (S.D. W. Va. May 3, 2012).   Thus, as the Fourth Circuit has explained, where billing records reveal "confidential information regarding legal advice," such as "specific research or litigation strategy," those billing records may be protected under the attorney-client privilege.   *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999); *see also Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992) (concluding that "general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege," however, records that "reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege").   Finally, "[t]o the extent that an attorney's billing records contain information protected by attorney-client privilege and the work product doctrine, redaction is a proper course of action toward preventing disclosure of the nature of attorney's services."  *Baker*, 2012 WL 13026649, at *1.   Other courts

47

have concluded billing records are not protected by the attorney work-product doctrine because the doctrine "only protects documents prepared in anticipation of litigation, not in the regular course of business" and "[b]illing records are commonly created in the regular course of business, which removes them from this doctrine's coverage." *Leach v. Quality Health Servs.*, 162 F.R.D. 499, 502 (E.D. Pa. 1995). The same analysis applies with even greater force where the billing records are not prepared in connection with litigation. The courts that have considered whether billing records are privileged appear to have largely done so in the context of the attorney-client, rather than the work-product, privilege. As such, these cases are instructive and provide guidance that billing records themselves are not, as a general matter, privileged, though certain information contained within those records may be if it would otherwise be privileged. Where, as here, the inquiry is whether the billing records are protected by the work-product doctrine, the relevant inquiry is not whether the records reveal confidential client communications, but rather whether the billing records reveal an attorney's work product (*i.e.*, an attorney's thoughts or mental impressions) and were prepared in anticipation of litigation.

Here, Ravenell has made no showing whatsoever of how the billing records he has identified reveal his thoughts or mental impressions or why they would otherwise be privileged. Instead, he has made generalized objections to billing records, which include bills for transactional and contract work (by in some cases non-attorneys) with no apparent connection to litigation whatsoever (*e.g.*, FILTER_KR_00000242; FILTER_KR_00004246; FILTER_KR_00008059). Ravenell has also asserted privileges over bills addressed to Byrd, again without any suggestion that the work was performed at Ravenell's direction or any explanation as to how he can claim work-product protections over them. Of course, to the extent Ravenell is claiming that these billing records are privileged because they convey confidential information *to his client*, that

argument is irrelevant because his client has waived the attorney-client privilege.   Thus, the only question is whether these billing records reveal Ravenell's thoughts and mental impressions, and there is nothing in the records to suggest that they do.

The cases Ravenell cites to the government do little to aid his cause.   *See* Exhibit A. These cases merely support the uncontroverted proposition that billing records may be privileged when they "contain narrative descriptions of conversations between clients and attorneys, the subjects of legal research or internal legal memoranda, and activities undertaken on the client's behalf."   *Cardenas v. Prudential Ins. Co. of Am.*, No. 99-1422, 2003 WL 21302957, at *3 (D. Minn. May 16, 2003).   The other case Ravenell cites rejected the claim of protection over the billing records entirely, concluding that they "were generated in the ordinary course of business and not in preparation for litigation," and observing that the billing records could "arguably constitute opinion work product if they had been prepared in anticipation of litigation."   *See Bieter Co. v. Blomquist*, 156 F.R.D. 173, 180 (D. Minn. 1994).   Simply put, these cases provide no support for the argument that the generic billing records at issue in this case are subject to work-product protection.

### D.    This Court Has Previously Deemed Many Similar or Identical Documents to be Subject to the Crime-Fraud Exception

Notably, versions of many of the Disputed Documents (some of which appear to be virtually identical) have previously been produced to the prosecution team after Magistrate Judge Sullivan determined that they were subject to a crime-fraud finding—that is, that Ravenell was a knowing participant in the criminal scheme and the documents bore a close relationship to that scheme.   Sealed Mem.   Thus, Ravenell, whose law firm was a party to the litigation regarding the materials arising out of those Search Warrants, cannot now argue that those same documents are not covered by the earlier crime-fraud ruling.   Assuming that he can, the fact remains that the

documents were properly deemed covered by the crime-fraud exception in 2016 and should no longer be protected here.

The Supreme Court has explained that the "preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (internal citations omitted). As applicable here, "[i]ssue preclusion […] bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* (internal citations omitted). As the Fourth Circuit recently explained, "[t]he doctrine of collateral estoppel precludes parties to a prior action *and their privies* from litigating in a subsequent action any factual issue that actually was litigated and essential to a valid, final judgment in the prior action." *Hately v. Watts*, 917 F.3d 770, 777 (4th Cir. 2019) (emphasis added). "By preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate, these [] doctrines protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor*, 553 U.S. at 892 (internal alterations and quotation marks omitted).

To "apply collateral estoppel or issue preclusion to an issue or fact, the proponent must demonstrate that (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

Here, the facts readily satisfy all five elements.  This Court previously adjudicated a crime-fraud dispute over similar, in some instances, identical documents—the issue here is thus identical to the one actually resolved by the judges in that case.  The crime-fraud finding was central to the ruling, which is final and valid (and was not appealed by either party).  Finally, Ravenell——through the Murphy Firm—was effectively a party, or at least a privy to a party, to Case No. 14-mj-1884, given his "substantive legal relationship" with the Murphy Firm.  *See Taylor*, 553 U.S. at 894.

Even if Ravenell is not estopped as a matter of law, he has waived any protections over these documents.  As set forth above, many of the documents over which Ravenell now claims privilege are highly similar, if not identical, to documents that have already been deemed not privileged and provided to the Prosecution Team.  Ravenell was placed on notice that the government had versions of these documents as soon as he learned of the federal search warrant that was executed at MFM in September 2014.  Ravenell consented to provide his Laptop to the government, and as this Court has already found, he gave this consent freely and voluntarily.  *See* Order Denying Second Motion to Suppress (Under Seal), Crim. No. LO-19-449 (Aug. 12, 2020) (ECF 138).  Where, as here "an attorney freely and voluntarily discloses the contents of otherwise protected work product to someone with interests adverse to his or those of the client, knowingly increasing the possibility that an opponent will obtain and use the material, he may be deemed to have waived work product protection."  *See In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981); *see also In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006) (concluding Qwest "waived the attorney-client privilege and work-product protection for the Waiver Documents by disclosing them to the SEC and the DOJ").  Ravenell cannot, now, seven years

after his office was first searched, and more than three years after his attorney voluntarily produced the Laptop to the government, claim privileges that he has long-since waived.

### E.     The Disputed Documents Are Not Privileged Because They Are Covered By the Crime-Fraud Exception

With respect to the first prong of the crime-fraud analysis, the evidence set forth above readily establishes a *prima facie* case that Byrd and his co-conspirators were "engaged in or planning a criminal or fraudulent scheme when they sought the advice of [Ravenell] to further the scheme." *See In re Grand Jury Proc. #5*, 401 F.3d at 254-55. As the Fourth Circuit has explained, "this prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *Id.*

With respect to the second prong of the analysis, the Disputed Documents also clearly "bear a close relationship" to the scheme. *See id.* at 255. As noted above, Judge Sullivan already determined that similar and identical documents bore a close relationship to Ravenell's scheme. Judge Sullivan made that determination well before the indictment (September 8, 2019) and superseding indictment (December 17, 2020) were returned against Ravenell, and thus his decision was limited to the facts as the government knew them at the time. As set forth above, with supplements since Judge Sullivan's ruling, the prosecution team has a wealth of incriminating information about Ravenell's knowledge and conduct. A finding that the Disputed Documents are subject to the crime-fraud exception is more easily made now with the passage of time, use of the grand jury, and analysis of the evidence; the crime-fraud exception applies even more broadly than Judge Sullivan was made aware of. Accordingly, it plainly covers the Disputed Documents at issue here.

**V.      Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court order that the documents listed in Exhibit G and Exhibit H are not privileged and may be turned over to the Prosecution Team.

Dated:   June 29, 2021

<div style="margin-left:40%">

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:      _____/s/_____
         Leah B. Grossi
         Elizabeth G. Wright
         Caitlin R. Cottingham
         Jeffrey J. Izant
         Assistant United States Attorneys

</div>

## Appendix – Index of exhibits

| Exhibit | | Description |
|---|---|---|
| A | | April 17, 2020 letter from P. White (counsel for Defendant) to Filter Team re: Privilege Review Objections related to *United States v. Ravenell* |
| B | | March 19, 2021 letter from P. White (counsel for Defendant) to Filter Team re: Privilege Review Objections related to *United States v. Ravenell* |
| C | | August 26, 2014 Search Warrant (including affidavit) in Case No. 14-mj-1885-RAJ |
| D | | KWR's Combined Notes |
| E | | Richard Byrd's privilege waivers |
| F | | ***Prior Privilege Rulings in Case Nos. 14-mj-1884-RAJ and No. 14-mj-1885-RAJ*** |
| | 1 | Report and Recommendation by Magistrate Judge Timothy Sullivan dated November 2, 2016 |
| | 2 | Ex Parte Sealed Memorandum by Magistrate Judge Timothy Sullivan dated November 2, 2016 (ECF No. 43) |
| | 3 | Letter Order by Magistrate Judge Timothy Sullivan amending the November 2, 2016 Report and Recommendation, dated November 17, 2016 (ECF No. 44) |
| | 4 | Letter correspondence from Magistrate Judge Timothy Sullivan to District Judge Raymond Jackson regarding the November 2, 2016 Report and Recommendation, dated November 22, 2016 (ECF No. 46) |
| | 5 | Order by District Judge Jackson adopting Judge Sullivan's November 2, 2016 Report and Recommendation, dated February 2, 2017 (ECF No. 47) |
| G | | Spreadsheet listing metadata associated with Disputed Documents (Financial Statements), defense objections, and government responses |
| | 1-3 | Financial Statements – DB Entertainment (*provided in native format*) |
| | 4-11 | Financial Statements – Email (*provided in native format*) |
| | 12-20 | Financial Statements – Event Expenses (*provided in native format*) |
| | 21-24 | Financial Statements – LOC Marketing (*provided in native format*) |
| H | | Spreadsheet listing metadata associated with Disputed Documents (Billing Documents), defense objections, and government responses |
| | 25 | Billing Documents – Jeffrey Barsky (*provided in native format*) |
| | 26-31 | Billing Documents – Blank Rome (*provided in native format*) |
| | 32-39 | Billing Documents – Barry Brandman (*provided in native format*) |
| | 40 | Billing Documents – Kenneth Frank (*provided in native format*) |
| | 41-42 | Billing Documents – Sean Gordon (*provided in native format*) |
| | 43-44 | Billing Documents – Ed Leyden (*provided in native format*) |
| | 45-52 | Billing Documents – Murphy Firm (*provided in native format*) |
| | 53 | Billing Documents – Osborn Maledon (*provided in native format*) |
| | 54-82 | Billing Documents – Perkins Coie (*provided in native format*) |