1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
2                       ALEXANDRIA DIVISION

3   UNITED STATES OF AMERICA,    )  Case 1:19-cr-449
                                 )
4               Plaintiff,       )  **REDACTED**
                                 )
5        v.                      )  Alexandria, Virginia
                                 )  July 7, 2021
6   KENNETH WENDELL RAVENELL,    )  1:07 p.m.
    JOSHUA REINHARDT TREEM, and  )
7   SEAN FRANCIS GORDON,         )
                                 )
8               Defendants.      )
    _____)  Pages 1 - 154
9

10          REDACTED TRANSCRIPT OF MOTIONS HEARING

11           BEFORE THE HONORABLE LIAM O'GRADY

12           UNITED STATES DISTRICT COURT JUDGE

13
    APPEARANCES:
14
    FOR THE PLAINTIFF:
15
         LEO J. WISE , ESQUIRE
16       MATTHEW J. MADDOX, ESQUIRE
         OFFICE OF THE UNITED STATES ATTORNEY
17       36 South Charles Street, 4th Floor
         Baltimore, Maryland  21201
18       (410) 209-4800

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
                            R E D A C T E D

         Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703) 299-4599

1   APPEARANCES CONTINUED:

2   FOR DEFENDANT KENNETH WENDELL RAVENELL:

3        PETER H. WHITE, ESQUIRE
         MCKENZIE E. HAYNES, ESQUIRE
4        AISLINN K. AFFINITO, ESQUIRE
         SCHULTE ROTH & ZABEL LLP
5        901 15th Street, N.W., Suite 800
         Washington, D.C.  20005
6        (202) 729-7486

7        LUCIUS T. OUTLAW, ESQUIRE
         OUTLAW PLLC
8        1351 Juniper Street, N.W.
         Washington, D.C.  20012
9        (202) 997-3452

10  FOR DEFENDANT JOSHUA REINHARDT TREEM:

11       ROBERT P. TROUT, ESQUIRE
         SCHERTLER ONORATO MEAD & SEARS
12       901 New York Avenue, N.W., Suite 500 West
         Washington, D.C.  20001
13       (202) 628-4199

14       DANIEL F. GOLDSTEIN, ESQUIRE
         131 Route 9A
15       Spofford, New Hampshire  03462
         (410) 218-8537

16

FOR DEFENDANT SEAN FRANCIS GORDON:

17

         GEREMY C. KAMENS, ESQUIRE
18       OFFICE OF THE FEDERAL PUBLIC DEFENDER
         1650 King Street, Suite 500
19       Alexandria, Virginia  22314
         (703) 600-0800

20

         REBECCA S. LEGRAND, ESQUIRE
21       LEGRAND LAW
         1100 H Street, N.W., Suite 1220
22       Washington, D.C.  20005
         (202) 587-5725

23

THE DEFENDANTS, KENNETH WENDELL RAVENELL, JOSHUA
24  REINHARDT TREEM, AND SEAN FRANCIS GORDON, IN PERSON

25

                          R E D A C T E D

     Rhonda  F.  Montgomery   OCR-USDC/EDVA   (703) 299-4599

 1            THE CLERK:  The Court calls *United States of*
 2  *America v. Kenneth Ravenell, Joshua Treem, and Sean*
 3  *Gordon*, Criminal Case No. 2019-cr-449.
 4            May I have appearances, please, first for the
 5  government.
 6            MR. WISE:  Good afternoon, Your Honor.  Leo
 7  Wise and Matthew Maddox for the United States.
 8            THE COURT:  All right.  Good afternoon to
 9  both of you.
10            MR. MADDOX:  Good afternoon, Your Honor.
11            MR. WHITE:  Good afternoon, Your Honor.
12  Peter White for Kenneth Ravenell, who is present.  With
13  me and arguing part of the motions are Aislinn
14  Affinito, McKenzie Haynes, and Lucius Outlaw.
15            THE COURT:  All right.  Good afternoon to
16  each of you.
17            MR. WHITE:  Good afternoon, Your Honor.
18            MR. TROUT:  Good afternoon, Your Honor.
19  Robert Trout on behalf of Joshua Treem.  Also with me
20  at counsel table and also arguing today is Daniel
21  Goldstein.
22            THE COURT:  All right.  Good afternoon to
23  each of you.
24            MR. TROUT:  Thank you.
25            MR. KAMENS:  Good afternoon, Your Honor.

1  Geremy Kamens on behalf of Sean Gordon.  With me is

2  Rebecca LeGrand.

3          Your Honor, if I could be heard briefly on

4  logistics to make a proposal?

5          THE COURT:  Certainly.

6          MR. KAMENS:  So I believe there are

7  approximately eight motions that are set, perhaps nine.

8  What the defense would propose is that a single lawyer

9  be the principal defense oralist on that motion,

10 however, that representatives from the two other teams

11 would have an opportunity to provide comments,

12 particularly as they relate to their own client,

13 additional comments but not to the substantive extent

14 of the initial person and that we would go in an order.

15         We've talked about consolidating some of the

16 arguments together on the motions.  Perhaps my

17 codefendants' counsel, colleagues can correct me if I'm

18 wrong.  I can make a proposal of an order if the Court

19 wants to do it that way or give us the order.

20         THE COURT:  No.  I'm happy to -- if you've

21 gotten together and thought about what order you'd like

22 to do it in and consolidating a couple of them, I think

23 it's appropriate.  Go ahead.

24         MR. KAMENS:  The way we would propose to

25 start is with the motion to dismiss for denial of equal

1   access to witnesses.  That's ECF 174.  That would be

2   the first motion.

3          The second would be the motion to dismiss

4   based on 18 U.S.C. 1515(c), which would also -- the

5   person arguing that is a representative of Mr. Treem --

6   would also argue at the same time the motion to

7   disclose the government's presentation of law to the

8   grand jury, ECF 184, and the motion to dismiss Count 7

9   or strike Count 4 paragraphs.  That's ECF 183.

10          THE COURT:  All right.

11          MR. KAMENS:  So those would be together.

12          The third motion or set of motions to present

13   would be the motion for severance -- that's ECF 180 --

14   along with the motion to strike Count 4, paragraphs 1,

15   13, and 15 as surplusage, which is ECF 182.

16          The fourth motion or set of motions would be

17   the motion to dismiss for lack of nexus, which is

18   ECF 181.

19          The fifth motion would be for the Due Process

20   Protections Act order, ECF 176, and then --

21          Well, the Court's indulgence.

22          And another motion for the Court's

23   consideration is the motion to exclude the privileged

24   evidence from the BGL search, and that's ECF 245 if the

25   Court were to consider that today.

1          THE COURT:  All right.  Does the government

2    have any objection to proceeding that way?  It makes

3    sense to me.

4          MR. WISE:  We don't, Your Honor.

5          One logistical issue we wanted to raise --

6    and I mentioned this to Mr. Trout.  Two of the motions

7    do include redactions in various matters under seal.  I

8    believe the first motion that the defendants have

9    proposed discussing and then the fifth based on the way

10   they're counting it.  So we were looking for guidance

11   from Your Honor as to how you'd like us to handle that.

12          I think it would be difficult for counsel to

13   try to argue those motions and -- I'll use Mr. Trout's

14   words -- self-sensor and not make certain arguments

15   that implicate the sealed and redacted material and

16   make others and then hold the sealed and redacted

17   materials for another point.

18          So I think our preference would be to have

19   the argument on those motions be done in a sealed

20   courtroom in order to enable both sides to freely argue

21   and Your Honor to engage.  That would be our

22   suggestion, but we, obviously, will defer to however

23   the Court wants to handle it.

24          THE COURT:  Again, I was hoping we could

25   avoid having sealed portions of the hearing and the

1   need to disclose any matters that were presently

2   sealed, but I hadn't, obviously, thought through the

3   arguments that counsel are going to make.  Certainly,

4   we don't want to bounce back and forth and have the

5   courtroom cleared and then opened up again and then

6   cleared again.  So how do we modify --

7            MR. WISE:  Perhaps we could address the two.

8   Since it's their order, my suggestion would be to leave

9   the two that are sealed first, the recording motion and

10  then the DPPA motion, and then that would require just

11  moving up the DPPA motion from their order to second

12  place instead of fifth.  It wouldn't affect the way

13  they've clustered them, and then we could proceed

14  through the rest without having to seal the courtroom

15  again.

16            THE COURT:  All right.  Mr. Trout.

17            MR. TROUT:  Thank you, Your Honor.

18            One thing that I did want to mention is that

19  the motion to exclude privileged evidence includes many

20  of the similar issues to the equal access motion.  It's

21  a different request for relief, but a lot of the issues

22  are very similar.  And I would actually expect, you

23  know, when I'm addressing one, I may slip into the

24  other.  So I would ask that basically those be kind of

25  included together because I expect that my arguments

1  would be similar.

2          THE COURT:  Okay.

3          MR. TROUT:  The other thing I should mention,

4  Your Honor -- and I think it comes as no surprise to

5  the Court that I believe -- I know on behalf of

6  Mr. Treem -- and I suspect the others as well -- we do

7  object to sealed proceedings.  I think we've made our

8  position on that clear.  We just wanted to repeat it

9  for the Court.  You know, we do believe that these

10  motions are not, oh, by the way sort of motions.  These

11  motions really go to critical issues on the merits of

12  this case; therefore, we believe the Sixth Amendment is

13  implicated.

14          In Mr. Treem's case, I think he has a First

15  Amendment right to complain, as he has, about

16  government conduct, and he does not want to be shut

17  down in his ability to complain.  So...

18          THE COURT:  Well, maybe I'm not fully

19  understanding why we need to close the courtroom at

20  all.  As long as the prior order that I entered

21  concerning using initials for the critical witness, not

22  identifying the name of the judge -- and I'm not sure

23  why we need to seal any of this.  I mean, if we're

24  referring to notes, for instance, the notes of the

25  meeting, they're just generally referred to as under

1  Mr. Ravenell's initials and --

2          Mr. Wise, I'm missing the big picture here.

3  Where am I going sideways?

4          MR. TROUT:  Could I just add one thing?

5          THE COURT:  Yes.

6          MR. TROUT:  Because I think the DPPA motion

7  and the *Brady* motion is very heavily redacted, and I'm

8  thinking out loud about how I could actually make the

9  arguments that I would like to make without getting

10 into some of the material that the Court has said

11 should not be publicly disclosed.

12         THE COURT:  Okay.

13         MR. WISE:  Your Honor, perhaps if we could --

14 I don't know what the Court's procedures are on

15 sidebars under the COVID-19 protocols.  Perhaps we

16 could approach sidebar or clear the courtroom just for

17 the limited purpose of addressing Your Honor's

18 question.  The redactions cover a specific issue that

19 we had litigated and that I could speak to, if we could

20 do that in a sealed setting.

21         THE COURT:  You mean now versus --

22         MR. WISE:  Yes, Your Honor.

23         THE COURT:  Well, I resumed having sidebars.

24 If everyone feels comfortable having a sidebar, we can

25 have a sidebar without clearing the courtroom, which I,

1  obviously, would prefer doing.  I mean, we're all

2  vaccinated here in the well of the court.  I don't know

3  whether all counsel are vaccinated or not.  Certainly,

4  if anyone wants to wear a mask while they're in close

5  proximity with each other, that certainly is

6  permissible.  I think I have to within the guidelines

7  that we have set here for the court.  So come to

8  sidebar then, please.

9            MR. WISE:  Thank you, Your Honor.

10      (Under seal Bench Conference A is under separate

11        cover, and then proceedings continued in open

12        court, as follows:)

13            THE COURT:  Mr. Kamens.

14            MR. KAMENS:  Thank you, Your Honor.

15            I am going to speak initially with respect to

16  the motion to dismiss based on the denial of equal

17  access to the witness, R.B.  The secret recording by

18  the government of a confidential defense witness

19  interview and the decision to prosecute the defendants

20  for obstruction of justice constitutes an unprecedented

21  abuse of prosecutorial power, in violation of the

22  Constitution, work product doctrine, and ethical rules.

23            The facts are undisputed.  A fact witness,

24  R.B., called Mr. Treem, who was representing

25  Mr. Ravenell, in April 2017 and stated that he had,

1  quote, exculpatory information about Mr. Ravenell.

2  Mr. Treem was ethically obligated to interview R.B.,

3  and he obtained permission from R.B.'s then counsel to

4  interview him.

5          The interview took place with Joshua Treem,

6  Sean Gordon, and R.B. in a small closed room set aside

7  for confidential communications at the Towers Jail in

8  Phoenix, Arizona.  And during the interview, Mr. Treem

9  and Mr. Gordon asked questions about the case against

10 Mr. Ravenell.  They didn't threaten R.B.  They didn't

11 attempt to bribe him.  They didn't accept R.B.'s offer

12 to provide testimony that R.B. said was false.  And on

13 the first day of the interview, consistent with R.B.'s

14 April 2017 call, he made statements that completely

15 exonerated Mr. Ravenell of any criminal conduct.

16         This was an absolutely commonplace defense

17 interview of a fact witness.  What is almost unheard of

18 is that the government decided to secretly record this

19 confidential witness interview.  The government makes

20 three arguments to justify what it did:

21         First, it wanted to make a, quote, accurate

22 record of the meeting;

23         Two, it did not impede the defense's access

24 to R.B.; and

25         Three, the argument that was mentioned at the

1  sidebar.

2          What is radical about the government's

3  response is that it seeks to provide a justification

4  that would authorize secret surveillance in any case

5  because it concedes it had no justification, no

6  probable cause, no specific information that would

7  warrant the secret surveillance of the witness

8  interview in this case.

9          THE COURT:  Well, that's not correct; is it?

10  I mean, the indictment lays out the fact that

11  Mr. Gordon had traveled to another detention center and

12  interviewed a different potential witness in Houston

13  and, as stated in the indictment, with the intent to

14  attempt to get that witness to make statements that

15  Mr. Ravenell wasn't involved in any criminal activity.

16  And the witness refused, and the witness terminated the

17  interview.

18          MR. KAMENS:  So that is what defense

19  investigators do, and what the government would have to

20  allege to make that improper is knowledge, actual

21  knowledge by the lawyer or the defense investigator

22  that the statement they are seeking to procure is

23  false.  The indictment never says that with respect to

24  Joshua Treem, with respect to Sean Gordon, or with

25  respect to the interview of R.B. with respect to

1  Mr. Ravenell.

2          THE COURT:  So let's get to the real -- I

3  understand the facts of the case and the history of it.

4  The government is going to get up and say that

5  communications with R.B.'s lawyer indicate that he was

6  clearly on alert that he might be cooperating with the

7  government before they ever went to the jail.

8          But what I looked at and I think is

9  critical -- and it does go to your focus -- is what

10  right does the witness have to determine the parameters

11  of the interview.  You know, we looked at it very

12  carefully, and there's a lot of law out there, whether

13  it's state law or Fourth Circuit law.  And it is clear

14  that -- and even, you know, the cases that you cited,

15  *Edelstein* and the *IBM* case -- the witness gets to

16  determine the parameters of the interview as he or she

17  chooses and the restrictions that they put on what

18  questions they're going to answer, where the interview

19  is going to take place, whether there's going to be a

20  recording of the interview.  All of those are subject

21  to the witness' dictation.  It's not the lawyer

22  interviewing or the investigator that determines the

23  setting or the parameters of it.

24          Now, whether you look at the *Martinez* case or

25  whatever case -- I mean, everyone involved in trial

1   practice is going to be upset initially about the
2   surreptitious recordings of interviews.  When you look
3   at the law of it, that's where -- when you get over
4   the, quote, shock of a surreptitious interview, the
5   legal basis for it is quite narrowly driven by the
6   witness' preference.
7            So what if you have a witness who meets you
8   in a park and records the conversation on his cell
9   phone, he doesn't tell you that he's recording it, and
10  then he turns it over to the government?  Is that
11  improper?  What if there's a telephone interview being
12  recorded?  Is that improper?
13           MR. KAMENS:  That's a great question, and
14  it's one that I asked our expert, Professor Joy:  What
15  if the witness decides on their own autonomously to
16  record this confidential interview and then turns it
17  over to the government?  What the expert would say in
18  that circumstance is that that is a confidential,
19  privileged interview, and the government would violate
20  that privilege by accepting and reviewing that
21  information.
22           THE COURT:  What's privileged about an
23  interview between a witness who has no attorney-client
24  relationship and there's a third person in the room as
25  well?  What's the privilege there?

1          MR. KAMENS:  The privilege is from the work

2    product doctrine, that is, that interviews of witnesses

3    are fully protected by the work product doctrine.

4    That's true from the first case that recognized the

5    work product doctrine, *Hickman*, which specifically

6    involved an insurance investigator who did interviews

7    of witnesses and took statements from them.  The court

8    said that is fully privileged.

9          Now, can a witness potentially go back and

10   talk to the other side?  Yes, although the --

11         THE COURT:  Work product doesn't apply to the

12   witness.

13         MR. KAMENS:  It applies to the information.

14   It is a doctrine designed to protect the privacy of the

15   information.

16         Let me step back for a second.  We have,

17   essentially, arguments that arrive from the right to

18   equal access to the witness and arguments that derive

19   from the work product doctrine, and they have different

20   interests.  So the right to equal access is about

21   parity and equality.  So simply -- and the cases

22   reflect this.  When the government asks a fact witness,

23   "Hey, if the defense contacts you, can you let us

24   know," that's a violation of the right to equal access.

25   Why?  Because it is not a symmetrical access to the

1  witness.  The government has had an advantage in that

2  circumstance.

3           And so in that case that the Court mentioned,

4  *IBM v. Edelstein*, in that case, the district court

5  ordered both parties to take transcripts of their fact

6  interviews and exchange them.  It was a symmetrical

7  rule, and so that would not violate the right to equal

8  access because it was symmetrical.  But the court said

9  that it would violate the work product doctrine.

10          There are certain circumstances in which a

11 fact witness can decide on their own to provide

12 information to the other side.  But let me be clear:

13 That's not this case.  This case is not at a park

14 somewhere or at somebody's home.  This is in a jail,

15 and this is not a case where the government didn't have

16 any involvement in the surveillance of the interview.

17 This is surveillance instigated by the government, not

18 the witness.

19          It is a very different circumstance and, I

20 would say, it's a far clearer answer under the case

21 law.  The *Martinez* case is clear.  The *Shaygan* case

22 that we've cited to the Court is also clear, albeit in

23 the context of a motion for sanctions.

24          But if the Court were to take the radical

25 step of accepting the government's view here that, hey,

1  if a witness says they can do it, if somehow they

2  decide that they are able to take advantage of the fact

3  that they can surveil an interview, if you allow them

4  to do that without any case law suggesting that that is

5  the law, then you are authorizing secret surveillance

6  in every criminal case.

7          And the problem with that is that once

8  defense attorneys or investigators are subject to

9  investigation, they are absolutely required to withdraw

10 once notified.  That is a conflict.  It is a denial of

11 the Sixth Amendment right to counsel to the defendant.

12         The *Shaygan* case makes that very clear.  In

13 that case, the court said if the government is allowed

14 to engage in an unfounded investigation of witness

15 tampering -- which they didn't in that case.  They had

16 no basis to believe that the individuals in that case

17 would engage in witness tampering.  If you allow that

18 to occur without any cause, without any judicial

19 intervention, you essentially create an unwaivable

20 conflict in every case where the government makes its

21 own decision that that is what it seeks to do.

22         That's what happened in this case.  The

23 lawyer had no choice.  Once notified of the

24 surveillance and the investigation, they had to

25 withdraw.  So the court in *Shaygan* said, what happens

1  if that happens, they're notified on the eve of trial

2  or in the middle of trial?  They have to withdraw.

3         THE COURT:  Well, the facts here are very

4  different because the government didn't move to

5  disqualify counsel until after the letter was sent to

6  the judge.  And prior to that, there's no obvious

7  conflict.  Nothing has been created that --

8         MR. KAMENS:  The facts of the investigation,

9  Your Honor.  So whether the government moves to

10 withdraw or not, there's going to be a 2255 if the

11 defendant is convicted, and they would say, I was

12 denied the right to effective assistance of counsel.

13 Because the same U.S. Attorney's Office that was

14 investigating me was also investigating my lawyer.  My

15 lawyer, therefore, had a conflict.  It is a denial of

16 the right to counsel.

17        THE COURT:  Well, that's quite a leap because

18 there's no evidence that they're investigating the

19 lawyer at the time they record the interview.

20        MR. KAMENS:  Well, it is the fact of having

21 the recording that allows the government to decide that

22 they are investigating the lawyer for witness

23 tampering.

24        THE COURT:  It's the acts that the attorney

25 takes after the interview which decide whether the

1  lawyer now has a conflict.

2          MR. KAMENS:  Well, I think that it is because

3  the government has the ability to investigate

4  criminally the defense lawyer by virtue of the

5  surveillance itself, that creates the conflict.  And

6  once notified --

7          THE COURT:  What if they interviewed the

8  witness afterwards without it having been recorded and

9  the same events occur, the letter goes out to the judge

10 and they send the same notice?

11         MR. KAMENS:  Well, then there's a very clear

12 path.  And if the government wants to investigate the

13 lawyer, they have to create -- under the DOJ Manual and

14 under the requirements of the work product doctrine,

15 they would have to have a set of prosecutors, unrelated

16 to the original prosecution team, who would investigate

17 the lawyer for witness tampering or obstruction.  And

18 that is required because otherwise you are exposing the

19 same prosecution team involved in the original case to

20 the work product created by the lawyer.

21         That's exactly what happened here except

22 there was no independent team involved in the

23 surveillance of this interview.  There was no decision

24 to abide by what would otherwise require the steps of

25 getting an independent set of prosecutors, unrelated to

1  these gentlemen here, to engage in an investigation.

2  Because the government had no preexisting basis to

3  engage in the surveillance.

4          And so, as the Court has said, there are

5  allegations about Mr. Gordon engaging in an interview

6  from 2014, nothing that says that Mr. Gordon had any

7  intention of getting a false statement.  But in this

8  case, there is certainly nothing about Mr. Treem, and

9  there is nothing to suggest that the government had any

10 probable cause to believe that these defendants would

11 engage in obstruction when they went to interview R.B.

12         And, in fact, no obstruction occurred in that

13 interview.  The government has essentially conceded

14 that in the interview itself, there is nothing that

15 occurred in that communication that is untoward, that

16 is, there is no attempt to bribe, there is no attempt

17 to exert pressure.

18         THE COURT:  Certainly, there's Mr. Treem

19 talking about what he might be able to do to get the

20 witness' money returned to him, and that certainly was,

21 you know, a conversation that might lead someone to

22 think that he was currying favor with that witness to

23 get his cooperation.

24         MR. KAMENS:  In response to -- and as you can

25 see from the transcript, the witness says, I want my

1   money.  That's my main concern.

2           And Mr. Treem entertains those questions and

3   said he'll see what he can do.  He suggests getting

4   others counsel to represent the witness, to identify if

5   there are funds that he may be entitled to.  But there

6   is nothing in that interview that suggests in any way

7   that Mr. Treem is going to provide money in exchange

8   for favorable testimony.  In fact, it's quite the

9   opposite.  That's essentially the motivation for the

10  letter that is subsequently sent to a U.S. District

11  judge.

12          And so the government itself doesn't allege

13  that there is any effort on behalf of these individuals

14  here, Mr. Treem and Mr. Gordon, to provide anything of

15  value in return for favorable testimony.  And the

16  transcript is very clear that when R.B. says he will

17  provide whatever they want on the stand but here's what

18  the truth is, they don't try to dissuade him or say,

19  "Hey, why don't you stick to those exculpatory

20  statements you said the day before."  They don't say,

21  "We're going to make sure you get something for

22  sticking to those previous statements."

23          It's quite the contrary.  They say nothing to

24  suggest anything untoward.  And the problem is, if that

25  communication itself doesn't reflect any improper

1   conduct, then it is by every measure privileged

2   communications, an absolutely typical, common defense

3   witness interview.

4           We started with the claim that this was a

5   violation of the right to equal access, and the case

6   law with respect to the right to equal access to

7   witnesses is extremely clear.  The government, in fact,

8   doesn't even respond to the principal cases that we

9   have cited, *Ebrahimi*, *Gregory*, *Edelstein*, *Martinez*.

10          The Fourth Circuit has said that, quote,

11  equal pretrial access to witnesses is essential to,

12  quote, remove any inequity in the adversarial process

13  and satisfy the goal of professional parity implicit in

14  the Sixth Amendment guarantee.

15          Allowing one side to secretly record the

16  other side's confidential witness interviews and then

17  to prosecute the defense team based on that recording

18  is flatly inconsistent with this principle of

19  professional parity.  The defendant certainly didn't

20  get the opportunity to listen in on fact witness

21  interviews of the government, but by their own

22  justification, it would essentially allow defense

23  counsel to ask to have access to those interviews or to

24  secretly record them by whatever way they can.

25          And that itself is what is the consequence of

1   what the government is arguing about here and the basis

2   of their justification for their conduct.  Because

3   without an initial justification that the defendants

4   are engaged in misconduct or likely to engage in a

5   bribe or likely to engage in some other unethical

6   conduct, without any preexisting justification, then if

7   the Court were to allow what the government has done

8   here, it would authorize it in every case.

9           THE COURT:  The problem is you're dancing

10  around the equal access and the cases, whether it's

11  *Ebrahimi* or *Martinez*, frankly, or the other cases that

12  focuses on either the government discouraged the

13  witness from agreeing to speak with defense counsel,

14  they obstructed in some way the witness.  Here we don't

15  have any obstruction.  We don't have the witness

16  refusing to answer certain questions.  We don't have

17  the witness refusing to see Mr. Treem and Mr. Gordon.

18  So we don't have those --

19          MR. KAMENS:  With respect, Your Honor, nor do

20  we have that in these other cases.  So in *Martinez*, of

21  course, the defense lawyer was able to interview the

22  witness who just happened to be wired up by the

23  government.

24          In *Ebrahimi*, the government made two

25  requests.  One was notice if the defense contacted the

1  witness and, two, the request that the witness require

2  or ask that a law enforcement or a prosecutor be

3  present.  And so the first request, simply request for

4  notice, doesn't inhibit in any way the defense from

5  accessing the witness, nor does the request that the

6  witness ask for a prosecutor to be present.

7          In *Gregory*, the D.C. Circuit case, the

8  prosecutor explicitly, quote, did not instruct the

9  witnesses not to talk to defense counsel.  So the court

10 found as a matter of fact in that case that there was

11 no obstruction, no hindrance in the defense's ability

12 to set up an interview with the fact witness.

13         And obviously, in *Martinez*, there was no

14 obstruction or hindrance in the defense lawyer's

15 interview of the witness.

16         Yet, in all three of these cases, the courts

17 found a violation of the constitutional right to equal

18 access.  Because the right to equal access is not

19 solely about being able to meet and set up an interview

20 with the witness.  It's not squarely about necessarily

21 the privacy interests that are protected by work

22 product.  It is about equality.  It is about does the

23 defense have the same ability to meet the witness that

24 the government does.

25         Because there are areas of litigation where

1  the adversarial process requires equality.  So the

2  government has lawyers, and even indigent defendants

3  have lawyers.  The Rules of Evidence apply equally to

4  the government and to the defense.  Witnesses don't

5  belong to either party, and the ability of the defense

6  to interview witnesses, by virtue of the adversarial

7  system and the due process right, must be equal and not

8  in any way different from what the government has

9  setting aside specific rules that have substantial

10  basis, like grand jury investigations.  That's

11  different.  But here we're talking about an arbitrary

12  distinction between the defense's ability to interview

13  a witness and the government's.

14          And the reason that this is such a

15  significant case is because if the government were able

16  to simply surveil witness interviews to make an

17  accurate record, then so should the defense.

18          THE COURT:  All right.  Thank you.

19          MR. KAMENS:  The last justification for the

20  government's conduct I'd like to raise at the bench if

21  I could.

22          THE COURT:  All right.  Come to sidebar.

23      (Under seal Bench Conference B is under separate

24      cover, and then proceedings continued in open

25      court, as follows:)

1        MR. KAMENS:  Your Honor, can I make a few

2   comments about work product and state law, and then

3   I'll be done with my presentation?

4        THE COURT:  Go ahead.

5        MR. KAMENS:  With respect to work product, it

6   is a doctrine that's designed to protect the privacy of

7   a party's materials created in anticipation of

8   litigation.  It protects, as a general matter, against

9   a compelled disclosure of those materials in discovery.

10       So ordinarily, the Court acts as a neutral

11   arbiter between the parties.  One party seeks to

12   require the opponent to provide in discovery materials

13   that they believe should be disclosed either because

14   the privilege has been waived or there's good cause and

15   no other way to get that information.

16       And so in this case, for example, if the

17   government had learned that the defense had created a

18   video of this recording and went to the court and said,

19   "Your Honor, we would ask that the defense disclose

20   this recording to the government," the first question

21   that the Court would ask is, "Well, can't you interview

22   the witness yourself?"

23       Of course, they couldn't satisfy the showing

24   for the disclosure of that fact work product.  They

25   could never require the Court to order the disclosure

1  of opinion work product.  They can interview the

2  witness themselves.  They have that opportunity.  They

3  don't have a right to the defense's interview of the

4  witness.

5          In this case, the government decided to

6  exclude the Court from that process, to simply decide

7  to take what it wanted, to obtain what it calls an

8  accurate record of the defense interview without going

9  through the process that is set forth in the discovery

10 rules, that is, for the Court to be the neutral

11 arbiter.  That's why the work product doctrine does not

12 allow, in any circumstance like this, the government to

13 secretly surveil the opponent's fact witness interview.

14 It must go through the ordinary process set forth in

15 the rules.

16          And the last point I would say is that with

17 respect to this interview, which we now have a

18 transcript of and we've reviewed the video, there is

19 nothing in that video itself that would authorize the

20 government to obtain it under the work product

21 doctrine.

22          And so if the Court were to consider the

23 government's arguments about whether it could have

24 access to this video had the defense itself created it,

25 there's no way that they would be able to make a

1 showing to obtain that document.

2          The government also seeks to justify its

3 conduct by virtue of Arizona's law, and we have cited

4 to the Court the fact that the Arizona ethical rules

5 preclude the surveillance of an opponent's fact witness

6 interview.  We've also cited to Maryland's law which

7 would likely govern the conduct in this case.  The

8 ethical rules preclude this type of surveillance, and

9 the DOJ Manual itself also requires the use of an

10 independent team to investigate a lawyer had they had

11 any suspicion that the lawyers would engage in this

12 conduct.

13          Under the circumstances, we've asked the

14 Court to consider two alternative remedies.  One is

15 simply dismissal because this is so outside the bounds

16 of what is authorized and what is fair in litigation

17 that the Court should consider this such egregious

18 misconduct that it should dismiss the indictment in its

19 entirety.  Alternatively, we have asked the Court to

20 exclude this video from the government's case in chief

21 and to discharge these prosecutors who have had access

22 to it from the case.  Under the circumstances, we don't

23 believe there is any other remedy for the government's

24 misconduct.

25          THE COURT:  All right.  Thank you,

1  Mr. Kamens.

2        Mr. Wise -- I'm sorry, Mr. Trout.

3        MR. TROUT:  Yes, Your Honor.  I will be

4  brief.  But on behalf of Mr. Treem, you know, we do

5  have something to say about this.  And I want to

6  respond to the Court's inquiry about isn't it the

7  witness who has the authority, really, to decide the

8  parameters for the interview.  And I think the *Gregory*

9  case -- which the *Martinez* case, I think, correctly

10 describes as a watershed case -- really is an important

11 case to consider.  Because in that case, I believe the

12 point would be, yeah, the witness can say, yeah, happy

13 to have the investigator or the prosecutor sit in on

14 the interview.

15        And because that was an open, essentially,

16 situation where the defense lawyer then knew that the

17 prosecutor was going to be sitting in, they had reason

18 to complain.  And the D.C. Circuit said, And with good

19 reason.  You should complain, and you're right.  That's

20 afoul.

21        In this case, yes, maybe there was a

22 situation where the government basically said, We are

23 going to record this.

24        Apparently, the government is taking the

25 position, well, it wasn't the witness' recording.  It

1 was -- or it wasn't the defense interview of the

2 witness.  It was the government's interview that we get

3 the right to record.  I mean, that is, essentially, the

4 logic of what they're saying, that they're the ones

5 that get to decide whether it gets recorded.  That's

6 just not correct.  And if that is the law, then *Hickman*

7 and *Upjohn* and *Nobles*, these Supreme Court cases have

8 no vitality anymore, and no one looking at the risk

9 that their defense witness interviews of important

10 witnesses in a criminal case -- no lawyer would expect

11 that their -- or should expect that their interviews

12 should be confidential and protected by the work

13 product doctrine.

14        Your Honor, the other point that I would make

15 is you raised a question about what happened during the

16 course of the interview, and I think perhaps Mr. White

17 mentioned this.  But there is nothing wrong with a

18 lawyer in an interview of a witness choosing to be nice

19 to the witness as opposed to alienating the witness, to

20 be inviting to the witness as opposed to being hostile

21 to the witness.  There is nothing wrong in responding

22 in a way that is designed to keep the conversation

23 going and to invite information from the witness.

24        There is nothing that happened in that

25 interview that was at all inappropriate.  In fact, the

1   government, I believe, has conceded the point when they

2   said the first time there was a crime in this case,

3   according to the way they see it, was only after the

4   interview when the government says Mr. Treem

5   mischaracterized -- the defendants mischaracterized

6   what happened at the interview.  There is no allegation

7   in the indictment or anywhere else suggesting that

8   anything happened at the interview that was at all

9   inappropriate.

10          Your Honor, as you know, we have filed our

11  own separate motion to exclude privileged evidence.  I

12  wanted to speak on the issue of what constitutes

13  opinion work product.

14          THE COURT:  All right.

15          MR. TROUT:  I wanted to speak on the issue of

16  waiver, an issue that, I think, was raised by Mr. Wise,

17  and I also wanted to speak to the issue of the crime of

18  fraud.  I'm happy to let Mr. Wise speak to some of

19  these issues, but if you'd like me to continue --

20          THE COURT:  Go ahead.

21          MR. TROUT:  All right.  Your Honor, I've made

22  the point that if the government choosing to tape the

23  witness interview constitutes a work-around of the work

24  product doctrine, then basically this will become a

25  routine part of the government's playbook, and the work

1  product doctrine is going to be eviscerated.  And I

2  don't believe the courts will tolerate that.  That is

3  true, Your Honor, for the videotape of the interview.

4         Let me talk about the KWR combined notes.

5  Now, it happens -- and we know this because of the

6  government's interview.  It happens that Mr. Ravenell

7  was the source of all of the things that Mr. Treem

8  presented to the witness for inquiry.  But when

9  Mr. Treem took that information that he got from his

10 client and made it his own as what he wanted to find

11 out from the witness, that became his work product.  It

12 was his expression of his judgment of what would be

13 helpful in defending his client.

14        Suppose, rather than actually giving the

15 document to R.B. to read and to respond to, Mr. Treem

16 had kept the document and simply asked questions off of

17 that document.  Is there any question that that

18 document would be treated as work product, opinion work

19 product?  I think the answer is no, there's no question

20 that it would be treated other than as opinion work

21 product.

22        His signature on the document would simply

23 and explicitly -- simply an affirmation that this is

24 the document that he had reviewed the day before and

25 responded to.  And that was accurate.

1          On those occasions when a party is entitled

2  to get work product, Your Honor, there is a showing of

3  particularized need because the information in the

4  document is -- the facts in the document are needed and

5  can't be otherwise procured.  In this case, the

6  government says, Those aren't facts.  Those are

7  falsities.  We don't need that in order to establish

8  the facts in there.

9          And so in cases, I submit, where there is a

10  showing of particularized need for fact work product,

11  those cases really do not apply here.  But as I've

12  said, I think it's pretty clear that the document in

13  question is really opinion work product.

14          Now, not only are the individual questions

15  opinion work product, but his handwritten notes are

16  also on this document.  He went through, and he made

17  check marks.  As the indictment points out, when they

18  left, his check marks were not on that document.  It

19  was only thereafter that he wrote down check marks to

20  indicate his thinking as to what he had been told.

21          And the government, of course, points out

22  that, actually, he checked off his thinking was that on

23  Items 23 through 26, I guess it is, he thought he had

24  gotten affirmative responses.  And the government

25  points out, as a result of having the recording, that,

1  in fact, he was wrong, and they want to prosecute him

2  for being wrong in his thinking.  And the way they

3  intend to prosecute him is to use his work product.

4          Let me talk about waiver, Your Honor.  The

5  government in effect says that whenever a lawyer

6  interviews a third-party witness, the lawyer is waiving

7  attorney work product to whatever is discussed between

8  the lawyer and the witness, the third-party witness.

9          And, again, Your Honor, I think this doctrine

10  that they want to propose of waiver eviscerates the

11  work product doctrine.  You cannot have a work product

12  doctrine where witness interview information is

13  protected by the work product if the idea that if you

14  have the interview in the first place, you've waived

15  work product.

16          Here, as far as Mr. Treem was concerned, R.B.

17  was not cooperating with the government.  He had no

18  intention of cooperating with the government.  He was

19  very insistent that whatever was said there would not

20  go outside this room.  He was very concerned about

21  that, made that very clear to Mr. Treem, and Mr. Treem

22  was equally insistent that under no circumstances --

23  this was his work product and under no circumstances

24  was it going to go to anybody else, including to R.B.'s

25  lawyer.  This was Mr. Treem's work product.  Everybody

1   understood that, the witness as well as Mr. Treem.

2           And so this is simply not a case where the

3   Court will be able to point to any other authority to

4   say this is a circumstance warranting the doctrine of

5   waiver.

6           Your Honor, let me turn to the issue of crime

7   fraud.  The government says that Mr. Ravenell is

8   guilty.  The government says they have evidence proving

9   that he was laundering money, he was trafficking in

10  drugs, and they say that they have evidence that when

11  Mr. Ravenell was representing his client, R.B., who was

12  involved in the drug trafficking, they say, and the

13  money laundering, that he was trying to obstruct

14  justice because he was trying to get witnesses to say

15  things that they say were not true.

16          Everything that the government says that

17  Mr. Ravenell did as part of the alleged money

18  laundering, as part of the alleged drug trafficking,

19  and as part of the alleged obstruction of justice or

20  tampering with witnesses, all of that occurred no later

21  than 2014.  Your Honor, there's not so much as a hint

22  of any involvement by Mr. Treem in any of that.

23          2014 is the year that Mr. Ravenell learned

24  that he was under investigation, and so he did the

25  appropriate thing.  He hired a lawyer to help him.  The

1  lawyer he hired was not Mr. Treem.  So it raises the

2  question:  When he hired this other lawyer, what is the

3  case that he, Mr. Ravenell, was using that lawyer to

4  commit a crime and what was the crime that he was using

5  that lawyer to commit?

6         Now, presumably, the government would say he

7  wanted the lawyer to defend him against the

8  government's criminal case.  The crime he was using the

9  lawyer to commit was the crime of obstruction of the

10 government's case.

11        So if we deconstruct the government's

12 argument, when Mr. Ravenell hired a lawyer to represent

13 him, he knows he's guilty, Mr. Ravenell -- the

14 government would say he knows he's guilty.  So when he

15 asked the lawyer to take action calculated to defend

16 him, he's asking the lawyer to help obstruct justice,

17 and that is the crime, presumably, that the government

18 would say he hired the lawyer and he used the lawyer to

19 commit.

20        That's just not the way the justice system

21 works, Your Honor, and it's not --

22        THE COURT:  That's not the government's

23 argument either.  I mean, if you want to apply the

24 crime-fraud exception, let's get to the documents that

25 we looked at and reviewed and that the Court has gone

1   over, the special master has reviewed and gone over and

2   focus on that.

3             MR. TROUT:  Well, Your Honor --

4             THE COURT:  We don't have all day here.  I

5   know the facts of the case.  I've read the briefs

6   carefully.  I've looked at the law.  I'm here to get

7   the succinct arguments that you have developed after

8   having gotten the parties' positions to help me further

9   the decision-making process.

10            MR. TROUT:  Okay, Your Honor.  All right.

11  Well, what I'm focused on is Mr. Treem, who wasn't

12  hired until 2016 --

13            THE COURT:  Right.

14            MR. TROUT:  -- and what did he know, what did

15  he do.

16            THE COURT:  Let's assume that he is

17  representing his client zealously.  He has no evidence

18  that Mr. Ravenell was having Mr. Gordon do anything

19  that was unethical.  Start there.

20            MR. TROUT:  Very well.  Your Honor, so he

21  gets a call from R.B. saying, I need to see you

22  immediately.  I have exculpatory information.

23            Of course, he has to go down and interview

24  the witness.  And as we've talked at some length, I

25  guess the Court would say about what happened at that

1   interview, nothing inappropriate happened at that

2   interview.  And so one question is, so what is the

3   crime-fraud justification for getting the attorney work

4   product at that point?  And the answer is there is

5   none.

6          And so the government would say, Fair enough.

7   At least there was no crime then.  The crime came in

8   the mischaracterization of what happened at the

9   meeting.

10          Well, I don't -- you know, I have addressed

11   in the search warrant -- we sought to deconstruct the

12   search warrant.  I don't think that I need to go

13   through that anymore.  But suffice to say, they have

14   abandoned whatever insinuations they had in the search

15   warrant of misconduct by Mr. Treem.  They have largely

16   abandoned in the superseding indictment, and there's

17   nothing in the briefing that seeks to resurrect some of

18   those issues.

19          And so what is it that Mr. Treem did?  It's

20   really focused on the letter that he wrote to the

21   federal judge, it seems to me.

22          If the Court wants, I can address the Gordon

23   affidavit.  I'm sure Mr. Kamens can address it as well.

24          But let's focus on the letter to the federal

25   judge.  As the Court knows, the search warrant had a

1   theory about why that was obstructive.  You can't find

2   any reference to that in the superseding indictment,

3   and you can't find anything about that in any of the

4   briefing that's occurred and with good reason.  I don't

5   want to belabor that point.

6            So where they are, Your Honor, is they have

7   alleged that this was a false representation of a

8   letter that was intended to serve up as evidence in

9   case Mr. Treem, the author of the letter, was to be a

10  witness at the trial where he would be expected to be

11  the lawyer for R.B.  At the time he wrote the letter,

12  he was the lawyer for R.B.  If there was going to be a

13  trial, he would be the lawyer for R.B.

14            THE COURT:  Mr. Treem would be the lawyer for

15  R.B.?

16            MR. GOLDSTEIN:  Ravenell, lawyer for

17  Ravenell.

18            MR. TROUT:  I'm sorry, Your Honor.  He would

19  be the --

20            THE COURT:  Right.

21            MR. TROUT:  Mr. Treem was going to be the

22  lawyer for Mr. Ravenell --

23            THE COURT:  Right.

24            MR. TROUT:  -- at any trial.  And the

25  government's position, as set forth in the superseding

1  indictment, is that this document in 2018 was created

2  in order for it to be evidence of a prior consistent

3  statement of Mr. Treem, if he was going to be a witness

4  in the trial of Mr. Ravenell, where Mr. Treem would be

5  Mr. Ravenell's lawyer.  That's their theory.

6           And, Your Honor, that just cannot happen.  It

7  could not happen, and their theory is that it's not --

8  the letter basically is very clear as to what it's

9  purpose was, and they're basically saying, no, that was

10 not its purpose.  Its purpose was something else that

11 could not happen, which is that the letter itself could

12 be evidence in the trial that Mr. Treem was conducting

13 on behalf of Mr. Ravenell.

14          And that's why, Your Honor, in one of our

15 briefs, we pointed out that if Mr. Treem had written

16 the identical letter to a distant cousin, it would have

17 the same evidentiary value as a letter that he wrote to

18 a federal judge, which he wrote, he said -- and the

19 letter is very clear about that.  He wrote the letter

20 in order to make a record that there was a shakedown

21 effort on the part of a witness.  And he wasn't going

22 to be part of it, but he wanted to make a record.  This

23 is important.  This matters.  We take it seriously.

24 We're not going to have anything to do with it, and

25 that's it.  That was the sum total of what he was

1   communicating.

2           He was under no obligation to put anything in

3   that letter that his client didn't consent to.  He was

4   under no obligation to put anything in that letter that

5   was adverse to his client.

6           THE COURT:  Well, that's not what he's

7   charged with doing.  He's charged with false

8   representations in the letter that he knew were false,

9   and that's why he's charged.  He is not charged because

10  he failed to include all of the information that was

11  included in the interview, but the fact that he made

12  material misrepresentations to the judge.

13          MR. TROUT:  Well, Your Honor -- and I think

14  this -- what I would point out is that the differences

15  between -- as we have described it, whatever he

16  misremembered, whatever details that he misremembered

17  and that he put into that letter were not material to

18  the purpose of the letter.

19          THE COURT:  Well, now you're arguing -- well,

20  all right.  I understand your argument.  I'm not sure

21  it doesn't go to whether the government ultimately

22  proves its case in front of a jury, but it's just in

23  terms of the sufficiency of the indictment.  And when

24  you're looking at the crime-fraud exception, the

25  notations that Mr. Treem makes on the notes and the

1   second day where he, you know, very clearly identifies

2   the fact that R.B. has changed his story entirely and

3   that from the first day, that's the *gravamen* of the

4   offense in the indictment.  That's the evidence which

5   the government says falls under the crime-fraud

6   exception, and I found that previously, that it falls

7   under the crime-fraud exception.

8           MR. TROUT:  So, Your Honor, what happened on

9   the 9th, on September 9th happened.  He made these

10  exculpatory statements.  Whether they were true or

11  false, it's beside the point.  As we pointed out, the

12  fact is he made them, and it's proper impeachment to

13  use.  The fact that he is changing his story is

14  perfectly appropriate if he gets on the witness stand

15  at some later point and gives information that is

16  contradicted by what he had said on the 9th.  And

17  that's perfectly appropriate impeachment.

18          You know, a jury would decide what's true,

19  you know, or is the jury basically saying, well, this

20  person just talks out of both sides of his mouth at any

21  one time.  We're not going to believe a word he says.

22  That's a perfectly appropriate argument to be making to

23  a jury.

24          So what should he have done that he didn't do

25  on the 10th?  I submit, Your Honor, there's nothing

1  that he should have done different on the 10th.  In

2  fact, as R.B. was kind of talking about needing money

3  on the 10th and going back and forth about this is what

4  I'm willing to say but this is what the truth is and I

5  need money, Mr. Treem appropriately shut down the

6  interview and in a polite, appropriate, friendly way

7  says, I've got to think about this.  We need to shut

8  this down.  And he left.

9            And then what happened is that in -- he

10 didn't go back and report anything to the federal judge

11 promptly.  What happened is that in January, he got an

12 unmistakable shakedown call or -- he didn't, but

13 Mr. Gordon did.  And the import of that was

14 unmistakable, what to do about that.  And, Your Honor,

15 I submit some lawyers would just have blown it off and

16 said, I'm not going to do anything.  Mr. Treem, in

17 consultation with his client, thought that that was not

18 the appropriate response, that they ought to say

19 something.  And so they wrote to the judge.  I think --

20 and Mr. Treem reported, you know, what he recalled of

21 the conversation some five months before.

22            I think any number of perfectly ethical

23 lawyers might well have done the exact same thing, Your

24 Honor.  They may have misremembered something here.

25 They may have misremembered something there, but I

1  just -- it seems so clear that this was the action of a

2  lawyer representing his client in an appropriate way.

3  Your Honor, that is not obstruction of justice.

4            THE COURT:  All right.  Thank you.

5            Mr. White.

6            MR. WHITE:  Thank you, Your Honor.

7            Your Honor, just a couple of very brief

8  points on the equal access motion.  I want to go back

9  to an observation that you made that the unifying

10 principle that you see in these cases -- and maybe I'm

11 drawing a little too much from them, but one of them is

12 that the witness gets to decide the parameters.  I

13 actually think that's a really elegant, useful,

14 unifying principle for a very dense set of cases that

15 can be hard to draw those out of.

16            THE COURT:  It could go both ways, right?

17            MR. WHITE:  Exactly.  And I think it does

18 help make sense of these cases.  The problem in this

19 case is the witness didn't decide the parameters.  The

20 government did.  The witness did not make the decision

21 to record.  The government made the decision to record,

22 and that's a critical difference.

23            Because the reason that typically in a -- I

24 think one way to think about it is flip it over and

25 think about what would happen if it were the other way

1    around.  So I, as a defense lawyer, have a witness who

2    I know the government is going to put in the grand jury

3    and is going to interview before the grand jury.  I

4    know that interview is set up, and I tell the witness:

5    I'll tell you what.  I want you to go in there, and I

6    want you to surreptitiously record.  And I want you to

7    draw out from the government everything you can about

8    their thoughts and impressions and theories of the case

9    because I really don't know what that's about.

10           I have no doubt, given what Mr. Treem is

11   facing now, that I would be facing an obstruction of

12   justice investigation if I caused the witness to do

13   that.

14           THE COURT:  What if you tell them to go in

15   and talk to the government lawyer in his office or in a

16   neutral place and do the same thing and it's not in the

17   grand jury?  Take the grand jury out.

18           MR. WHITE:  Take the grand jury out.  I

19   agree, Your Honor, because that's a very different

20   setting.  I have no doubt the government would view

21   that as improper conduct, as conduct that obstructed

22   their investigation.  And the reason is -- the very

23   reason is -- it goes straight to the heart of the

24   reason when there is an underlying investigation that

25   the Department of Justice Manual requires different

1 prosecutors to be assigned to investigate the lawyer.

2 Okay.  That was ignored here.  It was intentionally

3 ignored here.  The same lawyers did both.

4        The problem is when you start investigating

5 the lawyer, you can get access to impressions.  You can

6 get access to attorney work product, which you're not

7 supposed to have.  And if the government gets access to

8 that information, then they are tainted.

9        They ignored that here to their own

10 detriment.  They got something that they weren't

11 supposed to get.  The government would agree -- and the

12 case law is very clear -- that they couldn't tell that

13 witness, You're only allowed to talk to the defense

14 lawyers if I'm there.

15        They can't do that.  That would require

16 dismissal.  If they can't do it that way, they can't do

17 it surreptitiously, which is exactly what they did

18 here.  They told the witness without telling the

19 defense lawyer:  You're not allowed to talk to him

20 without us being there.

21        Because that's what this was.  That was them

22 being there.  They violated that principle.  If it's

23 the case that they can't do it overtly, then certainly

24 they can't do it surreptitiously, which is exactly what

25 they did here.  That's where the problem comes in.

1  It's not that the facts are privileged or protected in

2  any way.  The witness doesn't belong to either side.

3  That's very clear and well-established.  But the

4  attorneys' impressions, those do belong to the

5  attorney.

6          And if it were the case that any witness

7  who -- if the government's argument about waiver would

8  go well beyond the circumstance here.  I'll give you

9  this example.  If it's the case that a witness says, "I

10  waive any potential protection over this information,"

11  that there was -- if there was a waiver by the lawyer

12  every time the lawyer interviewed a nonparty witness --

13  that's the example I want to give.

14          THE COURT:  All right.

15          MR. WHITE:  -- then it would be routine, Your

16  Honor, in discovery in every case.  Civil, criminal, it

17  doesn't matter.  It would be routine for the notes of

18  those interviews of the attorney to be produced every

19  time.

20          THE COURT:  What if the lawyer turns the

21  notes over to the witness and says, Let's go over these

22  notes and go over them, go down the list, and provides

23  the work product to the witness?

24          MR. WHITE:  Your Honor, that, in part, is

25  applicable here, but there's a lot more that is

1   applicable here than that.  So even if I were to

2   concede -- I want to think about that a little more

3   because I do think that is still the attorney's work

4   product.  Now, when it's signed and then submitted to a

5   third party perhaps, maybe that's different.  Here it

6   was not.  I think there actually are cases that say

7   even a signed witness statement is attorney work

8   product and does not get turned over.

9            THE COURT:  Mr. Goldstein handed you a note

10  there.

11           MR. WHITE:  *Hickman*.  That's exactly what I

12  was going to say, but he got there before I did.  So

13  *Hickman* is that case.  I think, actually, that doesn't

14  change the analysis, but it's worse than that here.

15  Because they also have access to all of the thoughts

16  and impressions about the case as a whole.  It's not

17  just that one document.  They got the whole shooting

18  match, which they could not have insisted on getting

19  otherwise.  They couldn't have said, You're not allowed

20  to talk to him unless we're there.  Everybody agrees on

21  that.  If they can't do it overtly, how can they do

22  covertly?  And I do think that --

23           THE COURT:  You can go back and interview him

24  afterwards and take all the questions that were asked

25  and his mental impressions of the attorney interview

1 and get it that way, but they can't get it --

2          MR. WHITE:  They certainly can do that.  This

3 would be true -- as I was mentioning, Your Honor, this

4 would be true in nearly every case, right.  If it were

5 every time an attorney interviewed a witness, then it

6 would be a routine discovery request to say, "We want

7 your notes of that interview."  They don't get that.

8 They never get that without this heightened showing.

9          As Mr. Kamens said, they decided to just take

10 surreptitiously what they could not get otherwise

11 because they didn't have the basis to do it.  I think

12 that's the real nub of the problem here, and it goes to

13 the Court's observation in the beginning, that it's the

14 witness who gets to set the parameters, and the problem

15 is that the witness didn't set them here.  The

16 government just took it.

17          THE COURT:  Okay.  Thank you, Mr. White.

18          All right.  Mr. Wise, do you want to --

19          MR. WISE:  Your Honor, may we approach just

20 on one issue that the attorneys addressed for the

21 record?

22          THE COURT:  Yes.

23          MR. WISE:  Thank you.

24     (Under seal Bench Conference C is under separate

25     cover, and then proceedings continued in open

1       court, as follows:)

2               THE COURT:  Please go ahead, Mr. Wise.

3               MR. WISE:  Thank you, Your Honor.

4               Your Honor, I'll be brief.  It's very clear

5    Your Honor is very familiar with the facts and the

6    pleadings.  I'll try not to be repetitive of what's in

7    the lengthy and detailed indictment and the pleadings.

8               But let me be clear on this issue -- which

9    it's interesting -- they're now calling the equal

10   access to witnesses.  I think it does not actually

11   appear in the title of their motion.  It seemed to be a

12   motion about the recording.  So I'm going to address

13   the equal access to witnesses point briefly.  Then

14   Mr. Maddox will address the work product privilege

15   issue since that straddles both this motion, which I

16   happened to work on the response to, and Mr. Maddox

17   worked on the response to their motion to exclude

18   privileged materials.

19              But at the outset, let me be clear.  The

20   government acted honorably and conducted a thorough and

21   professional investigation in this case in full

22   accordance with the law, and the defendants' lengthy

23   filings on this pile outrage on hyperbole on shock to

24   the conscience and screws in the rack, but it offers

25   very little in terms of authority for the position

1    they're taking.  And it is their motion.  They are the

2    ones seeking the radical remedy of dismissing the

3    superseding indictment in this case.

4            In terms of equal access to witnesses and the

5    argument and the cases they have cited, which we did

6    address, they all stand for the proposition that the

7    government cannot interfere or prevent a putative

8    defendant's ability to interview witnesses.  That did

9    not occur here.

10           Mr. Treem on a dozen occasions attempted and

11   had contacts with lawyers for R.B.  He was a

12   represented party at the time.  Those lawyers set the

13   parameters of the interactions that would be had with

14   R.B.  At no point was the government involved in any of

15   that, and at no point did the government ever tell any

16   witness in this investigation not to talk to defense

17   lawyers or ask to be present when defense lawyers

18   interviewed witnesses.  There simply is no equal access

19   issue.

20           I'll briefly address the *Martinez* case and

21   then the *Shaygan* case.  That may bleed as well into

22   Mr. Maddox's argument.  We're trying to keep them as

23   separate as we can.

24           As Your Honor has laid out in the

25   hypothetical situation, the *Martinez* case seems to draw

1  this very false distinction between being able to

2  debrief a witness for all of the information that might

3  have been captured in a recording and somehow tries to

4  say, on the one hand, the debrief is allowed and, on

5  the other hand, the recording is not.  It is simply a

6  distinction without a difference.

7          This is, in fact, a decision of a New Jersey

8  intermediate appellate court.  There isn't a single

9  federal case they cite that addresses on all fours the

10 facts in this case.

11         Just jumping ahead, *Shaygan*, if I'm

12 pronouncing it right, is not that case.  *Shaygan* was a

13 vindictive -- the way the opinion reads was apparently

14 a vindictive prosecution.  There were concessions made

15 that it was a vindictive prosecution.  It was not about

16 the propriety of recording an interview.  It was about

17 the motivations of the prosecutors in bringing a

18 superseding indictment.  That is not at issue here.

19 That is not at issue here.

20         Briefly addressing *Martinez*, since they do

21 raise it in both of these contexts -- the Court draws,

22 essentially, three principal distinctions between a

23 debrief and a recording.  They say that the government

24 could play back the recording and somehow that's an

25 unfair advantage.  Again, we're talking about

1    misconduct here.  Well, that ignores the fact that the

2    government can debrief a witness.  And if a witness has

3    a good memory and is descriptive, the government can

4    have a rich and detailed account of that interview that

5    the government can review as many times as it wants.

6              The Court said that the interviewee may say

7    things to please the government if he is taped, what

8    the New Jersey court called the observer effect.  So

9    that presumes that an interviewee will lie if he knows

10   something is being recorded, but the interviewee has

11   the same incentive to lie if he's recorded as he has to

12   lie in a debrief.

13             In fact, it's easier for the interviewee to

14   say one thing in the interview and then another thing

15   to the government if there isn't a contemporaneous

16   recording of what was actually said.

17             Finally, the New Jersey court said a

18   recording can reveal the tenor of the discussion and

19   other intangibles about a witness that can be of great

20   tactical value to an experienced trial attorney.

21   Again, a witness can reveal the tenor of the discussion

22   during a debriefing session.

23             I, frankly, have no idea what intangibles

24   about a witness even means.  Anything you can see on a

25   video in terms of someone's demeanor, facial ticks,

1  tells that look like they're lying, a good witness can

2  describe to you.  The court doesn't even say what these

3  intangibles mean, which is further proof of how poorly

4  reasoned the opinion is.

5        That's the only case they cite that

6  specifically addresses the facts that we're presented

7  with here.  As I said, *Shaygan* is far, far afield from

8  what we've seen here.

9        THE COURT:  So I asked Mr. White:  What if

10 the shoe was on the other foot and the witness is being

11 interviewed by the government instead of by defense

12 counsel and whether that would present any issues.

13 What's your response to that?  If you find out that a

14 defense witness, who you believe is going to testify

15 for a defendant, has made a recording of your

16 interview?  What legal measures can you take?  What

17 legal issues does that present?

18        MR. WISE:  None under federal law that I'm

19 aware of.  If it's a dual-consent state, like Maryland

20 is, there may be a state law violation.

21        THE COURT:  Any ethical issues?

22        MR. WISE:  I don't see any.  In fact, I'll

23 say this, Your Honor:  I occasionally get phone calls.

24 Sometimes I've had inmates that will call me from jail

25 and try to talk to me, or I'll get folks that want to

1    provide a tip or something.  I always assume I'm being

2    recorded, and I'm also careful about what I say.

3    Because I imagine -- if this was played publicly --

4              You know, I had someone call me recently, and

5    they had an allegation against a politician.  They

6    said, "Well, you know that so-and-so is paid to play."

7    The first thing that crossed my mind is I could be

8    recorded.  And if this is played, it would be

9    embarrassing to the Justice Department and embarrassing

10   to me.

11             So in answer to your question, I have no

12   expectation that anything I say to a witness -- and we

13   talk to witnesses all the time that are friendly to

14   defendants.  I have no expectation that information is

15   not going back to the defendants, to their lawyers, and

16   will be used strategically or in other ways.

17             THE COURT:  So how does that play into

18   Mr. Treem's expectations that he was aware that R.B.

19   might be cooperating and that he has conversations with

20   or inquiries about that with counsel and then goes into

21   the interview?  Does that play at all into your

22   reasoning about the use of the recording?

23             MR. WISE:  I think it further establishes why

24   it is not the radical system shaking catastrophe that

25   the defendants have pointed out.  I think every good

1   experienced criminal defense attorney knows that when

2   they talk to someone, hypothetically, that person can

3   be saying what they -- they can be relaying that

4   conversation to their own lawyers, to third parties, to

5   the government, to whomever.  Because the defense

6   lawyer doesn't get to decide what someone they don't

7   represent says or doesn't say.

8           Mr. Treem had a right to resist a subpoena,

9   and this is a distinction they keep blurring.  He has a

10  work product privilege right.  He has a duty of

11  confidentiality to his client.  So if we say, "You tell

12  us what was said in that interview," he can say, "No, I

13  have a work product privilege."  But he can't say

14  anyone I interview, if you go to them, you can't ask

15  them what I asked them.  That's what he can't say.

16  That's what work product doesn't cover.

17          And so when they keep bringing up -- first of

18  all, Justice Department policies are clearly in the DOJ

19  Manual and in every place they're printed say these do

20  not create substantive rights for defendants.  So the

21  idea that they keep citing them is of no moment.

22          As a factual matter, they don't actually know

23  what happened in the course of the investigation.  So

24  they're marking claims without any facts in the record

25  to support them even if these policies did create some

1  kind of right.

2            I look in *Shaygan*, the policy that they

3  claim -- the Department of Justice policy they claim

4  was violated was actually a policy in that U.S.

5  Attorney's Office that said you have to tell the U.S.

6  Attorney if you open an investigation into a lawyer,

7  and that was not done.  So it's a sort of a -- you

8  know, it's a shading.  Like a catcher, these are balls

9  that are being thrown, and there's sort of shading to

10 make them look like strikes.  These cases are not

11 strikes.

12            THE COURT:  Go ahead.

13            MR. WISE:  In terms of just briefly a couple

14 of other things they brought up, there was mention of

15 having probable cause to make a recording.  There's,

16 obviously, nothing in the law that says the recording

17 has to be made based on probable cause.  There's simply

18 no support for that.

19            You know, what's interesting is Mr. Treem --

20 you asked a question about the various ways in which

21 Mr. Treem offered to help R.B. in the first course of

22 that meeting.  And Mr. Trout said there's nothing wrong

23 with that.

24            But what's wrong is that Mr. Treem then lies

25 to the judge about what happened in that interview in

1 the letter, and that's what -- I know Your Honor knows

2 these facts, so I'm not going to belabor the point.

3 But the version of events that's laid out in that

4 letter is just not what happened in that room.  That,

5 in terms of the letter, is the heart of the matter.

6 When Mr. Treem writes to the judge that on the

7 following day, when we returned to continue our visit,

8 R.B. stated that the statements were accurate.  No, he

9 didn't, and the indictment makes that clear.  He said

10 just the opposite.

11        He then began to complain about not having

12 access to money that he claimed was owed to him -- this

13 is all quoted in the indictment -- that he wanted for

14 his family.  And then at that point, concerned that

15 these statements sounded extortionist, we reminded

16 R.B. that we represented Mr. Ravenell, and if he

17 had any complaints about money that he believed he was

18 owed, he would need to raise those with his counsel.

19        That's not what happened.  They spent hours

20 on the first day talking about this money.  It didn't

21 just come up after he had agreed with the false

22 exculpatory statements, which didn't happen on the

23 second day.  Mr. Treem tried over and over again on the

24 first day.  He offered things that he would do to help

25 him.  He would get him a lawyer.  He would go to the

1  lawyer for the law firm that had his escrow money.  He

2  would go to the media to embarrass the prominent

3  lawyers that this investment was made through.

4         So this attempt to reframe the issue away

5  from the allegations in the indictment, I think, as

6  Your Honor has asked questions about, is not a basis

7  for dismissing the indictment.

8         Much of what the defendants say are factual

9  arguments, and the jury will have to decide that.  The

10 jury will have to decide the truth or falsity of the

11 letter based on what went on in that room.  There is

12 nothing wrong.  There was no misconduct in making that

13 recording in order to preserve what went on in that

14 room precisely so that when we came to a proceeding

15 like this, we knew the truth.

16         As I said, Mr. Maddox will address, I think,

17 further the privilege issues, and I'll sit down at this

18 point.

19         THE COURT:  All right.  Thank you.

20         Mr. Maddox.

21         MR. MADDOX:  Thank you, Your Honor.

22         I will also be brief because we've covered a

23 lot of ground here.  Just to touch on a few key points,

24 the recording of the interview, I think that we sort of

25 glossed over this point, but it wasn't work product at

1   the outset because it wasn't created by an attorney.

2           This is not the *Hickman* case.  The *Hickman*

3   case had to do with an attorney being required -- or

4   being asked to turn over notes of interviews that that

5   lawyer had participated in.  This would be the

6   attorney's work product, and that's not what this case

7   was about.

8           The defense even concedes here that

9   everything that was presented during the interview --

10  we're even now talking about the words of Mr. Treem and

11  the questions that he posed to R.B.  He said that all

12  of that, everything that he presented, had come from

13  Mr. Ravenell.  So even those weren't work product

14  because those were facts.  There was a listing of facts

15  that had come through their client.

16          And they were disclosing this information --

17  and this is the key point, Your Honor.  They were

18  disclosing this information to an uninterested third

19  party that did not share their interest in the

20  litigation that they foresaw.  For that reason, any

21  privilege that may have otherwise applied to anything

22  that Mr. Treem said or anything that Mr. Gordon said,

23  that privilege would have been waived.  The law is

24  clear on this point.

25          It's true:  R.B. had information that was

1  relevant to the investigation of Mr. Ravenell, but he,

2  again, did not have a personal interest in

3  Mr. Ravenell's case.  They were not parties to a joint

4  defense agreement.  They did not share a common

5  interest.  If anything, R.B.'s interests were adverse

6  to Mr. Ravenell, and that was some cause of concern on

7  Mr. Treem's part, as laid out in the search warrant

8  affidavit.

9         But aware of the risk that R.B. may turn the

10  information over, Mr. Treem decided to participate in

11  the interview anyways.  And for that reason, he ran the

12  risk and waived any privilege that would have otherwise

13  applied to any comments that he made during the

14  interview.

15         As recently as May, Your Honor, another judge

16  of this court issued an opinion that pretty well wraps

17  up the law concerning waiver and disclosure.  It

18  applies directly to this case.  This was the decision

19  of Judge Boardman in the case of *Johnson v. Baltimore*

20  *Police Department*.  Judge Boardman was a magistrate

21  judge at the time.  She's now been elevated to district

22  judge, and this was a case presided over by Judge

23  Hollander.  In that opinion, Judge Boardman wrote,

24  "...disclosure to a third party amounts to waiver if

25  'it has substantially increased the opportunities for

1   potential adversaries to obtain the information.'"

2          In the case of *Johnson*, the plaintiff's

3   counsel had asserted work product protection for a

4   compilation of documents that they showed a witness

5   before his deposition when the defendant sought to

6   question the witness about the documents.  So they

7   asserted work product privilege.  Judge Boardman

8   disagreed finding the fact that they waived it to an

9   uninterested third party, who effectively disclosed it

10  to an uninterested third party, waived any privilege

11  that applied.

12          In coming to that conclusion, Your Honor,

13  Judge Boardman relied upon the prior opinion by Judge

14  Chasanow that made a similar determination, as well as

15  a Fourth Circuit decision, *In re Doe*, which is cited in

16  the government's brief.  It's a Fourth Circuit case out

17  of 1981 where the court held that when an attorney

18  freely and voluntarily discloses the contents of

19  otherwise protected work product to someone with

20  interest adverse to his or those of the client,

21  knowingly increasing the possibility that an opponent

22  will obtain and use the material, he may be deemed to

23  have waived work product protection.

24          Despite a lot of the hyperbolic language

25  that's used in the briefing and has been used here

1  today, the fact that the federal law has long

2  recognized the waiver doctrine will not eviscerate work

3  product protection.  An attorney can still keep their

4  work product private to themselves.  They can keep it

5  between themselves and their client.  They can even

6  disclose it to another third party that shares a common

7  interest with the client, such as a person who may have

8  a joint defense agreement with that client.

9          The protection of work product would not be

10 waived in that situation, but if an attorney exposes

11 work product to an uninterested third party or someone

12 with interests adverse to theirs, then they run the

13 risk of disclosure.  When they become aware of it or

14 when they are aware of it, when the disclosure is made,

15 they've then waived any privilege that would otherwise

16 apply.

17         Mr. Wise touched on the *Martinez* case.

18 There's just one additional point I wanted to make with

19 respect to that decision.  It's questionable on a

20 number of levels, and I don't think the Court should be

21 persuaded by it.  There's a gaping hole in the court's

22 analysis as to waiver.  It's almost as if New Jersey

23 state law doesn't even recognize waiver, if you were to

24 judge that opinion on its face, because the waiver

25 issue is never even raised or considered by the court.

1         Now, federal law in this circuit does
2   recognize waiver, obviously, and that waiver does apply
3   to this case.

4         One additional point about the *Shaygan* case.
5   I did not see in the district court opinion, nor the
6   appellate court opinion in that case any finding that
7   any recorded conversations constituted work product.
8   There were questions raised about the circumstances
9   surrounding the recording.

10        THE COURT:  Maybe something in the dissent
11  that may have talked about it.  I can't remember.

12        MR. MADDOX:  I believe Your Honor may be
13  correct on that, but in the decisions that there made
14  in that case, there was no finding of work product
15  protection.

16        Instead, what the focus of those cases were,
17  both at the district level and the circuit court level,
18  was the finding of a discovery failure.  The facts that
19  these recordings existed but they were not disclosed in
20  discovery in advance of trial was the issue that
21  occurred in that case.

22        The Court has already touched on the
23  applicability of the crime-fraud exception.  I'm not
24  going to belabor that point.  The Court has already
25  specifically made crime-fraud determinations with

1  respect to KWR's combined notes, the handwritten notes,

2  which, by the way, Your Honor, the government did not

3  have access to those handwritten notes until after the

4  search of Mr. Treem's office and after it passed

5  through a privilege review by the special master and by

6  this court.  But the government is, obviously, in

7  agreement that the crime-fraud exception applied there

8  and justified disclosure and the use of that document

9  by the government at trial.

10         The same would apply to the Gordon affidavit,

11  and the same actually applies to the recordings of the

12  interview even if you set aside waiver.  Now, there's

13  multiple bases upon which the government can lawfully

14  get access to that recording and use it at trial.  One,

15  it wasn't work product privilege to begin with.

16  Second, any work product privilege was waived due to

17  the third-party disclosure, and third, that the

18  crime-fraud exception applies.

19         In none of those situations is there a

20  requirement for the government to show substantial

21  need.  Your Honor heard some argument earlier today

22  that the government hasn't made a case of substantial

23  need.  That's because the government doesn't have to if

24  the work product privilege is waived, if it's not work

25  product to begin with, or if the crime-fraud exception

1    applies, the government does not have to make a showing

2    of substantial need.

3              For that proposition, Your Honor, I'll

4    specifically refer the Court to *In re Grand Jury*

5    *Proceedings, Thursday Special Grand Jury September*

6    *Term, 1991*.  That's a case out of the Fourth Circuit in

7    1994, 33 F.3d 342.  There's a specific holding in that

8    case that if a *prima facie* showing of fraud is made,

9    then there's no need for the government to show

10   substantial need to get access to the material.

11             Unless Your Honor has any questions, I'll

12   just rest at this point.

13             THE COURT:  I don't.  Thank you.

14             All right.  Let's take ten minutes.  I've

15   heard enough argument on this issue.  Let's move on.

16   We're never going to get finished.  So let's go on to

17   1515 and then severance and the next two sections.

18             All right.  We're going to take ten minutes.

19             We're in recess.

20        (Recess from 3:01 p.m. until 3:16 p.m.)

21             THE COURT:  All right.  Mr. Goldstein.

22             MR. GOLDSTEIN:  *Daniel* Goldstein on behalf of

23   Mr. Treem.

24             THE COURT:  Good afternoon, Mr. Goldstein.

25             MR. GOLDSTEIN:  Good afternoon, Your Honor.

1          When a federal grand jury indicts a lawyer

2    for obstruction of justice, an additional element of

3    the offense must be pled that the lawyer was not

4    lawfully providing *bona fide* legal services.

5          Here the indictment fails in two distinct

6    ways.  First and most important, the indictment alleges

7    facts that, taken as true, are not crimes but, as a

8    matter of law, are proper actions by a defense

9    attorney.  Second, because by its terms the indictment

10   fails to plainly, expressly, and unambiguously address

11   this element of the offense, the lawful provision of

12   *bona fide* legal services, the indictment fails to

13   satisfy the Fifth Amendment.  I say that because there

14   can be no certainty in this indictment that all of the

15   elements of the offense have been found and considered

16   by the grand jury.

17         Because the second issue is simpler, I will

18   address it first.  In *United States v. Jackson*, Judge

19   Flanagan explained in the Fourth Circuit

20   Section 1515(c), the lawful provision of *bona fide*

21   legal services, is an element of the offense when

22   lawyers or their agents are charged, not an affirmative

23   defense.  In its opposition, the government expresses

24   no disagreement with this holding and its application

25   to this case.

1          The *Jackson* indictment, like the one before

2   us, described in painstaking detail the actions of the

3   attorney and its agent that the government asserted

4   constituted obstruction.  Nonetheless, Judge Flanagan

5   dismissed those counts for not explicitly negating

6   1515(c).

7          The reason for that, Your Honor, lies in the

8   Fifth Amendment.  You know, *Hamling v. United States* is

9   familiarly cited for the proposition that an indictment

10  expressly alleges the elements of the statute suffices.

11  But that's not, in fact, what *Hamling* says.  *Hamling*

12  says something more conditional and nuanced.

13         What the Supreme Court said speaks directly

14  to the issue at hand.  The Supreme Court said it is

15  generally sufficient that an indictment set forth the

16  offense and the words of the statute itself -- and then

17  came the condition -- as long as those words of

18  themselves fully, directly, and expressly without any

19  uncertainty or ambiguity set forth all the elements

20  necessary to constitute the offense.

21         And there can be no question here that the

22  provision of 1515(c) is not fully, directly, and

23  expressly without uncertainty or ambiguity set forth in

24  the superseding indictment.

25         The Fourth Circuit has put it more plainly

1  than the Supreme Court in *Loayza*, *Daniels*, and

2  *Blankenship*.  The Fourth Circuit simply said if the

3  indictment does not contain every essential element of

4  the offense, it is invalid.

5      Now, the government suggests that you should

6  measure this indictment using a nontechnical and

7  forgiving approach.  And to support that standard, it

8  cites cases to you that, if you read them, you can see

9  they're about untimely challenges to an indictment.  In

10 fact, the Fourth Circuit makes it clear that's a

11 different standard.  But our challenge is timely.

12     And in *United States v. Kingrea* and other

13 cases, the Fourth Circuit has said that a timely

14 challenge submits an indictment to a heightened

15 scrutiny.  This is not mere formalism on the part of

16 the Fourth Circuit.  They have said the express recital

17 of all elements of the offense serves to satisfy the

18 Fifth Amendment requirement that all elements of the

19 offense have been considered and found by the grand

20 jury.

21     THE COURT:  So I understand the *Jackson* case,

22 and I've read it carefully.  Judge Flanagan makes much

23 of the analysis as applying Title 21, 841(a)(1), but

24 841(a)(1) starts out by saying in its preamble that

25 except as authorized by the subchapter, it shall be

1  unlawful for any person to knowingly or intentionally,

2  and then it goes on and then subsequently accepts the

3  lawful dispensing of narcotics.

4         Here the *bona fide* legal services is

5  certainly not identified in the preamble of the

6  statute, and the Eleventh Circuit in *United States v.*

7  *Kloess* and in *United States v. Cueto*, the Ninth Circuit

8  in *United States v. Kellington* have all found that the

9  *bona fide* legal services is an affirmative defense

10 versus one that needs to be identified in the elements

11 of the offense of the statute.  I'm sure you've read

12 *United States v. Royal*, the gun case where the Fourth

13 Circuit commented that the antique gun exception is an

14 affirmative defense.

15        So address those, if you would, sir.

16        MR. GOLDSTEIN:  I'm happy to do so, Your

17 Honor.

18        The Fourth Circuit in deciding the

19 prescription drug cases was not depending on where it

20 appeared in the statute, that this was in the preamble.

21 Rather, they were depending on the fact that an element

22 that must be proved must be pled.  By definition, an

23 element of the offense is something that must be

24 proved, and what they found in those cases was that

25 this was an element.

1          We'll come back to this with nexus, but there
2   is no such animal as an element that must be proved and
3   not pled.  The Supreme Court, when it finds an implicit
4   element, be it *mens rea* in a statute that doesn't say
5   it or whatever, has said that an element is something
6   that must be proved.

7          So the first point is, other than the fact
8   that the government did not choose to make the argument
9   that the Court has raised, is that the Fourth Circuit
10  in *Daniel* was looking at an indictment that
11  specifically said that the prescriptions were outside
12  the bound of legitimate conduct and said, because of
13  that, this indictment is sufficient.

14         It seems to me that a terrible risk is being
15  taken here because if, in fact, the government can
16  satisfy a grand jury as to 1515(c), what we're looking
17  at, if the Court were to deny this motion, is we go
18  through trial, we go through an appeal, and if the
19  Fourth Circuit says uh-uh, 1515(c) needed to be alleged
20  just as we said in *Daniel* about doctors, because it's
21  an element that must be proved beyond a reasonable
22  doubt, we've just wasted a massive amount of time to no
23  apparent purpose.

24         But the government is also wrong at a more
25  fundamental level, because some of what it describes in

1    the indictment criminalizes the practice of criminal

2    defense.  And this, Your Honor, is a question of law,

3    not fact.

4           Our argument rests on two statements of law

5    set forth in our briefs.  First, defense lawyers and

6    those acting at their direction have a constitutional

7    obligation to interview witnesses and to seek to obtain

8    exculpatory statements consistent with the presumption

9    of innocence enjoyed by their client.

10          Now, this is, apparently, an area where the

11   government has made concessions, but I would ask you to

12   consider what the indictment says.  In Count 5, the

13   government says that the KWR notes were a false and

14   fictitious record that Treem and Gordon created in

15   their meeting with R.B.  They're called a false --

16   instead of false exculpatory statements, that Treem and

17   Gordon encouraged R.B. to sign.  They say that the KWR

18   combined notes were fraudulently prepared to be used to

19   undermine and impeach R.B.'s credibility if he were to

20   be called in an official proceeding.

21          Now, I understand perhaps the government has

22   conceded -- and this was discussed earlier -- that

23   nothing wrong happened during the R.B. interview, but

24   that's not what the indictment says.

25                THE COURT:  It's R.B.

1          MR. GOLDSTEIN:  I'm sorry, R.B.  It's not

2    what the indictment says with respect to R.B. in

3    Count 4 or Count 5.

4          And the indictment also goes on to

5    criminalize in subparagraphs 106(a) and (b) of

6    paragraph 106 of Count 4 the failure to disclose

7    adverse statements.  I heard the Court say earlier that

8    the letter to the federal judge contained false

9    statements, but the indictment alleges more than that.

10   It alleges a failure to disclose what occurred on day

11   two.  And except under very limited and clearly

12   delineated circumstances, a defense attorney is not

13   permitted to disclose client confidences that are

14   adverse.

15         So here are these allegations, both with

16   respect to the KWR combined notes, charged as an

17   offense under 1512(c)(2) and with respect to the

18   federal judge letter in both Count 7 --

19              MR. WISE:  Your Honor --

20              MR. GOLDSTEIN:  I'm sorry, the federal judge

21   letter under Count 4 and Count 7 that are not, in fact,

22   offenses.  Someone who was not an attorney or an agent

23   for an attorney who presented a document such as the

24   one presented to R.B. might indeed be guilty of

25   obstruction.  I think the *U.S. v. Edlind* case teaches

1  that.  But Mr. Treem had a legal duty to interview

2  R.B., who claimed to possess exculpatory information,

3  and he had a legal obligation to document those

4  exculpatory statements.

5          Not doing so would have been ineffective

6  assistance of counsel under a long chain of Supreme

7  Court cases.  It would have, therefore, deprived

8  Mr. Ravenell of his Sixth Amendment rights.  And as we

9  have cited in our briefs, it's also a ground for

10  disbarment to not interview defense witnesses.

11          So this allegation of fraudulently

12  preparing -- and that's the allegation -- fraudulently

13  preparing false exculpatory statements is a statement

14  of a lawful act.  That's a question of law.  It's not a

15  question for a petit jury.  This allegation may have

16  been retreated from, but it's still in the indictment.

17  And it creates considerable concern that this grand

18  jury did not understand all of the elements of the

19  offense.

20          And you asked earlier about perhaps it should

21  be considered an affirmative defense as was said in

22  *Kellington* and other cases.  Your Honor, this wouldn't

23  be much of a safe harbor for the practice of criminal

24  defense law if one has to go through a trial and assert

25  such an affirmative defense.  It's appropriate to look

1  at this indictment and see does it charge bribery, does

2  it charge intimidation, does it charge something that

3  is not the lawful provision of *bona fide* legal

4  services.

5       THE COURT:  Well, so the government's

6  argument is -- and if you strip it down to the material

7  misrepresentations that are alleged in the indictment

8  and the affidavit by Mr. Gordon, if you just included

9  those, which, of course, are part of the 1512 and 1515

10  counts, is it still facially invalid?

11       MR. GOLDSTEIN:  Well, you would have amended

12  the indictment, Your Honor, with all respect.  You

13  would have amended the indictment, and you would still

14  have no satisfaction to know that the grand jury

15  understood and was correctly instructed.

16       The fact that 1515(c) is never mentioned in a

17  negating kind of way, that they're never saying X is

18  not the lawful action of a defense attorney has to

19  raise a question whether this grand jury was fully and

20  correctly advised when --

21       Consider also the other principle we talked

22  about, the duty not to disclose adverse information.

23  There are two faults there.  One is the simple due

24  process notice issue.  If a failure to disclose is not

25  found in the statute regulation or form, there's not

1    sufficient notice.

2            But the more serious question from a 1515(c)

3    point of view is that Mr. Treem has to be a member of

4    the Maryland Bar to be a member of the federal court in

5    Maryland, and he has to be subject to the Maryland

6    disciplinary rules.  Maryland -- and this was not

7    addressed by the prosecutors.  Maryland has a very

8    clear provision of law as to the circumstances under

9    which you may disclose client confidences.  It's in

10   19-301.6(b), and there are things like preventing

11   reasonably certain death.  None of those exceptions

12   apply to this letter, none.

13           So we would submit, Your Honor, that you're

14   not free to simply strip these out of the indictment,

15   but rather that -- and I neglected to mention -- I

16   apologize.  Let me digress for a second.  The same

17   thing is true for the Gordon declaration, the failure

18   to disclose that which was said the second day.  All of

19   these things apply because an investigator for the

20   defense should properly record a witness' exculpatory

21   statements.  But just as the government wasn't

22   obligated in the search warrant to tell Magistrate

23   Buchanan about the many overtures that R.B. had made

24   saying he had exculpatory evidence, much less the phone

25   call that finally precipitated this visit -- just as

1  the search warrant affidavit did not have to recite

2  that Mr. Treem said "if you're going to lie, I can't

3  put you on the stand" and just as the search warrant

4  affidavit didn't disclose that, "I can't alter the

5  laptop, and it's got to be produced as is," so the

6  defense does not have an obligation to record

7  inculpatory evidence.

8           So we submit, Your Honor, that this

9  indictment is inadequate for both of those reasons,

10 it's failure to clearly and unambiguously and expressly

11 negate the safe harbor of 1515(c) and in its failure or

12 rather -- let me back up a second -- and it including

13 in its indictment actions that clearly fall within

14 1515(c).  This issue is easy.  If the government

15 correctly instructed the grand jury, they ought to show

16 it to you.  And you could say, Okay, they got it.  I

17 feel confident now.

18           But the government is in effect asking you

19 not to look at what they said or didn't say, and

20 they're asking you to overlook their mistake in how

21 they frame their charging document and how this case is

22 currently indicted and take a giant risk that we do all

23 of this work only to be told that, yes, this is an

24 element and it did need to be expressly pled.

25           Unless the Court has questions, that would be

1   our submission.

2          THE COURT:  All right.  Thank you.

3          Mr. Kamens.

4          MR. KAMENS:  First, on whether 1515(c) is an

5   element, the government essentially conceded that in

6   their pleading and haven't argued that --

7          THE COURT:  That doesn't mean I don't need to

8   look at the law behind it.

9          MR. KAMENS:  Understood.

10         THE COURT:  Okay.

11         MR. KAMENS:  The law in the Fourth Circuit is

12  very different from the law in the Eleventh Circuit.

13  So in the Eleventh Circuit, for example, with respect

14  to prosecutions of doctors, that is considered that the

15  doctor was acting outside of their employment, outside

16  of their authorization to distribute controlled

17  substances.  That's considered an affirmative defense.

18         The Fourth Circuit takes a different view,

19  that is, that the indictment itself must allege that

20  the doctor is acting outside of their registration,

21  their authorization to distribute controlled

22  substances.

23         And as we pointed out in our briefing, that

24  is even more true with respect to the obstruction

25  statutes.  The obstruction statutes contain an explicit

1   affirmative defense in 1512(e) where Congress has

2   specifically said this is an affirmative defense, and

3   the defendant bears the burden of persuasion to

4   establish this affirmative defense.  With respect to

5   1515(c), it says these statutes shall not prohibit or

6   punish the lawful provision of legal services.

7           And so I just want to be clear that the

8   obstruction statutes make very obvious that 1515(c) is

9   an element of the offense, and it's just simply not

10  alleged in this indictment.

11          With respect to Mr. Gordon and the Gordon

12  declaration specifically, I'd ask the Court to consider

13  if this had been done by a law enforcement

14  investigator.  So imagine a law enforcement

15  investigator, a police officer, investigates a witness

16  who says inculpatory things about a defendant on the

17  first day of the interview and then on the second day

18  of the interview says exculpatory things about the

19  defendant.  And the law enforcement officer documents

20  the inculpatory things said on day one in their

21  memorandum.

22          The government has an independent *Brady*

23  obligation to provide that information to the defense.

24  But with respect to the memorandum created by the law

25  enforcement officer, the law is very clear they have no

1   obligation to document those exculpatory statements

2   about the defendant, that is, that there's nothing in

3   *Jencks*.  There's nothing in the requirement of the law

4   enforcement officer to take a memoranda of what the

5   witness has said, that they must document those

6   statements.

7          Certainly, if that law enforcement officer is

8   on the stand and is asked, well, did this witness say

9   exculpatory things, of course, they would have to say

10  those things.  The government has that independent

11  *Brady* obligation to provide that information to the

12  defense, but there's nothing else that requires the

13  government to document the exculpatory statements about

14  the defendant.

15         Well, the same is true with the defense with

16  the exception that we do not have a *Brady* obligation to

17  provide inculpatory things to our opposing party; that

18  is, when Mr. Gordon or Mr. Treem are documenting the

19  information obtained from a witness, they have no

20  obligation to document inculpatory things said about

21  the witness about their client.  In fact, as you just

22  heard, there is a duty of confidentiality about that

23  information.

24         So what the indictment alleges with respect

25  to the Gordon declaration is that Mr. Gordon signed a

1  declaration that says on the first day, R.B. provided

2  exculpatory statements, and he didn't have any

3  hesitancy about it.  And the only thing that the

4  government comes back now and says is untruthful,

5  essentially, is that, in fact, on that first day, R.B.

6  said only 49 -- or affirmed only 49 of those 53

7  statements.

8         Now, if a law enforcement officer had a

9  similar memorandum and the Court was deciding whether

10 to admit that statement as an inconsistent statement

11 about a witness, the Court would say, well, that's free

12 for cross-examination.  You can go into it.

13        And the entire point of our pleading with

14 respect to 1515(c) is that ethical efforts by a

15 criminal defense lawyer or a criminal investigator to

16 obtain admissible evidence cannot constitute

17 obstruction.  And so when the government has no answer

18 to the fact that R.B., in fact, on the first day of the

19 interview made exculpatory statements completely

20 exonerating Mr. Ravenell, said he had no knowledge of

21 R.B.'s misconduct, that he didn't knowingly launder

22 drug proceeds, all of those things could be potentially

23 admissible under Federal Rule of Evidence 613.  The

24 government doesn't dispute that.

25        And so when the defendants seek to document

1    that information, they have agreed together to try to

2    document that information because it is potentially

3    admissible under the Federal Rules of Evidence, and

4    that cannot be obstruction.  That is lawful everyday

5    criminal defense conduct.

6            And so when the government comes back and

7    says, well, actually what we're really talking about

8    here is the documentation of false statements, they're

9    very vague about what those are.  But the indictment

10   suggests that the false statements are everything in

11   the KWR combined notes, everything that was

12   exculpatory.  But we know, based on the Rules of

13   Evidence, that it does not matter whether a prior

14   inconsistent statement is true or false.  What matters

15   is that the witness said something different.

16           So if R.B. were to testify at a trial and say

17   inculpatory things about Mr. Ravenell and were to say

18   that he was fully in the know about R.B.'s misconduct,

19   everything that R.B. said on day one would be

20   admissible potentially under F.R.E. 613.  And so the

21   fact that the defendants engaged in this conduct to

22   develop this information, that's completely consistent

23   with the Federal Rules of Evidence, cannot be

24   obstruction of justice.

25           The only thing the government has to say in

1  response is, well, they didn't completely and

2  accurately describe R.B.'s statements.  He assented to

3  only 49 of 53 statements.  The Gordon declaration says

4  that they went back and asked R.B. on the second day,

5  "Do you want to make any changes," when in fact, they

6  said, "We want you to sign this to show you've seen

7  it."

8          But the entire thrust of the indictment is

9  that the defendants engaged in a criminal conspiracy to

10 fabricate evidence to impeach R.B. when they're now

11 conceding that they have done exactly what the Federal

12 Rules of Evidence and the ethical rules governing

13 defense conduct authorize.  That simply is not

14 something that the government gets to prosecute a

15 criminal defense team for.  Because they have now

16 conceded that what the defense has done is to seek and

17 document evidence that is completely authorized by the

18 Federal Rules of Evidence.

19          THE COURT:  Thank you.

20          Mr. White.

21          MR. WHITE:  Thank you, Your Honor.

22          Very briefly.  I'll adopt the arguments of

23 cocounsel on this.

24          I just wanted to take the opportunity to

25 point out that the government's requirement to prove

1  that the actions complained of in the indictment were

2  not in the provision of lawful legal services exists as

3  to Mr. Ravenell too, who is charged in those counts

4  that deal with the letter to the judge.

5          And it's important to keep in mind why that's

6  there, right.  That provision in 1515(c), without that

7  provision in (c), that statute would be

8  unconstitutional because it would interfere with the

9  defendant's right to counsel.  So it has to be there.

10 It's not just an add-on as an affirmative defense might

11 be as would be the case with prescription drugs.  It

12 could easily be the case -- and it is for some -- that

13 there is no authorized use for them under 21 U.S.C.

14 841.  That can't be the case as to the obstruction

15 statute because it would be unconstitutional if it did

16 not include that exception.  That's why it's an element

17 right at the very core.

18          The problematic aspect of this, which ties in

19 a bit with the other aspects we're arguing, it becomes

20 very clear when you think about what the government has

21 charged is that Mr. Ravenell knew that statements in

22 the letter to the judge were false.  Well, how could he

23 possibly have known that?  He wasn't there.  They agree

24 with that.  He didn't have access to the recording.

25 They had that.  Nobody on this team had that.  The only

1    way he would possibly know is in the context of a

2    provision of the legal services that he had hired

3    Mr. Treem to provide.  That's the crux of the problem

4    here.

5             The government wants to get inside that, and

6    they can't as to Mr. Ravenell because there's multiple

7    layers of problematic activity with that.  That is

8    clearly -- that's not even work product.  That's just

9    attorney-client communications that they're seeking to

10   evade, and that gets to the core of the 1515(c) issue.

11   And that's why that's an element that needs to be

12   proven and pled.

13             THE COURT:  All right.  Thank you, Mr. White.

14             All right.  Mr. Wise.

15             MR. WISE:  Thank you, Your Honor.

16             Again, I'm going to try not to repeat the

17   arguments we've made but rather respond to what I've

18   been trying to listen to defense counsel say.  And I

19   tried really hard to understand what their argument is

20   because on the one hand --

21             And this is in part one of their reply most

22   recently.  They argue that the specific statutory

23   phrase, quote, providing of lawful *bona fide* legal

24   representation services in connection with or in

25   anticipation of an official proceeding have to be

1   specifically pled in every indictment involving a

2   lawyer sort of like magic words, which, obviously, cuts

3   against the notice pleading regime that we use in

4   federal court.

5          But then they say that if that exact

6   phrase -- those words in that order was in the

7   indictment, according to them, it wouldn't make any

8   difference because they argue that what is pled, which

9   is quite detailed about the unlawful conduct, is, in

10  fact, lawful *bona fide* legal conduct.  And this is

11  really part two of their argument in their reply.

12         And so I've tried to figure out what kind of

13  relief are they actually seeking.  I heard

14  Mr. Goldstein say, "Well, it's a terrible risk to try

15  this case without those words in the count."  And so we

16  could go back to the grand jury and supersede and add

17  them.  But, again, the substantive issue seems to be

18  their contention that what we have pled, what the proof

19  will show at trial simply is not illegal conduct, that

20  it is lawful *bona fide* services.

21         At the end of the day, that is a decision

22  that cannot be made at this stage in the proceeding.

23  That's a decision the jury will have to make depending

24  on the facts that are presented.

25               THE COURT:  Well, I think they're making both

1  arguments, and I'm sure they'll make it at the

2  appellate level, if it's necessary, so that you ought

3  to address them.  And you have addressed them,

4  certainly part two of their argument, that there was

5  insufficient evidence or allegations in the indictment

6  of the obstruction.  I think you've laid that out well

7  in your pleadings and why you think that notice is

8  sufficient.

9          Do you have further thoughts or do you agree

10 that the *bona fide* legal services is an element of

11 1515(c) that has to be identified in the indictment,

12 and, if so, what's your position there?

13         MR. WISE:  So as we said, we've -- and I

14 think this is the principal distinction between *Jackson*

15 and this case.  In *Jackson*, which is the principal case

16 the defendants rely on, the government disputed that it

17 had to prove the conduct was not the *bona fide*

18 provision of legal services.  And as we said in our

19 response, we do not based on the facts in this case.

20 Without conceding that the government has to prove that

21 as an element in every case or in every case involving

22 a lawyer, we intend to prove it in this one.  And I

23 think this will be reflected in the jury instructions

24 ultimately that we have to work out as to what the jury

25 will see.

 1          And I think that's what distinguishes this

 2  case from *Jackson*, not whether those magic words have

 3  to be in an indictment or not.  In that case, the

 4  government said we don't have to prove it, so the

 5  allegations in the indictment are not reflecting an

 6  element of the statute.  We're saying they are, and

 7  they seem to be saying, well, it's not good enough to

 8  actually say what the conduct is.  You have to make

 9  this kind of incantation and that somehow is what the

10  law requires.

11          The Fourth Circuit --

12          THE COURT:  So it's your argument that you

13  believe it is part of the statute and was presented to

14  the grand jury, and the way it was presented to the

15  grand jury was through the specific paragraphs of the

16  indictment which identify the clear instances where

17  there was no *bona fide* legal services being conducted?

18  Is that what your argument is?

19          MR. WISE:  It is, Your Honor.  It is.

20          THE COURT:  Okay.

21          MR. WISE:  I think our position -- while the

22  Fourth Circuit has never held -- *Jackson* is, obviously,

23  not a Fourth Circuit opinion.  I've read and reread

24  *Jackson* and tried to really understand it.  The Fourth

25  Circuit has never held that that specific quoted

1    language -- and the courts are reluctant to do that --

2    that there are some specific order of words that has to

3    be included is required.

4            Finding that runs contrary to two of the

5    cases we cite -- and these are not the only ones --

6    *Mathis* and *Williams* where the Fourth Circuit has said

7    the fact that the language at issue in the indictment

8    did not track the precise language of the statute did

9    not constitute error.  And as *Mathis* explained, the

10   indictment detailed the factual basis for the witness

11   tampering charge and cited to the correct statute

12   fairly appraising the defendants of the crime charged

13   and its required elements.

14           And I think here there's no doubt that in the

15   50-page indictment there is a detailed factual basis

16   for the obstruction of justice charges.  We cite to the

17   correct statute, and the defendants have been fairly

18   apprised of the charges they face.

19           So our position is -- now I'm addressing the

20   grand jury legal instructions argument.  Our position

21   is the indictment is facially valid, and the Fourth

22   Circuit is clear that if it is, we don't litigate

23   behind that to see what evidence was presented, what

24   was instructed.  So it's only if the Court were to

25   find, I think, that that phrase has to be used in that

1   precise order, which seems to be what the *Jackson*

2   opinion stands for, but I can't quite tell.

3            You know, they fault us for citing *Matzkin* as

4   being the wrong standard, but *Jackson* cites *Matzkin*,

5   which talks about taking a practical approach to

6   indictments.  That is consistent with, I think,

7   indictments that we see in federal court.  If you look

8   at two fraud indictments, there's never some magic

9   order of words that you see in precisely all of them or

10  any other -- frankly, that I'm familiar with -- species

11  of federal law where it has to be pled in a particular

12  way.

13           Now, if there was no mention -- if we simply

14  used the 1512(c) language, (c)(2) language without any

15  mention of the facts or the safe harbor, I think you

16  could argue it wasn't facially valid, but we were

17  aware.  They argue we weren't aware of 1515 at one

18  point, and we certainly were.  I think our approach was

19  to address the practical way to express it.  If we

20  hadn't, they'd file for a bill of particulars and say,

21  "Well, you've said it's not *bona fide* legal services,

22  but what do you mean?"  So we've laid that out in

23  detail.

24           But if the fix is simply to add that

25  language, we could do that, you know, a week from today

1  in the grand jury on Wednesday.  But I don't think

2  that's really what the Court -- I don't think that's

3  really what the law requires based on what we have pled

4  and based on the notice pleading that we do.

5          THE COURT:  All right.

6          MR. WISE:  Just briefly, Your Honor, I'm just

7  going to look to see if I had --

8          And, obviously, you know, we have said this

9  over and over again -- and this will come as no

10 surprise -- you know, the factual questions they raise

11 about what the defendants did will have to be addressed

12 by the jury.  This persistent theme of reframing it as,

13 you know, they went to interview a witness, well, they

14 weren't indicted for going to interview a witness.

15 That's not the charges in the indictment.  They are

16 charged with among other things.

17         I would say this frequent reference to the

18 government has conceded this or abandoned that, that's

19 rhetoric.  The indictment says what it says.  To the

20 extent they claim we've made arguments in our response

21 that give up parts of the indictment, we're not

22 amending the indictment through the filing of

23 responses.  That's not the way it works.

24         But the indictment stands for the proposition

25 that the statements that were made in the letter and

1   in -- at least as to the two substantive counts -- I'll

2   address those.  The letter to the judge and the

3   affidavit are affirmative misrepresentations, as Your

4   Honor has pointed out.  This, I think, addresses their

5   motion on the duty to disclose.  This is their ECF 183,

6   which I'll briefly address.

7            We haven't alleged that they simply failed to

8   disclose something like in the Foreign Agents

9   Registration Act case.  There are other cases where

10  there's an affirmative obligation to disclose

11  something.  Mr. Treem chose to write a letter to the

12  federal judge.  As I read the passages to the judge,

13  it's simply false as a factual matter.  That sequence

14  he lays out didn't happen.  What went on in that room

15  is not what's in that letter.

16           Similarly, you know, Mr. Kamens says, "Well,

17  the government is vague."  We're not vague about the

18  Gordon declaration.  We specifically identify the

19  paragraphs in the declaration and what is false about

20  them.  And at this stage, that's what controls.  They

21  can dispute it and they can put on their defense at

22  trial, but none of that is a basis to dismiss an

23  indictment.

24           And it is not simply that the one statement

25  Mr. Kamens made that R.B. didn't acknowledge all of the

1   statements.  And they try to minimize those, but as we

2   point out in the indictment, those are not trivial

3   matters.  Those are specific highly inculpatory

4   statements.  And one of the things the jury will see

5   and Your Honor will see is at that point in the

6   interview, it was like they weren't even listening to

7   him.  It was just such a perfunctory exercise.  Nobody

8   was writing down what he was saying.  It was just he

9   was rattling through them, and then they chose to make

10  the representation that he had adopted all of these.

11  And it's just not what happened as a factual matter.

12            To say, well, that amounts to us alleging him

13  failing to disclose something, it's just not true.  The

14  affidavit was an affirmative act.  The letter was an

15  affirmative act.  These are not failures to disclose.

16            Briefly as to Mr. White's argument, you know,

17  Mr. Ravenell, the evidence at trial will show, knew

18  that those were false exculpatory statements, and he

19  got them from the *Jencks* in the case that had been

20  amassed against R.B. and he got them from cooperator

21  statements.  And the testimony will be that his conduct

22  in Count 1 and the related counts put him at the center

23  of that criminal conduct.  Therefore, he knew that

24  those statements were false, and he had done a similar

25  exercise for R.B. with Gordon when he represented him.

1  Now he dispatched Treem to do the same for him.  So it

2  is not the case that no one knew that those statements

3  were false.  That's not what's been alleged in the

4  superseding indictment, and that's not what the proof

5  at trial will be.

6           Unless Your Honor has any questions, I think

7  I'll sit down at this point.

8           Thank you.

9           THE COURT:  Thank you.

10          MR. GOLDSTEIN:  Your Honor, what Mr. Wise

11  dismisses as magic words and incantations is the Fifth

12  Amendment and the holding in *Hamling* and the holding in

13  *Kingrea*.  You are supposed to allege every element of

14  the statute, and I think, if I understood clearly what

15  Mr. Wise said, we are in agreement on certain points.

16  We are not attacking every paragraph of the indictment.

17  We are attacking the fact that the indictment says the

18  KWR combined notes were fraudulently prepared, that is,

19  to say that Mr. Treem, I guess, was hiding under the

20  table or in the closet during the events of 2012, '13,

21  and '14 and, therefore, had personal knowledge of what

22  was true or what was not because he's charged with

23  this.

24          And the question of going and seeking

25  confirmation of those exculpatory statements, given the

1   presumption of innocence, that's not a question of fact

2   for trial any more than if this indictment said, And

3   Mr. Treem used his *voir dire* to select juries who would

4   be sympathetic to the defense's case and believed in

5   proof beyond a reasonable doubt and the presumption of

6   innocence.

7          It is a question for Your Honor and not the

8   petit jury, whether on taking every one of the facts

9   alleged in this indictment as true, does it allege a

10  crime when Mr. Treem went and presented this -- excuse

11  me -- these notes to R.B.  And the answer is no.  As a

12  matter of law, that was his duty.  And if that's the

13  case, there's nothing for a petit jury to decide.

14         Mr. Wise represents to this Court that it's

15  all about false statements, but that's not what the

16  subparagraphs A and B of 106 say.  And I did not hear

17  him address that.  That has to do with a failure to

18  disclose.

19         But if there is one thing that disturbs me

20  here, it is his reliance on *Matthews* [sic] and

21  *Williams*.  I'm sorry.  I misstated.  My tongue is

22  falling over itself.  The two cases that he cited that

23  are both cases that say that for untimely challenges to

24  the indictment, this loose standard is used.

25         As to magic words, we don't have to go any

1   further than *Kingrea* itself.  In *Kingrea*, the error

2   that led to the dismissal after trial of the indictment

3   was -- instead of saying --

4             The Court's indulgence while I find it.

5             The indictment said "to knowingly sponsor and

6   exhibit an animal fighting venture."  And, in fact, it

7   needed to say knowingly -- I apologize to the Court.  I

8   thought I highlighted this.  But I believe we point to

9   it in our reply.  It was, essentially, a preposition

10  with respect to animal venture that was omitted in

11  *Kingrea*, and the court threw out the indictment because

12  it did not charge an offense under the statute.

13            Finally, I think that if the government, in

14  fact, is, as it must be, the adviser to the grand jury

15  on issues of law, that to go back and negate 1515(c)

16  while charging failures to disclose client confidences

17  and while charging the presentation of exculpatory

18  statements as an obstruction of justice may not be as

19  easy as Mr. Wise believes.

20            But whether it's easy or hard, we can then at

21  least go to trial knowing that the Fifth Amendment

22  requirement that the grand jury know all of the

23  elements and find probable cause will have been

24  satisfied.

25            Unless the Court has further questions --

1          THE COURT:  Thank you, sir.

2          Mr. Kamens.

3          MR. KAMENS:  Your Honor, as we said in our

4   pleadings, the crux of the indictment is the charge

5   that the defendants fraudulently prepared the KWR

6   combined notes, the Gordon declaration, and the letter

7   to the district judge to be used to undermine and

8   impeach R.B.'s credibility if he were to be called in

9   an official proceeding against Ravenell.  That is the

10  crux of the indictment's allegation.

11          And what we're saying is that the superseding

12  indictment also says that R.B. made exculpatory

13  statements on the first day of the interview, and the

14  documentation of those exculpatory statements in the

15  KWR combined notes, the Gordon declaration, and the

16  letter to the district judge are entirely lawful and

17  consistent with the Federal Rules of Evidence.

18          And the government now says in their

19  response, no, it's not the documentation of those

20  exculpatory statements.  It's the fact that they

21  falsely said he assented to all 53 as opposed to 49 of

22  those statements.  But they never allege in the

23  superseding indictment that that's what the conspiracy

24  is about, that's what Count 5 is about.

25          They even concede -- or don't respond to the

1  fact that, according to the video, the defendants,

2  Mr. Treem and Mr. Gordon, couldn't even see R.B. when

3  he was reviewing and going through the numbered list.

4          And the prosecutor, Mr. Wise, seeks to

5  diminish the import of those exculpatory statements by

6  saying, Oh, this is *pro forma*.  They weren't really

7  listening.  He was going through them very quickly.

8          But this is a witness who has said he has

9  exculpatory information.  This is a witness who

10  ostensibly was going to be friendly to the defense.

11  There was no need to consider at the time that this

12  witness might be adverse.

13          And so the problem with this case is that the

14  superseding indictment itself alleges that this witness

15  provided exculpatory statements, and the vast

16  majority -- the effort by the defendants to document

17  those statements is entirely lawful.

18          This would be a completely different case if

19  day one had never happened.  If the defendants had gone

20  in and they had shown these statements and the witness

21  said It's all false, he knew the whole time, I'm

22  providing you inculpatory statements about

23  Mr. Ravenell, and then they said, "You know what?  I

24  hear you.  We'd like you to sign these statements," and

25  then they created a declaration that said this witness

1   provided exculpatory statements, that would be

2   obstruction.  That would be completely false.  But in

3   this case, the superseding indictment itself reveals

4   the lawfulness of the defendant's conduct.

5            Thank you.

6            THE COURT:  Mr. White.

7            MR. WHITE:  Very briefly, Your Honor.

8            Mr. Wise stated that Mr. Ravenell knew that

9   the statements in the notes were false exculpatory

10  statements because he got that from the *Jencks* and the

11  cooperator statements.  That, of course, assumes that

12  the cooperator statements in R.B.'s case were true in

13  the first place, which is not something any defendant

14  is ever required to assume.

15           The fact that the government would claim

16  there was a problem, even if he was guilty, which he's

17  not -- even if he were guilty of these charges, a

18  guilty defendant still has -- the guilty defendant's

19  lawyer has the obligation to develop impeachment

20  evidence and to develop evidence that would contradict

21  the government's theory in those cooperators'

22  statements.

23           Criminalizing that behavior is a huge, huge

24  problem.  I realize the government would like the

25  narcotics defendants not to have hired counsel who are

1   retained.  Maybe that's the real objective here.

2         But the problem with this is saying that the

3   defense lawyer by taking the opportunity to interview

4   someone who says the government's cooperators aren't

5   telling you the truth, this man is, in fact, not guilty

6   of those things is committing a crime itself shows the

7   real depth of the problem here.  That would have a

8   huge, huge chilling effect on defense lawyers doing

9   what they're required to do under the ethical

10  obligations.

11        That obscures the fact that what the

12  government is saying that Mr. Ravenell knew is that the

13  statements that are in the notes were contradicted by

14  statements by other cooperators.  Okay.  So they're

15  saying, I guess, that means he knew they were false.

16  It means he knew they were contradicted perhaps.  It

17  certainly doesn't mean he knew they were false.

18        But that doesn't say anything about whether

19  he knew the contents of the letter were true or not.

20  He had no idea what R.B. had said -- I'm sorry,

21  what R.B. had said during the recorded session.  The

22  only way he would have access to that is through

23  privileged communications with his attorney, and that's

24  the core of the problem here.

25              THE COURT:  All right.  I understand the

1   distinction.

2          Mr. Wise.

3          MR. WISE:  Briefly, Your Honor.

4          So starting with Mr. White first, it is not

5   the case that we are alleging the only way Mr. Ravenell

6   knew the statements were false was because he saw them

7   in the cooperators' statements.  What I said was he

8   knew they were false because he participated in the

9   criminal conduct.

10          So when a cooperator says, I delivered book

11   bags of cash to Mr. Ravenell, that cooperator will

12   testify at trial that he did that.  That's what the

13   proof will be.  That's why these are not questions that

14   can be resolved in the absence of fact on a motion to

15   dismiss the indictment.

16          As to Mr. Goldstein's arguments, he said the

17   thing I said that, I guess, troubled him the most was

18   that the *Mathis* decision was addressing an untimely

19   objection.  If you actually read the *Mathis* opinion,

20   what it says is, at the portion we quoted, while it is

21   true an untimely objection is viewed under a plainer

22   analysis, the court says, more fundamentally, there was

23   no defect, plain or otherwise.

24          So we have not misquoted -- we have not cited

25   the wrong standard.  The language in *Mathis* is the

1    controlling law that indictments are to be treated as

2    practical instruments, and the question is whether the

3    defendant is on notice.

4             They are the ones that have taken the

5    position that even if this language were included, the

6    Court should dismiss the indictment, which is

7    essentially their magic words.  They have taken the

8    position that these are magic words and that that would

9    not cure the defect.  That's what we think is contrary

10   to what the Fourth Circuit has held.

11            Thank you.

12            THE COURT:  Thank you.

13            MR. GOLDSTEIN:  If I may --

14            THE COURT:  We're done.  That's enough.

15            Let's move on to severance, or we're never

16   going to get done today.

17            MS. LEGRAND:  Thank you, Your Honor.  I will

18   attempt to be brief.

19            The question proposed in the defendants'

20   motion for severance and motion to dismiss Count 4 as

21   duplicitous or, in the alternative, strike the

22   extraneous material, those motions -- except for the

23   time being that there actually is an alleged crime

24   here -- asks is there one alleged conspiracy or two.

25            And while the ultimate answer should be no

1    conspiracies for the reasons everyone has been

2    explaining, let's take what's in the indictment at face

3    value.  What it alleges in Count 4 is almost entirely

4    about the September 2017 interview with R.B. that we've

5    been discussing at length and two documents created

6    after that interview.

7             Count 4 has over 90 paragraphs of alleged

8    overt acts.  All but three of those deal with the

9    interview we've been talking about at length and those

10   two documents created afterwards.  What Count 4

11   improperly does, however, is join those with three

12   overt acts incorporated by reference in Count 1 and

13   also includes an effort in paragraph 1 of Count 1 --

14   I'm sorry, paragraph 1 of Count 4 to import all of

15   Count 1.

16            So let me slow down a little.  Talking first

17   about the three overt acts that are incorporated by

18   reference into Count 4., those took place in 2013 and

19   2014.  They involve Mr. Ravenell and two different

20   investigators that Mr. Ravenell was, apparently,

21   working with at the time.  The only allegation in

22   Count 1 that talks about an investigator getting a

23   false statement, talks about a different unindicted,

24   not here unnamed investigator.

25            There are then two brief paragraphs in

1  Count 1, paragraphs 34 and 35, that discuss two

2  meetings that Mr. Gordon went to.  He attempted to meet

3  with one witness in D.C., and he met very briefly with

4  one witness in Houston in early 2014.  That's it.

5           In neither case did he obtain a statement,

6  false or otherwise.  In neither case is it alleged he

7  was knowingly seeking a false statement.  He was

8  engaging in what my colleague, Mr. Kamens, has

9  explained is routine functions for any defense

10 investigator.  You are asked to go meet with a witness

11 and see what they'll say, see if they agree with what

12 the client is saying.

13          He went, and in both cases, basically, the

14 witnesses said, "I don't want to talk to you."  So he

15 left.  That's what's alleged in paragraphs 34 and 35 of

16 Count 1 with respect to Mr. Gordon.  That is then

17 tacked onto a much more detailed discussion of a

18 different investigator that has nothing to do with

19 Mr. Gordon, certainly nothing to do with Mr. Treem, who

20 has no involvement in this case whatsoever until he

21 begins representing Mr. Ravenell in 2016.

22          So you've got these two routine defense

23 events in 2013 and' 14, and then you jump from that to

24 a meeting in 2017 where instead of Mr. Ravenell working

25 to defend his client, which is the thrust of Count 1 --

1  Mr. Ravenell's work to defend his client and was it

2  appropriate or not -- you're talking about

3  Mr. Ravenell's attorney, Mr. Treem, working to

4  represent Mr. Ravenell.  It's three-and-a-half years

5  later.  The only similarity is that, again, Mr. Gordon

6  and Mr. Treem attempt to meet with a witness.

7           So the only continuity here is that a defense

8  investigator attempted on three occasions, separated by

9  three-and-a-half years, to meet with a witness.  That

10 is far too thin a thread on which to create a single

11 conspiracy, which is what they attempt to do in

12 Count 4.

13          It is clear from the government's response to

14 our motions that that is what they are trying to do.

15 They are trying to say in Count 4 that there is a

16 conspiracy stretching all the way from May 2013, when a

17 different investigator met with some witness, all the

18 way from May 2013 to 2018 that encompasses the two

19 meetings Mr. Gordon went to in 2013 and 2014.  Then

20 there's a three-and-a-half year break and includes the

21 meeting that we've been talking about all day, which is

22 really the thrust of Count 4, the meeting with R.B. in

23 September 2017.  That is not a single conspiracy.

24          Again, it's not illegal at all, but it's not

25 a single conspiracy regardless.  There is no

1    continuity.  There's temporal discontinuity.  There's
2    geographic discontinuity.  There's discontinuity in the
3    actors and in the nature and the roles played by the
4    actors.  The only thing that is common between them,
5    really, is the presence of Mr. Ravenell.  But that
6    alone is clearly insufficient.
7            And also, Mr. Ravenell's role is very
8    different, as you heard Mr. White just discussing.
9    Mr. Ravenell is the client in the bulk of Count 4.  And
10   so he's in a very different role.  So there is simply
11   no unifying continuity of time, of manner, of goals to
12   support a single conspiracy stretching across this full
13   time frame.
14           And for that reason, the count, as currently
15   written, is duplicitous and needs to either be
16   dismissed as duplicitous for improperly combining two
17   conspiracies in a single count, or the four paragraphs
18   that seek to smuggle in Count 1 should be stricken as
19   surplusage.  They should be stricken as surplusage, if
20   the claims survive at all, because they are clearly
21   prejudicial, because they are both unnecessary to the
22   conspiracy that actually is properly charged in Count 4
23   or, if any is, but to the more narrow set of actions
24   involving Mr. Treem, Mr. Gordon, and Mr. Ravenell
25   during Mr. Treem's representation of Mr. Ravenell.

1            So the discussion -- the incorporation of

2   allegations from Count 1 is not a necessary element of

3   the 2017 -- of the conspiracy about everything we've

4   been talking about today.  What they're bringing in

5   from Count 1 is not a necessary element of that

6   conspiracy, and it's clearly prejudicial.

7            The most clear-cut surplusage is paragraph 1

8   of Count 4.  Paragraph 1 of Count 4 seeks to

9   incorporate by reference essentially every single

10  paragraph in Count 1 into Count 4.  Count 1 alleges a

11  RICO conspiracy with 15 to 20 unindicted coconspirators

12  that stretched from 2009, I believe, to 2014 that

13  involved drug trafficking, involved money laundering.

14  That has no bearing on the --

15           Think about Mr. Treem's role.  Mr. Treem

16  comes into this to represent Mr. Ravenell.  To place

17  him in a conspiracy or to force him to respond to an

18  indictment that incorporates by reference pages of

19  allegations about the actions of Mr. Ravenell's prior

20  client, which includes drug trafficking allegations and

21  money laundering, things that are salacious, to just

22  include those all by reference is plainly prejudicial.

23  It is unnecessary, and it's extremely confusing.

24           To try and make it brief, the confusion the

25  jury would feel if we try this case with all of the

1   counts joined in a single indictment --

2            Well, here, let me change the subject to make

3   that point.  So in sum, Count 4 is duplicitous as

4   currently pled.  Those are two separate conspiracies

5   under well-established Fourth Circuit law as set forth

6   in our briefs.

7            The remedy for that should be either the

8   dismissal of Count 4 or striking the material that is

9   not relevant to the real conspiracy, or they could try

10  to plead two separate conspiracies.  For what it's

11  worth, that would be time-barred.  So to strike it or

12  to dismiss it as duplicitous, that is our position as

13  we've briefed heavily about Count 4.

14           A related question is can Count 1 and Count 4

15  be tried together?  So can these offenses be joined at

16  trial?  And Count 4, as properly narrowed to just

17  include what we've been talking about all day, which is

18  a meeting with R.B. in 2017 and the documents later

19  described in that meeting, can that alleged conspiracy

20  be properly joined and tried with the Count 1

21  conspiracy, which, again, is a multi-year RICO

22  conspiracy involving dozens of people who will not be

23  here; who the jurors will, you know, never -- weren't

24  here, as well as the two other counts against

25  Mr. Ravenell, a money laundering count and a drug

1   trafficking count.  Can all the RICO claims, the money

2   laundering and drug trafficking claims, can those be

3   tried along with what is really a very narrow question?

4          I think we should least of all perhaps come

5   to agreement on here is the issue about -- at the heart

6   of the charges against Mr. Treem and Mr. Gordon is

7   about a pretty narrow set of facts, a single interview

8   and how it was documented in two documents after that.

9   That is a pretty straightforward thing.  If we must

10  present this to a jury -- and for all the reasons my

11  colleagues have said, I don't think we must.  But if we

12  must, it's simple.  We can do this -- on behalf of

13  Mr. Gordon, we can try this case in a day and a half

14  this week if that's what it's about.

15         It is prejudicial and does not advance

16  judicial economy to join that simple question with the

17  government's burden of proving a RICO conspiracy

18  stretching across many, many additional years against

19  Mr. Ravenell only.  That's a far more complicated, far

20  more detailed question with a huge amount of evidence

21  that is unnecessary to resolving the question about

22  Mr. Treem and Mr. Gordon and Mr. Ravenell's behavior in

23  2017.  It is prejudicial.  It does not advance judicial

24  efficiency, and I think it would be incredibly

25  difficult for it not to confuse the jurors, for them

1    not to assume, well, there is this RICO conspiracy
2    they're describing is extremely broad.  Surely, the
3    government must be just charging the worst members of
4    it.  Well, we see two members here.  We see
5    Mr. Ravenell and Mr. Gordon.  Nobody else is being
6    charged.
7            It's going to create confusion about the
8    nature of the conspiracy, the requirement -- and it's a
9    RICO organization.  There's going to have to be massive
10   amounts of legal instruction to the jury and of
11   argument about is this a RICO enterprise.  None of that
12   matters to this very narrow issue that we want to
13   resolve now, which is the 2017 interview and how it was
14   recorded.
15           So I think this is a clear case where joinder
16   is not appropriate.  It's not appropriate under Rule 8
17   because the charges in Counts 1 through 3 are not
18   based -- are not part of a -- are not part of a
19   continuous scheme, and that's why this is sort of
20   circular with why they can't all be in Count 1.  But
21   they are not part of a continuous scheme.  They're not
22   of the same character.  They're not based on the same
23   transactions, at least when correctly separated.
24           To the extent there is a similar character,
25   the similarity is -- you're talking about defense

1  lawyers doing -- and defense investigators doing

2  standard work.  Yes, there are defense investigators

3  who interview witnesses in both cases, but that's not

4  enough.  That's far too general a kind of link to join

5  trial of these offenses.  And fundamentally, it's not

6  efficient.  It's the opposite here.  It's inefficient.

7  It's likely to be prejudicial.

8          Just, finally, the circularity of what you

9  can already feel happening with the prosecution's

10  arguments here.  Why did Mr. Ravenell commit

11  obstruction of justice when he said, here, go see if

12  these notes are true or false?

13          As Mr. Wise said, well, he committed

14  obstruction of justice because he knew the statements

15  were false.  Why did he know the statements were false?

16  Because he's guilty.

17          I mean, that's fundamentally what Mr. Wise

18  said, and that destroys Mr. Ravenell's presumption of

19  innocence.  It destroys, you know, our client's duty to

20  defend clients, guilty or innocent.  We have a duty to

21  defend clients regardless of their guilt or innocence.

22          And to essentially say that they are going to

23  prove that -- no.  Making an assumption that

24  Mr. Ravenell is guilty -- therefore, any efforts to

25  obtain exculpatory information were dishonest -- is

1  circular and undercuts everything the presumption of

2  innocence in the role of defense counsel is supposed to

3  do.

4         So I would just politely propose that this

5  one, there's an easy solution.  If we must take this to

6  trial, let's try the relatively simple, certainly

7  factually limited issue presented by the interview of

8  R.B. and the documentation of it thereafter, rather

9  than trying to combine that with a far more complicated

10 set of allegations involving very different actors,

11 different times, different places, and different goals.

12         Thank you.

13         THE COURT:  Thank you.

14         All right.  Mr. Trout.

15         MR. TROUT:  Thank you, Your Honor.  I'll be

16 brief.

17         Ms. LeGrand described whatever activities

18 Mr. Gordon was involved in in 2014 as a very thin read

19 or thin thread -- I think it was she said -- connecting

20 the two alleged conspiracies.  I certainly agree with

21 that; although, I think that's a generous

22 characterization.

23         I want to talk about Mr. Treem.  There was no

24 thread with respect to Mr. Treem.  Your Honor, the

25 allegations -- if you look at the original indictment,

1  all of the conspiracies which are similar conspiracies

2  to what has now been alleged in 1 through 3 ended in

3  2014.  Today the money laundering conspiracy is taken

4  up to August 15, 2017, as is the drug trafficking

5  conspiracy.  I would suggest that sounds like an

6  artifice, but in any event, none of it, none of it

7  involves Mr. Treem.  There is no allegation of any

8  involvement by him prior to 2016.

9          There's no allegation of any knowledge by

10  Mr. Treem of anything involving the money laundering or

11  drug conspiracy allegations.  None of the evidence,

12  Your Honor, relating to those counts in that conspiracy

13  count should be admitted as evidence in any case in

14  which Mr. Treem is a defendant.

15          There is clear misjoinder here as to

16  Mr. Treem, and the prejudice is obvious.

17          Thank you.

18          THE COURT:  All right.  Thank you.

19          MR. OUTLAW:  Thank you, Your Honor.  Lucius

20  Outlaw for Mr. Ravenell.

21          THE COURT:  Good afternoon.

22          MR. OUTLAW:  Your Honor, I think I'm going to

23  take a step back, and I think there's three key

24  starting points for this severance question and

25  analysis:

1          One, there's no allegation that when
2 Mr. Treem walked into the Towers Jail in Arizona on
3 September 9 that he knew all of the facts or alleged
4 facts in Counts 1 through 3.

5          The government will say, well, they had
6 access to *Jencks*.  Well, *Jencks* -- grand jury testimony
7 by witnesses who are not subject to cross-examination,
8 those are not facts in true, and an attorney has every
9 right to doubt those, especially when their client
10 tells them.  There's no allegation he knew all of those
11 facts or was even aware of all the facts of Counts 1
12 through 3.

13          And there's no allegation that he walked into
14 the jail in Arizona on September 9, 2017, with the
15 intent to obstruct justice by bribing, intimidating, or
16 any other obstructive conduct involving R.B.  There's
17 no allegation there.

18          And three, that he was -- Mr. Treem was
19 obligated to find evidence and witnesses to support the
20 defense of his client, Mr. Ravenell, especially when
21 R.B. calls Mr. Treem and says, You've got to come see
22 me.  I have important exculpatory information.

23          Now, if we start there, I think the road to
24 severance becomes very clear and obvious.  Why?  Well,
25 the government says, well, there's no severance

 1  because, one, all the evidence admissible in Counts 1

 2  through 3 is admissible against the defendants in

 3  Counts 4 through 7, and it involves the same scheme and

 4  transaction.

 5          When we start with those three starting

 6  points, that all tumbles down.  Why?  Because if

 7  Mr. Treem didn't have any actual knowledge of the facts

 8  underlying 1 through 3, that evidence is not admissible

 9  against him, right, and it's cumulative evidence that

10  has nothing to do with him.

11          Put another way, Your Honor -- I'll put it

12  delicately, and I apologize to my client now.  But if

13  something happened to him that made him unavailable, a

14  coma or death, and the case proceeded against Mr. Treem

15  and Mr. Gordon, they would not bring in all that

16  evidence through Counts 1 and 3 to prove up Counts 4

17  through 7.

18          Why do we know this?  Because the allegations

19  in 4 through 7 are essentially this:  That when -- the

20  obstruction occurred when Mr. Treem -- I'm not going to

21  get into a debate about what's being abandoned or not.

22  I'm just going by the indictment.  When Mr. Treem

23  presented the notes -- the obstruction happened when

24  R.B. said some of this is not true and Mr. Treem said

25  sign anyway, obstruction one.  The second obstruction

1   happens when he writes the letter to the judge, and the

2   third obstruction happens with the Gordon affidavit.

3           None of that is reliant on Counts 1 through

4   3.  The notes could have been about anything.  They

5   could have been about the Euro Cup for all we know.

6   Whether or not, the truth of those notes has no bearing

7   on the obstruction.  What has bearing is what happened

8   in that meeting, and Mr. Treem's and Mr. Gordon's and

9   Mr. Ravenell's memorialization or communication of what

10  happened in that meeting in subsequent events.  So

11  whether or not the notes themselves are actually true

12  or not has no bearing on 4 through 7.

13          So that evidence -- they say, well, we need

14  that to prove up.  That has no bearing because that's

15  not what's at issue here in 4 through 7.  It's the

16  defendants' characterization of what happened in that

17  meeting.  So they don't have to prove up 1 through 3 to

18  get to 4 through 7.

19          More importantly, the jury does not have to

20  understand the factual allegations of 1 through 3 to

21  understand whether or not the defendants, as the

22  government alleges, misrepresented what happened in

23  that meeting.  It simply does not matter what happened

24  in Counts 1 through 3 for the jury to make a

25  determination on 4 through 7.

1          The alleged conspiracy, the drug activity,

2     the money laundering alleged against my client has no

3     bearing on the question before the jury in 4 through 7.

4     And if Mr. Ravenell was gone tomorrow, they would not

5     be bringing the 30-something witnesses on 1 through 3

6     to try to prove up 4 through 7.  It would not happen.

7          The government -- I want to talk just briefly

8     about some of the cases the government cites, and they

9     are plainly distinguishable.  But not only

10    distinguishable, but they actually cut against them.

11         The *U.S. v. Carmichael* case which they

12    heavily rely on is at 685 F.2d 903.  In those cases,

13    there are two defendants, and they were involved with a

14    voting crime scheme -- an alleged voting crime scheme

15    and obstruction into the investigation of that

16    prosecution of those voting schemes.

17         It's not true here.  There's no allegation

18    that Mr. Treem was involved at all with any of the

19    stuff happening in Counts 1 through 3.  Mr. Gordon is

20    mentioned briefly, but he's not charged as a defendant

21    in 1 through 3.  So *Carmichael* has no application.  It

22    cuts against them because in *Carmichael*, the court said

23    there's no prejudice in having a joint trial because

24    the amount of evidence admissible against one and not

25    the other is not substantial.  So that totally

1  undercuts their admissibility evidence.

2           There is mounds of evidence in Counts 1

3  through 3 that has no bearing on Mr. Treem and

4  Mr. Gordon in Counts 4 through 7.  If you recall, Your

5  Honor, when we -- when Mr. Ravenell was the sole

6  defendant, the government said, "We will need three to

7  four weeks for this case, three to four weeks."  So

8  we're going to have a jury here sitting for three to

9  four weeks and never hear Mr. Treem's name but hear

10 over and over and over again about all this drug stuff,

11 and then say, well, it can be separated in their minds,

12 especially when they get up there and say, "Well, he's

13 defending the drug in-house lawyer who was involved

14 with other stuff."  That's asking too much of the jury,

15 Your Honor.

16          A lot of their cases that they cite, Your

17 Honor, go to the same point, the *Muir* case, the *Poulin*

18 case, and the *Milan* case.  All of those cases say you

19 have to have evidence of the underlying counts to

20 understand the obstruction charge because of the

21 motivation, because the actions are altogether.  That

22 is not the case here.  Again, the jury doesn't have to

23 have any understanding of Counts 1 through 3 to make a

24 decision on whether or not Mr. Treem, Mr. Gordon, and

25 Mr. Ravenell criminally misrepresented what happened in

1  that meeting with R.B.  They don't have to know any of

2  that stuff, and they shouldn't.

3         Going to the common scheme justification,

4  again -- I won't repeat -- it's the same analysis that

5  applies, but it goes further.  Because Counts 1 through

6  3 -- where they touch on obstruction is they allege

7  obstruction by Mr. Ravenell to protect R.B.  Counts 4

8  through 7 is an allegation that they were working to

9  protect Mr. Ravenell.  These are not comments --

10  they're not shared schemes.  They're not the same

11  scheme.  They're completely separate.

12         And we know that the government sees them

13  separately by how they acted in discovery when

14  Mr. Ravenell was the sole defendant.  Your Honor, we

15  made two specific discovery requests, including one on

16  November 5, 2019, for the government to produce any

17  exculpatory information they have, particularly of

18  memorialized statements of any witness, cooperator,

19  target, or subject.  The government wrote back to us

20  and said, We don't have it.  We know our discovery

21  obligations.  We know our *Brady* obligations.  We don't

22  have it.  If we find it, we'll give it to you.

23         We then filed a motion, not content,

24  compelling them to produce *Brady*.  I'm not going to get

25  into their response because that's under seal.  Your

1  Honor responded how you did.  That's under seal.  But
2  all this said, they never produced the video or
3  transcript of that meeting with R.B. in response to
4  those requests until February 2, 2021.  So 17 months
5  after the original indictment, after we had asked them
6  repeatedly to produce to us any exculpatory information
7  given by any witness, after we filed a motion on it,
8  they said, "We don't have it."  And they can't come
9  back now and say, well, it's *Jencks*.  Because in the
10 letter to us, they specifically said -- and in their
11 opposition, they specifically said they're not
12 withholding any *Brady* because it's *Jencks*.

13         Now, how is day one, September 9, 2017, when
14 R.B. is given all that exculpatory information about
15 Ken Ravenell -- he wasn't involved.  He didn't know.
16 He wasn't involved in money laundering.  How is that
17 not *Brady* that should have been produced right after
18 that initial indictment and certainly in response to
19 our requests?

20         Why?  Because if Mr. Ravenell had gone to
21 trial alone and been convicted and we learned about
22 that video afterwards, they would have come in here and
23 said, "That's not related to that case.  That was part
24 of a separate investigation of Josh Treem."  That's
25 what they would have said.  We all know it.  We all

1 know it.  They held that separately in their mind

2 because in their mind, it was a completely different

3 case.

4          THE COURT:  It was still under investigation,

5 right?

6          MR. OUTLAW:  It doesn't -- Your Honor, I

7 don't -- I don't know unless the government is going to

8 cite that, well, because you have a continuing

9 investigation, that gives you the right to withhold

10 *Brady* evidence when you are prosecuting someone and you

11 have a trial date.  I've never seen, "Well, we didn't

12 have to produce it because I was under investigation."

13 No.  It's *Brady*.

14          More importantly, they didn't say, "We're not

15 producing it because there's another investigation this

16 might impact."  They said, "We don't have any *Brady*."

17          THE COURT:  Okay.

18          MR. OUTLAW:  And that's a problem.  So it's a

19 separate case in their mind.

20          Just finally, Your Honor, the cases that they

21 rely on, the *Muir* case, the *Hornsby*, the *Cohen*, the

22 *Poulin*, those, again, are distinguishable here because

23 those cases involve one defendant who was involved with

24 the underlying charges and the obstruction.  That's not

25 the case here.  So those don't help them.

1          Finally, just one indulgence, Your Honor,
2    because in the briefing there was a lot of discussion
3    about the *Oaks* case.  I was a party of record to that.
4    Mr. Wise was a party of record.  I think that's not
5    only important for severance.
6          And just a brief indulgence.
7          But to a question the Court posed much
8    earlier in the day, when you asked the government if
9    the shoe was on the other foot regarding recording of
10   witnesses and the government says that would not be a
11   problem, we always think that we're recording, the
12   question is does the United States government, a U.S.
13   Attorney's Office of Maryland, believe it's okay for a
14   defense counsel to direct a witness to go into the U.S.
15   Attorney's Office, meet with them, derive information
16   of a recording, and give it to -- and the government, I
17   don't know their answer, but they seem to say no, that
18   that would not cause any legal jeopardy.
19         That's exactly what happened in the *Oaks*
20   case, Your Honor, if you go look at it.  Mr. Oaks was
21   first charged with honest services related to some
22   bribery.  There was a separate obstruction charge.  The
23   obstruction charge was based on the fact that
24   Mr. Oaks -- and this is all public now.  He's out of
25   jail, so there's no threat -- had signed on to be a

1  cooperator, was working with the government to target a

2  certain individual in an investigation.  And then he

3  went and told that person, basically, you're under

4  investigation.  And the government charged him with

5  obstruction of justice because they said, "That

6  disrupted our investigation."  It made it not viable

7  anymore.

8         So this idea that they don't believe -- that

9  they believe that somebody can come into the U.S.

10 Attorney's Office, get information in a confidential

11 setting, and then go tell it to the world is okay is

12 debunked by their own actions, including the government

13 counsel sitting here today.  It's simply not true.

14        Thank you, Your Honor.

15        THE COURT:  All right.  Thank you,

16 Mr. Outlaw.

17        MR. MADDOX:  Your Honor, when Ms. LeGrand

18 first stepped up here, she presumed to tell the Court

19 what Count 4 is really about, quote/unquote, and then

20 her colleagues followed suit with that definition.  The

21 defendants don't get to define what Count 4 is really

22 about.  The indictment defines what Count 4 is about.

23 What the indictment says about Count 4 is that there

24 was a conspiracy to obstruct justice involved with all

25 three of these defendants and other persons that began

1  in May 2013 and continued through December 2018.

2          Paragraph 8 of that count describes the

3  object of the conspiracy in a unified fashion as

4  creating false records and documents with the intent to

5  obstruct federal and criminal investigations in cases

6  in order to protect the members of the conspiracy, not

7  to protect Mr. Ravenell, not to protect R.B., but to

8  protect all members of the conspiracy, to include

9  Ravenell and R.B.

10          Paragraph 9 provides that those criminal

11  investigations include the investigations and

12  prosecutions of R.B. and Ravenell, and then paragraphs

13  10 through 12 describe the manner, means, and methods

14  of the conspiracy and make specific reference to the

15  investigations and prosecutions of R.B. and Ravenell.

16          That's what Count 4 is about, not what

17  Ms. LeGrand said, and they also don't get to prune

18  inconvenient allegations from the indictment in order

19  to fit their definition.  The indictment itself defines

20  what that charge is about.

21          The defendants do ask to strike paragraphs 1

22  and 13 through 15 of the count, but they assert no

23  legal basis for that given how that conspiracy is

24  defined.  Paragraph 13 alleges overt acts by

25  Mr. Ravenell by causing a false witness interview

1  report to be created of J.G. to protect R.B., and it

2  incorporates from Count 1, paragraphs 30 through 33,

3  for further factual detail and description.

4          Paragraph 33 from Count 1 is critical to

5  Count 4 because it describes the point at which the

6  conspiracy charged in Count 4 is alleged to begin.

7  Paragraph 33 also fits within the manner, means, and

8  methods described in paragraph 10 of Count 4.  So to

9  strike that from Count 4 would change the entire

10  character from Count 4 and would eliminate evidence in

11  support of Count 4.

12          Paragraphs 30 through 32 put the facts stated

13  in paragraph 13 in its proper context and is,

14  obviously, relevant to paragraph 33, and that's

15  paragraph 33 of Count 1, again, incorporated properly

16  into Count 4.

17          Paragraph 14 of Count 4 alleges an overt act

18  by Ravenell and Gordon traveling to a detention center

19  with an attempt to meet with D.W., and it incorporates

20  paragraph 34 from Count 1 for further factual detail

21  and description.

22          And then paragraph 15 incorporates

23  paragraph 35 from Count 1 for further detail and

24  description describing yet another overt act by

25  Mr. Ravenell sending Gordon to visit D.W. again.

1           Yet, additional detail from paragraphs 34 and

2    35 of Count 1 is relevant to Count 4 because it

3    describes an effort to procure a false witness

4    statement from D.W. involving both Ravenell and Gordon

5    which occurred in August 2013 and continued in May

6    2014.  Again, paragraphs 34 and 35 from Count 1 fit

7    within the methods and means described in paragraph 10

8    of Count 4.

9           So what we see here is these counts and the

10   allegations specifically mentioned here are

11   inextricably intertwined.  There's no question that

12   Count 4, paragraphs 13 through 15, are relevant to the

13   conspiracy charged in Count 4 describing an early point

14   in the conspiracy and how the conspiracy continued and

15   persisted beyond that date.

16          Any fair reading of paragraphs 10 through 12,

17   which describe the methods and means, reveals the

18   continuity in which those methods and means were

19   exercised after Treem joined the conspiracy.

20          To turn to Count 1 -- I'm sorry, to

21   paragraph 1 of Count 4, it incorporates various

22   paragraphs from Count 1 which describe the criminal

23   conduct of Ravenell and others that was the subject

24   matter of the investigations and prosecutions with

25   which the defendants obstructed, as alleged, or

1   conspired to obstruct as alleged in Count 4.

2          Those allegations are all relevant because

3   they supplied the motive for the obstructive conduct

4   that's alleged in Counts 4 through 7, and it also has

5   the tendency to make the charge of the obstruction --

6   conspiracy charged in Count 4 more probable and,

7   therefore, fits the definition of relevance.

8          Specifically, with respect to those

9   paragraphs from Count 1, I can point out specifically

10  paragraphs 3(b), 15(a), 16, 17, 21, 24, and 30 through

11  35 all from Count 1 all make specific reference to

12  criminal investigations and prosecutions that Ravenell

13  and others conspired to obstruct as charged in Count 4.

14  They are, therefore, properly incorporated into

15  Count 4.

16          All of the other paragraphs from Count 1 that

17  are incorporated into Count 4 explain those

18  investigations and put those investigations and

19  prosecutions in their proper context in order to make

20  sense of them.  Therefore, the relevancy of paragraph 1

21  from Count 4 and paragraphs 13 through 15 of Count 4

22  are clear, and the motion to strike should be denied on

23  that basis alone.

24          Again, the standard for striking allegations

25  from an indictment, Your Honor, under Rule D are that

1  the only allegations that are subject to striking are

2  allegations that are either not relevant or both not

3  relevant and are inflammatory and prejudicial.  Since

4  it's clear that all of these allegations are relevant

5  to Count 4, the motion to strike should be denied on

6  that basis alone.

7       It also happens that the allegations from

8  Count 1 incorporated into Count 4 are not inflammatory

9  or prejudicial.  Taking specifically paragraphs 13

10  through 15, they are of a similar character and no more

11  inflammatory than the remainder of Count 4.  Paragraphs

12  16 through 108, if anything, they're less inflammatory

13  than those paragraphs.

14       Also, paragraphs 13 through 15 do not suggest

15  that Defendant Treem was a member of the conspiracy at

16  that point in time.  He joined the conspiracy at a

17  later point in time.

18       The defendants argue that the allegations

19  suggest that Gordon and Treem were involved in the

20  activities that they were not involved in, the

21  activities alleged in Count 1.  But there's so much

22  factual detail in the indictment, Your Honor, it's

23  impossible to make that mistake.  Treem is not

24  mentioned in Count 1 at all, so it's impossible to make

25  the mistake that he was somehow involved in it.  And

REDACTED

1   the evidence to be presented to the jury at trial will

2   not show that Treem was involved in those activities.

3   So there's no -- there will be no confusion on the part

4   of the jury as to that point.

5           Is summary, the government has presented and

6   the grand jury has approved Count 4 in its current

7   form, not as the defendants seem to prune it in order

8   to fit their definition of what Count 4 should be

9   about.

10          As to duplicity, Your Honor, Count 4 alleges

11  a single conspiracy to obstruct justice.  It is not

12  duplicitous.  Even if it was duplicitous, dismissal

13  would not be the appropriate remedy unless there was a

14  showing of prejudice made.

15          The singularity of the conspiracy is clear

16  from the paragraphs I've cited.  There's a singular

17  object of the conspiracy, to protect members of the

18  conspiracy by creating false documents and records, and

19  the manner and means track that objective.  All of the

20  allegations in that count, including the ones

21  incorporated from Count 1, track that objective.

22          Just to cite some of the case law, Your

23  Honor -- some of this was cited in our response brief

24  but not all of it -- the *United States v. Jeffers* case

25  from the Fourth Circuit in 2009 says a single

conspiracy exists when the conspiracy has the same objective as I've just described and it has the same goal, the same nature as I've just described, the same geographic spread, the same results and the same product. And the same product and results in this case were false documents and false records in order to obstruct investigations in cases against members of the conspiracy.

The defendant need not be involved in every phase of the conspiracy in order for a conspiracy to be singular. In order for that member to be deemed a participant in the conspiracy, he does not have to be part of it from the very beginning. He can join the conspiracy at a later point in time.

If the Court takes seriously the argument that the defendants are making here, then you could never have a conspiracy where there are latecomers who get charged in the same conspiracy count. You could also never have a conspiracy that has multiple facets or multiple parts or sectors where you have some participants who are only involved in one part of the conspiracy and not others. They would always allege that that is duplicitous and, therefore, that conspiracy count should be split.

Citing the Court to *United States v. Patel*,

1   the Fourth Circuit decision that relied upon *United*
2   *States v. Urbanik*, which was cited in the government's
3   brief, the question of whether evidence shows a single
4   conspiracy or multiple conspiracies is for the jury,
5   and the finding of a single conspiracy must stand
6   unless the evidence, taking it in the light most
7   favorable to the government, will not allow a
8   reasonable jury to so find.

9           In other words, this is a question of whether
10  there's a multiple conspiracy versus a single
11  conspiracy.  This is a question to be presented to the
12  jury as properly instructed by the Court, and if the
13  Court sees that it's fit at the time that the matter is
14  presented to the jury, the Court can give a limiting
15  instruction as to the multiple conspiracy argument that
16  the defendants are making here.

17          In general, it is black-letter law that
18  duplicitous indictments can be cured through
19  appropriate jury instructions.  That's *United States v.*
20  *Robinson* out of the Fourth Circuit in 2010.

21          In short, if Count 4 is indeed duplicitous,
22  the duplicity can be appropriately addressed with a
23  jury instruction.  Dismissal is not the appropriate
24  remedy.

25          As to the severance, Your Honor, what we have

1  here -- in this indictment, we have in Count 1 a
2  racketeering conspiracy that overlaps with a drug
3  trafficking conspiracy, a money laundering conspiracy,
4  and an obstruction conspiracy.  That is Counts 2
5  through 4.  The unlawful purposes for which the
6  enterprise charged in the first count was put included
7  drug trafficking, money laundering, and the obstruction
8  of justice.  In that sense, Count 1 is interwoven with
9  Counts 2 through 4.

10         These are all distinct conspiracies, as I've
11  just defined.  They all had their own objectives and
12  their own goals.  One defendant is charged in all four
13  conspiracies.  Two defendants are charged in the
14  conspiracy to obstruct justice.  On that ground alone,
15  the defendants are seeking to sever Counts 4 and the
16  remaining counts from Counts 1 through 3.

17         In terms of the time spans of the
18  conspiracies as charged, the obstruction conspiracy
19  charged in Count 4 overlaps with the RICO conspiracy by
20  well over a year.  That's between May 2013 through
21  September 2014.

22         In terms of the manner, means, and methods of
23  the conspiracies, some means and methods are shared
24  between Count 1 and Count 4.  If you compare
25  paragraph 16(b) from Count 1 to paragraph 10 from

1  Count 4, you find basically the same method and means

2  by which those conspiracies were carried out, each for

3  their own unlawful purposes.

4          In terms of overt acts, Count 4 and Count 1

5  share several overt acts which the defendants have now

6  sought to strike with no legitimate basis, and those

7  are paragraphs 30 through 35 of Count 1 and paragraphs

8  13 through 15 of Count 4.

9          In terms of the evidence, again, there's a

10 substantial overlap between Count 1 and Count 4.  Overt

11 acts alone indicate that several witnesses and

12 exhibits, through which the government will present

13 evidence, is directly relevant to both counts will be

14 presented in a severed trial if those counts were

15 severed.  In other words, there would be a duplicated

16 effort in the prosecution and a duplicated effort on

17 this court to hear evidence in both of those trials.

18         In addition, the paragraphs that I've cited

19 before that refer to the specific investigations and

20 prosecutions that Ravenell sought to obstruct refer to

21 evidence -- they refer to evidence relevant to both

22 Count 1 and Count 4.  That evidence would, again, be

23 duplicated in a severed trial.

24         Those investigations and official proceedings

25 are encompassed within a larger body of evidence

1  relevant to both counts, Count 1 and Count 4.  All of

2  that would have to be presented in both trials.  So if

3  this case were severed, then all of this evidence would

4  need to be presented.  Judicial and prosecutorial

5  efforts would be duplicated, and the resources would be

6  wasted.

7          Unfair advantage would also be gained to

8  whoever goes second, whoever's trial happens second in

9  the sequence.  Witnesses and the larger body of jurors

10 would be inconvenienced, and that is the very reason

11 why the policy underlying Rule 8 is one of broad

12 joinder.

13         Just to be clear, Your Honor, in the papers,

14 there was a mistake made on the defense's part in

15 citing Rule 8(a), and the government followed suit and

16 analyzed this issue under Rule 8(a) with the applicable

17 subsection of Rule 8 that applies here, Rule 8(b),

18 because this is a case that involves multiple

19 defendants.  And what Rule 8(b) says is that an

20 indictment may charge two or more defendants if they

21 are alleged to have participated in the same act or

22 transaction or the same series of acts or transactions

23 constituting an offense.  And the defendants may be

24 charged in one or more counts together or separately.

25 All defendants need not be charged in every count.

1           On its face, Rule 8 supports a policy of

2   broad joinder, and the case law interpreting that rule

3   makes that clear.  I can cite the *Zafiro* case from the

4   Supreme Court which says that joint trials promote

5   efficiency and serve the best interest of justice by

6   avoiding scandal, an inequity of inconsistent verdicts.

7   That case also held that there is a preference in the

8   federal system for joint trials of defendants who are

9   indicted together.

10          Also, circuit law supports the same view.  In

11  the Second Circuit, the *Werner* case, for example, held

12  that an important policy behind the rule is that trial

13  convenience and economy of judicial and prosecutorial

14  resources, and these considerations are of particular

15  weight when the government and the courts have been

16  placed under strict mandates to expedite criminal

17  trials.

18          Now, under Fourth Circuit law, the test to

19  determine whether or not joinder is proper is whether

20  the defendants are alleged to have participated in the

21  same series of acts or transactions.  Now, I think

22  there was some citation to the case law on this point

23  earlier in the defense's presentation, Your Honor.  The

24  cases are almost universal that anytime you have an

25  obstruction count, the conduct charged in obstruction

1   is part of the same series of acts or transactions as

2   the underlying criminal conduct.  Therefore, any counts

3   of obstruction are properly joined with any counts

4   charging the underlying conduct.

5          The government in its response cited the

6   *Carmichael* case which Mr. Outlaw spoke about.  There's

7   another case that, I think, may be more fitting and may

8   address the objection that Mr. Outlaw had to the

9   *Carmichael* case.  That's *United States v. Curry* under

10  the Seventh Circuit, 977 F.2d 1042.

11         In that case, Your Honor, there was a joinder

12  of one defendant's perjury count, one defendant.  So

13  let me just back this out.  There are several

14  defendants.  I don't know the exact number, but there

15  were many.  One defendant alone was charged in a

16  perjury count.  That one defendant was not charged in

17  any of the other counts.  There were various other

18  counts charging drug trafficking conspiracies,

19  possession with intent to distribute narcotics, and so

20  forth.  The defendant charged in the perjury counts was

21  not charged in any of the earlier drug trafficking

22  counts, and he was the only defendant charged in the

23  perjury counts.

24         So if that was a case in which joinder -- or

25  misjoinder occurred, according to the defendants'

1   argument, that case certainly should have been severed.

2   But it was not because it was found that the

3   obstructive conduct, the perjurious conduct that

4   occurred in the counts, charged against that one

5   defendant were part of the same series of transactions

6   as the underlying drug trafficking charges.

7          There are other cases that support a similar

8   position.  The *Potamitis* case, 739 F.2d 784, out of the

9   Second Circuit had a similar holding.  Again, the cases

10  are almost universal.

11         They try to cite *Oaks* as a counterexample to

12  this because in the *Oaks* case, you had an obstruction

13  count that was found to be misjoined or severed from

14  the underlying -- from the other counts.  But that's

15  not a case where the underlying criminal conduct

16  relevant to the obstruction count was charged in the

17  earlier counts.  What you had was that the earlier

18  counts, which alleged bribery and various bribery

19  related conduct, was based on Defendant Oaks' accepting

20  bribes from an informant.

21         What the obstruction had to do with is Oaks

22  telling another person that they were under

23  investigation, and the obstruction there occurred in

24  the investigation of that other person, not in the

25  investigation of Oaks.  That is the key distinction

1   between *Oaks* and all of these other cases that hold

2   that obstruction counts are properly joined with the

3   underlying conduct.

4           So given all of this, the defendants' only

5   recourse is Rule 14, and Rule 14(a), of course,

6   requires that if joinder of offenses or defendants in

7   an indictment appears to prejudice a defendant or the

8   government, the Court may order separate trials or

9   counts.  So you need prejudice in order to get relief

10  under Rule 14, in order to get severance under Rule 14.

11          The only basis for severance is any basis

12  that any defendant in a multi-defendant case could

13  claim.  It's that all the evidence that the government

14  is going to present on all of these counts I'm not

15  charged with is going to spill over and make me look

16  guilty.  It's case after case that holds it's wholly

17  insufficient in order to support severance under

18  Rule 14.  I won't belabor that point, Your Honor,

19  because it's cited heavily in the government's response

20  memorandum.

21          I would also cite the Court to the *Curry* case

22  that I mentioned earlier, which also supports this

23  view.

24      So unless the Court has any questions, I'll rest

25  on that point.

1          THE COURT:  Thank you, Mr. Maddox.

2          MR. MADDOX:  Thank you, Your Honor.

3          THE COURT:  Let Ms. LeGrand start.

4          MS. LEGRAND:  Briefly -- because this has

5    been extensively briefed, and I think it's relatively

6    straightforward -- I want to clarify a few things.

7          First of all, I think the confusion created

8    by Count 4's current structure is apparent from the

9    government's own arguments.  Repeatedly they draw us

10   back to paragraphs 30 through 33 in Count 1.  Again,

11   that is an uncharged, unindicted, unnamed investigator.

12   It is extraordinarily confusing to hear the government

13   argue that this conspiracy started on the date when an

14   investigator allegedly created a false statement and

15   that's when this conspiracy started when that

16   investigator is not here.  That investigator is not

17   Mr. Gordon.

18         And the result of lumping that all together

19   is a very specific and clear risk of prejudice that

20   Mr. Gordon must be just like this investigator, that he

21   must be this investigator.  It's prejudicial, and it's

22   confusing.  And it happens again and again in the

23   government's own arguments.  When they're trying to

24   explain what Mr. Gordon did wrong, they talk about

25   paragraphs 30 through 33, which are not Mr. Gordon.

1        In terms -- and a lot of what Mr. Maddox

2   argued becomes essentially circular, not in a negative

3   way.  I'm just saying to the extent that Count 4 is

4   duplicitous, as we believe it must be because there is

5   not the necessary continuity, overlap between

6   individuals, overlap between goals, and because there's

7   not enough overlap for it to be a single conspiracy,

8   the allegations pulled in from Count 1, the 2013 and

9   2014 allegations should not be in Count 4.

10        When they are not in Count 4, there is no

11   continuity of acts -- no transactional continuity

12   between Counts 1, 2, and 3 and Counts 4, 5, 6, and 7.

13   So there are no common acts when Count 4 is properly

14   drawn.

15        Regardless, under 8(b) which, as Mr. Maddox

16   points out, generally -- it's a little unclear in the

17   Fourth Circuit, but it generally applies to severance

18   of offenses in a multi-defendant case.  All of the

19   defendants have to be -- if we're joining all the

20   defendants, all of the defendants have to be involved

21   in that same set of acts and transactions.  Again, it

22   is undisputed that Mr. Treem was not involved at all in

23   the allegations in Count 1.

24        So 8(b) itself, I think, requires severance

25   of Mr. Treem and requires severance of Mr. Gordon

1    because there's no continuous scheme.  There's nothing

2    continuous between Mr. Gordon's actions in 2013 and '14

3    and 2017 besides on three occasions that he met with a

4    witness.

5              Just last, in terms of the alleged relevance,

6    the detailed discussion in Count 1 of this alleged RICO

7    enterprise, there was a design to facilitate a drug

8    trafficking organization, the idea that that's all

9    necessary to show what Mr. Treem was later defending

10   against, what Mr. Treem was later allegedly

11   obstructing, that's just wrong.

12             There's a wealth of case law.  I would say

13   *U.S. v. Poore*, a Fourth Circuit case from -- I'll never

14   find the citation.  Sorry.  Oh, found it.  It's Fourth

15   Circuit, 1979, an old case, still good law, 594 F.2d

16   39.  That's just one of many cases stating the sort of

17   straightforward proposition that, for example, if

18   you're charging someone with being a felon in

19   possession or something of the like, you tell the jury

20   he committed a felony.  You don't get to tell the jury:

21   Here's exactly what that felony was in painful detail

22   because that's extraneous and it's prejudicial.

23             That's exactly what they're trying to do

24   here.  To the extent they are saying that all or

25   essentially all of Count 1 should come in through

1   Count 4 because the jury needs to know what

2   Mr. Ravenell was being prosecuted for or being

3   investigated for, that's not right.  The fact of an

4   investigation is what needs to come in.

5           This detailed discussion of prejudicial and

6   inflammatory details of that should not come in for the

7   same reason that the nature of the felony usually

8   shouldn't come in in a felon in possession case, that

9   the exact nature of a firearm offense shouldn't come

10  in, for those same reasons.

11          And with that, unless the Court has any

12  questions, I will stop.

13          Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. TROUT:  Your Honor, just very briefly.  I

16  won't belabor the point that Mr. Treem has nothing to

17  do with Counts 1 through 3.

18          I will point out that Counts 4 through 7, the

19  government could put on its entire case without a

20  witness.  It's just not going to take that long.

21          THE COURT:  Okay.  Thank you.

22          All right.  What do we have left?

23          I'm sorry.  Mr. Outlaw, you want to -- I'm

24  sorry.

25          MR. OUTLAW:  Just quickly, Your Honor.

1          The case that the government cites -- I
2    believe it's the *Peer* (phonetic) case or *Puryear*
3    (phonetic) case.  I can't remember, Your Honor.
4               THE COURT REPORTER:  I'm sorry?
5               MR. OUTLAW:  I don't know.  It's starting
6    with a P that Mr. Maddox just raised.
7               THE COURT:  The Seventh Circuit case?
8               MR. OUTLAW:  Right.  I'm trying to pull it up
9    now.
10          Essentially, Your Honor, from what I recall,
11    there was not much discussion about the relationship
12    between the perjury charge and the underlying.  They
13    just kind of said it's perjury.  We are just not going
14    to sever.  So I don't think that gets them where they
15    need to go.
16          What the government has not addressed is if
17    you take Mr. Ravenell out, would all that evidence in
18    Counts 1 through 3 be admissible against Mr. Treem and
19    Mr. Gordon?  And it would not be.
20          If you recall, when Mr. Ravenell was the sole
21    defendant, they gave us a list of 39 witnesses, 39
22    witnesses.  If there was a case against Mr. Treem and
23    Mr. Gordon just on Counts 4 through 7, maybe two of
24    those witnesses are going to be allowed to testify.
25    There is not sufficient overlap.  There is not

1   sufficient commonality.  There is not sufficient

2   relationship between 1 and 3 and 4 through 7.  The jury

3   does not have to understand 1 through 3 to make a

4   determination on 4 through 7.

5           Thank you.

6           THE COURT:  Thank you.

7           MR. GOLDSTEIN:  Can I answer Your Honor's

8   question about what we have left?

9           THE COURT:  Yes, sir.

10          MR. GOLDSTEIN:  There is the nexus argument,

11  which I can do in under three minutes.

12          THE COURT:  Okay.

13          MR. GOLDSTEIN:  There is the Due Process

14  Protections Act argument that Mr. Trout would address

15  and, I think, the motion with respect to grand jury

16  records of attendance.

17          Are we submitting on the briefs?

18          We're submitting on the briefs.

19          THE COURT:  Okay.

20          MR. GOLDSTEIN:  I didn't mean to turn my back

21  on the Court, but I wasn't sure I was up-to-date.

22          THE COURT:  All right.

23          MR. GOLDSTEIN:  So on nexus -- and I will

24  talk as fast as I can without straining the court

25  reporter -- I would start with the Fifth Amendment,

1  which requires that an indictment expressly charge all

2  of the elements of the offense.  That's hornbook Fifth

3  Amendment law, and I'm sure the government would not

4  disagree with that principle.

5         We know also that an element of 15(c)(2) is a

6  nexus between the obstructive act and the official

7  proceeding.  We know that because the Fourth Circuit

8  has said that twice in *U.S. v. Southerland* and *U.S. v.*

9  *Young*.

10        So the question becomes, is there, as the

11 government suggests, a hippogriff.  It's a mythical

12 beast.  In this case, an element that need not be pled

13 but must be proved.  And I think the case law is clear

14 that when an element is implicit, such as *mens rea*

15 that's missing from the words of a statute, as *Hamling*

16 said, you still have to allege it if it's an element of

17 the offense.

18        And so when we look at this indictment, it's

19 very clear that neither paragraph 12 of Count 4 or

20 paragraph 2 of Count 5 allege, in terms or otherwise --

21 what Mr. Wise would call incantations or magic words --

22 that the natural and probable consequences of the

23 creation of the KWR combined notes was to obstruct a

24 likely federal proceeding.  Nor does it say that the

25 creation of the Gordon affidavit would have as its

1   natural and probable consequence the obstruction of a

2   likely federal proceeding.  And the same is true for

3   the letter to the federal judge.

4           It's cast in terms of "if" and "in the event

5   of," which we are taught by *Aguilar*, by *Arthur*

6   *Andersen*, and by *Marinello* doesn't cut the mustard.

7   Might or might not will not do.

8           So for that reason, we believe the indictment

9   is insufficient and ask that you dismiss it without

10  prejudice to give the government an opportunity, if it

11  so wishes, to properly allege the nexus that is

12  required.  The cases cited by the government nowhere

13  address the Fifth Amendment at all.

14          Judge Roszel Thomsen of blessed memory, when

15  I would cite a case like the ones the government cited,

16  would say, Mr. Goldstein, you've just cited a mule

17  case.  And I would look puzzled, and Judge Thomsen

18  would say -- and it's T-H-O-M-S-E-N.  Judge Thomsen

19  would say a mule case, Mr. Goldstein, is one without

20  pride of an ancestry or hope of progeny.

21          Thank you, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Any other members on the defense team want to

24  speak on the nexus?

25          MS. HAYNES:  Very briefly, Your Honor, and I

REDACTED

1    will actually be brief because I know we are going --

2                THE COURT:  Good afternoon to you.

3                THE COURT REPORTER:  I'm sorry.  Could you

4    state your name, please.

5                MS. HAYNES:  Absolutely.  McKenzie Haynes for

6    Mr. Ravenell.

7                Just to reiterate what Mr. Goldstein said

8    earlier today, that the question here is does the

9    indictment allege a crime.  And in this instance, for

10   Counts 4 and 5 for Mr. Ravenell, there is no nexus that

11   is properly alleged in the indictment.  Mr. Ravenell

12   may be many things, but not a fortune-teller is he.  He

13   cannot predict the future.  He did not know at the time

14   that he constructed the KWR combined notes that

15   Mr. R.B. would potentially be a witness in any

16   investigation, whether or not a grand jury would

17   official indict him.

18               And so the very prospect that the government

19   now presents here in alleging that it is possible that

20   Mr. Ravenell could know the future or what the future

21   held is, frankly, absurd.  And given the burden that

22   the government has in regards to putting forth an

23   indictment that states very clearly what is being

24   charged, they have not done so in this instance.

25               And, finally, just to say that -- you know,

1  we talk about -- so much in this case is about the

2  chilling effect that the government's actions have on

3  the attorney-client relationship and also the work

4  product doctrine.  In this particular instance, when

5  Mr. Ravenell crafted the KWR combined notes, he was

6  giving those to his counsel purely for his counsel's

7  reference.

8        What Mr. Treem later did with those notes,

9  you know, the government has alleged.  But in this

10  instance, Mr. Ravenell produced those for his counsel

11  and his counsel alone.  So how could he then have

12  presumed or even foreseen that they would be an

13  eventual indictment, an eventual use of Mr. R.B.'s

14  testimony is really an absurd notion that could not

15  have been predicted at the time.

16        So if you have nothing further --

17        THE COURT:  Thank you.

18        MS. HAYNES:  Thank you.

19        THE COURT:  All right.  Mr. Wise.

20        MR. WISE:  Thank you, Your Honor.

21        Both counsel's arguments ignore the fact that

22  Count 4 is a multi-object conspiracy, and they both

23  address exclusively the 1512(c) two objects and not the

24  1519 object.  So even if their argument is persuasive,

25  which it's not, the remedy would not be to dismiss

1   Count 4 because there is -- they don't claim and

2   there's no case law to support this, that the nexus

3   requirement applies to 1519, which is the second object

4   of the Count 4 conspiracy.

5           Further, they don't address the fact that

6   there -- even for the 1512(c) object, that there are

7   three distinct sets of conduct that are alleged.  They

8   only address two of those.

9           Now, as we cited, *Meza*, *Moyer*, *Triumph*

10  *Capital Group*, *Black*, *Ring*, *Potts*, *Gabriel*, all of

11  those are decisions from district courts in the Middle

12  District of Pennsylvania, Connecticut, the Northern

13  District of Illinois, the District of Columbia,

14  Minnesota, and the Southern District of New York that

15  have expressly held that the government need not plead

16  nexus in a 1512 count in an indictment.  I can't

17  imagine all of those district judges are unfamiliar

18  with the Fifth Amendment, as Mr. Goldstein seems to

19  suggest.

20          The bottom line is the government will prove

21  nexus at trial.  Their argument on this point ignores

22  the fact that the black-letter law on 1512 is that it

23  not only criminalizes obstructing an extant proceeding

24  that exists at the time, but it also criminalizes

25  obstructing a foreseeable prosecution as pled in the

1   indictment.  *Aguilar* only addressed the former.

2   *Aguilar* was charged with obstructing a grand jury

3   proceeding that was in process, not a foreseeable

4   prosecution, and the logic of *Aguilar* doesn't fit,

5   doesn't work with a foreseeable prosecution.  No one

6   can know who a witness is in a foreseeable prosecution,

7   and the law doesn't require anyone to know something

8   that is foreseeable, not certain but foreseeable.  So

9   there is a degree of contingency and probability

10  anytime a foreseeable prosecution is charged.  And so

11  the use of the word "if" and "in the event of" is

12  perfectly appropriate.

13          As we said, we don't -- the law is clear we

14  don't have to plead nexus.  So, therefore, it does not

15  form a basis for dismissing Count 4 in addition to the

16  fact that that's not the only object.

17          But looking at what we have pled, it is

18  sufficient nexus, and it will be sufficient at trial if

19  the evidence meets what was pled.

20          Thank you, Your Honor.

21          THE COURT:  All right.  Thank you.

22          MR. GOLDSTEIN:  Very briefly, Your Honor.

23          THE COURT:  Yes, sir.

24          MR. GOLDSTEIN:  We don't have a problem with

25  the foreseeable part.  It's the natural and probable

1  consequence part.  In *United States v. Young*, the

2  Fourth Circuit found that there was not an adequate

3  nexus between the defendants' conduct and the pending

4  or foreseeable official proceeding and reversed the

5  conviction.

6        And in *United States v. Southerland*, the

7  Fourth Circuit found an adequate connection when

8  documents had been subpoenaed by the grand jury, and

9  the witness, the target personally gave documents not

10 to the grand jury, but to the Assistant U.S. Attorney.

11       And unlike Mrs. McDonnell in Virginia, unlike

12 Judge Aguilar, the court there said it was a natural

13 and probable consequence that the Assistant U.S.

14 Attorney was going to turn and give those documents,

15 those false documents to the grand jury.  So no matter

16 how you slice it, that natural and probable consequence

17 part needs to be part of the equation.

18       And with all respect, I am not ignoring that

19 Count 5 contains multiple documents.  Because there's

20 no allegation that a natural and probable consequence

21 of the Gordon affidavit was obstruction.  Maybe that

22 can be alleged, but it's not alleged.  There's no

23 allegation that the letter to the federal judge would

24 have, as its natural and probable consequence, an

25 obstruction of a foreseeable proceeding.  Maybe that

1  can be alleged, but it's not an element that's alleged.

2          And Count 4, even though there are present

3  the 1519, again, I don't think that you can amend the

4  conspiracy count to exclude all references to the 1512

5  parts and leave the 1519.  I'm not even sure how that

6  surgery could be performed.

7          At the end of the day, if you look at those

8  district court cases, the later ones cite the earlier

9  ones and say that -- the earlier ones say, well,

10 *Aguilar* didn't say what has to be in the indictment,

11 which is absolutely true.  But what we do know is that

12 every court that has considered the question of whether

13 the Fifth Amendment can allow an implicit element not

14 to be pled, circuit courts -- not the Fourth Circuit,

15 but circuit courts and district courts alike in greater

16 numbers have said consistently and universally:  If

17 it's an element, it must be pled.

18         And what the government has not offered you

19 is any justification other than there are these cases,

20 Judge, for how the Fifth Amendment can allow the return

21 of an indictment that is missing an element.

22         Thank you, Your Honor.

23         THE COURT:  All right.  Thank you,

24 Mr. Goldstein.

25         Mr. Trout.

1            MR. TROUT:  Yes, Your Honor.  The last motion
2  is the Due Process Protections Act motion, and I think
3  it's a matter that we need to take up at the sidebar.
4            THE COURT:  Okay.  Come to the sidebar,
5  please.
6       (Under seal Bench Conference D is under separate
7        cover, and then proceedings continued in open
8        court, as follows:)
9            THE COURT:  I think I said it earlier.  If I
10 didn't, all of the bench conferences are under seal.
11           All right.  I think we'll adjourn for the day
12 unless someone has something that is urgent to tell the
13 Court.
14           I'll take the motions under advisement.  I've
15 looked at them.  I very much appreciate the focus on
16 the issues that you brought to the Court this
17 afternoon, and I want to look and focus on some of the
18 issues that you've raised and the way they've been
19 brought out here today and the back-and-forth that's
20 gone on before I issue a ruling.  We'll get you a
21 ruling pretty soon on the motions.
22           Mr. Maddox, I want a follow-up on that.
23 There's nothing more important to the administration of
24 justice that the Court relies on the representations of
25 counsel on both sides of the aisle about what evidence

1   exists or doesn't exist and when it has to be turned

2   over.  So that is a serious matter to me, and I want

3   you to fully explore it and respond.  You may ask to do

4   it *ex parte* if it involves issues that you believe

5   should be dealt with *ex parte*, but there will be a

6   public record of it ultimately.

7             All right.  Thank you all again.

8             We're in recess.

9             ------------------------------------
                    Time:  5:48 p.m.
10

11

12

13

14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                              _____
                                      /s/
25                           Rhonda F. Montgomery, CCR, RPR
                                 R E D A C T E D

        Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599