1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,   )  Case 1:19-cr-449
                                 )
 4              Plaintiff,       )  UNDER SEAL
                                 )
 5         v.                    )  Alexandria, Virginia
                                 )  July 7, 2021
 6   KENNETH WENDELL RAVENELL,   )
     JOSHUA REINHARDT TREEM, and )
 7   SEAN FRANCIS GORDON,        )
                                 )
 8              Defendants.      )
     _____ )  Pages 1 - 37
 9

10        TRANSCRIPT OF UNDER SEAL BENCH CONFERENCES

11           BEFORE THE HONORABLE LIAM O'GRADY

12           UNITED STATES DISTRICT COURT JUDGE

13
     APPEARANCES:
14
     FOR THE PLAINTIFF:
15
          LEO J. WISE , ESQUIRE
16        MATTHEW J. MADDOX, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
17        36 South Charles Street, 4th Floor
          Baltimore, Maryland  21201
18        (410) 209-4800

19

20

21

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
                         UNDER SEAL
```

1  APPEARANCES CONTINUED:

2  FOR DEFENDANT KENNETH WENDELL RAVENELL:

3       PETER H. WHITE, ESQUIRE
        MCKENZIE E. HAYNES, ESQUIRE
4       AISLINN K. AFFINITO, ESQUIRE
        SCHULTE ROTH & ZABEL LLP
5       901 15th Street, N.W., Suite 800
        Washington, D.C.  20005
6       (202) 729-7486

7       LUCIUS T. OUTLAW, ESQUIRE
        OUTLAW PLLC
8       1351 Juniper Street, N.W.
        Washington, D.C.  20012
9       (202) 997-3452

10 FOR DEFENDANT JOSHUA REINHARDT TREEM:

11      ROBERT P. TROUT, ESQUIRE
        SCHERTLER ONORATO MEAD & SEARS
12      901 New York Avenue, N.W., Suite 500 West
        Washington, D.C.  20001
13      (202) 628-4199

14      DANIEL F. GOLDSTEIN, ESQUIRE
        131 Route 9A
15      Spofford, New Hampshire  03462
        (410) 218-8537
16
   FOR DEFENDANT SEAN FRANCIS GORDON:
17
        GEREMY C. KAMENS, ESQUIRE
18      OFFICE OF THE FEDERAL PUBLIC DEFENDER
        1650 King Street, Suite 500
19      Alexandria, Virginia  22314
        (703) 600-0800
20
        REBECCA S. LEGRAND, ESQUIRE
21      LEGRAND LAW
        1100 H Street, N.W., Suite 1220
22      Washington, D.C.  20005
        (202) 587-5725
23
   THE DEFENDANTS, KENNETH WENDELL RAVENELL, JOSHUA
24 REINHARDT TREEM, AND SEAN FRANCIS GORDON, IN PERSON

25

                    U N D E R   S E A L

   R h o n d a   F .   M o n t g o m e r y     O C R - U S D C / E D V A     ( 7 0 3 )   2 9 9 - 4 5 9 9

1                           **I N D E X**

2                                                     PAGE

3   Bench Conference A                                4

4   Bench Conference B                                10

5   Bench Conference C                                19

6   Bench Conference D                                21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Under seal Bench Conference A is as follows:)

2          THE COURT:  Let me start by thanking

3    everybody for coming to Alexandria.  That was,

4    obviously, inconvenient for you but certainly

5    convenient for me, and I appreciate your coming here.

6          So please go ahead.

7          MR. WISE:  Your Honor, the issue that has

8    never been publicly identified is R.B. cooperated in

9    making the recording, and we've been redacting any

10   mention of that per Your Honor's order, which we

11   litigated in order to keep him safe.  He is

12   incarcerated.  The indictment is charged in such a way

13   that allows him to maintain, if he chooses to, that the

14   room was bugged.

15          Obviously, central to both sides' arguments

16   on the specific motions that we're talking about is the

17   DPPA motion and privileged materials motions.  We are

18   going to make argument that he was essentially

19   recording it.  It speaks to the issues they've raised.

20   I think that it's important to maintain his physical

21   safety.

22          THE COURT:  Beyond just his initials, you

23   want the information that he cooperated in doing the

24   recording also kept under seal?

25          MR. WISE:  Yes.  That's what's been redacted

1  out of all the motions to date.  That's never been

2  publicly acknowledged in any public filing at all.

3          THE COURT:  Since I've been reviewing

4  unredacted materials, I appreciate that.

5          MR. KAMENS:  Can I make a suggestion, Your

6  Honor?

7          THE COURT:  Yes.

8          MR. KAMENS:  The issue comes up with respect

9  to the government's response to our motions saying that

10 the witness consented, and that reveals the fact that

11 the witness cooperated with the government.  In our

12 affirmative motion, it is not essential that we say

13 that he cooperated.  We are challenging the secret

14 eavesdropping of the recording.  It is only in

15 responding to the issue of consent.

16         We are using a pseudonym.  If we just use the

17 word "consent" as the shorthand for the government's

18 response, it seems like we could argue about the legal

19 issue of consent.  And it may appear on the transcript

20 it's the consent of the jail or the consent of the

21 authorities in charge, but we don't say that it's the

22 consent of the witness.  But everyone has that

23 understanding, and it's now on the record.  I think we

24 could essentially have the full argument in the public

25 hearing.

1          The law is that the public hearing is the

2    rule, not the exception, and any closure has to be

3    narrowly tailored.  I would suggest here we have a way

4    to meek about the legal issues without revealing the

5    fact of R.B.'s cooperation.

6          THE COURT:  And if you want to address any

7    other specific issues, we could have a sidebar at that

8    stage.

9          Do you think that would do it?

10         MR. WISE:  In their reply, they make argument

11   about if we couldn't do it surreptitiously, we can't do

12   it with his involvement.  In their motion, there are

13   numerous redactions that refer to his cooperation.  In

14   the other motions, they also make allegations that --

15   well, frankly -- yeah, they make allegations that his

16   testimony was essentially affected by his cooperation,

17   that is how we were interfering with the witness.  So I

18   don't think it is the case you can sort of tease out

19   the fact that he was cooperating from the larger

20   arguments.

21         THE COURT:  I don't want to bounce back and

22   forth with an open and closed courtroom.  So let's use

23   consent.  When you want to approach the bench to

24   clarify the record for your purposes -- I, obviously,

25   understand the record.  We also understand the

1   record -- then you ask to approach.  We'll go from

2   there.  We are not going to then close the courtroom.

3   Let's just be mindful of when you actually need to use

4   information that is going to require us to come to the

5   sidebar.

6          MR. WISE:  Just so I understand, what is it

7   that the defense will say that Mr. Byrd did?

8          MR. KAMENS:  Well, we won't say that the

9   consent came from him, but in describing the

10  government's response and justification for making the

11  recording, the government has argued that consent

12  justifies the government's conduct.  So we'll just use

13  that word "consent."

14         MR. WISE:  I think that sounds like

15  cooperation.  I think everybody will know.  The only

16  person that could consent is him.  Certainly not

17  Mr. Treem or Mr. Gordon.  It was three people in that

18  room.

19         THE COURT:  Okay.

20         MR. KAMENS:  The alternative, if the Court is

21  concerned about that, is argument about consent could

22  be at sidebar and everything else would be public.

23         THE COURT:  Yes, let's do it that way.

24         MR. TROUT:  Your Honor, one last thing.  On

25  the DPPA motion, I think we are just going to have to

1  argue that at sidebar maybe at the end of the day.  I

2  just don't think we can have that argument --

3          THE COURT:  You know, okay.  I mean, it's an

4  issue that's been addressed, and we've looked at it.

5  So I'll allow some argument about it, but it's not

6  going to be a protracted argument.

7          MR. TROUT:  I don't expect it would be.

8          THE COURT:  All right.  We'll do it at

9  sidebar then.

10         MR. WHITE:  Okay.  Can I say one thing for

11  the record?  I don't believe any of this needs to be

12  under seal under *Crawford*.  It is clear the government

13  could not have proved this case without that witness.

14  The way they indicted it, it could not be done.  There

15  would be a confrontation clause problem if the case

16  were tried without that witness being called.  The way

17  the government indicted it made it very clear what they

18  would be proving.

19          I think this is all a canard to try to keep

20  this from the public eye.  So I think the whole thing

21  should be open.  There is no confusion he's a

22  cooperating witness given the way it's charged.

23  There's no other way it could be proven.

24         THE COURT:  You don't get the correspondence

25  on a weekly basis that I get about witnesses who are

1  cooperating and being threatened, being assaulted, and

2  are not being protected in a lot of environments.  So

3  I'm very mindful of that.

4  His name is out there.  Some people have

5  reported it, but it's not widely known.  Within the

6  confines of the prison, wherever he is these days, I

7  think that the less information that's available for

8  now, that's important.

9  MR. WHITE:  Your Honor, I'm not trying to

10 gate the issue.  I just wanted to say that for the

11 record.  That's part of the reason previously we -- we

12 are very mindful of witness issues.  I know that's of

13 paramount importance, and I don't mean to disagree with

14 that at all.  I just wanted to say that for the record.

15 THE COURT:  All right.  Let's give it a go.

16 (Proceedings continued in open court.)

17

18

19

20

21

22

23

24

25

1          (Under seal Bench Conference B is as follows:)

2              THE COURT:  That one is free.  The next

3  one --

4              MR. WHITE:  I understand, Your Honor.  It's

5  not going to happen again.

6              THE COURT:  Okay.  Yes, sir.

7              MR. KAMENS:  So the last justification the

8  government has for its conduct in this case is the

9  consent of the fact witness, but the other cases also

10 involve consent.  So if the government was asking the

11 fact witnesses give us notification or why don't you

12 ask for a prosecutor to be present, same thing in

13 *Gregory* and in *Martinez*.

14             Obviously, the cooperating witness gave

15 consent for the recording.  Consent is not a free pass

16 to violate the right to equal access.  And so if it is,

17 then certainly the defense could ask a witness, when

18 they interview with the government, to record the

19 interview and provide it.

20             Again, that invasion of what is supposed to

21 be a confidential investigation by one side is not

22 subject to secret surveillance by the other.  And so,

23 for example, there are cases such as *United States v.*

24 *Levy*, which we have cited from the Third Circuit, that

25 prohibit the government from planting a cooperating

1  witness in defense discussions that's done by the

2  consent of the witness.

3         Consent itself does not affect the analysis

4  here.  It doesn't matter that this individual

5  consented.  What matters is that the government took

6  the opportunity, simply because it wanted to find out

7  what the defense was learning from this witness, to

8  secretly surveil and wire up this witness.  That is

9  completely improper, and the government can't cite a

10 single case to support it.

11        THE COURT:  Okay.  Do you want to respond to

12 the consent argument while we're at sidebar?

13        MR. WISE:  Sure, Your Honor.  So it's their

14 motion.  They are claiming that this is somehow

15 egregious misconduct; yet, they can't cite a single

16 case, as Your Honor has pointed out, that says a

17 private citizen who has no attorney-client relationship

18 with a defense attorney who is asked -- and Mr. Treem

19 made 12 kinds of outreach, before the phone call they

20 keep mentioning, to talk to him.  They cite no

21 authority for the fact that defense attorneys can

22 effectively gag private citizens forever, that they

23 can't tell their own lawyer what the defense attorney

24 asked them, they can't tell the government what the

25 defense attorney asked them.

1           Here, in this case, R.B. made a decision not

2    to cooperate.  That was within his Sixth Amendment

3    right.  So they are saying he can't make a decision to

4    cooperate to provide this information.  That is simply

5    untoward from the law or practice.

6           Even the *Martinez* case says the government

7    could fully debrief a cooperator as to the work product

8    issue and obtain all the same information.  But it

9    makes this distinction, without a defense, that somehow

10   we could get all the statement information but we

11   couldn't record it because it might -- and this is the

12   phrase we used -- actually be more accurate.  We could

13   get the detail.  We could get the substance, everything

14   that the *Martinez* court distinguishes between recording

15   a post hack debrief.  It isn't a distinction that bears

16   any weight.

17           They can't cite a case that says they can gag

18   R.B. forever because he was interviewed by someone who

19   didn't represent him, and that's why they can't prevail

20   on this motion.

21           THE COURT:  I didn't mean to require you to

22   do your oral argument at sidebar, but the consent

23   portion of it that is raised, is there anything

24   specific about that you want to raise as well?

25           MR. WISE:  Simply that the work -- really,

1   it's -- well, the work -- as I'll argue in open court,

2   the waiver is what they keep avoiding, that this is a

3   form of waiver.  They say the fact he consented doesn't

4   change anything.  Well, you first have to establish

5   that they have the ability to control him and to exert

6   confidentiality over him, and they don't because of the

7   waiver issue.  He can consent to essentially whatever

8   he wants.  He's an American citizen, and he can turn

9   that information over to the government or record it if

10  he wants to.

11              THE COURT:  Okay.

12              MR. KAMENS:  Can I respond to that?

13              THE COURT:  Yes.

14              MR. KAMENS:  This is not about what R.B. says

15  after the interview is over to the government.  That

16  would be hearsay.  This is about the ability of the

17  government to create a tape recording or an audio

18  recording or visual recording of the interview itself.

19              So when the government, as they said in their

20  pleading, say the defense can't cite any case that

21  directly prohibits this type of conduct, I don't

22  understand why they don't look to *Martinez* and *Shaygan*,

23  which involve exactly this type of conduct.  Not the

24  ability of the witness to go back and debrief the

25  government, but the inability of the government to take

1  a confidential defense interview and make a secret

2  recording of it.  Those cases directly address this

3  circumstance.

4          It is a very different circumstance if the

5  witness were to go back and say what he remembers, and

6  the *Martinez* court explicitly explains why that is

7  different.  Could the government bring an obstruction

8  prosecution against the defense lawyer and investigator

9  based on the hearsay of R.B.?  No.  What they have done

10 is created evidence, which they have then used to

11 prosecute these defendants, which they otherwise would

12 never have the ability to do because they have made a

13 secret recording.

14          MR. WISE:  This is the point.  He is saying

15 we couldn't debrief R.B. because it would be violating

16 Treem's work product privilege.

17          MR. KAMENS:  That is not true.  What I'm

18 saying -- I'm sorry.

19          MR. WISE:  I thought that's what I heard you

20 say at the podium.  We would have to set up a filter

21 team, and anything that was work product would be kept

22 from the team.

23          MR. KAMENS:  No.  What I'm saying is if the

24 government believes that lawyer is going to engage in

25 improper conduct, witness tampering, or obstruction,

1  even there the proper way to address that is to get

2  independent lawyers, per the DOJ Manual, to come in and

3  do that investigation.  That's what they tried to do in

4  *Shaygan*, but they didn't keep the wall up between the

5  prosecution team.

6          Now, what I have not said is that the

7  government couldn't try to debrief R.B. after the

8  interview.  They can certainly do that.  Now, the work

9  product process would say the government can't ask the

10 witnesses about the -- try to get into the mind of

11 defense counsel because that would be trying to get at

12 opinion work product.  But could they try to ask him

13 what happened in the interview and he said, "Sure,

14 absolutely," that is completely different from what the

15 government did here.

16          MR. TROUT:  Your Honor, could I just be heard

17 on behalf of Mr. Treem very briefly on this?

18          THE COURT:  Yes, sir.

19          MR. TROUT:  Your Honor, I think the cases

20 illustrate the fallacy of the government's position.

21 There were 53 statements on this form.  Forty-nine of

22 them we now know R.B. responded to and there was

23 discussion about them.  And as the Court knows, at a

24 certain point, they digressed and talked about

25 follow-up.

1                THE COURT:  Right.

2                MR. TROUT:  The idea that as effective a

3    debrief -- to be able to remember all of the 49 things

4    that he was asked, I mean, it's just fanciful that it

5    could accomplish the same thing if they were to ask

6    immediately afterwards what happened at the meeting.

7                Let me also add, Your Honor:  Every lawyer in

8    this room has experienced the situation where the

9    question is asked of the client:  Tell us who else have

10   you discussed this with.

11               And always the lawyer says, But don't tell me

12   about anything that you discussed with your lawyer.

13               And that's because lawyers are supposed to

14   respect the privilege.  And so, for example, if there's

15   some sort of inadvertent disclosure of material that

16   the lawyer knows his adversary or her adversary didn't

17   want disclosed, they have an obligation, and that

18   obligation is to call up the lawyer and say, Did you

19   really want to give me this?

20               So lawyers have an obligation to protect the

21   privilege, and work product is every bit as important

22   to a lawyer's work as the attorney-client privilege.

23               THE COURT:  Okay.  All right.  Thank y'all.

24               MR. WHITE:  Your Honor, can I say one thing

25   about the consent point?

1           THE COURT:  Yes, Mr. White.

2           MR. WHITE:  I'll limit it strictly to that

3    issue.

4           As to his consent, obviously, this is not a

5    situation where the witness came to the government and

6    offered to record it.  It was the government's decision

7    to ask for the recording.  He was a cooperator at the

8    time.  You know how that works.  It's not consent in

9    the normal sense of consent where somebody does an

10   interview and decides to tell the other side what they

11   said.  This was dictated by the government.  It is much

12   akin to --

13          You mentioned before Mr. Treem saying, Well,

14   we'll see what we can do about whatever financial

15   situation there is.

16          I would submit to you:  I don't think there's

17   anything more wrong with that than there is with the

18   government saying, Cooperate with us.  We'll see what

19   we can do about your sentence.

20          There's clearly nothing wrong with that,

21   right.  So both of those are things that are allowed

22   for the lawyers to do.  That's what happened here.  But

23   when you have that situation, you eject something into

24   it that is different from the normal version of

25   consent.

1          I'll save the rest of it for open court.

2          THE COURT:  All right.  Thank you.

3      (Proceedings continued in open court.)

```
 1            (Under seal Bench Conference C is as follows:)
 2                  THE COURT:  Yes, sir.
 3                  MR. WISE:  I was listening to the consent
 4      issue, and I think I heard Mr. White say it wasn't
 5      R.B.'s decision to record, it was the government's
 6      decision to record.  Factually, that's not true.  R.B.
 7      was asked if he would record, and he agreed to record
 8      on advice of counsel.
 9            He was not and has never been under a
10      cooperation agreement.  He pled guilty without a
11      cooperation agreement.  He was sentenced, and only
12      after that did he decide to begin cooperating.  So
13      there was -- it was always his choice.  He was advised
14      by counsel at the time to take it, I assume, and he
15      did.  And so it's not -- it is his choice.  That's, I
16      think, where their argument really falls apart.
17                  THE COURT:  So if I hear you correctly,
18      R.B.'s lawyer allowed the interview to take place also.
19                  MR. WISE:  And was involved in the decision.
20      He was counseled in the decision whether to cooperate
21      and what the parameters were.  He was represented the
22      whole time.  So to say that the government, you know --
23      I forgot the word that was used -- sort of overcame his
24      volition, he made that choice, and it was not the
25      government's choice as Mr. White said.
```

1          MR. WHITE:  Your Honor, as to that point, the

2  government stated in a pleading recently, I believe,

3  that R.B. became a cooperator prior to that interview.

4  I believe it was August, the date prior to the

5  September interview.  Clearly, at this point, you know

6  he is a cooperating witness with the government, which

7  changes the dynamic.  Mr. Wise's representations that

8  he was just doing this out of the goodness of his heart

9  are just not -- that's not the facts.  I think we all

10  know that.

11          THE COURT:  I think the point that he is

12  trying to make is notwithstanding that he is

13  cooperating, he also has his own counsel who is

14  directing and who he's got a relationship with and who

15  evidently has worked to set up the parameters of this

16  interview, including the taping.

17          MR. WHITE:  Obviously, Your Honor, he had the

18  right to say he didn't want to do it at all and do his

19  26 years in prison without getting out.  He had that

20  right too.  I think everybody knows how that works.

21          THE COURT:  Understood.

22          All right.  Then let's go back and finish

23  your argument.

24      (Proceedings continued in open court.)

25

1          (Under seal Bench Conference D is as follows:)

2                    THE COURT:  All right.  Please go ahead.

3                    MR. TROUT:  Thank you, Your Honor.

4                    I'll start where I left off.  This case could

5    be tried without any witnesses, including R.B.  And so

6    where we are, Your Honor, is what would account for

7    R.B. giving these exculpatory statements.  And in view

8    of the fact that we are not necessarily talking about

9    *Giglio* material, it, obviously, seems to me very

10   exculpatory either way, whether this was a planned

11   setup of a lawyer without any basis for doing so or

12   whether the exculpatory statements came as a surprise

13   to the government after they had signed him up as a

14   cooperator in mid-August.

15                   And so a jury is presumably going to be

16   sitting there trying to figure out what would account

17   for this.  Why would the cooperator give this

18   statement, give all of these statements on September 9?

19   And the evidence of that, Your Honor, which involves

20   the communications between the government and this

21   cooperator who may or may not be a witness, is clearly

22   exculpatory.

23                   Now we go to September 10.  He flips.  Again,

24   let's assume R.B. is not a witness.  The jury is going

25   to be sitting there wondering:  What was that about?

1  Did he flip because he was taken to the woodshed?  What

2  was -- you know, how emphatic was it that he needed to

3  change his story and get his story straight?  That's,

4  obviously, exculpatory.

5          The government basically says it was a false

6  exculpatory statement.  They have alleged that that is

7  the core of their obstruction case.  A jury might

8  conclude, It sounds to me like what he said on

9  September 10, not what he said on September 9, is what

10 was false.

11         We need to know that.  A jury is going to be

12 scratching their head trying to figure that out.  And

13 either way, whatever the case may be, it would serve a

14 defense argument one way or the other, whether it was

15 all planned as a setup by the government with no good

16 reason or whether it was a complete surprise to the

17 government that their cooperator had given an

18 exculpatory statement and then the next day, after

19 meeting with the agents, he changed his mind.

20         Now we come to mid-January, five months

21 later.  He makes the phone call.  The Court has got the

22 phone call.  Maybe it has listened to the phone call.

23 It's clear that he is now threatening to go to the

24 AUSA, James Warwick.  He says so if he doesn't get the

25 love that he expects and wanted and asked for.

1          Was the government involved in that?  Was
2 that part of the plan?  Gee, it's not working so well.
3 Now let's dial it up and bring him -- kind of get him
4 to do this again.  Again, highly exculpatory if that's
5 what happened.

6          Let's say that's not what happened.  Let's
7 say that came as a complete surprise to the government.
8 Again, what we're left with, if that's the scenario, we
9 know that in August 2018, the government received the
10 letter that was sent to the federal judge.  The
11 evidence will show that Mr. Treem approved that.

12          But that aside, what did the government do in
13 August 2018 when they just learned to their dismay --
14 let us hope -- that their main cooperator had committed
15 a crime?  Normally, that's grounds for revoking the
16 cooperation agreement.  Normally, that's grounds for
17 prosecuting someone.  What did they do?

18          Again, this evidence is critical to the
19 defense, and presumably, the jury is going to be
20 scratching their head asking themselves these very
21 questions because they're going to want to know, and
22 we're going to want to be able to tell them.

23          That's why we filed this specific -- it is
24 not just the government has their duty to provide *Brady*
25 material.  We are basically saying -- we are telling

1  you exactly the material we need and why.  And we

2  believe it is *Brady*, and we believe the Court should

3  order them in this circumstance.

4        We'd be the first to agree how unusual this

5  is when the cooperator, within a month of signing up,

6  provides over the course of three hours exculpatory

7  information.  We get it, and we get it that normally

8  the government thinks of this as *Giglio* type material.

9  But this is different because this witness may not be a

10  witness at all, and we are entitled to this

11  information.

12        Thank you.

13        THE COURT:  All right.  Thank you.

14        Any other counsel?

15        MR. KAMENS:  If I can just be heard briefly,

16  Your Honor.

17        This is on the Due Process Protection Act

18  motion.  That act is not meant to be a *pro forma*

19  exercise where the Court just says to the government:

20  Do what you're supposed to do.

21        And in this case, I don't think the

22  government could bring Counts 4 through 7 against the

23  defendants without calling R.B. as a witness.  It would

24  violate the confrontation clause because we have to

25  have an opportunity to cross-examine this witness.

1              And I don't think that the statements that

2     R.B. made on the second day would be admissible as

3     prior consistent statements.  If R.B. comes and

4     testifies and makes adverse statements about

5     Mr. Ravenell, he can't also say, "Oh, and by the way,

6     on September 10, 2017, I said similar things."  Because

7     the law is clear he was cooperating.  He had an

8     incentive to fabricate those statements.  And so,

9     according to the case law, if you're cooperating, you

10    can't introduce those statements as prior consistent

11    statements.

12             The only part of this interview that would be

13    admissible is potentially the statements from the first

14    day as prior inconsistent statements or potentially --

15    if there was some invocation of the Fifth Amendment and

16    R.B. became unavailable, they could be potentially

17    admitted under 804 if the witness was unavailable

18    because of that invocation.  But the day two statements

19    could not be admitted by the government.

20             Now, what we are asking with respect to the

21    Due Process Protection Act is that we have a witness

22    who made completely diametrically opposed statements

23    between day one and day two, and the government clearly

24    failed in what seems to be a clear obligation to have

25    provided the day one statements for years when they

1   were asked to provide exculpatory statements.

2          And given this context, it is very clear that

3   the government should be required to give all

4   exculpatory information and material relevant to the

5   credibility of R.B. and relevant to their conduct with

6   respect to R.B. between day one and day two and

7   everything that could be useful to the defense in

8   cross-examining R.B. at trial because he is the central

9   witness.

10          THE COURT:  Mr. Outlaw or Mr. --

11          MS. AFFINITO:  Mine doesn't need to be made,

12   but I can do it if that's easier.  Aislinn Affinito on

13   behalf of Defendant Kenneth Ravenell.

14          So the reason the proposed order here is

15   necessary is because the government has demonstrated

16   throughout the history of this case that it either does

17   not understand or is unwilling to comply with its *Brady*

18   obligations.

19          As Mr. Outlaw talked about, the defense

20   counsel submitted two discovery requests in 2019

21   expressly seeking exculpatory materials, including

22   exculpatory information and/or testimony from witnesses

23   regarding the charges and allegations against

24   Mr. Ravenell, as well as all statements and

25   memorialized witness interviews, cooperating witnesses,

1  subjects, or targets of these investigations who

2  provided exculpatory information about Mr. Ravenell.

3           During the first day of his interview, R.B.,

4  who is a key witness to the facts in this case, stated,

5  among many other exculpatory statements, that

6  Mr. Ravenell did not know that any portion of the money

7  he received was sourced from drug proceeds and that

8  R.B. deliberately concealed this information from

9  Mr. Ravenell.

10          So this is clear exculpatory information.

11  It's clear *Brady* material.  It goes to the heart of the

12  allegations in Counts 1 through 3 which have been

13  pending since September 2019.

14          So in response to these discovery requests,

15  the government responded on December 3, 2019, that it

16  would, quote, produce any *Brady* material if and when

17  any such material is discovered, end quote.

18          The government also affirmatively stated,

19  quote, We are not withholding any *Brady* material on the

20  basis that it was also *Jencks* material, end quote, and

21  that the government was, quote, confident that we have

22  complied with our *Brady* obligations, end quote.

23          And, obviously, as Mr. Outlaw discussed, we

24  had an actual motion to compel *Brady* material, and the

25  Court ruled on that.  The Court denied it as moot

1  because the government in its response brief denied

2  having any such exculpatory statements.  And because

3  the Court pointed out that the government had

4  repeatedly reaffirmed that it is aware of its ongoing

5  discovery obligations.  Nonetheless, the Court still

6  ordered the government to promptly produce exculpatory

7  material pursuant to *Brady*.

8          Despite all of this, despite the government's

9  repeated insistence in 2019 and 2020 that it understood

10  and complied with its *Brady* allegations, the government

11  failed to produce the statements from the September

12  2017 interview until February 2, 2021.

13          This means that as of March 18, 2020, when

14  Mr. Ravenell's trial was still set for April 13, 2020,

15  less than a month away, the government still had not

16  produced these expressly requested exculpatory

17  materials and was, in fact, denying their existence at

18  all and did not produce them for another year.

19          By withholding exculpatory evidence in

20  contravention of *Brady* and this Court's order and in

21  the face of direct requests for these materials, the

22  government has demonstrated that it does not understand

23  its *Brady* obligations and can no longer be given the

24  benefit of the doubt that it will comply with them.

25          So the government here requires express

1  instruction from this Court explaining these

2  obligations and directing it to produce all of the

3  requested exculpatory materials immediately.

4  Accordingly, the defendants' proposed order is

5  necessary.

6          Thank you.

7          THE COURT:  All right.  Thank you.

8          MR. MADDOX:  With respect to the history of

9  this case as just laid out, it goes without saying that

10  the defendants now have all that information that they

11  requested.  To the extent that that information was

12  requested in discovery requests they just recited --

13          THE COURT:  When the motion was pending back

14  in 2019 -- I don't remember too many cases and too

15  little brain mass left -- did the government file

16  anything under seal that said, hey, Judge, we have this

17  other information that's part of an ongoing

18  investigation and we don't want to have to turn it over

19  or it would result in prejudice to the government?

20          MR. MADDOX:  Your Honor, I have to admit.  I

21  don't remember either.  This is not a matter that was

22  specifically raised in the briefing, so it's not

23  something I researched.  I would have to go into the

24  case history and look at that and look at what the

25  state of what we had in our possession at that point in

1  time.

2          THE COURT:  Please do.

3          MR. MADDOX:  Yes.

4          THE COURT:  But go ahead now.

5          MR. MADDOX:  As to the history, the defense

6  now has the recording that they are claiming is *Brady*

7  material, and I understand their position on the

8  question of whether it is *Brady*.  I would just note

9  that on the second day, R.B. did recant many of the

10 statements he made on the first day.  And he has also

11 offered further explanation that doesn't really -- and

12 I understand Mr. Trout's efforts to sort of hypothesize

13 for the reasons between the flip between day one and

14 day two.

15         THE COURT:  That is a curious question.

16         MR. MADDOX:  Right.

17         THE COURT:  I mean, everyone that's looked at

18 the cases is going to say the exact same thing, as will

19 a jury.

20         MR. MADDOX:  Mr. Trout on that point -- it

21 wasn't hard for him to peek everyone's curiosity on

22 that.  He peeked the curiosity on other points that

23 have nothing to do with *Brady*.  But on that point, I

24 understand, you know, the efforts to hypothesize what

25 happened there.  Neither of those scenarios is correct.

1          It is the government's position that the
2  information surrounding any statements that Mr. R.B.
3  made about the flip between day one and day two is not
4  *Brady* material.  And if R.B. is called as a witness in
5  this case, any information, any statements that he made
6  about the subject matter of his testimony will be
7  disclosed in the *Jencks* production.

8          And the government continues to observe its
9  *Brady* obligation and will disclose any *Brady* that comes
10 into its possession.

11         THE COURT:  Why is it not exculpatory?  Why,
12 if he received instructions either from his counsel or
13 from the government to change his version of events, is
14 that not --

15         MR. MADDOX:  Well, that wasn't the
16 instruction, Your Honor.  That instruction -- that
17 wasn't the instruction as I understand it.  Now, I have
18 to admit.  Mr. Wise and I were not part of the
19 prosecution team at that point.  So we weren't there.
20 All we have is what's in the documents.  It is our
21 understanding that that instruction did not exist.

22     (Mr. Wise and Mr. Maddox confer.)

23         MR. MADDOX:  So what --

24         THE COURT:  Go ahead.  I'm sorry.

25         MR. MADDOX:  So the flip between day one and

1  day two, R.B. had an explanation as to what happened as

2  to day one.  What he was told after day one during a

3  debrief session is to tell the truth.  So what happened

4  on day two is what he said on day two.  I'm not sure if

5  that's based on the advisement of what the prosecutor

6  in the case at the time had said to him.  I am not sure

7  what he would say as to whether or not he changed his

8  story because of that, but that's the only instruction

9  that occurred.  And it's the government's position that

10 that's not *Brady*.

11         MS. LEGRAND:  There is a written document

12 somewhere that documents what allegedly happened

13 between those days.

14         MR. MADDOX:  What allegedly happened.

15         MS. LEGRAND:  That's not discoverable because

16 it hasn't been produced.

17         MR. MADDOX:  It hasn't been produced because

18 its *Jencks*.

19         THE COURT:  Okay.

20         MR. WISE:  Your Honor, I'm sorry to --

21         THE COURT:  It's okay.

22         MR. WISE:  To your earlier question, at that

23 time, Your Honor asked if we had filed anything.  At

24 that time, that's when the proceedings were in front of

25 a special master as to the seized materials.  So the

1    information about the recording was before the special
2    master and before the Court.
3            THE COURT:  Was that all part of the Chinese
4    Wall information that had been ordered to go to the
5    special master?
6            MR. WISE:  Well, we had provided information
7    to the special master about the recording.  And then
8    she had based many of her decisions on the recording,
9    and Your Honor then in adopting the report and
10   recommendation also had access to the recording.
11           MR. WHITE:  Your Honor, if I could just say
12   one thing about this.  None of that explanation
13   explained why we did not get the exculpatory material
14   they had at that time.  There was no excuse because it
15   was a pending investigation or it was in front of a
16   special master.  They didn't give it to us.  We had a
17   trial date, and they didn't give it us.  We had a trial
18   date in April.  They didn't give it to us.  They
19   clearly don't understand that --
20           THE COURT:  I asked Mr. Maddox and Mr. Wise
21   to go back and check with others who were involved in
22   the case at that time and explain why there was no
23   explanation to the Court that, in fact, they had
24   exculpatory evidence.  I'll pursue that.
25           MR. WHITE:  Thank you, Your Honor.

UNDER SEAL

```
 1              THE COURT:  I'm not going to ignore that.
 2              So the question is whether it's exculpatory
 3   evidence or whether it's Jencks material is the issue.
 4   Do you want to be heard further on that now that you
 5   have had an explanation?
 6              MR. TROUT:  Well, Your Honor, I mean, I view
 7   Giglio as part of Brady.
 8              THE COURT:  Giglio, yes.  Excuse me.
 9              MR. TROUT:  I think it needs to be turned
10   over promptly when it becomes known.  I think in this
11   particular instance, again, beginning with what
12   happened on September 9 and leading up to
13   September 9 -- I mean, you just don't expect one of the
14   first things the cooperator is going to do after
15   entering into a cooperation agreement is to spend three
16   hours damaging the government's case.  That just
17   doesn't happen.
18              And so it's important for us to know what
19   happened before September 9 and what happened after
20   September 9, and it's also important for us to know
21   what happened after the government learned that their
22   cooperator had committed a crime.  All of that, Your
23   Honor, is Brady.  We need to figure out what do we say
24   about that.
25              THE COURT:  Okay.  Understood.
```

1          MR. OUTLAW:  If I could just --

2          THE COURT:  Go ahead.

3          MR. KAMENS:  I was just going to say *Jencks*,

4    that doesn't override *Brady*, Your Honor.  *Brady* has to

5    be provided in a timely manner.  So the government

6    can't hide behind the fact this relates to a witness

7    statement.  The fact is that if the government says to

8    a witness that's helpful to a defendant, you know, you

9    can invoke the Fifth Amendment, that is a true

10   statement, but it also can violate the government's

11   obligation not to influence the testimony of a witness

12   who may be helpful to the defendant.

13          In the same way, telling a defendant who has

14   just provided exculpatory statements helpful to a

15   defendant, "You, sir, who are facing 26 years in

16   prison, need to tell the truth," that also is directly

17   relevant to how we are going to be able to address

18   R.B.'s flip on day two.  And it is absolutely

19   discoverable.  It is absolutely the obligation of the

20   government to provide that to us now.

21          THE COURT:  All right.  Mr. Outlaw.

22          MR. OUTLAW:  Your Honor, just to put on my

23   law professor here, just the idea that the government

24   says, well, it's not *Brady* because it's not true, the

25   government does not have the right to determine the

1  veracity of information that undermines their case, to

2  determine whether it's not *Brady*.  They do not have

3  that authority or power.  If it undermines their case,

4  it is *Brady* regardless of their opinion of whether it's

5  true or not.  So they can't say, "Well, he recanted, so

6  it's not *Brady*."  No, that's point one.

7          Point two, what is lost is *Brady* doesn't also

8  extend to impeachment evidence.  We say, well, it's

9  *Giglio*.  No.  No.  If you read the cases around *Brady*,

10  it involves impeachment as well because it undermines

11  the government's case.  So whether or not he was

12  truthful on day one or truthful on day two, for *Brady*

13  purposes, it doesn't matter because they are completely

14  opposite statements.  There in itself is *Brady* because

15  it's conflicting statements.  So they can't say, Well,

16  it's *Giglio*.

17          Also, they represented to us over and over

18  again not withholding *Brady* or *Jencks*.  So *Jencks*

19  doesn't save them.  *Giglio* can't save them.  It is

20  *Brady* because it is, one -- day one is exculpatory in

21  and of itself and is impeachment when you put it with

22  day two.  It is clearly *Brady* evidence, and they are --

23  that they withheld it is very telling that they don't

24  understand or they are doing it for strategic purposes.

25          THE COURT:  Okay.  All right.  Thank you.

UNDER SEAL

1          (Proceedings continued in open court.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          I certify that the foregoing is a true and

22   accurate transcription of my stenographic notes.

23

24

                                    _____
                                            /s/
25                          Rhonda F. Montgomery, CCR, RPR
                                  U N D E R   S E A L

      R h o n d a   F.   M o n t g o m e r y    O C R - U S D C / E D V A    ( 7 0 3 )   2 9 9 - 4 5 9 9