## Schulte Roth&Zabel LLP

901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
202.729.7470
202.730.4520 fax

www.srz.com

Writer's Direct Number
202.729.7476

Writer's E-mail Address
Pete.White@srz.com

April 29, 2022

**BY E-MAIL & ECF**

The Honorable Liam O'Grady
Judge, U.S. District Court
United States District Court for the District of Virginia,
sitting by designation in the District of Maryland
401 Courthouse Square
Alexandria, VA 22314

Re:   *United States v. Ravenell* (1:19-cr-00449)

Dear Judge O'Grady:

We write in anticipation of Kenneth Ravenell's sentencing hearing scheduled for May 13, 2022.  As the Court is aware, Mr. Ravenell was found guilty of one count of money laundering conspiracy (Count 2) on December 28, 2021, and was acquitted of all the other counts brought by the government (Counts 1, 3, 4, 5, 6, and 7).  Verdict Form (Dkt. No. 490).

This verdict came after a three-week trial at the end of an aggressive investigation spanning over seven years.  During that investigation, the DOJ, the IRS, and the DEA conducted scores of interviews of nearly everyone professionally associated with Mr. Ravenell, including clients, co-defendants, lawyers, and other professionals, who provided legal services for Richard Byrd and his associates.  They issued countless subpoenas to financial institutions and other businesses. Despite this years-long, deeply thorough investigation, the government lost six of seven counts at trial and produced a paucity of evidence that Mr. Ravenell committed any crime or engaged in any improper conduct.

The jury's acquittals are direct proof of what evidence the jury did and did not credit. Notably, the jury's acquittals indicate that they wholly discredited the testimony of Byrd, Jerome Castle, and all of the other members of Byrd's drug trafficking organization (the "Byrd DTO").  If the jury had believed *any* of these witnesses, they would have convicted Mr. Ravenell of the narcotics conspiracy, at a minimum.  In light of how thoroughly discredited Byrd's and Castle's testimonies were at trial, it is clear that the jury agreed with the government's argument that they could convict Mr. Ravenell of Count 2 based solely on the testimony of Leonaldo Harris and Avarietta Bailey, even if they thoroughly discredited everything Byrd and his associates said.  *See*

The Honorable Liam O'Grady
April 29, 2022
Page 2

Trial Tr. 81:9-17, Dec. 23, 2021 (AUSA Wise, Rebuttal Summation) ("That satisfies Count Two, the money laundering conspiracy and you can convict on the basis of Harris and Bailey alone."). As the government admitted, Harris's and Bailey's conduct was wholly separate from the Byrd DTO.  PSR ¶¶ 7, 32 (Dkt. No. 537).

The Pre-Sentence Report ("PSR") completed in this matter calculates a Guidelines range of life imprisonment (total offense level 43 at criminal history category I).  PSR ¶ 80 (Dkt. No. 537).  This calculation exceeds the statutory maximum sentence of 10 years allowed by the count of conviction.  *See* 18 U.S.C. § 1956(h) ("Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy"); 18 U.S.C. § 1957(b)(1) (limiting punishment for convictions under § 1957 to "not more than ten years").  U.S. Probation has recommended a sentence of 240 months based on its incorrect reading of these statutes.  *See* PSR ¶¶ 79-80.  As of the date of this filing, the government has not provided a sentencing recommendation.

We respectfully request that the Court sentence Mr. Ravenell to a term of two years of supervised probation and an applicable period of supervised release.  Such a punishment is consistent with Mr. Ravenell's limited unlawful conduct (as reflected by the jury's rejection of nearly all of the government's theories), accords with the lack of prosecution and limited sentences imposed on others accused of similar misconduct, and acknowledges Mr. Ravenell's exemplary, law-abiding life before and after the conduct at issue here.

## I.   The Court May Not Impose a Term of Imprisonment Greater Than 10 Years.

As a matter of law, the Court may not impose a sentence greater than 10 years (120 months) of imprisonment.  In the absence of a special verdict, which the government failed to seek here, the Court must deem Mr. Ravenell to have been convicted of conspiring to violate the alleged conspiratorial object carrying the lowest maximum sentence—here, 18 U.S.C. § 1957.

Count Two charged Mr. Ravenell with conspiring to launder money under three potential conspiratorial objects: (1) by intending "to promote the carrying on of specified unlawful activity," under § 1956(a)(1)(A)(i); (2) by knowing the transaction was designed, in whole or in part, "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," under § 1956(a)(1)(B)(i); and/or (3) by engaging or attempting to engage "in a monetary transaction in criminally derived property of a value greater than $10,000 and [] derived from specified unlawful activity."  *See* Second Superseding Indictment at 16-17 (Dkt. No. 281).

In the absence of a special verdict identifying which of the objects was the basis of the jury's verdict, the Court is required to deem Mr. Ravenell to have been convicted of the least burdensome of the three conspiratorial objects—*i.e.*, the object with the shortest maximum sentence.  *See United States v. Quicksey*, 525 F.2d 337, 340-41 (4th Cir. 1975); *United States v. Rhynes*, 196 F.3d 207, 238 (4th Cir. 1999), *opinion vacated in part on reh'g en banc on unrelated grounds*, 218 F.3d 310 (4th Cir. 2000), *and on reh'g in part on unrelated grounds*, 218 F.3d 310

The Honorable Liam O'Grady
April 29, 2022
Page 3

(4th Cir. 2000);[1] *United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998). This result is required "[b]ecause the object of a conspiracy is an element of the offense, [and] the Fifth and Sixth Amendments [therefore] require a jury to determine all facts necessary to establish the existence of the object of the conspiracy, and the government must prove it beyond a reasonable doubt." *United States v. Bush*, 70 F.3d 557, 561 (10th Cir. 1995).

It is, of course, "the government's responsibility to seek special verdicts." *Rhynes*, 196 F.3d at 238 (citing *Barnes*, 158 F.3d at 672); *see also Brown v. United States*, 299 F.2d 438, 441 n.3 (D.C. Cir. 1962), *cert. denied*, 370 U.S. 946 (1962). The government's failure to do so here prevents the Court from determining under which conspiratorial object the jury convicted Mr. Ravenell. Accordingly, the Court is "prohibited . . . from imposing a sentence in excess of the statutory maximum for the least-punished object on which the conspiracy conviction could have been based." *Rhynes*, 196 F.3d at 238; *United States v. Jones*, 17 Fed. Appx. 240, 244-45 (4th Cir. 2001) (remanded for resentencing, where government conceded that term of imprisonment could not exceed 10 years based on general verdict and sentencing maximum for "least-punished object"); *see also United States v. Davis*, 208 F.3d 210 (4th Cir. 2000) (Table) (government required to choose between Court resentencing defendant or government re-trying defendant, where general verdict was issued for conspiracy based on substances that carried different maximum sentences and defendant received sentence that exceeded lowest maximum sentence).

The Court must, therefore, deem Mr. Ravenell to have been convicted of conspiring to violate § 1957, which carries with it the lowest maximum sentence of the government's alleged conspiratorial objects—a maximum sentence of 10 years.

**II.   <u>The Court Is Otherwise Free to Sentence Mr. Ravenell to a Fair Sentence.</u>**

The Court is free to depart from the once non-negotiable parameters of the United States Sentencing Guidelines (hereinafter the "Guidelines" or "U.S.S.G."). *Gall v. United States*, 552 U.S. 38, 49 (2007). Of course, judges must consider the advisory Guidelines range in crafting a sentence. The Court, however, "may not presume that the Guidelines range is reasonable . . . [and] must make an individualized assessment based on the facts presented." *Id.* at 49-50 (*citing Rita v. United States*, 551 U.S. 338, 351 (2007)); *see also United States v. Raby*, 575 F.3d 376, 380 (4th Cir. 2009) ("The Sentencing Guidelines are advisory, and sentencing courts have discretion to sentence defendants within the statutory range, regardless of whether the sentence falls within the Guidelines range or without.").

Thus, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the Court should consider all of the sentencing factors outlined in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by each party. Ultimately, a sentencing court must never disregard the legislative mandate that "[18 U.S.C. § 3553] . . . contains an overarching provision instructing district courts to *impose a sentence sufficient, but not greater*

---

[1]      The portions of the *Rhynes* cited herein "remain in full force and effect." *See United States v. Rhynes*, 218 F.3d 310 (4th Cir. 2000).

The Honorable Liam O'Grady
April 29, 2022
Page 4

than necessary to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (emphasis added) (internal quotation marks omitted).

## III.   The Jury Discredited the Government's Byrd DTO Allegations.

The jury convicted Mr. Ravenell on the sole count of money laundering conspiracy, while acquitting him of all of the six additional counts, including RICO conspiracy, drug trafficking conspiracy, conspiracy to commit offenses against the United States, obstructing an official proceeding, and two counts of falsification of records. *See* Verdict Form (Dkt. No. 490).  The jury's wholesale rejection of Mr. Ravenell's alleged participation in the Byrd narcotics conspiracy directly affects the conduct the Court should consider for sentencing.  In acquitting Mr. Ravenell of Count 3, the jury necessarily found that the government did not prove that Mr. Ravenell participated in the Byrd DTO.  The only way to convict Mr. Ravenell of money laundering conspiracy that is consistent with the acquittal on Count 3 was for the jury to credit the testimony of Harris and Bailey, as the government encouraged in rebuttal argument.  *See* Trial Tr. 81:9-17, Dec. 23, 2021 (AUSA Wise, Rebuttal Summation).  Had the jury credited any of the government's evidence about Mr. Ravenell supposedly laundering money for the Byrd DTO, it would have found Mr. Ravenell guilty of narcotics conspiracy as well.

Although the Court of course may consider acquitted conduct, it may do so only after finding the conduct has been proved by a preponderance of the evidence. *See United States v. Carter*, 300 F.3d 415, 426 (4th Cir. 2002); *United States v. Perry*, 560 F.3d 246, 258-59 (4th Cir. 2009).  In evaluating whether the government's evidence was proven by a preponderance of the evidence, the Court must synthesize the evidence in a manner that accounts for conflicting evidence and gaps in the government's presentation. *See United States v. Willis*, 14 F.4th 170, 189 (2d Cir. 2021) (citing *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004)) (reversed and remanded for resentencing and reconsideration where court erred in failing to account for the gaps in the government's evidentiary presentation of acquitted conduct).  The Court also must determine whether the government's evidence was plausible based on the totality of evidence presented. *Id.* (noting that "[a]dditional record evidence render[ed] [certain] testimony implausible").  Here, there is no way to account for the significant gaps and conflicts in the government's evidence in a manner that would support use of that evidence for sentencing purposes.

### A.    The Jury Discredited All of the Byrd DTO Allegations Regarding Mr. Ravenell and the Court Should as Well.

The reason for the jury's wholesale rejection of the government's evidence is obvious to all who attended the trial—the government's witnesses and the stories they were telling were not believable.  For example, Byrd admitted on the witness stand that he regularly commits perjury during court proceedings in an attempt to manipulate the courts into serving his interest in being released from prison.  He admitted that he repeatedly lied to this Court and to the Fourth Circuit Court of Appeals.  In light of this, there is not a sufficient record for the Court to credit his testimony for sentencing or to find that the government proved by a preponderance of the evidence any of the allegations Byrd made against Mr. Ravenell. *See, e.g.*, Trial Tr. 135:1-24, Dec. 10, 2021 (Byrd & White) (White: "And that was a lie told right here in this courthouse to a judge [Judge Bennett]?"  Byrd: "Yes." [. . .]  White: "You lied to a judge in this courthouse about being

The Honorable Liam O'Grady
April 29, 2022
Page 5

innocent, right?"  Byrd:  "Yes."  White:  "After you had pled guilty, right?"  Byrd:  "Yes."  White:  "And at that point you thought it was in your interest to lie to him rather than tell the truth, right?"  Byrd:  "Yes."); *id.* at 193:10-194:3 (Byrd & White) (White:  "So you lied to the Fourth Circuit there, didn't you?"  Byrd:  "Yes."  [. . .]  White:  "And you were willing to lie to get out of [your guilty plea] to a court, right?"  Byrd:  "Yes.").

Byrd admitted at trial that he would say anything to get out of jail—including committing perjury.  This is why the jury knew that it could not credit any of his testimony about Mr. Ravenell, and why this Court cannot do so now.   The government offered Byrd a way out of prison in exchange for his testimony, but because of his extensive history of perjury and the outlandish and uncorroborated tales he told from the witness stand, every charge against Mr. Ravenell that depended upon Byrd's testimony resulted in an acquittal.[2]

The lack of credibility of the government's witnesses was not just on display in Byrd's admissions of perjury—it materially affected the soundness of the case that the government presented throughout this trial.  Its presentation of evidence was full of gaps and conflicts that the government was unable to fill or reconcile at trial, and which this Court cannot now account for or fill in synthesizing the evidence for sentencing.  *See Willis*, 14 F.4th at 189.

In his testimony, Byrd made numerous specific allegations that were not refuted by any other witnesses and yet were still rejected by the jury because they were simply not credible.  For example, the government sponsored Byrd's testimony that he met with Mr. Ravenell and Sean Gordon, and the three agreed to have Gordon visit a member of Byrd's DTO in prison (Daniel Williams a/k/a Thurston Lindsey) and attempt to get Williams to make and sign a false statement that he had not been involved in narcotics trafficking.  *See* Trial Tr. 199:19-201:4, Dec. 8, 2021 (Byrd & Wise).  The government also had Williams testify in an attempt to corroborate Byrd's story.  *See* Trial Tr. 53:22-56:21, Dec. 15, 2021 (Williams & AUSA Hines).  This story was offered in support of the RICO conspiracy charge in Count 1 and in direct support of Count 4, which alleged that Gordon and Mr. Ravenell had conspired to obstruct justice in seeking this false statement.  *See* Second Superseding Indictment at Count One ¶¶ 34-35, Count Four ¶¶ 14-15, 76; *see also* Verdict Form (Dkt. No. 490).  The defense produced documentary evidence that Gordon never met Byrd prior to his visit with Williams, and the jury ultimately rejected all of this testimony as to the offenses, acquitting Mr. Ravenell and Gordon of Counts 1 and 4.  In doing so, the jury necessarily rejected the credibility of the government's witnesses connected to the Byrd DTO.

---

[2]      The jury also heard testimony and evidence as to what Byrd said about Mr. Ravenell when Byrd had not yet started cooperating and had no incentive to lie to escape the remainder of his 26-year prison sentence.   In these candid, pre-sentence communications, Byrd unequivocally maintained that Mr. Ravenell was innocent of any criminal wrongdoing.  For example, in an unsolicited letter Byrd wrote in April 2015, Byrd maintained that "Ravenell did nothing illegal, period, point blank.  The man is a [*sic*] of the highest integrity, and as [*sic*] the utmost regards for the law" and is "probable [*sic*] the most prominent, winningest defense trial lawyer, a consummate professional, man of the highest moral and professional standards bar none.  The best attorney in my humble eye this side of the mid-atlantic period."  *See* Exh. 1 at 2-3 (Gov't Trial Exh. 225); *see also* Trial Tr. 86:5-9, 92:17-21, Dec. 10, 2021 (Byrd & White).

The Honorable Liam O'Grady
April 29, 2022
Page 6

As other examples, Byrd testified repeatedly that he invested $2 million into the MGM National Harbor Resort & Casino ("MGM Casino"). *See, e.g.*, Trial Tr. 215:17-219:25, Dec. 8, 2021 (Byrd & Wise). Yet, Special Agent Sequeira testified that there was absolutely no evidence whatsoever to corroborate Byrd's claim about this supposed investment. *See* Trial Tr. 116:13-17, Dec. 16, 2021 (Agent Sequeira & White) (White: "In all of the documents that you have reviewed from all of those sources, have you ever seen a single document that indicates that Mr. Byrd has an investment in the MGM Casino?" Sequeira: "I have not.").

Byrd and his lieutenant Castle also each testified that they paid Mr. Ravenell "millions" of dollars in cash as part of the Byrd DTO. *See, e.g.*, Trial Tr. 62:12-22, Dec. 10, 2021 (Byrd & White) (Byrd: "Mr. Ravenell got millions of dollars from me." White: "In cash?" Byrd: "Yes."); Trial Tr. 99:6-20, Dec. 13, 2021 (Castle & AUSA Hines) (Castle estimating the total amount of money he provided to Mr. Ravenell over the course of five years as "in the millions"). Yet again, Special Agent Sequeira testified that despite a very extensive investigation looking for any evidence to support these allegations, none was ever found. Indeed, despite a seven-plus-year investigation that included searches of Mr. Ravenell's law firms, bank accounts, his wife's bank accounts, and his laptop, the government could not find a single dollar of these supposed "millions" in cash. *See* Trial Tr. 108:2-6, Dec. 16, 2021 (Agent Sequeira & White) (White: "Did you ever find millions of dollars in any account of Mr. Ravenell's anywhere in the world?" Sequeira: "No, I have not seen it." White: "Did you ever find millions of dollars buried somewhere?" Sequeira: "No."). Indeed, the government could not even find a single asset that could potentially account for where this money could have gone. *See id.* at 108:7-25 (Agent Sequeira & White) (White: "Did you ever find evidence that Mr. Ravenell owns yachts?" Sequeira: "No." White: "Did you ever find evidence that Mr. Ravenell owns villas somewhere?" Sequeira: "No." White: "Did you ever find evidence that Mr. Ravenell has substantial sums in off-shore accounts?" Sequeira: "No." [. . .] White: "And everybody was looking for this. They didn't find any of it, did they?" Sequeira: "Correct.").[3]

Castle's trial testimony fares no better, as he repeatedly found himself unable to explain away inconsistencies and holes in his stories. For example, Castle presented an ever-shifting and evolving story regarding the time span supposedly covered by his Byrd DTO ledger, the names

---

[3]    The catalogue of unbelievable statements Byrd made while testifying at trial are too long to list here, but another example is worth mentioning. Byrd testified about a recorded conversation with his sister (Andrea King), one day after he met with AUSA Jim Warwick, in which he told her "essentially" that the government made a deal with him so he could "buy [his] way out of prison." He then testified that his statements to King were false because his references to "money" in the recording were "code" for "truth." *See* Trial Tr. 175:2-25, Dec. 10, 2021 (Byrd & White). When confronted on the stand about Byrd's similar recorded statements to his ex-wife (Stacie Stewart) about Byrd giving "double digit millions" to the government in exchange for an early release from prison, Byrd conceded he was referencing having to forfeit various financial investments to the government, but then backtracked and testified he was not promised an early release for forfeiting these monies, alleging that these "double digit millions" were still just "code" for telling the "truth." *See id.* at 179:5-181:25 (Byrd & White). There is, of course, no support for these obvious lies by Byrd.

used to refer to Mr. Ravenell, and how Castle was supposedly "protecting" Mr. Ravenell while simultaneously alleging to the government that Mr. Ravenell was an active member of the Byrd DTO. *See* Trial Tr. 199:5-204:23, Dec. 13, 2021 (Castle & Outlaw). When confronted with the lack of cell phone record evidence to corroborate Castle's allegations that he texted with Mr. Ravenell two to three times per week to set up meetings to deliver cash, he again shifted his story on the stand. *See id.* at 215:2-217:17 (Castle & Outlaw). Other government witnesses presented evidence that deeply discredited the tales Castle spun while testifying, including Mr. Ravenell's assistant, Deb Ness, who testified that she never saw any of Castle's supposed 30 visits to the Murphy Firm to deliver bags full of cash despite sitting right outside Mr. Ravenell's office, whose glass door was "always open." *See id.* at 90:9-91:4 (Castle & Outlaw), 270:2-9 (Ness & Outlaw), 278:12-20 (Ness & Outlaw).

Such clear deficiencies and holes in the government's case cannot be overlooked by the Court at sentencing. They bear directly on whether the government actually proved by a preponderance of the evidence the allegations of acquitted conduct relied upon in the PSR for sentencing. *See Willis*, 14 F.4th at 189; *see also Menefee*, 391 F.3d at 164. There is no way to reconcile the gaps and inconsistencies in the Byrd DTO evidence in a manner that would constitute proof by a preponderance of the evidence. Accordingly, none of the evidence presented to support the allegations regarding the Byrd DTO should be credited for purposes of sentencing.

### B.      The Jury Only Credited the Harris and Bailey Allegations.

The jury did, however, hear evidence of a money laundering conspiracy entirely separate from the Byrd DTO involving Harris and Bailey (the "Harris DTO"). The only logical conclusion from the jury's verdicts is that it convicted Mr. Ravenell for his acceptance of criminal defense legal fees that were the proceeds of the Harris DTO.[4] This conclusion is the only way to reconcile the jury's verdict. The jury clearly discredited most of the offense conduct cited in the PSR, which is heavily based on the government's theory that Mr. Ravenell was involved in or assisted the Byrd DTO. We encourage the Court to do the same.

Harris—through Bailey and family members—paid Mr. Ravenell approximately $187,000 in criminal defense legal fees. *See* Exh. 2 (Gov't Trial Exh. 92a); Trial Tr. 184:21-25, Dec. 16, 2021 (Harris & AUSA Hines); *id.* at 270:8-13 (Bailey & White) (White: "I think you said that you paid somewhere between $175,000 and $200,000 for this representation on direct examination, correct?" Bailey: "Correct." White: "So it wasn't 300 or $350,000, right?" Bailey: "No."). The criminal defense of Harris was the only thing that money was used for. There has never been any allegation or proof that Mr. Ravenell used the money provided by Harris and Bailey to facilitate Harris's drug trafficking activity, or that Mr. Ravenell laundered this money for the purpose of returning "cleaned" money to Harris. At trial, the government presented evidence and attempted to prove solely that Mr. Ravenell accepted criminal defense legal fees that were the proceeds of drug trafficking. *See generally id.* at 184:21-187:8 (Harris & AUSA Hines); *id.* at 239:25-240:1

---

[4]      As explained in Mr. Ravenell's Motion for New Trial, this government theory is legally infirm, as the acceptance of criminally derived legal fees necessary to preserve a person's right to representation as guaranteed by the Sixth Amendment is not a crime pursuant to 18 U.S.C. § 1957. *See* Mem. of Law in Supp. of Mot. for New Trial at 16-25 (Dkt. No. 542-1).

The Honorable Liam O'Grady
April 29, 2022
Page 8

(Bailey & AUSA Hines) (Hines: "What were you paying [Mr. Ravenell]?"  Bailey: "I was making payments towards Leo, Leo's fees[.]").

Notably, Mr. Ravenell also did not represent Harris alone.  Mr. Ravenell's co-counsel in representing (and receiving fees from) Harris was Paula Xinis, then his law partner at the Murphy Firm and now a United States District Court Judge for the District of Maryland.  *See* Entry of Appearance in a Criminal Case, *United States v. Harris*, No. 8:13-cr-0202 (D. Md. June 21, 2013) (Dkt. No. 31).  The legal fees from Harris were for services provided by Mr. Ravenell, Judge Xinis, and those who assisted them.  In fact, Harris ultimately fired Mr. Ravenell from the representation, undermining any possibility that Mr. Ravenell was assisting Harris's DTO through his criminal defense legal representation.  *See* Mot. for Leave to Withdraw Appearance as Counsel for Leonaldo Harris ¶ 2, *United States v. Harris*, No. 8:13-cr-0202 (D. Md. Nov. 13, 2014) (Dkt. No. 138) ("Mr. Harris discharged the undersigned [Mr. Ravenell] as counsel in his case").

While the burden of proof at trial (beyond a reasonable doubt) is greater than the burden of proof at sentencing (preponderance of the evidence), it is clear that the government failed to meet this lesser standard of proof applicable here.  *See United States v. Tessina*, 2017 WL 6345400, *3 (W.D.N.Y. Dec. 12, 2017).  Only two of the government's witnesses, Byrd and Jerome Castle, testified that Mr. Ravenell knowingly participated in the Byrd DTO.  Ultimately, the jury discredited the vast majority of the government's evidence in finding Mr. Ravenell not guilty of narcotics conspiracy.  This is not a case where the government fell slightly short of its burden at trial but presented sufficient evidence for sentencing.  The government—despite a full-throated effort at trial—wholly failed to meet *any* burden of proof with respect to the Byrd DTO allegations against Mr. Ravenell.

## IV.  Guidelines According to the Jury's Verdict.

The PSR in this case—based on the government's version of the facts that were largely discredited at trial and rejected by the jury—calculates Mr. Ravenell's presumptive Guideline range to be life imprisonment (which exceeds the maximum term allowed under any of the improperly cited statutes in the PSR), based on a final offense level of 43 at criminal history category I.  Mr. Ravenell's summary objections to this calculation and the remainder of the PSR are on file with the Court.  *See* PSR Obj. (Dkt. No. 532); Am. PSR Obj. (Dkt. No. 540).  For the reasons stated in those objections, which are summarized below, and to be further explained at sentencing, the PSR Guidelines calculation—recommending a 20-year sentence that is itself prohibited as a matter of law—is unsupported by law or fact.

### A.  PSR Base Offense Level Calculation Based on the Value of Laundered Funds.

The PSR asserts that Mr. Ravenell's base offense level is 24 because the alleged money laundering conspiracy resulted in $1,800,000 in laundered funds.  PSR ¶ 40 (citing U.S.S.G. § 2S1.1(a)(2)(I)).  This finding is inconsistent with the jury's verdict and is unsupported by the evidence presented at trial.

"The government must establish the amount of loss by a preponderance of evidence." *United States v. Shephard*, 892 F.3d 666, 673 (4th Cir. 2018) (citing *United States v. Catone*, 769

The Honorable Liam O'Grady
April 29, 2022
Page 9

F.3d 866, 876 (4th Cir. 2014)).  The court must also "make a 'reasonable estimate' of the loss."
*Id*. (citing U.S.S.G. § 2B1.1 cmt. n.3(C)).  The PSR fails to indicate how the amount of $1,800,000
in allegedly money laundered funds was calculated,[5] but it presumably is based upon the amounts
received by the Murphy Firm from Byrd, which the government asserted at trial totaled
$1,816,075.91 based on the Byrd escrow ledgers.  *See* Exh. 3 (Gov't 1006 Summary, "Byrd
Related Ledgers").

But both Byrd and Special Agent Sequeira testified at trial that Byrd paid Mr. Ravenell's
legal fees with drug proceeds as well as legitimate money, and there was no way to differentiate
between the two based on the evidence uncovered in the government's investigation.  *See* Trial Tr.
176:10-20, Dec. 8, 2021 (Byrd & AUSA Wise) (Wise: "[W]hat funds did you use to fund the
parties?"  Byrd: "It was funded in part by drug proceeds."  Wise: "And what, if anything, did you
do with the cash generated by the parties?"  Byrd: "I deposited some and paid bills with others."
Wise: "Did you mix any other funds with the revenue generated by the parties?"  Byrd: "Yes."
Wise: "And what was the source of those funds?"  Byrd: "Marijuana sales."); Trial Tr. 105:6-
106:25, Dec. 16, 2021 (Agent Sequeira & White) (Sequeira: "[W]e couldn't differentiate between
legitimate and non-legitimate. [. . .]"  White: "[Y]ou didn't have any way of determining how much
of that money, the cash that went in was from this cash heavy LOC Marketing business and how
much of it was from the cash heavy drug proceeds, right? [. . .]  Sequeira: "Specifically, no.").

Throughout trial, the government introduced multiple witnesses in an attempt to prove that
Mr. Ravenell knowingly accepted and laundered drug proceeds derived from the Byrd DTO and
from the unrelated Harris DTO.  The amounts associated with the Byrd DTO should not be
considered by this Court because the jury appropriately rejected all of the testimony purporting to
establish that Mr. Ravenell was criminally complicit with Byrd and his cohorts, and because all of
the witnesses providing that testimony were unreliable and not credible.  The jury found the
government's proof at trial regarding the Byrd DTO allegations to be unpersuasive, resulting in
acquittals as to every count that depended on them, and this Court, for the same reasons, should
find this conduct not proven by a preponderance of the evidence.  The government has failed to
establish the PSR's unsupported loss amount at all, much less by a preponderance of the evidence.

Even if the Court disagrees with the jury's verdict and finds that the Byrd money laundering
allegations were proven by a preponderance of the evidence, the amounts from the Byrd escrow
ledgers at the Murphy Firm cannot support a loss amount calculation under U.S.S.G. § 2S1.1
because the witnesses testified that legitimate funds were commingled with any drug proceeds
*before* they were deposited into the Murphy Firm.  *See e.g.*, Trial Tr. 77:2-78:1, Dec. 9, 2021 (Byrd
& White).  Application Note 3(B)—which allows the court to considered total commingled funds
for purposes of calculating a loss amount—"only applies where a transaction . . . *results in* the
commingling of legitimately derived funds with criminally derived funds," not when the amounts

---

[5]     The PSR also fails to account for the fact that approximately 67% of the money received
by the Murphy Firm was provided by Byrd for his criminal legal defense and in the exercise of his
Sixth Amendment rights, which conduct is excluded from money laundering prosecution under 18
U.S.C. § 1957.  *See* Exh. 4, (Gov't Trial Exh. 14); Exh. 5 (Gov't 1006 Summary, "Byrd Criminal
Matter Ledger"); Exh. 3 (Gov't 1006 Summary, "Byrd Related Ledgers").

The Honorable Liam O'Grady
April 29, 2022
Page 10

were "previously commingled." *United States v. Chao Fan Xu*, 673 F. App'x 616, 619 (9th Cir. 2016) (citing U.S.S.G. § 2S1.1 cmt. n.3(B)) (internal quotation marks omitted). Because the commingled amounts may not be used and all of the witnesses at trial testified that there was no way to determine how much money paid to Mr. Ravenell and the Murphy Firm was drug proceeds, the Court cannot "make a reasonable estimate of the loss" based on the Byrd legal fees paid to the Murphy Firm. *See* U.S.S.G. § 2B1.1 cmt. n.3(C).

To the extent the Court believes it *can* make a reasonable estimate of the loss based on some estimate of the portion of money paid by Byrd to the Murphy Firm that was drug proceeds, this amount would be $59,000, which is 10% of the approximately $590,000 paid to the Murphy Firm which was *not* used solely for criminal defense legal fees in exercise of Byrd's Sixth Amendment rights. *See* Exh. 4 (Gov't Trial Exh. 14); Exh. 5 (Gov't 1006 Summary, "Byrd Criminal Matter Ledger"); Exh. 3 (Gov't 1006 Summary, "Byrd Related Ledgers"); *see also* discussion *supra* note 5. At trial, the government presented a secret recording in which Byrd made a prior statement confirming that 80-90% of the money deposited in LOC Marketing was legitimately earned, and accordingly, only a very small portion of the money he paid to Mr. Ravenell could possibly be estimated to be drug proceeds. *See* Exh. 6 (USG Trial Exh. 161), Tr. 89:24-90:1 (Byrd: "There [w]as a lot of legitimate money deposited in LOC bank accounts? Absolutely. The majority of it[,] 80 percent, 90 percent of it.").

These statements were corroborated by Byrd's testimony at trial that he earned "millions" (and possibly "tens of millions") in legitimate money from his extremely successful entertainment promotions business. *See* Trial Tr. 77:16-78:12, Dec. 9, 2021 (Byrd & White) (White: "Did you have real events?" Byrd: "Yes." White: "Did they make real money?" Byrd: "Yes." [. . .] White: "You made millions of dollars in real money, right?" Byrd: "Yes." White: "Tens of millions?" Byrd: "Possibly." White: "So a very successful business even without what you're calling the wash, right?" Byrd: "Yes."); *id.* at 88:8-12 (Byrd & White) (White: "I want to know what real money came in." Byrd: "Yeah, millions of dollars came in[.]" White: "And millions of dollars in profit was made, right?" Byrd: "Yes."); *see also* Trial Tr. 96:23-25, Dec. 14, 2021 (Stewart & White) (White: "[A]s far as you can tell, Mr. Byrd was a very successful event promoter?" Stewart: "Yes."); *id.* 160:17-25 (H. Byrd & White) (White: "[Y]ou know your brother had a very successful events business?" H. Byrd: "Yeah, the All Star events." [. . .] White: "They were impressive big events, right?" H. Byrd: "Right."); Trial Tr. 217:22-23, Dec. 15, 2021 (King-Chang & White) (White: "[Byrd] had a very successful marketing business?" King-Chang: "Yes.").

In sentencing here, the Court should rely only on the conduct that formed the basis for conviction here—the payments made by Bailey on behalf of Harris toward the end of his representation, that were paid solely for the purpose of criminal defense legal fees. These amounts are not properly considered monetary transactions for the purposes of sustaining a money laundering conviction (meaning that the loss amount is properly zero) because they were paid solely for criminal defense legal fees.[6] If the Court nonetheless believes they can sustain a

---

[6]     For the sake of this calculation only, the defense assumes that this amount might properly support a conviction for money laundering conspiracy. As explained in Mr. Ravenell's Motion for New Trial, however, any drug proceeds used to pay criminal defense legal fees—which account

The Honorable Liam O'Grady
April 29, 2022
Page 11

conviction, the proper loss amount is $55,000, which is the amount of payments Bailey made during and after the meeting in the D.C. restaurant, which is the earliest point at which she credibly could have told Mr. Ravenell the payments were drug proceeds.  *See generally* Trial Tr. 16:5-19:22, Dec. 17, 2021 (Bailey & White).  Under § 2B1.1, this $55,000 amount warrants a 6-level increase on top of the base offense level of 8.  *See* U.S.S.G. §§ 2S1.1(a)(2), 2B1.1(b)(1)(D).

Based on the foregoing, Mr. Ravenell's **correct base offense level is 14**.

## B.    Knowledge that Laundered Funds Were Drug Proceeds.

The PSR recommends a 6-level increase is warranted pursuant to § 2S1.1(b)(1)(i) because "the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance."  PSR ¶ 41.  The Court should reject this recommendation and not impose this increase.

The only evidence credited by the jury at trial was that Mr. Ravenell was aware of the illicit source of funds he received for representing Harris in his criminal legal defense.  "[A]ny transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution," however, cannot support a money laundering conviction, *see* 18 U.S.C. § 1957(f)(1), so Mr. Ravenell's alleged knowledge of these funds' illegitimate source cannot support the enhancement under § 2S1.1(b)(1)(i).

## C.    Business of Laundering Funds.

The PSR asserts that a 4-level increase per § 2S1.1(b)(2)(C) and Application Note 4 are warranted because "the defendant regularly engaged in laundering funds during an extended period of time (2009 to 2014) from multiple sources and generated a substantial amount of revenue in return for laundering funds."  PSR ¶ 42.  The Court should reject this claim and not impose any increase under this subsection, as the government failed to prove at trial that Mr. Ravenell was "in the business of laundering funds."  U.S.S.G. § 2S1.1(b)(2)(C), n.4.

Under Application Note 4 of § 2S1.1(b)(2)(C), the guideline reveals a non-exhaustive list of factors that "may indicate the defendant was in the business of laundering funds:

> (i) The defendant regularly engaged in laundering funds.
>
> (ii) The defendant engaged in laundering funds during an extended period of time.
>
> (iii) The defendant engaged in laundering funds from multiple sources.

---

for *all* of the payments made on behalf of Harris—cannot support a conviction here and, accordingly, cannot support a loss amount for purposes of sentencing.  *See* Mem. of Law in Supp. of Mot. for New Trial at 16-25 (Dkt. No. 542-1).

The Honorable Liam O'Grady
April 29, 2022
Page 12

(iv) The defendant generated a substantial amount of revenue in return for laundering funds.

(v) At the time the defendant committed the instant offense, the defendant had one or more prior convictions for an offense under 18 U.S.C. § 1956 or § 1957, or under 31 U.S.C. § 5313, § 5314, § 5316, § 5324, or § 5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense. A conviction taken into account under subsection (b)(2)(C) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History).

(vi) During the course of an undercover government investigation, the defendant made statements that the defendant engaged in any of the conduct described in subdivisions (i) through (iv).

U.S.S.G. § 2S1.1(b)(2)(C).

First, there is no proof that Mr. Ravenell regularly engaged in laundering funds. Mr. Ravenell was acquitted of both the RICO conspiracy count that charged him with using the Murphy Firm to launder money and the narcotics conspiracy count. *See* Second Superseding Indictment (Dkt. No. 281); Verdict Form (Dkt. No. 490). Had the government proven its allegations related to the Byrd DTO money laundering at trial, Mr. Ravenell would have been convicted not *solely* of money laundering conspiracy, but of the charged RICO and narcotics conspiracies as well. Thus, the only money laundering allegations credited by the jury were related to the funds received on behalf of Harris. The Byrd DTO-allegations were rendered wholly implausible and unproven in light of the totality of evidence presented, including inconsistencies and gaps in the government's evidence and significant impeachment of the government's witnesses. *See* discussion *supra* Part III; *see also Willis*, 14 F.4th at 189.

The money Mr. Ravenell received from Harris and Bailey, however, was used solely for criminal defense legal fees, and each payment was proportionate to the work Mr. Ravenell and his team performed for Harris's legal defense. *See* Exh. 2 (Gov't Trial Exh. 92a); Trial Tr. 184:21-25, Dec. 16, 2021 (Harris & AUSA Hines); *id.* at 270:8-13 (Bailey & White). These payments cannot support a money laundering conviction as a matter of law. *See* Mem. of Law in Supp. of Motion for New Trial at 16-17 (Dkt. No. 542-1). And, even if they could, the government presented evidence that Mr. Ravenell only had knowledge that a limited number of payments were the proceeds of drug trafficking, thereby refuting Mr. Ravenell having "regularly engaged" in money laundering. *See* Trial Tr. 240:25-241:14, Dec. 16, 2021 (Bailey & Wise) (Bailey testifying that she developed a "rapport" with Mr. Ravenell over time before telling him that payments were drug proceeds); *id.* at 283:20-284:2 (Bailey & White) (Bailey testifying to only having met with Mr. Ravenell "about three or four times").

As explained above, there is no allegation or proof that Mr. Ravenell used the money provided on Harris's behalf to facilitate the Harris DTO or that Mr. Ravenell ever laundered the

The Honorable Liam O'Grady
April 29, 2022
Page 13

funds and returned "cleaned" money to Harris. Mr. Ravenell was not in the "business" of laundering money for Harris; indeed, there are no allegations that he played any role at all in the Harris DTO. Eventually, Harris fired Mr. Ravenell as his attorney. *See* Mot. for Leave to Withdraw Appearance as Counsel for Leonaldo Harris ¶ 2, *United States v. Harris*, No. 8:13-cr-0202 (D. Md. Nov. 13, 2014) (Dkt. No. 138).

Second, the PSR incorrectly finds that Mr. Ravenell laundered funds from 2009 through 2014. The PSR's statement that Mr. Ravenell participated in this criminal conduct starting in 2009 is a clear misrepresentation of the evidence presented at trial. The government did not introduce any evidence at trial that Mr. Ravenell was involved in any money laundering-related conduct starting in 2009. Mr. Ravenell's alleged conduct in 2009 was—according to the government's own witnesses—solely related to Mr. Ravenell's representation of a woman named Najah Stewart whose luggage was seized at the Baltimore airport. *See generally* Trial Tr. 100:4-103:25, Dec. 14, 2021 (Stewart & White); *id.* at 139:25-145:23 (Officer Shoul & AUSA Ray). Neither Stewart nor former Officer Russell Shoul testified as to any unlawful conduct by anyone, including Mr. Ravenell, in connection with these events in 2009. Moreover, neither testified as to any conduct related to money laundering. Indeed, Stewart herself said she believed the money she was transporting was legitimate and would have conveyed the same to Mr. Ravenell. *See* Trial Tr. 103:16-25, Dec. 14, 2021 (Stewart & White) (White: "[A]t the time in any event, you didn't believe it was the proceeds of drug trafficking activity because you didn't know that Mr. Byrd or Mr. Castle were drug dealers, right?" Stewart: "Correct." White: "And you would have told Mr. Ravenell that whatever was in there was legitimate, right?" Stewart: "Correct, that was my understanding." White: "Because that was actually your understanding at the time, right?" Stewart: "Yes."); *see also generally id.* at 147:2-18 (Officer Shoul & White). Though the Second Superseding Indictment introduces this 2009 "starting" year, the government did not prove at trial any illegal conduct, let alone money laundering, by Mr. Ravenell beginning in 2009.

The jury's verdict indicates they disbelieved the testimony of Byrd and his associates but convicted Mr. Ravenell based on the testimony of Harris and Bailey. Mr. Ravenell did not begin representing Harris until mid-2013, and solely used the funds provided by Bailey for Harris's legal fees. Even if the jury had convicted on Byrd's testimony, Byrd was not a client of the Murphy Firm until 2011, and thus no funds could have been laundered by Mr. Ravenell before then. *See* Trial Tr. 133:15-21, Dec. 8, 2021 (Byrd & AUSA Wise).

Mr. Ravenell did not engage in laundering funds from multiple sources. The only funds Mr. Ravenell was convicted of laundering came from Bailey on behalf of Harris. Mr. Ravenell solely acted in a defense-attorney capacity for Harris, only coordinating with Bailey to receive his required legal fees for representation. Trial Tr. 239:9-24, Dec. 16, 2021 (Bailey & AUSA Hines). Because the government's evidence failed to prove that Mr. Ravenell was allegedly laundering funds from multiple sources, this factor does not support an enhancement.

Mr. Ravenell also did not generate substantial—or any—amounts of revenue in return for laundering funds. Mr. Ravenell served as legal counsel for Harris (and Byrd) and his compensation was for legal fees, not money laundering. There was no testimony presented at trial that Mr. Ravenell received additional fees for "money laundering" from Harris or Bailey. Because the

The Honorable Liam O'Grady
April 29, 2022
Page 14

government did not prove that Mr. Ravenell received any payments apart from fees for providing legal services—from either Harris or Bailey—this enhancement should not apply.

The final two factors—a prior conviction under certain specified statutes and incriminating statements made by a defendant during the course of an undercover investigation—have no applicability to Mr. Ravenell. Mr. Ravenell has no prior convictions and was known only for his stellar reputation as a Baltimore criminal-defense attorney. *See* Exhs. 10-87 (Character Letters). And, despite literally hundreds of undercover audio and video recordings made by the government as part of its years-long investigation, Mr. Ravenell never made a single incriminatory statement during any of these recordings regarding the alleged criminal conduct. Neither of these final two factors is applicable to Mr. Ravenell.

Because this test adheres to a totality of the circumstances and none of the factors here demonstrate that Mr. Ravenell was engaged in "the business of laundering funds," the enhancement should not apply. *See United States v. Aguasvivas-Castillo*, 668 F.3d 7, 14 (1st Cir. 2012).

### D.    Sophisticated Laundering.

The PSR asserts that a 2-level increase per § 2S1.1(b)(3) and Application Note 5 are warranted because:

> the laundering involved "two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions involving criminally derived funds that were intended to appear legitimate," and "offshore financial accounts." The drug proceeds, in cash, were transported from the United States to Jamaica. Those funds were then deposited in the bank account of a Jamaican law firm which in turn wired them to a U.S. based real estate broker, who converted them into a cashier's check which was given to a Ugandan diplomat, who then wired the funds to MFM, which were then wired out to the mother of one of Byrd's children to repay her for money she had advanced to MFM on Byrd's behalf.

PSR ¶ 43. The Court should reject this assertion and not impose an increase.

Mr. Ravenell did not engage in any "sophisticated means" with respect to the Okullo transaction described in Paragraph 43 of the PSR. Byrd, whose testimony was rejected by the jury, was the only witness to testify to Mr. Ravenell's knowledge of and involvement in this transaction, which allegedly involved an unrelated third party and an offshore Jamaican account. *See generally* Trial Tr. 207:24-209:1, Dec. 8, 2021 (Byrd & Wise).

The government presented no additional evidence at trial that Mr. Ravenell was involved in or aware of any of the supposed "layering" of transactions. Rather, the government presented evidence of only the single Okullo transaction involving Mr. Ravenell. The jury's rejection of Byrd's testimony reflects the government's failure to prove that Mr. Ravenell was involved in or

The Honorable Liam O'Grady
April 29, 2022
Page 15

had knowledge of any of the supposed transaction "layering" that could possibly warrant application of the enhancement under § 2S1.1(b)(3) and Application Note 5. Therefore, the 2-level enhancement should not apply.

### E.  Aggravating Role as Organizer or Leader of Criminal Activity.

The PSR asserts that a 4-level increase per § 3B1.1(a) and Application Notes 2 and 4 are warranted because "[t]he defendant exercised management over the property, assets or activities of a criminal organization, specifically the laundering proceeds from a drug trafficking organization, beginning in 2011 and continuing until 2014. The defendant was an organizer or leader of a criminal activity, the money laundering conspiracy, and was otherwise extensive. [*sic*]" PSR ¶ 45. The Court should reject this assertion and not impose an increase as none of the factors required for its application apply to Mr. Ravenell.

Application Note 4 lays out a seven-factor test used to determine a defendant's leadership or organizational role in the alleged criminal conduct. *See United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002). The factors are: "[1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others." *Id.* (citing U.S.S.G. § 3B1.1(a)). None of these factors support a finding that Mr. Ravenell was an organizer or leader of criminal activity under the Guidelines.

First, Mr. Ravenell did not exercise any decision-making authority in either the Byrd or Harris DTOs. Multiple witnesses who were part of Byrd's DTO testified that Byrd—and not Mr. Ravenell—was the leader who exercised decision-making authority over the DTO. *See e.g.*, Trial Tr. 243:3-8, Dec. 13, 2021 (Drummond & Outlaw) (Outlaw: "[Byrd] was the boss, correct?" Drummond: "Correct." Outlaw: "You didn't answer to Mr. Ravenell, correct?" Drummond: "Correct."); Trial Tr. 160:8-10, Dec. 14, 2021 (H. Byrd & White) (White: "So in terms of the drug activity, your brother, Richard, was your boss?" H. Byrd: "Yeah."); Trial Tr. 58:3-12, Dec. 15, 2021 (Williams & Outlaw) (Outlaw: "Richard Byrd was the boss of that [DTO], correct?" Williams: "Yes, sir." Outlaw: "He was the one who made the decisions, correct?" Williams: "Yes, sir."); *id.* at 130:12-14 (Gilbert & Outlaw) (Outlaw: "You understood that Frank [a/k/a Byrd] was the boss of the whole situation, correct?" Gilbert: "Yes. He was my go man for this company.").

Based on this evidence—sponsored by the government—there can be no credible argument made that Mr. Ravenell exercised any authority over anyone in the DTO. On cross-examination, Byrd's lieutenant, Castle, agreed with the statement that "beginning in 2009 and continuing through April of 2014, Richard Byrd was the leader and organizer of a drug distribution network which acquired large quantities of cocaine and marijuana from sources of supply from California and Arizona, and distributed those drugs in Maryland, Ohio and Pennsylvania." *See* Trial Tr. 156:4-12, Dec. 13, 2021 (Outlaw & Castle) (Outlaw: "And you agree with that statement, don't you?" Castle: "Yes."). Castle conceded that it was Byrd who decided what drugs were distributed by the DTO, where those drugs would be distributed, and who would become members of the

The Honorable Liam O'Grady
April 29, 2022
Page 16

DTO.  *See* Trial Tr. 156:22-157:9, Dec. 13, 2021 (Outlaw & Castle).  And it was Byrd and Castle who decided where the money generated by the Byrd DTO would ultimately go.  *See* Trial Tr. 157:10-12, Dec. 13, 2021 (Outlaw & Castle).  Castle alleged that Byrd merely "sometimes . . . got advice from [Mr. Ravenell]."  *See* Trial Tr. 157:13, Dec. 13, 2021 (Outlaw & Castle).

On examination, multiple members of the Byrd DTO testified that they had either never met, heard from, or received any orders from Mr. Ravenell, including Richard Drummond, Jeffrey Gilbert, Joseph Byrd, and Daniel Williams.  *See e.g.*, Trial Tr. 239:4-240:25, Dec. 13, 2021 (Outlaw & Drummond) (Drummond testifying he did not know Mr. Ravenell at all, never had a direct or face-to-face conversation with Mr. Ravenell, had never been introduced to him, and that everything Drummond testified about on direct examination as to Mr. Ravenell was information provided to him by Byrd); Trial Tr. 137:9-20, Dec. 15, 2021 (Gilbert & Outlaw) (Gilbert testifying that he did not know Mr. Ravenell, never heard of Mr. Ravenell, and was never instructed and had no way to contact Mr. Ravenell); Trial Tr. 15:6-16, 18:16, Dec. 15, 2021 (J. Byrd & White) (J. Byrd testifying he was not instructed to call Mr. Ravenell if arrested, did not have Mr. Ravenell's phone number, and "never even heard [Mr. Ravenell's] voice"); Trial Tr. 73:13-25, Dec. 15, 2021 (Williams & Outlaw) (Williams testifying that he was never instructed to contact Mr. Ravenell, did not have Mr. Ravenell's phone number, never spoke with Mr. Ravenell before Williams's arrest, and repeatedly referring to Mr. Ravenell as "Kevin" during testimony).

The government has not proven that Mr. Ravenell had "decision-making authority" as to the Byrd DTO.  Indeed, the government's own witnesses *proved the opposite* at trial.  And no evidence was ever presented that Mr. Ravenell had any decision-making authority or played any role whatsoever in the Harris DTO.

Moreover, as the government is well aware, a witness it declined to call at trial confessed to and was convicted of being the person who orchestrated Byrd's entire money laundering scheme.  James Bowie, a former attorney who worked for and was convicted of being involved in the Byrd DTO, was the actual mastermind behind Byrd's money laundering activities.  *See* Judgment, *United States v. Bowie*, No. 1:14-cr-00186-005 (Apr. 16, 2019) (Dkt. No. 479); *see also* Exh. 7, ¶¶ 33-34 (Oct. 26, 2015 Dep't of Treasury Mem. of Interview with James Bowie) ("Bowie came on board LOC in 2012 and *designed* it to be a sophisticated money laundering scheme. Bowie *designed* a system where the money going into LOC would be complicated to define what was legitimate money and what was drug proceeds.") (emphasis added).

The nature of Mr. Ravenell's alleged participation in the commission of the offense—as actually proven at trial—was limited to Mr. Ravenell's provision of legal services.  He solely acted in the capacity of retained counsel for his clients' legal needs, and the government failed to prove any conduct beyond this at trial.  *See generally* Trial Tr. 184:21-187:8, Dec. 16, 2021 (Harris & AUSA Hines); *id.* at 239:25-240:1 (Bailey & AUSA Hines); *see also* discussion *supra* Part III.  Indeed, the PSR cites as the supposed loss amount only those amounts that Mr. Ravenell received in legal fees for his work for Byrd.  *See* PSR ¶¶ 13, 40; *see also* Exh. 3 (Gov't 1006 Summary, "Byrd Related Ledgers").

Third, Mr. Ravenell did not participate in recruiting accomplices for the alleged criminal conduct.  The government claims that Mr. Ravenell hired attorneys and an accountant "in an

The Honorable Liam O'Grady
April 29, 2022
Page 17

attempt to legitimize the activities by tying cash drug deposits to events." PSR ¶ 47. None of these individuals were called to testify at trial, and they were never proven to be "accomplices" of the Byrd DTO or Mr. Ravenell. They were never even alleged to have engaged in any criminal activity whatsoever, as an "accomplice" necessarily must.

Fourth, the government did not prove at trial that Mr. Ravenell had a right to a "larger" share in the fruits of the crimes committed by the Byrd and Harris DTOs. Byrd was the only witness who testified that he was not the leader of his own DTO and that Mr. Ravenell was actually the highest paid from Byrd's criminal activities. *See* Trial Tr. 69:14-70:6, Dec. 10, 2021 (White & Byrd) (White: "And you don't consider yourself the leader of that organization." Byrd: "I consider myself—I took a plea based upon the fact of what the law says I am, but as far as how the organization run, that's not how it runs." [. . .] White: "Who made the most money from the company?" Byrd: "Probably Mr. Castle and Mr. Ravenell." [. . .] White: "Mr. Ravenell made more money from the company than you did?" Byrd: "Yes."). At trial, however, the government could not prove any payments *whatsoever* that Mr. Ravenell supposedly received from Byrd or Harris that were not specifically related to their legal representations. The government failed to prove that Mr. Ravenell profited in any way—apart from standard legal fees—from his former clients' drug-related activities. As the defense stated at the outset of trial, "where is the cash?" *See e.g.*, Trial Tr. 8:12, Dec. 8, 2021 (Outlaw Opening). The government was never able to locate or identify any additional, unlawful profit apart from standard legal fees—let alone a "larger" share of these profits. *See* Trial Tr. 107:11-108:25, 113:7-114:8, Dec. 16, 2021 (Agent Sequeira & White).

Fifth, the government failed to prove that Mr. Ravenell planned or organized any criminal activities. The jury discredited Byrd and his associates, and per the government's own record of its interview with Bowie, Bowie was actually the orchestrator of Byrd's sophisticated money laundering scheme. Exh. 7, ¶¶ 33-34. Mr. Ravenell's relationship with Bailey and Harris was purely for legal representation purposes, and therefore, neither planning nor organizing any supposed money laundering was involved in this attorney-client relationship.

Sixth, the nature and the scope of Mr. Ravenell's conduct was limited to his acceptance of money in connection with representing Byrd and Harris in various legal matters. The government wholly failed to prove Mr. Ravenell served any other role, as evidenced by his blanket acquittals on every other charge, including the allegation that he served any role whatsoever in a narcotics conspiracy.

Finally, as explained above regarding the decision-making authority factor, the government did not prove at trial that Mr. Ravenell exercised control or authority over others involved in either DTO. Mr. Ravenell was not an organizer or leader in the alleged criminal activities of the Byrd and Harris DTOs—indeed, the government could not prove he was even *involved* in either narcotics conspiracy. *See* Verdict Form at 1 (Dkt. No. 490) (acquitting Mr. Ravenell of Count 3, Narcotics Conspiracy).

Even if the Court found Mr. Ravenell acted in any capacity under this Guideline by managing "property, assets or activities," it does not warrant a 4-level increase. The Fourth Circuit has held that to be eligible for the 4-level adjustment under this enhancement, "the defendant *must*

The Honorable Liam O'Grady
April 29, 2022
Page 18

have been the organizer or leader of one or more *participants* as opposed to merely exercising management responsibility over the property, assets, or activities of a criminal organization." *United States v. Bracamontes*, 464 Fed. Appx. 157, 159 (4th Cir. 2012) (quoting *United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) (emphasis added). As explained above, the government did not prove at trial that Mr. Ravenell was an organizer or leader of other "participants" in the Byrd or Harris DTOs. The government proved only that Mr. Ravenell received money for Byrd's and Harris's legal fees (which were apparently derived, in part, from drug proceeds), and therefore, a 4-level increase under § 3B1.1(a) is unwarranted.

### F.   Abuse of Position of Trust or Use of Special Skill.

The PSR asserts that a 2-level increase per § 3B1.3 and Application Notes 1 and 4 is warranted because:

> The defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. The defendant used his specialized skill as an attorney at his law firm, where he was able to move the drug trafficking money through the firm's attorney trust account at his own discretion and without having to obtain permission from any other member of the firm. The defendant's status as an attorney and a partner at the firm is a specialized skill that is ordinarily subject to significantly less supervision[.]

PSR ¶ 46. The Court should decline to impose any increase under this enhancement because the PSR's findings are based on significant (and inexcusable) misrepresentations of facts. Mr. Ravenell was not subject to less supervision, nor did he utilize any special skill with respect to the alleged conduct.

Although Mr. Ravenell was an attorney and partner at the Murphy Firm, there were multiple people who oversaw the transfer of funds at the firm. Heather Mangus (now known as Mangus Ferrare)—a former accountant manager for the Murphy firm—testified at trial that she was in charge of tracking money across client accounts. *See* Trial Tr. 281:25-282:10, Dec. 13, 2021 (Mangus & AUSA Wise). Additionally, Special Agent Sequeira testified on cross-examination that Beth Wybolt, who was Mangus's boss and fellow accounting manager, had signature authority over the firm's corporate accounts. *See* Trial Tr. 92:16-93:4, Dec. 16, 2021 (Sequeira & White). Other members of the firm had explicit oversight over Mr. Ravenell (and his fellow partners at the firm). Mr. Ravenell *did not* have sole discretion or power to transfer or move client funds on his own. The government presented no evidence at trial that he did, and any representation to the contrary in the PSR now is a clear misrepresentation of the facts. Therefore, the facts presented in Paragraph 46 are erroneous and unsupported by the evidence presented at trial, which confirmed that Mr. Ravenell was *not* "subject to significantly less supervision" based on his "status as an attorney and a partner at the firm."

Moreover, the government presented no evidence at trial that Mr. Ravenell used his skills as an attorney to help facilitate any money laundering. At most, the government presented

The Honorable Liam O'Grady
April 29, 2022
Page 19

evidence and proved that Mr. Ravenell accepted money in exchange for his services—much like any other service provider would. The fact that Mr. Ravenell is an attorney, and thus was accepting fees for his legal services, does not support the unfounded allegation that he used any "specialized skill as an attorney" in connection with the count of conviction. It is not enough for Mr. Ravenell to have possessed a special skill; he must have used it "in a manner that significantly facilitated the commission or concealment of the offense." *See* U.S.S.G. § 3B1.3. Here, the government made no such showing at trial.

Mr. Ravenell's "status" as an attorney is not sufficient to account for the "special skill" enhancement. For the "special skill" enhancement to apply, the crime must require more than that the defendant merely possess legal training and knowledge. *See generally United States v. Weisberg*, 297 Fed.Appx. 513 (6th Cir. 2008). In *Weisberg*, the defendant—an Ohio attorney—pled guilty to tax evasion for failing to pay income taxes over a set of years and utilizing his client's IOLTA account to hide his assets. *Id.* at 513. The court refused to impose the "special skill" enhancement, and the government appealed this portion of the sentence, arguing that the court erred because—as the Presentence Investigation Report stated—"[t]he defendant is a lawyer, and therefore possesses a special skill that requires substantial education and licensing. The defendant used this special skill to facilitate the instant offense." *Id.* at 514.

The Sixth Circuit rejected the government's argument, explaining that the "special skill" enhancement requires legal knowledge "beyond simply having access to an IOLTA account." *Id.* at 516. The crime the defendant in *Weisberg* was convicted of—which included hiding assets in his client's IOLTA account—did not require legal training or knowledge, but could have occurred using any account, including one not associated with a lawyer's trust/IOLTA account. *Id.* at 516-17. Similarly, here, the alleged conduct in Paragraph 46 of Mr. Ravenell's PSR does not require legal training or knowledge. Even if the conduct were true, as explained by multiple witness at trial, attorneys at the Murphy Firm did not have sole discretion to move client funds; rather, this responsibility was entrusted to the firm's accountants and other personnel. *See e.g.*, Trial Tr. 282:7-10, Dec. 13, 2021 (Mangus & AUSA Wise) (Mangus tracked monies through client accounts); Trial Tr. 67:12-16, Dec. 14, 2021 (Mangus & White) (White: "On wire transactions, did you have the authority to approve wire transactions or did that have to go through Beth [Wybolt]?" Mangus: "I could set them up and [Wybolt] could approve them and then vice versa."); Trial Tr. 92:12-93:2, Dec. 16, 2021 (Agent Sequeira & White) (White: "So his secretary at this period at the Murphy Firm also had signature authority for this corporate account?" Sequeira: "That's what it states here." [. . .] White: "And [Beth Wybolt] also had signature authority on this corporate account . . .?" Sequeria: "Yes."). And as explained in *Weisberg*, moving money through an IOLTA/trust account does not require special legal training; the funds here could have been moved through any type of account, not solely an IOLTA account. *See Weisberg*, 297 Fed.Appx. at 516-17. Accordingly, the "special skill" 2-level enhancement is inapplicable to Mr. Ravenell.

### G.  Obstructing or Impeding the Administration of Justice.

The PSR asserts that a 2-level increase per § 3C1.1 is warranted because:

> The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the

The Honorable Liam O'Grady
April 29, 2022
Page 20

> investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense. The defendant created false records for LOC Marketing in an attempt to conceal drug proceed transactions. After LOC Marketing received a federal grand jury subpoena in 2014, the defendant continued to obstruct justice by hiring other attorneys and an accountant in an attempt to legitimize the activities by tying cash drug deposits to events[.]

PSR ¶ 47.  This enhancement is not relevant or supported by the record and is not applicable here.

The government failed to prove any of the allegations stated in Paragraph 47 of the PSR—indeed, they were disputed by the government's own key witness.  The jury acquitted Mr. Ravenell of the obstruction-related allegations charged here, *see* Verdict Form (Dkt. No. 490), expressly rejecting the allegations asserted in Paragraph 47.  The Court should not impose an enhancement based on evidence the jury reasonably found to be not credible.

Although Mr. Ravenell represented Byrd in his business ventures involving LOC Marketing, the government did not allege at trial that Mr. Ravenell hired other attorneys or an accountant to legitimize criminal activity or that Mr. Ravenell created any "false records" (and indeed, he was acquitted of all charges related to the creation of false records).  Rather, the government presented evidence that Mr. Ravenell worked with other attorneys and an accountant hired by Byrd to compile an accurate record of Byrd's entertainment business.  *See* Trial Tr. 95:9-97:23, Dec. 9, 2021 (Byrd & White).  Byrd, on the stand, confirmed that the records assembled by Mr. Ravenell were real and that they documented real events that his entertainment business helped to promote.  *See* Trial Tr. 77:16-17, Dec. 9, 2021 (Byrd & White) (White: "Did you have real events?" Byrd: "Yes."); *id.* at 100:12-18 (White: "And these are all documents that you got together for Mr. Barsky; is that correct?"  Byrd: "Not me specifically, but, you know, it was a team effort." [. . .] White: "And are these all legitimate events?"  Byrd: "Yes."); *id.* at 102:9-13 (White: "You can flip through. There's about 600 pages in it. But if you can flip through a few more, take a look at them and see if these are to the best of your knowledge, the documents that you and others of Lok [*sic*] Marketing provided to Mr. Barsky."  Byrd: "Yes.").

Critically, the jury's verdict is limited to allegations pertaining to the money paid on behalf of Harris for his criminal defense legal fees.  This enhancement has no applicability as to any of the allegations pertaining to the alleged Harris money laundering conspiracy.  The government asserted no allegations and did not present any proof that Mr. Ravenell engaged in any obstructive conduct for the benefit of Harris or his DTO.

The Court should reject this suggested 2-level enhancement; the government should not be permitted to make up for its deficient showing at trial by now asserting unsupported, unproven, and discredited allegations as a basis for sentencing enhancements.

The Honorable Liam O'Grady
April 29, 2022
Page 21

### H.      Final Offense Level.

Mr. Ravenell's true final offense level is, at most, **14**:

| | |
|---|---|
| Base offense level (§ 2S1.1): | **8** |
| Loss amount $55,000 (§ 2B1.1(b)(1)(D)): | **+6** |
| Victim-Related Adjustment | **+0**[7] |
| Chapter Four Enhancement | **+0**[8] |
| **Total Offense Level:** | **14** |

### I.      Criminal History Category.

Mr. Ravenell has no objection or challenge to the PSR's determination that he has zero (0) criminal history points, and he is therefore in criminal history category I.  PSR ¶ 54.

### J.      Presumptive Guidelines Range.

For the reasons explained above, Mr. Ravenell's true presumptive Guidelines range is, at most, 15-21 months imprisonment (offense level 14 at criminal history category I), not life as calculated by the PSR, or 240 months as contemplated by the PSR.

## V.      A Probation Sentence Fully Satisfies the Requirements of 18 U.S.C. § 3553(a).

As discussed in this section, the sentencing factors that the Court must consider pursuant to 18 U.S.C. § 3553(a) weigh heavily in favor of Mr. Ravenell receiving a non-carceral sentence of probation.

### A.      Nature, Circumstances, Seriousness of the Offense (§ 3553(a)(1) & (2)(A)).

As explained earlier, the verdict reflects the jury's complete rejection of the allegations and charges connected to Byrd and his criminal organization.  The jury found that Mr. Ravenell's criminal conduct was limited, narrow, and confined to his receipt of drug proceeds from Bailey belonging to Harris as compensation for the legitimate legal services that Mr. Ravenell provided to Harris.  With this understanding of the jury's verdict, a sentence of probation would appropriately reflect the nature, circumstances, and seriousness of Mr. Ravenell's conduct underlying the single count of conviction.

---

[7]      Mr. Ravenell has no objection or challenge to the PSR's determination that no victim-related adjustments are applicable.  PSR ¶ 44.

[8]      Mr. Ravenell has no objection or challenge to the PSR's determination that no Chapter Four enhancements are applicable.  PSR ¶ 49.

The Honorable Liam O'Grady
April 29, 2022
Page 22

The limited and narrow nature of the jury's verdict is critical to weighing these § 3553(a) factors. The jury did not find that Mr. Ravenell helped facilitate Harris's drug trafficking, or that he served as in-house counsel to the Harris DTO (as the government alleged in regards to the Byrd DTO). Indeed, the jury convicted Mr. Ravenell **not** for any services or assistance that he provided Harris, but rather for his failure to insist that the payments he received for his legal services come from a lawful source. A sentence of incarceration is not needed to reflect the nature and circumstances of this limited criminal conduct found by the jury.

**B.      History and Characteristics of Mr. Ravenell (§ 3553(a)(1)).**

Mr. Ravenell is an American success story. He rose from impoverished and meager circumstances through hard-work, diligence, and dedication to the transformational power of education, to reach the highest level of the legal profession and to be recognized as a leader in his profession and his community.

Born in 1959, Mr. Ravenell is the eighth of twelve children born to Francis and Daisey Bell Ravenell (now deceased) living in Cross, South Carolina. PSR ¶ 58. To describe the financial status and well-being of the family as impoverished and challenging is to politely understate the reality. Like many other black Americans living in the South during the times of Mr. Ravenell's birth and childhood, the Ravenell family were sharecroppers—*i.e.*, tenant farmers who tended farmland owned by another under crop-sharing and rent arrangements that exploited the sharecroppers' labor for the benefit of the landowner.[9] For the Ravenells, sharecropping truly was a family affair. Every member of the family, including Mr. Ravenell, did the hard "back breaking" work of sharecropping farming. PSR ¶ 58; *see also* Exh. 20 (Letter of Doris Ravenell-Brown explaining how the family "planted all kinds of crops, worked the land, gardened, and ate off the land."); Exh. 29 (Letter of Cealie Ravenell-Williams) ("Momma and Daddy made Ken and all of us work in the cotton, cucumber, corn, and peas fields to make a living. It was hard work; but we worked together."). This was very common at the time.[10]

The Ravenells were no exception to the cage of poverty built by sharecropping, even with Francis Ravenell also working as a minister and laborer. PSR ¶ 58; *see* Exh. 20 (Letter of Doris Ravenell Brown) ("we lived well below the poverty line"). The family lived in a small and very humble home with no running water (*see* photo below) and an outhouse as a bathroom. Exh. 29 (Letter of Cealie Ravenell-Williams). The large Ravenell family often slept in shifts due to cramped confines of their home. *Id.*

---

[9]      *See* Leon Dash, "Children of the Old South," *Washington Post*, Jan. 29, 1989, available at: https://www.washingtonpost.com/archive/opinions/1989/01/29/children-of-the-old-south/bf89fd8a-a4ea-4a7a-9216-7cda6245385e/ (explaining how "[s]harecroppers were the least independent, the most desperate and the most vulnerable of the black tenant farmers").

[10]      *See id.* (explaining how "[d]uring the hard times and the good times, the survival or prosperity of the tenant farmer was tied directly to the labor of his children [on the farm]").

The Honorable Liam O'Grady
April 29, 2022
Page 23



*Figure 1 - Photo of Mr. Ravenell's childhood home in South Carolina.*

While the cage of poverty limited the Ravenells' lives in many ways, it did not limit Francis's and Daisy's aspirations for their children. Even though they had limited education themselves, Francis and Daisy Ravenell understood and appreciated that education was the path to a better life for their children. PSR ¶ 58. As parents, they insisted that their children appreciate and value education, and they imposed high educational expectations on their children. *Id.* Put best by Mr. Ravenell's sister, their parents continually stressed that "the way to a better life was through a life surrendered to Christ coupled with a good education." Exh. 20 (Letter of Doris Ravenell-Brown).

The Ravenell parents' approach and commitment to education bore fruit. Most of the Ravenell children earned college degrees and are employed as school teachers, corporate executives, statisticians, mental health counselor, and engineers. PSR ¶ 59. Among this talented and accomplished group of siblings, Mr. Ravenell is a stand-out. After graduating from Cross High School as valedictorian in 1977, Mr. Ravenell attended South Carolina State University as a recipient of the first Presidential Scholarship awarded by the school. PSR ¶¶ 68-69. He graduated with a B.A. in Political Science, earned a grade point average of 3.44, and he was a constant presence on the school's Dean List. PSR ¶ 69. After college, Kenneth attended the University of Maryland School of Law. PSR ¶ 70. He graduated law school with Juris Doctorate in 1984. *Id.* He is the only lawyer among the siblings.

Upon graduating from law school, Mr. Ravenell set out to begin his legal career and start a family. He started his legal career as an assistant state attorney with the Office of the State's Attorney for Baltimore City. For three-and-a-half years he served the Baltimore community as a prosecutor.

It was during this early time in his legal career that Mr. Ravenell began to build and grow his own family. He married his first wife (Regina Ravenell) right after graduating law school. Regina brought two children—Erica and Dana (not fathered by Mr. Ravenell)—to the marriage. To ensure that Erica and Dana felt secure and a part of his growing family, Mr. Ravenell adopted them. PSR ¶ 60. Despite Regina and Mr. Ravenell divorcing in 2008, Mr. Ravenell still maintains

The Honorable Liam O'Grady
April 29, 2022
Page 24

a fatherly relationship with both Erica and Dana.  PSR ¶ 60.  According to Erica, Mr. Ravenell "is the only father I've known for most of my life."  Exh. 32 (Letter of Erica Jones).  Prior to the divorce, Regina and Mr. Ravenell had two children together: Christia (a corporate attorney at Amazon and graduate of Georgetown Law School), and Kenneth Jr. (a law firm administrative assistant).  PSR ¶ 60.

In 1988, Mr. Ravenell left public service and joined the Baltimore-based law firm of Schulman, Treem, Kaminkow, and Gilden.  Mr. Ravenell was so successful at the firm that he was promoted to named partner, which transformed the firm's name to Schulman, Treem, Kaminkow, Gilden, and Ravenell.  PSR ¶ 75.  In 2008, Mr. Ravenell joined the Murphy Firm, under an arrangement that allowed Mr. Ravenell to maintain a separate firm of his own (Ravenell Law).  PSR ¶¶ 73-74.  As a result of the FBI warrant raid on the Murphy Firm in 2014, Mr. Ravenell's arrangement with the Murphy Firm became untenable, so he completely separated Ravenell Law from the Murphy Firm.  PSR ¶ 73.

The impact and importance of Mr. Ravenell's legal career to date is nearly impossible to quantify or adequately summarize here.  He is a recognized and respected fixture of the Maryland legal community having represented hundreds of clients in criminal and civil matters before the state and federal courts in the state.  He has appeared and argued before the United States Supreme Court, numerous times before the United States Court of Appeals for the Fourth Circuit, the Maryland Court of Appeals, and the Maryland Court of Special Appeals.  But Mr. Ravenell's impact and influence is not contained solely to Maryland.  He has represented clients and handled federal and state cases in New York, Virginia, California, North Carolina, Arizona, Georgia, Vermont, Pennsylvania, Nebraska, West Virginia, St. Thomas, and St. Croix.

This sentencing memorandum does not provide enough space to discuss the broad range of clients and cases that comprise of the fabric of Mr. Ravenell's legal career.  But the following case highlights provide sufficient insight into the stellar lawyering, zealous advocacy, and professionalism that Mr. Ravenell has served his clients, the interests of justice, and the rule of law.

### _State of Maryland v. Walter Lomax (Baltimore City Circuit Court)._

Mr. Ravenell was instrumental in obtaining a finding of _actual innocence_ for Walter Lomax, who had spent nearly 40 years in prison for crimes, including murder, that he did not commit.  Lomax's private firm attorneys (Crowell & Moring LLP) had filed a petition for a declaration of actual innocence on Lomax's behalf.  The attorneys approached Mr. Ravenell to assist their efforts to reverse Lomax's conviction and have him declared innocent.  Mr. Ravenell agreed to help and to do so _pro bono_.  Mr. Ravenell assistance proved invaluable in securing Lomax's finding of actual innocence and clearing his name for crimes he did not commit.  Through multiple meetings and conversations, Mr. Ravenell convinced the state attorney's office to join the defense's innocence petition.  What remained was to convince the judge overseeing the matter to grant the innocence petition.  Mr. Ravenell argued the petition on Lomax's behalf.  After hearing Mr. Ravenell's argument, the judge granted Lomax's petition for actual innocence.  The grant of

The Honorable Liam O'Grady
April 29, 2022
Page 25

the motion erased the wrongful convictions from Lomax's record, and allowed Lomax to obtain a settlement from the State of Maryland for his wrongful incarceration.[11]

Freed from the shackles of a wrongful conviction, Lomax became an advocate for the wrongfully convicted.  His advocacy contributed to the Maryland General Assembly passing Senate Bill 14: Compensation to Individual Erroneously Convicted, Sentenced, and Confined, also known as the Walter Lomax Act, in April 2021.  Prior to the law, only exonerees who had been pardoned or had a petition of innocence supported by the prosecution were eligible for compensation for their wrongful conviction.  The Walter Lomax Act expanded the eligibility for compensation for more exonerees.[12]  A character letter from Lomax further explaining the life-changing impact Mr. Ravenell had on his life is attached to this memorandum as Exhibit 13.

_State of Maryland v. Melvin Russell Jr. (Baltimore City Circuit Court)._

In 2015, Melvin Russell, then 28 years old, was charged with first and second degree murder after he stabbed his roommate to death.  There was no dispute that Russell committed the act that caused the victim's death.

At the time, Russell's father was a Lieutenant Colonel with the Baltimore City Police Department.[13]  Lt. Colonel Russell had known Mr. Ravenell for many years, mostly as an adversary in court.  Lt. Colonel Russell was also well aware that federal agents had raided the Murphy Firm in 2014, and that Mr. Ravenell was the target of a federal criminal investigation.  Yet, he still asked Mr. Ravenell to represent his son in the murder case.  Mr. Ravenell agreed to take on the representation.

Mr. Ravenell learned that Russell had been diagnosed with a mental disorder, and was in assisted living because of his mental disorder when the incident occurred.  Mr. Ravenell filed a not criminally responsible (insanity) plea on Russell's behalf, and also developed a self-defense defense.  Based on his investigation and advocacy, Mr. Ravenell was able to convince the state prosecutor to dismiss the murder charges in favor of manslaughter plea agreement, under which instead of prison time, Russell was sentenced to five years of probation under the supervision of a

---

[11]     _See_ Jessica Anderson, "Charges against Walter Lomax dropped in 1968 murder case," _Baltimore Sun_, April 2, 2014, available at: https://www.baltimoresun.com/news/crime/bs-xpm-2014-04-02-bs-md-ci-lomax-case-20140402-story.html.

[12]     _See, e.g._, Bryan Stole, "Maryland officials approve compensation for wrongly convicted Baltimore man.  For others exonerated, law change will make claims easier," _Baltimore Sun_, April 21, 2021, available at: https://www.baltimoresun.com/politics/bs-md-pol-exoneree-compensation-20210422-imkyp667jnhvdaihptq3ua442q-story.html.

[13]     _See_ Justin Fenton and Alison Knezevich, "Son of Baltimore police commander charged in killing," _Baltimore Sun_, Sept. 1, 2015, available at: https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-russell-son-arrested-20150901-story.html.

The Honorable Liam O'Grady
April 29, 2022
Page 26

mental health court.[14]   The mental health court is supervised by Judge Gail Raisin whom this Court heard testify on behalf of Treem.

Russell thrived under probation.  He recently graduated from probation/mental health court.  He is now pursuing his passion—stage acting.  A letter from Russell's father discussing how Mr. Ravenell changed the trajectory of his son's life is attached to this memorandum as Exhibit 10.

*State of Maryland v. Kwame Rose (District Court of Maryland for Baltimore City & Baltimore City Circuit Court).*

In 2015, Kwame Rose participated in lawful protest concerning the 2015 death in police custody of Baltimore resident Freddie Gray.  Based entirely on his participation in a lawful protest, Rose was charged with disorderly conduct, disturbing the peace, and failure to obey a lawful order.



Mr. Ravenell, working as a *pro bono* cooperating attorney with the American Civil Liberties Union ("ACLU"), represented Rose in state court.  Mr. Ravenell served as trial counsel.  At trial, the judge acquitted Rose of all charges except the failure to obey.  Mr. Ravenell stayed with the case for the appeal. Thanks to Mr. Ravenell's written and oral advocacy, the circuit court granted the defense's motion to dismiss the failure to obey charge.  The circuit court held that the order Rose and others were given, which prohibited the use of amplified sound outside of the courthouse, was unconstitutionally overbroad and violated Rose's First

*Figure 2 - From left, Mr. Ravenell, Kwame Rose, and ACLU Senior Staff Attorney David Rocah.*

Amendment rights.[15]  A character letter from Rose, and a letter from the ACLU about Mr. Ravenell's work on the case, are attached to this memorandum as Exhibits 14 and 12, respectively.

These highlights provide merely a glimpse into Mr. Ravenell's impactful career as an attorney, and why in 2009 he was inducted into the American College of Trial Lawyers, the preeminent organization of trial lawyers that is invitation only.  As the Court will recall, Mr. Paul Bekman, who vetted Mr. Ravenell's candidacy for the organization by speaking to many lawyers

---

[14]    *See* Justin Fenton, "Son of Baltimore police commander gets mental health treatment for fatal stabbing," *Baltimore Sun*, Dec. 21, 2016, available here: https://www.baltimoresun.com/news/crime/bs-md-ci-russell-guilty-plea-20161221-story.html.

[15]    *See* Kevin Rector, "Final charge dismissed from activist's arrest during protest in Freddie Gray case," *Baltimore Sun*, Sept. 20, 2016, available at: https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-kwame-cleared-20160920-story.html.

The Honorable Liam O'Grady
April 29, 2022
Page 27

and judges who have interacted with Mr. Ravenell, testified at trial. Mr. Beckman testified that Mr. Ravenell's reputation in the legal community "was in a word, superlative." Trial Tr. 18:4, Dec. 20, 2021 (Bekman & White).

Without question, Mr. Ravenell is well-respected and held in high esteem by his peers in the legal community and by members of the judiciary. As a result of this respect and high esteem, Mr. Ravenell was named a permanent member of the Judicial Conference of the Fourth Circuit. *See* Trial Tr. 50:10-51:6, Dec. 17, 2021 (Judge Davis & Outlaw). Mr. Ravenell earned his conference membership by being invited twice to the conference (and attending twice) by the Honorable William D. Quarles Jr. (now retired) of the United States District Court for the District of Maryland.

Neither the federal prosecution or the conviction in this case has diminished the respect Mr. Ravenell garners in the legal community, nor the high esteem in which he is held in the community. Before, during, and after Mr. Ravenell's trial, there has been an outpouring of support from fellow attorneys, judges, current and former clients, and other members of the legal community of Maryland and beyond.

For instance, as the Court will recall, one of the most-respected jurists in Maryland, the Honorable Andre M. Davis, who retired from the Fourth Circuit Court of Appeals after a distinguished career, testified on Mr. Ravenell's behalf during the trial. Judge Davis stated: "Mr. Ravenell is a person of unquestioned good character. He is a professional in every sense of the word. He's diligent. He's smart. He's a person of integrity." *See id.* at 49:20-23. Judge Davis also testified that: "[Mr. Ravenell] has the respect of judges and other lawyers and he has really manifested in my view, over the course of his career, just everything we want in a legal professional." *Id.* at 49:23-25. Finally, Judge Davis noted that: "[Mr. Ravenell's] reputation in the community is one of excellence, commitment, dedication, hard work and integrity. And this is—my source for this view comes not just from the many lawyers who know Mr. Ravenell with whom I've interacted, of course it comes from my own observations." *Id.* at 50:6-10.

The Court also heard from another highly respected Maryland jurist: the Honorable Joseph F Murphy, Jr., former Chief Judge of the Court of Special Appeals, and a former member of Maryland's highest court, the Court of Appeals, and the Circuit Court for Baltimore County. Judge Murphy testified that Mr. Ravenell "has a very fine and excellent character for truthfulness [and] candor, and candor to the tribunal." *See* Trial Tr. 42:13-14, Dec. 17, 2021 (Judge Murphy & Outlaw).

Accompanying this memorandum are 37 sentencing character letters submitted by lawyers who know Mr. Ravenell, have worked with Ravenell, and have observed Mr. Ravenell practice as an attorney.[16] Exhs. 11-12, 19, 52-58, 60-86. While each letter author has a unique relationship and history with Mr. Ravenell, a common thread throughout the letters is the high regard for Mr.

---

[16]     Most of these letters were submitted to the Maryland Court of Appeals in support of Mr. Ravenell's effort to retain his law license. As discussed later, Maryland's Office of Bar Counsel filed a petition seeking the suspension of Mr. Ravenell's law license as a result of the conviction in this case.

The Honorable Liam O'Grady
April 29, 2022
Page 28

Ravenell's outstanding character, unquestionable integrity, unparalleled work ethic, and legal acumen.  For example:

- "Simply put, we know Mr. Ravenell to be an attorney of extraordinary ability, integrity, and dedication to the public good, who is a credit to the Maryland bar." Exh. 12 (Attorneys and staff members of the ACLU of Maryland).

- "I have always viewed Mr. Ravenell as a shining example of professionalism and a man of integrity."  Exh. 64 (Alan C. Cason, Esq.).

- "He has always been a person of high moral character and honesty."  Exh. 65 (David B. Irwin, Esq.).

- "In my opinion, Kenneth Ravenell represents the qualities for which we as attorneys strive:  honesty, integrity, intelligence, preparedness, friendly, and guided by a strong belief in justice for all." Exh. 54 (Howard L. Cardin, Esq.).

- "He has always maintained the highest degree of integrity.  His character is beyond reproach."  Exh. 55 (Andrew White, Esq.).

- "I, and other members of the Commission [Judicial Nomination Commission], have always found him to be of the utmost integrity.  Ken is a very knowledgeable attorney, who is well regarded in our legal community."  Exh. 66 (David J. Ralph, Esq.).

- "Judges, fellow defense attorneys, and prosecutors have great respect for his trustworthiness, ethics and skills as a lawyer as evidenced by the array of judges, federal and state, and prosecutors who appeared as character witnesses at his trial to attest to his stellar character and his glowing reputation as a defender of the accused."  Exh. 19 (Michael E. Kaminkow, Esq.).

- "When we handled cases together Ken has never suggested anything that was not legally or ethically appropriate or in the best interest of his clients." Exh. 72 (Larry Allen Nathans, Esq.).

- "I met him in law school and have maintained a constant friendship with him since then. I have also followed closely his professional career. I know how hard he has worked to earn and maintain his sterling professional reputation. I can say without any reservation whatsoever that Ken is one of the finest people and attorneys I have had the pleasure of knowing."  Exh. 74 (Ronald Cherry, Esq.).

- "I have known Mr. Ravenell for over twenty (20) years. . . . In my opinion Mr. Ravenell has always conducted himself with honesty and integrity. I have never known him to practice law in any other way."  Exh. 76 (James J. Gitomer, Esq.).

These excerpts are just a sample taken from the numerous attached character letters attesting to the character of Mr. Ravenell.  Individually and collectively, the letters reflect the wide and deep well of respect and admiration that Mr. Ravenell has earned within the legal community over the course of his multi-decade career as an attorney and which continues even after this conviction.

The Honorable Liam O'Grady
April 29, 2022
Page 29

It would be a mistake to assume or believe that Mr. Ravenell's contributions and impact are limited to the legal community. In keeping with the "give back" spirit in which he was raised, Mr. Ravenell has continually used his experience, means, and stature to improve the communities that are a part of his life journey. To honor his parents and simultaneously help the community of his childhood, Mr. Ravenell established the Reverend Francis and Daisy Ravenell Educational Scholarship for young members of childhood church. Exh. 29 (Letter of Cealie Ravenell-Williams). As his sister Claretha explains in her attached letter to the Court, Mr. Ravenell has made tremendous efforts to "decrease the educational barriers" that the indigent, particularly the black residents hampered by the region's sharecropping history, face in rural South Carolina. Exh. 25 (Letter of Claretha Ravenell-Eaddy). His efforts include mentoring "countless local youths who have an interest in a law career" and providing "free legal advice to many people" in the community of his childhood. *Id.* As succinctly put by his sister Claretha: "No matter how successful Ken became, he is always willing to help others, whether a stranger, a community member, or a family member." *Id.*

The only thing surpassing Mr. Ravenell's dedication to improving to his community, is Mr. Ravenell's dedication to his family. Attached to this memorandum are letters of support from Mr. Ravenell's siblings. Exhs. 20, 22, 24-30, 42. Without exception, the letters explain Mr. Ravenell's complete dedication to his family, and how he has used his success to improve the lives of his family and to open doors of opportunity for them. For instance, his sister Cealie explains how Mr. Ravenell used money he earned from a job he held while attending college to support his sister Doris who was also attending college. Exh. 29 (Letter of Cealie Ravenell-Williams).

In sum, when the life of Mr. Ravenell, as reflected in the letters accompanying this memorandum, is balanced against the limited and narrow conduct that the jury found crossed a legal line, the natural conclusion is that the conduct underlying the conviction was an aberration. Indeed, the accepting of drug proceeds from Bailey/Harris was one small misstep in the millions of lawful and praise-inducing steps that Mr. Ravenell has taken as an attorney during his long career. *See* U.S.S.C. § 5K2.20 (allowing for downward departure for criminal conduct that "represents a marked deviation by the defendant from an otherwise law-abiding life").

### C.   Seriousness of the Offense/Respect for Law/Just Punishment (§ 3553(a)(2)(A)).

As discussed at length earlier, the jury rejected all of the government's allegations against Mr. Ravenell connected to the Byrd DTO, and convicted him solely for knowingly accepting drug proceeds from Bailey as compensation for the legitimate and proper legal services that Mr. Ravenell provided to Harris. The jury's finding that Mr. Ravenell's acceptance of drug proceeds was the criminal conduct here, and not anything that Mr. Ravenell did in return for the proceeds is critical to defining the context and boundary in weighing the seriousness of this offense and the just punishment here.

Within this context and boundary, a probationary sentence certainly satisfies this § 3553(a) factor. Mr. Ravenell's criminal conduct, as found by the jury, did not aid or facilitate the Harris DTO or drug trafficking activity. Moreover, Mr. Ravenell did not use the drug proceeds he received to assist, aid, or further the Harris DTO. Indeed, critical in weighing this factor, is that the problematic proceeds Mr. Ravenell received were compensation *for legitimate legal services*

The Honorable Liam O'Grady
April 29, 2022
Page 30

that Mr. Ravenell provided to Harris. There is no allegation or proof that Harris paid Mr. Ravenell for "consigliere" type services the government accused (but failed to prove) regarding the Byrd DTO. Mr. Ravenell was paid for representing Harris in a criminal case, and there is no suggestion that Mr. Ravenell did anything improper, unethical, or unlawful in representing Harris. A sentence of incarceration, therefore, is not needed or warranted by this factor. A sentence of probation would sufficiently reflect the seriousness of Mr. Ravenell's offense in accepting $55,000[17] in drug proceeds for legitimate legal services, demonstrate respect for the law, and adequately punish Mr. Ravenell.

Finally, the devastating impact of this conviction on Mr. Ravenell's legal career cannot be overstated, and lone constitutes a harsh punishment. As a result of his conviction, on January 11, 2022, the Maryland's Office of Bar Counsel, on behalf of the state's Attorney Grievance Committee, filed a petition seeking the suspension of Mr. Ravenell's law license. The petition initiated a legal process (now ongoing) that may end with Mr. Ravenell losing his law license, and thereby ending his distinguished career as an attorney. Mr. Ravenell faces an unceremonious end to a dream he has had his entire life. *See* Exh. 25 (Letter of Claretha Ravenell-Eaddy) ("Ken always wanted to become a lawyer; he wanted to help people."); Exh. 42 (Letter of John Ravenell) ("Ken told me at any early age he would love to become a lawyer."). Mr. Ravenell has dedicated countless hours to achieving and living his dream. This dream may not only end due to this case and conviction, but it could end with a fall from grace and with Mr. Ravenell never again holding the stature and standing in the community he had prior to his conviction. In many ways, Mr. Ravenell will suffer a "civil death" as a result of his conviction. *See United States v. Nesbeth*, 188 F.Supp.3d 179, 179-83 (E.D.N.Y. 2016) (discussing the collateral consequences of a conviction and how they can result in a defendant's "civil death"). The loss of his legal career and his fall in the community are great punishments that should factor into the Court's § 3553(a) analysis. *See United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding it was proper for sentencing court to apply a 36-month downward departure because the child pornography defendant lost his teaching certificate and his state pension as a result of his conviction); *see also Nesbeth*, 188 F.Supp.3d 179 (imposing one-year probation sentence for drug trafficking defendant in large part because the defendant would suffer a "civil death" because of the conviction).

### D.    General Deterrence (§ 3553(a)(2)(B)).

A sentence of incarceration is not needed for general deterrence purposes. As the Court observed and experienced, Mr. Ravenell's case garnered tremendous attention from the legal community within and outside of Maryland. Lawyers, particularly those practicing in Maryland, followed the case closely due to its implications and consequences for practicing criminal defense attorneys. Indeed, the eyes and ears of the legal community, particularly the Maryland legal community, remain fixated on this case.

A sentence of incarceration is not needed to send the legal community the message that lawyers must not accept payment for their services knowing that the payment is drug trafficking proceeds. The collateral consequences of this case alone have communicated a strong and effective deterrent message. The raiding by federal agents of Mr. Ravenell's offices and the office

---

[17]       *See* discussion *supra* at Part IV(A) (pgs. 10-11).

The Honorable Liam O'Grady
April 29, 2022
Page 31

of his attorney (Josh Treem of Schulman Treem), the cloud of the investigation and prosecution that has harmed and diminished Mr. Ravenell's legal career and ability to earn a living, the stain of conviction, and the current efforts to take away Mr. Ravenell's law license, are consequences that the legal community is now well-aware will follow if anyone repeats Mr. Ravenell's misstep in accepting drug proceeds as payment for legitimate legal services. A sentence of probation would not undermine this message of deterrence, and more punishment (specifically a carceral sentence) is not needed for the message to be heard and taken seriously by the legal community.

E.    **Specific Deterrence & Need to Protect the Public From Mr. Ravenell (§ 3553(a)(2)B)).**

Mr. Ravenell has never previously been charged with or convicted of any crime, and has zero (0) criminal history points. PSR ¶ 54. As reflected in the letters of support accompanying this letter, and in the discussion above, Mr. Ravenell has dedicated his life to helping people and his community, not harming it. There is no reason to believe that Mr. Ravenell now or in the future presents a danger to the public. Specific deterrence is not an issue here, and not needed. Therefore, a term of imprisonment is not needed for specific deterrence or to protect the public from Mr. Ravenell. A term of probation fully satisfies this § 3553(a) factor.

F.    **Provision of Efficient Medical Care, Vocational Training, and Education (§ 3553(a)(2)(D)).**

This factor weighs heavily against a sentence involving incarceration. Mr. Ravenell is in no need of vocational training or education that could be provided during a term of incarceration.

That said, the Court should not forget another important fact when weighing this factor— that the COVID pandemic is still ongoing. While the last few months have seen the lifting and loosing of pandemic restrictions and mandates as death rates fall, infection rates are beginning to surge again as new variants make their way across the country.[18] As we have seen throughout the pandemic, prisons are particularly vulnerable to COVID complications due to the close confinement of inmates and prison staff and the inability of prison medical personnel to effectively

---

[18]    *See, e.g.*, Mary Kekatos, "COVID-19 cases are rising in Northeast partly fueled by BA.2, experts say," *ABC News Online*, April 11, 2022, available at: https://abcnews.go.com/Health/covid-19-cases-rising-northeast-partly-fueled-ba2/story?id=84011868; "Covid News: New Omicron Subvariants Spreading Fast in New York," *New York Times*, April 13, 2022, available at: https://www.nytimes.com/live/2022/04/13/world/covid-19-mandates-cases-vaccine.

The Honorable Liam O'Grady
April 29, 2022
Page 32

prevent and contain the spread of the virus within prisons.[19]  According to the federal Bureau of Prisons, to date 294 inmates and seven BOP staff members have died as a result of COVID.[20]

Mr. Ravenell is particularly susceptible to COVID-related complication, even though he is fully vaccinated.  First, Mr. Ravenell's age (62) makes him particularly vulnerable to the health and life threatening complications of COVID.[21]  As the Center for Disease Control and Prevention ("CDC") maintains:

> Older adults are more likely to get very sick from COVID-19. Getting very sick means that older adults with COVID-19 might need hospitalization, intensive care, or a ventilator to help them breathe, or they might even die.  **The risk increases for people in** their 50s and increases in 60s, 70s, and 80s.  People 85 and older are the most likely to get very sick.[22]

In addition to his age, Mr. Ravenell suffers from pre-existing conditions that make him, as confirmed by his doctor, particularly vulnerable to COVID-caused serious injury and death.  Exh. 8 (Letter from Dr. Richard Berg).

The reality of the danger poses to Mr. Ravenell cannot be ignored, and further supports the Court imposing a non-carceral sentence in this case.

**G.      Avoiding Unwarranted Sentencing Disparities (§ 3553(a)(6)).**

The Court is required to consider and impose a sentence that avoids sentencing disparities among similarly situated federal defendants, and the failure to do so is grounds for Mr. Ravenell's sentence to be vacated in the future.  *See United States v. Clark*, 434 F.3d 684, 687-688 (4th Cir. 2006).  This subsection discusses a District of Maryland case involving an attorney who was convicted of conduct involving the handling of a client's drugs proceeds: *United States v. Farrell*. This case is instructive for Mr. Ravenell's sentencing, and is particularly important for the Court in weighing § 3553(a)'s disparity factor.  This case heavily supports and justifies Mr. Ravenell receiving a probationary sentence.

---

[19]      *See, e.g.*, Meg Anderson and Huo Jingnan, "As Covid spread in federal prisons, many at-risk inmates tried and failed to get out," *NPR.org*, March 2, 2022, available at: https://www.npr.org/2022/03/07/1083983516/as-covid-spread-in-federal-prisons-many-at-risk-inmates-tried-and-failed-to-get-; Katie Park, "A Half-Million People Got COVID-19 in Prison, Are Officials Ready for the Next Pandemic," *The Marshall Project*, June 30, 2021, available at: https://www.themarshallproject.org/2021/06/30/a-half-million-people-got-covid-19-in-prison-are-officials-ready-for-the-next-pandemic.

[20]      *See* https://www.bop.gov/coronavirus/.

[21]      *See* CDC.gov, "COVID-19 Risks and Vaccine Information for Older Adults," available at: https://www.cdc.gov/aging/covid19/covid19-older-adults.html.

[22]      *Id.* (emphasis in original).

The Honorable Liam O'Grady
April 29, 2022
Page 33

<u>*United States v. James M. Farrell*</u> (15-cr-562-RWT/DKC (D.Md.)).

In October 2015, James Farrell, an attorney, was indicted for one count of money laundering conspiracy, six substantive money laundering counts, and five obstruction-related counts (witness tampering and tampering with an official proceeding). Case No. 15-562, Dkt. No. 1 (Indictment). In short, Farrell was charged with using his status as an attorney to criminally assist a drug organization ("the Nicka Organization") responsible for distributing thousands of pounds of marijuana around the country (including Maryland) by laundering drug proceeds, directing drug proceeds to lawyers representing members of the Nicka Organization, structuring drug proceed transactions in ways to avoid IRS scrutiny, and arranging and paying witnesses to provide misleading information to federal investigators and grand juries about the Nicka Organization. *Id.* Farrell was charged with providing his unlawful assistance for multiple years—from the start of 2009 and continuing through at least April 2013. *Id.* at 4.

Farrell went to trial and was convicted of 10 of the 12 charged counts—all seven of the money laundering related counts, and three of the obstruction counts. Case No.15-562, Dkt. No. 110 (Verdict Form). The Court's Guidelines recommendation in *Farrell* (based on the probation officer's assessment) was offense level 30, criminal history category 1, which produced a recommended range of sentence of 97 to 121 months on each count. *See* July 17, 2017, Sentencing Hr'g Tr. at 155:25-156:8, 163:12-13, *United States v. Farrell*, No. 8:15-cr-00562-RWT (D. Md. Oct. 3, 2017) (Dkt. 176). The probation officer recommended 97 months, and the judge ultimately imposed 42 months. *Id.*

The gap between Mr. Ravenell's conviction conduct and Farrell's is vast, long, and wide. For starters, there is the duration of the criminal conduct as found by the two respective juries. Farrell was found guilty of participating in a criminal conspiracy for four years (2009 through April 2013). In stark contrast, Mr. Ravenell was convicted of criminal conduct that consisted of three or four interactions during 2014 where Mr. Ravenell accepted from Bailey payments for Harris' legal services. *See* Second Superseding Indictment at 14 (Dkt. No. 281) (titled "A.B. Gave Ravenell Narcotics Proceeds to Represent L.H."). Mr. Ravenell's sentence should reflect this large duration gap. Given Farrell's sentence of 42 months of imprisonment, a probation sentence here would properly and sufficiently reflect the duration gap.

There is also a large gap in the criminal conduct as found by the respective juries. Farrell was convicted of conspiring with a drug organization that was responsible for trafficking thousands of pounds of drugs around the entire country, and serving as the "consigliere" of the drug organization by helping the organization avoid detection and prosecution by law enforcement, and structuring the organizations financial transactions to avoid IRS scrutiny. Exh. 9 (DOJ Press Release of July 18, 2017 stating that "Defense Attorney [Farrell] was Consiglieri for Drug Organization"). Indeed, according to the Fourth Circuit, Farrell's 15-day trial firmly established the following laundry list of criminal conduct by Farrell:

- That from at least 2009 to 2012, Farrell received thousands of dollars in cash from Nicka and the Organization;

The Honorable Liam O'Grady
April 29, 2022
Page 34

- Farrell obtained and distributed cash from the defense fund created and controlled by Nicka— and funded by the Organization's drug dealers—for use in defending Nicka and the Organization and seeking to maintain the Organization's collapsed defense;

- Farrell knew "everything" about the Nicka Organization, including that Nicka and the Organization's drug dealers made large sums of cash money from marijuana trafficking;

- That Farrell falsified his law firm's financial records regarding its receipt of defense fund cash from Nicka and the Organization;

- Farrell advised Forman that he maintained constant contact with the Organization's drug dealers who had been prosecuted in the Maryland federal case, as well as their lawyers;

- Farrell explained to [government witness] that his role with Nicka and the Organization was to "protect the family, the group of us," referring to the Organization coconspirators;

- Farrell advised Organization drug dealer Sharpeta that he should take "a vacation somewhere" because Sharpeta's name had been mentioned to the federal grand jury investigating the Organization;

- At the direction of an Organization member, Mitchell and Constantinides travelled from Annapolis to Farrell's Philadelphia office, where Farrell—who had never met those drug dealers—gave them cash;

- Farrell used the defense fund to pay [a lawyer] Brown $2,500 to represent Amy Mitchell and asked Brown to keep her from testifying before the federal grand jury;

- Farrell thereafter obtained money from the defense fund to pay Brown another $5,000 and asked Brown to represent an Organization drug dealer;

- Farrell paid lawyer Tully $2,500 from the defense fund to represent Constantinides;

- That Farrell told drug dealer Harryman that his legal fees were "being taken care of," after Harryman's lawyer had received $9,000;

- That Farrell threatened Harryman and directed that he adhere to the collapsed defense of the Organization, in order to protect Nicka and the Organization;

- That Farrell used defense fund cash to purchase money orders and then deposited them into Phillips's jail commissary account;

- Farrell paid lawyer Henry to represent Organization drug dealer Phillips;

- That Farrell directed drug dealer Forman to write a check to Farrell for $10,000 and exchange the check with Farrell for $10,000 in cash, in order that Farrell could falsely "show on the books" that he had been paid by Forman; and

The Honorable Liam O'Grady
April 29, 2022
Page 35

- That Farrell received $19,800 in defense fund cash from Nicka and the Organization and delivered that cash to Forman for legal fees.

*United States v. Farrell*, 921 F.3d 116, 137-39 (4th Cir 2019).

Based on these facts revealed during Farrell's trial, the Fourth Circuit was "entirely satisfied" that Farrell's conviction was "sufficiently supported." *Id.* at 138. The appellate court stressed that the trial firmly established that Farrell "went well beyond [providing legal advice] and took steps to extensively involve himself in the alleged offenses" and "performed his roles as consigliere and fixer [to the drug organization] in multiple ways," *id.* at 139, including obstructing justice on numerous occasions, *id.* at 141-42.

The jury in this case did not find similar facts nor similar conduct by Mr. Ravenell—not even close. The jury *rejected* the government's case and the counts alleging conduct by Mr. Ravenell that mirrors the allegations and conduct that the Farrell jury found in convicting Farrell (and endorsed by the Fourth Circuit). Indeed, the jury's verdict was a complete rejection of the government's effort to portray Mr. Ravenell as the "consigliere" of the Byrd organization.

Instead, the jury here determined that Mr. Ravenell's conduct was extremely limited in comparison to Farrell's. The jury found that Mr. Ravenell knowingly accepted drug proceeds as payment for the *lawful and legitimate* legal services that he provided to Harris. There was no allegation, and no proof offered at trial, that Mr. Ravenell counseled Harris on how to operate his drug business, how to avoid law enforcement detection and prosecution, or how to launder his drug proceeds. And there was no allegation or proof that Mr. Ravenell engaged in any obstruction of justice activity to benefit Harris or his drug operation. As Harris testified at trial, he paid Mr. Ravenell to represent him in his criminal case pending at the time. *See generally* Trial Tr. 175:21-176:8, Dec. 16, 2021 (Harris & AUSA Hines); *see also id.* at 239:25-240:1 (Bailey & AUSA Hines). That was the sole purpose of Harris's payments to Mr. Ravenell. No payments from Harris (through Bailey) to Mr. Ravenell were compensation for Mr. Ravenell providing unlawful "consigliere" services to Harris and his drug operation. As such, there is a Grand Canyon-sized gap between the criminal conduct found by the respective juries in Farrell's and Mr. Ravenell's case. Such a gap justifies Mr. Ravenell receiving a probation sentence in comparison to Mr. Farrell's 42-months imprisonment sentence.

In sum, the requested probationary sentence here is justified by the *Farrell* case discussed here. Similar to the case discussed above, the instant case involves a Maryland attorney being convicted of crossing ethical and legal lines in connection to his receipt of drug proceeds. That is where the similarities end however. The jury convicted Mr. Ravenell of conduct that is far limited and narrow in terms of duration, money/proceeds involved, and more importantly, scope and involvement than what underlaid the conviction of Farrell. As such, the sentence imposed on Mr. Ravenell needs to reflect the wide gap in the conduct when compared to the 42-month sentence imposed on Farrell to avoid unwarranted sentencing disparities as mandated by § 3553(a)(6). A probation sentence sufficiently satisfies the mandate of this factor.

The Honorable Liam O'Grady
April 29, 2022
Page 36

### H.    Kinds of Sentences Available (§ 3553(a)(3)).

Mr. Ravenell was not convicted of an offense carrying a mandatory minimum prison sentence. Therefore, all sentencing options are available to the Court, including alternatives to incarceration in a federal prison, such as home confinement and probation.

As discussed throughout this sentencing memorandum, a sentence of incarceration is not warranted by the conduct underlying the single count of conviction as found by the jury. As discussed above, a sentence of incarceration is not called for by any § 3553(a) factor. Indeed, a careful and unemotional consideration of the factors leads to the conclusion that a non-carceral options is not only justified in this case, but warranted.

The Court is able to structure and impose a non-carceral sentencing option that satisfies § 3553(a). A sentence of probation, which may or may not include a period of home confinement, would protect the public, afford adequate general and specific deterrence, sufficiently punish Mr. Ravenell, and promote respect for the law without being overly punitive (which a sentence of incarceration would be). Indeed, probation would satisfy the court's responsibility of fashioning a sentence that is "sufficient but not greater than necessary to comply with" § 3553(a). 18 U.S.C. § 3553(a).

## VI.   <u>Conclusion</u>

For the reason explained herein and at sentencing, the sentences recommended by the PSR and the government are both illegal and far greater than necessary to satisfy § 3553(a). Both recommendations are based on factual allegations rejected by the jury and not reflected in the jury's verdict. Both recommendations are efforts to have the Court impose a harsh carceral sentence that is not warranted nor deserved based on the jury's verdict. The jury convicted Mr. Ravenell of knowingly accepting $55,000 in drug proceeds in payment for the legitimate legal services he provided Harris, and nothing more.

Mr. Ravenell's limited and aberrant criminal conduct as found by the jury stands in stark contrast to the vast remainder of Mr. Ravenell's law-abiding life and his impressive and impactful legal career. It also stands in contrast to the other lawyers—Farrell and Blair—who were convicted in the District of Maryland for far more egregious conduct. No § 3553(a) factor would be served by Mr. Ravenell's incarceration. The public will certainly not be better served or protected by his incarceration. Therefore, we respectfully request that the Court impose a sentence of two years of probation.

Sincerely,

 /s/ Peter H. White

Peter H. White