**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. LO-19-0449** |
| **KENNETH WENDELL RAVENELL,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

**\*\*\*\*\*\***

## UNITED STATES SENTENCING MEMORANDUM

The United States, by and through undersigned counsel, hereby respectfully submits this memorandum in connection with the sentencing of defendant Kenneth W. Ravenell.    For the reasons stated in more detail below, the government respectfully requests that this Court sentence this Defendant to eight (8) years or 96 months of incarceration.

Kenneth Ravenell stands before this Court a convicted money launderer.  He abused his position as a member of the Bar of Maryland to break the law, treating his firm's escrow account like a dirty bank for a coast-to-coast drug distribution organization for years and taking drug money for doing so.  As the Chief Justice Burger noted in *Application of Griffiths*:

> The role of a lawyer as an officer of the court predates the Constitution; it was carried over from the English system and became firmly embedded in our tradition.  It included the obligation of first duty to client.  But that duty never was and is not today an absolute or unqualified duty.  It is a first loyalty to serve the client's interest but always within—never outside—the law, thus placing a heavy personal and individual responsibility on the lawyer.  That this is often unenforceable, that departures from it remain undetected, and that judges and bar associations have been singularly tolerant of misdeeds of their brethren, renders it no less important to a profession that is increasingly crucial to our way of life.  The very independence of the lawyer from the government on the one hand and client on the other is what makes law a profession, something apart from trades and vocations in which obligations of duty and conscience play a lesser part.  It is as crucial to our system of justice as the independence of judges themselves.

413 U.S. 717, 732 (1973) (Burger, C.J., dissenting).   These unique attributes of the legal

profession—wide latitude to manage one's practice, especially financial matters relating to clients and freedom from government oversight in so doing—are the very ones that the Defendant exploited.

And the Defendant's crime could not be more serious.  Were it not for the ability to move drug proceeds from the street to the legitimate economy there would be no incentive to engage in large scale narcotics trafficking.  The Defendant's history and characteristics, far from being a mitigating factor, is an aggravating one in determining his sentence.  Unlike the defendants that typically appear before this Court, the Defendant was, by the accounts of the numerous character witnesses he called in his defense, highly successful, both professionally and financially.  And unlike most cases where the Government isn't privy to information about the defendant's character and background until sentencing, in this case, the  many character witnesses the Defendant called testified at his trial and the Government has factored that information into its sentencing recommendation.  Simply put, what the testimony of those witnesses demonstrate is that the Defendant lived a double life.  In Jekyll and Hyde like fashion, the Defendant presented one version of himself to his colleagues, and another to his clients like Richard Byrd and Leonaldo Harris.  To the former, he was a zealous and professional attorney.  To the latter, he was someone with his hand constantly out, hoovering up gargantuan sums of drug money and washing them through his law firm.  The Defendant's crime in this case shows he was also a zealous criminal, who was adept at covering up and concealing his criminal activity.  He deserves to be punished for this and would deserve to be punished even if he weren't a lawyer.  But in order to show that that rule of law applies to everyone, even the lawyers, the insiders, a significant sentence is necessary.  And a significant sentence is necessary to deter other lawyers who face the same incentives to break the law as they represent defendants involved in crimes that generate substantial illicit proceeds.

2

## I.   FACTUAL SUMMARY

### A.   Richard Byrd Operated a Coast-to-Coast Marijuana Distribution Organization

Ravenell began representing Richard Byrd in the early 1990s when Byrd was charged with firearms and narcotics offenses in state court.  In 1994, Byrd was charged with murder and Ravenell represented him at trial.  Byrd was acquitted.

From 2009 to 2014, part of the period charged in the money laundering count, the count of conviction, Byrd sold thousands of pounds of marijuana generating millions of dollars in cash.  The marijuana was purchased on the West Coast from growers in Sinaloa, Mexico, and then shipped to the East Coast where it was sold to wholesale distributors who then retailed it, including in Baltimore. From 2009 to 2014 alone, Byrd shipped 88,000 pounds through a single freight business, Airport Pak and Ship, from Arizona to Baltimore.   Seventy-five percent of that weight was marijuana, or approximately 66,000 pounds or 30,000 kilograms.   Byrd operated this marijuana distribution operation with Texas attorney James Bowie, Jerome Castle, Josef Byrd, Harold Byrd, Rasan Byrd, Thurston Lindsay, Kimberly Reid, Richard Drummond and others.

### B.   From 2009 through 2014 Ravenell Advised Byrd on Laundering the Proceeds of Narcotics Sales, and Starting in 2011 Ravenell Laundered the Money Himself through MFM

From 2009 through 2014, Ravenell gave Byrd advice on how to launder the millions of dollars of cash that Byrd's marijuana sales generated.  Ravenell advised Byrd to set up businesses that generated cash themselves and to make investments in real estate projects, which Byrd did, in order to launder drug proceeds.

Byrd's business activities were mainly in entertainment.  Byrd organized concerts and other events where drug proceeds were used to pay expenses, like renting venues, hiring entertainers, and purchasing food and alcohol for re-sale.  Attendees to these events largely paid in cash for their tickets, which provided a second opportunity to launder money, namely, by mixing cash generated

by marijuana sales with cash generated by ticket sales.  Ravenell and Byrd discussed all aspects of these events and Byrd's entertainment-related activities including the use of drug proceeds to fund the events and the mixing of drug proceeds with ticket sales.  From 2009 until 2011, Byrd's main vehicle for entertainment business was an entity called DB Entertainment.  The "DB" stood for Deandre Byrd, which was one of Byrd's aliases.

In 2011, Byrd was arrested in a reverse-sting operation in Chandler, Arizona.  He was video recorded attempting to buy 500 pounds of marijuana from undercover law enforcement agents.  At the time of his arrest, Byrd had a suitcase with more than $250,000 in cash with him.  It was at that time that Byrd became a formal client of Ravenell and Murphy Falcon & Murphy (MFM), the law firm where Ravenell was a partner at that time.  As a result of this attorney-client relationship, starting in 2011 and continuing until 2014, in addition to advising Byrd on how to launder money, Ravenell personally laundered Byrd's drug proceeds using MFM's attorney trust account.  Ravenell accepted more than $1.8 million in drug proceeds and funds co-mingled with drug proceeds from entities and individuals associated with Byrd.  Ravenell also directed the payment of more than $1.2 million of these funds to various projects and third parties to benefit Byrd.  Ravenell's purpose in accepting and disbursing these funds was to conceal the source of the funds as drug proceeds and promote Byrd's on-going marijuana distribution activities.  The following summary of the inflows and outflows credited to the Byrd related ledgers was presented to the jury:

| BYRD RELATED LEDGERS (CRIMINAL, BUSINESS VENTURES, HOTEL MATTER, OVERTOWN REBORN) | |
| --- | --- |
| AMOUNT DEPOSITED | $1,816,075.91 |
| AMOUNT RETAINED BY MFM | $632,662.49 |
| AMOUNT DEBITED FROM ALL LEDGERS FOR THIRD PARTIES | $1,183,413.42 |

Government Exhibit 277 (Attachment 1).

In exchange for Ravenell's advice and for laundering Byrd's funds through the MFM attorney trust account, Byrd paid Ravenell, in cash, using drug proceeds. Byrd personally delivered drug proceeds, in the form of cash, to Ravenell. With Ravenell's approval, other members of Byrd's drug trafficking organization also delivered cash to Ravenell including Jerome Castle, Josef Byrd, Harold Byrd and Rasan Byrd.

Ravenell set up a series of ledgers within MFM, eventually four of them in total, to account for the money that Ravenell was laundering for Byrd. Those ledgers were the "Byrd Criminal Matter," "Byrd Business Ventures," "Byrd Hotel Matter" and "Overtown Reborn." The latter three related to various investments Byrd was making, using drug proceeds, that Ravenell advised and counseled him on. Thus, while the drug proceeds flowed in and out of a single bank account at MFM, Ravenell tracked the funds across four Byrd-related ledgers. The following is a summary of the four Byrd-related ledgers that Ravenell managed at MFM:

| MFM  Ledger Names | Credits |
|---|---|
| Byrd Criminal Matter (712-001) | $1,236,766.34 |
| Byrd Business Ventures Matter (712-003) | $300,409.57[1] |
| Byrd Hotel Project Matter (712-004) | $170,600.00 |
| Byrd Overtown Reborn Matter (712-006) | $200,600.00[2] |
| **Total** | **$1,908,375.91** |

[1] $17,000 transferred from Byrd Criminal Matter
[2] $90,600 transferred from Byrd Hotel Matter ledger      GOVT. EXHIBIT NO.    22

Government Exhibit 22 (Attachment 2).  Ravenell was assisted in these activities by at least two staff members of MFM, Heather Mangus, the firm's accountant, and Deborah Ness, Ravenell's legal assistant.

Ravenell wired drug proceeds to other law firms, consulting firms and professionals to advance Byrd's various investments and conceal the source of the funds.  Ravenell advised Byrd to cycle the drug funds through MFM because, Ravenell believed, these other entities would not have taken the funds directly from Byrd or his entities because Byrd was a drug trafficker.

Ravenell accepted these funds and directed their disbursement while Byrd and members of his drug trafficking organization were arrested and various assets were seized.  One month after Byrd's February 2011 arrest in Chandler, Arizona, law enforcement seized approximately $750,000 from a house where Byrd was staying.  In April 2013, law enforcement conducted coordinated searches and arrests in both Arizona and Baltimore.  Thurston Lindsay was arrested transporting a large quantity of marijuana in Arizona and a significant quantity of marijuana was seized at Airport Pak and Ship.  Law enforcement also arrested Jerome Castle, Josef Byrd and Harold Byrd in Baltimore and seized several hundred pounds of marijuana and cash from them.

**C. All Monies Associated with Byrd were Funneled Through Third Parties at Ravenell's Direction**

On Ravenell's instructions and in order to conceal the source of the funds, none of the monies that were deposited in the MFM attorney trust account that was associated with Byrd actually came from Byrd himself.  Instead, Byrd gave drug proceeds, in the form of cash, to third parties or entities that Byrd partially controlled, who then provided the funds to MFM.  Ravenell personally approved these third-parties and would only take funds from individuals and entities that he had authorized Byrd to use.  This practice resulted in the creation of multiple layers, including both individuals and corporate entities, between the source of Byrd's funds, narcotics sales, and the ultimate recipients of the funds, including other law firms, professionals and various investment opportunities.

For example, Byrd gave drug proceeds, in cash, to a lawyer in Houston, Texas, named David Levine who then deposited the cash into accounts associated with two business entities he controlled, Repo Productions and Ares Industrial LLC.  Levine then wired the funds on to MFM.  These wires totaled approximately $155,000.   The jury was shown the ledger from MFM recording these incoming wires:

## Murphy Falcon & Murphy
### Byrd Criminal Matter (712-001) Ledger
*As of 08/28/2014*

| te | Billing/Payee | Desc | Check No | Amount | | Running Balance |
|---|---|---|---|---|---|---|
| 1101 / PNC Escrow Checking 9253 | | | | | | |
| 12/27/2012 | | Wire received from Ares industrial LLC | | $ | 30,000.00 $ | 34,000.00 |
| 12/27/2012 | | Wire Received from LOC Marketing | | $ | 30,000.00 $ | 64,000.00 |
| /28/2012 | | Wire Received from Repo Productions | | $ | 40,000.00 $ | 104,000.00 |

| 03/27/2013 | | Transfer from Ares Industrial, LLC | | $ | 50,000.00 | $ | 54,000.00 |
| 03/27/2013 | Murphy Falcon Murphy | Trust Application | 9999 | $ | (50,000.00) | $ | 4,000.00 |
| 04/08/2013 | | Wire - Ares Industrial LLC | | $ | 50,000.00 | $ | 54,000.00 |
| 04/09/2013 | | Wire - Ares Industrial LLC | | $ | 25,000.00 | $ | 79,000.00 |

Government Exhibit 14 (Attachment 3).  By doing so, Byrd created two layers using two different corporate entities between himself and the source of his funds, drug sales, and MFM.

Byrd also provided drug proceeds to his sister, Andrea King Chang, who then wired funds to MFM from her business account, Chang Jewelry, to MFM.  This created two layers, including a corporation, between the source of funds, Byrd's narcotics sales, and MFM.

Jerome Castle, a co-conspirator of Byrd's, provided drug proceeds to Jamila Lyn, a woman who had a child with Byrd.  The drug proceeds were then moved to MFM by way of an American Express credit card in the name of Alana Lowe, Jamila Lyn's mother.  Ravenell personally directed MFM to accept payments from this credit card:

| From: | Beth Wybolt |
| To: | Debbie Ness |
| Cc: | Ken Ravenell (kennethravenell@me.com) |
| Subject: | RE: Credit Cards |
| Date: | Monday, May 13, 2013 9:36:01 AM |

Debbie,

Per Ken's instructions we took $55,000.00 from the American Express credit card of Alana Lowe from Mr. Byrd.  Those monies have NOT yet been received by the firm; however, they have been charged to the card number.  Because our account is new and we rushed the set up to take these payments, there are still aspects of the account that must be verified and set up.  I've been working with PayPal since Friday to get these completed.  It may be a few days before the money is in our account.  I will let you know as soon as it is received.

Government Exhibit 81 (Attachment 4).  Subsequently, Ravenell made approximately $260,000 in charges on the card.  The following summary of Ravenell's use of the Lowe credit card was presented to the jury at trial:

| SUMMARY OF LYN / LOWE PAYMENTS TO MURPHY FALCON & MURPHY | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | BYRD CRIMINAL MATTER LEDER (712-001) | Amount | BYRD BUSINESS VENTURES LEDGER (712-003) | Amount | RUPERT CASTLE LEDGER (1316-001) | Amount | TOTALS |
| 5/17/2013 | Credit Card Transfer from PayPal | $21,333.34 | Credit Card Transfer from PayPal | $31,741.66 | | | $53,075.00 |
| 5/24/2013 | | | Credit Card Transfer from PayPal | $24,305.00 | Credit Card Transfer from PayPal | $50,000.00 | $74,305.00 |
| 6/7/2013 | | | PayPal Transfer from Alana Lowe | $14,475.00 | | | $14,475.00 |
| 6/25/2013 | | | PayPal Transfer from Alana Lowe | $22,436.25 | | | $22,436.25 |
| 7/11/2013 | | | PayPal Transfer from Alana Lowe | $42,460.00 | | | $42,460.00 |
| 7/24/2013 | Paypal transfer from Alana Lowe | $38,600.00 | | | | | $38,600.00 |
| 1/6/2014 | Wire received from Alana Lowe | $15,000.00 | | | | | $15,000.00 |
| | | | | | | | $260,351.25 |

Government Exhibit 246 (Attachment 5).

The Lowe credit card, controlled by Lyn, was also used to generate funds to pay criminal defense attorneys to represent Byrd's brothers, Harold and Josef, after they were arrested in Spring 2013. In order to conceal that Byrd was the source of the funds, Ravenell directed the creation of a fake ledger at MFM that made it appear that the money for Josef and Harold Byrd's defense had come from Rupert Castle, Jerome Castle's father. Ravenell then directed that checks to the defense attorneys for Harold and Josef Byrd then falsely identify Rupert Castle as the source of the funds. The jury was shown the following email at trial:

**Heather Mangus**

| | |
|---|---|
| From: | Kenneth Ravenell |
| Sent: | Thursday, June 06, 2013 8:07 AM |
| To: | Heather Mangus |
| Subject: | Castle |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Please cut a check for 25K to Brian Kelly LLC from Ruppert Castle escrow and give to Deb. Ty Kelly will pick up tomorrow. Thanks

Sent from my iPhone

Government Exhibit 87 (Attachment 6). None of these funds actually came from Rupert Castle and Rupert Castle was never a client of MFM.

### D.  At Ravenell's Direction, Byrd Acquired an Interest in LOC Marketing and Used it to Move Drug Proceeds to MFM

At Ravenell's direction, in 2011, Byrd acquired an interest in a new, entertainment-related business called LOC Marketing. Significant sums of money moved from that entity to MFM. As with his earlier entertainment-related business, DB Entertainment, Byrd funded events put on by LOC Marketing with drug proceeds and mixed cash generated by drug sales with cash generated at LOC Marketing events. Approximately $646,000 was received from LOC Marketing and deposited at Ravenell's direction in the MFM attorney trust account from 2011 to 2014. Kim Reid and Lamont Wanzer were responsible for depositing cash into LOC Marketing's various accounts and wiring it to MFM. Ravenell had direct contact with both Reid and Wanzer. The cash that Reid and Wanzer moved through LOC Marketing to MFM came from marijuana sales.

It is impossible to determine precisely what funds were derived from ticket sales or other legitimate sources and what funds were drug proceeds. Byrd testified during the trial that each of the payments made to MFM that originated from LOC included cash drug proceeds that were mixed in with revenues from the events that had been funded with drug monies.

### E.  Ravenell Accepted Drug Proceeds in Order to Assist Byrd in Securing the Right to Bid on the Overtown Reborn Development Project

In Fall 2012, Byrd attempted to invest drug proceeds in a development project near Miami, Florida, called Overtown Reborn. Byrd, acting through an intermediary, won the right to bid on this project by demonstrating that he had $200,000 in funds in escrow that could be used on the project. Ravenell was instrumental in Byrd winning the right to bid on this project. Ravenell directed that $90,000 in drug proceeds be transferred from the Byrd Hotel Matter Ledger to the Byrd Overtown Reborn ledger. Ravenell then accepted an incoming wire of $110,000 from LOC Marketing,

consisting of drug proceeds co-mingled with funds derived from other sources.   Ravenell then provided an account statement from MFM showing that $200,000 was in escrow at MFM to the entity organizing the project.



Government Exhibit 252 (Attachment 7).

The following summary of the transaction was presented to the jury at trial:



Government Exhibit 276 (Attachment 8).

### F.  The Use of Offshore Accounts

Offshore accounts were also used to funnel money through MFM.  In August 2013, Byrd had drug money delivered to an attorney in Jamaica named Stacey Allen.  Ravenell advised Byrd that funds that flowed through foreign law firms would draw less scrutiny than funds that came from other sources.  Allen in turn provided approximately $99,000 to a real estate agent in New York named Owen Robinson.  Robinson, in turn, provided $90,000 of those funds to a Ugandan diplomat at the United Nations, Patrick Okullo, with whom he had a professional relationship.  Robinson had obtained housing for the Uganda Mission to the UN in the past.  Robinson asked Okullo to wire the $90,000 to Ravenell, falsely telling Okullo that the money was needed for a real estate transaction with Robinson.  Okullo did as Robinson asked.  Ravenell personally accepted receipt of the $90,000 from Okullo, someone whom he had no attorney-client relationship with and had never met.  The following email was shown to the jury at trial



Government Exhibit 100 (Attachment 9).  Ravenell then personally directed that the $90,000 be

wired to Jamila Lyn, to pay off monies that Lyn had advanced to MFM for Byrd using Lyn's mother's American Express Card.

In sum, drug proceeds, in cash, were transported from the United States to Jamaica, those funds were then deposited in the bank account of a Jamaican law firm which in turn wired them to a U.S. based real estate broker who converted them into a cashier's check which was given to a Ugandan diplomat who then wired the funds to MFM which were then wired out to the mother of one of Byrd's children to repay her for money she had advanced to MFM on Byrd's behalf. The following summary of this transaction was presented to the jury at trial:



Government Exhibit 276 (Attachment 8).

A second transaction involving offshore accounts occurred in January 2014. In January 2014, Jamila Lyn also wired $15,000 from her mother's Jamaican bank account to MFM. This occurred after Lyn had been given drug proceeds by Jerome Castle in 2013.

### G.  Ravenell Concealed the Source of Byrd's Funds Even Within MFM

Ravenell took steps to conceal the source of incoming funds related to Byrd even from MFM. In September 2012, he instructed MFM's top accountant, Heather Mangus, to white out the source of three inbound wires totaling $122,600, on one of the Byrd-related internal ledgers, the Byrd Hotel

Project Matter.  The jury was shown the following email exchange between Ravenell and Mangus at trial:

> **From:**              Kenneth Ravenell
> **Sent:**              Friday, September 28, 2012 4:44 PM
> **To:**                Heather Mangus
> **Subject:**           Re: Byrd Business Ventures - Hotel Project
>
> Heather, Please white out who the senders of the money was on all 3 wires (Bad Boy, Chang Jewelry and AG) and resend your email and the redacted attachment to me asap. Thx
>
> ---
>
> **From:** Heather Mangus
> **Sent:** Friday, September 28, 2012 03:59 PM
> **To:** Kenneth Ravenell; kennethravenell@me.com <kennethravenell@me.com>
> **Subject:** Byrd Business Ventures - Hotel Project
>
> Ken,
>          Please see attached Ledger of the Byrd Business Ventures – Hotel Project Escrow Account. The current balance before the international wire today is $122,600.00. Please let me know if you need anything further. Thank you.
>
> Heather Mangus | Accounting Manager
> **Murphy, Falcon & Murphy**
>
> One South Street, 23rd Floor | Baltimore, MD 21202
> MAIN | 410-951-8744  DIRECT | 410-951-8753  FAX | 410-630-3532
> heather.mangus@mfmrk.com | www.mfmrk.com

Government Exhibit 270 (Attachment 10).

### H. Ravenell Created False Business Records for LOC Marketing In Order to Obstruct Justice

Ravenell also worked with Byrd to create false records for LOC Marketing in an attempt to conceal the fact that drug proceeds were used to fund events and were then co-mingled with any revenue the events generated.  This was done with an intent to obstruct justice and thwart an investigation into Byrd and LOC Marketing's activities, and, by extension, Ravenell's money laundering for Byrd.

These efforts increased after LOC Marketing received a federal grand jury subpoena in 2014.  Ravenell even went so far as to hire other lawyers and an accountant in an attempt to legitimize LOC Marketing's activities and try to tie cash drug deposits to events.  These efforts were unsuccessful.

### I.   Ravenell Solicited Byrd to Invest Drug Money in a Restaurant that Would Then Launder Byrd's Drug Proceeds

Ravenell also solicited Byrd to invest drug money in a restaurant called Judy's Island Grill II in April 2013.  The restaurant was owned and operated by Freka Scott, a woman who Ravenell provided financial support to and with whom he was in a long-term romantic relationship.  The purpose of this investment would be to create another vehicle through which Byrd could launder drug money.  Ravenell proposed that Byrd invest $150,000 in the restaurant.  Ultimately, Byrd decided not to invest but Ravenell told Byrd that Ravenell would invest in the restaurant himself, which he did, using cash drug proceeds that Byrd had given Ravenell.  Ravenell also directed Byrd to provide funds to Freka Scott through his sister, Andrea King Chang, who wrote a $9,000 check to Freka Scott after receiving cash drug proceeds from Byrd deposited in her bank account.  The reason that Ravenell directed Byrd to provide funds to Scott through Byrd's sister was to conceal the fact that Byrd was the source of the funds.

### J.   Ravenell Directed Another Client to Convert Drug Proceeds into Money Orders In Order to Conceal their Source

In June 2013, Ravenell began representing Leonaldo Harris, who had been charged with federal narcotics offenses.  Harris was not a member of the Byrd drug trafficking organization.  Harris paid Ravenell more than $350,000 in drug proceeds through an associate of Harris's, Avarietta Bailey.  Bailey discussed with Ravenell that she was collecting drug proceeds from customers of Harris in order to pay Ravenell.  Ravenell instructed Bailey to convert the drug proceeds into money orders and other instruments to conceal the source of the funds.

After Ravenell withdrew from his case, Harris learned that Ravenell had only credited $187,000 to Harris's case at MFM, not the more than $350,000 that Harris had paid him.

### K. Ravenell Offered to Launder Drug Funds for Darnell Miller in Exchange for $250,000 to $300,000

In 2014, prior to his arrest, Byrd began discussing entering into a criminal partnership with Darnell Miller.  Eventually, Miller met directly with Ravenell.  The two discussed connecting Miller's source of marijuana supply with Byrd's distribution network with Ravenell acting as an intermediary between the two and collecting his, Ravenell's and Byrd's profits from the operation. During this meeting, Ravenell also offered to launder Miller's drug proceeds, like he had done for Byrd, for a fee of $250,000 to $300,000.  Before Miller could act on Ravenell's offer, he learned that MFM had been searched by law enforcement, in August 2014, and thereafter decided to have no further contact with Ravenell.

## II.     SENTENCING ARGUMENT

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'"  *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264).   The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).   In *Gall*, the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id*. at 596-97.  The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.* (noting that a "major departure should be supported by a more significant justification than a minor

one."). Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

### A. Guidelines Range

The United States agrees with the United States Probation Office's calculation of the Sentencing Guidelines set forth in the final Pre-Sentence Report (PSR). ECF 537. The PSR correctly calculates the total offense level of 43. PSR ¶80. Because, pursuant to USSG § 5G1.1(a), the statutorily authorized maximum sentence of 10 years is less than the minimum of the applicable guideline range, the advisory guidelines term of imprisonment is 120 months.

#### 1. Base Offense Level

The Defendant's base offense level is **eight (8)** pursuant to U.S.S.G. § 2S1.1(a)(2).

The base offense level is increased by **16 levels** pursuant to U.S.S.G. § 2B1.1(b)(1)(i) because the amount of laundered funds is greater than $1.5 million and less than $3.5 million. Application Note 3(B) provides

> Commingled Funds.—In a case in which a transaction, financial transaction, monetary transaction, transportation, transfer, or transmission results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, not the total amount of the commingled funds, if the defendant provides sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process. If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection (a)(2), is the total amount of the commingled funds.

The evidence at trial showed that approximately $1.8 million was deposited into the MFM attorney trust account and credited to the four ledgers associated with Richard Byrd. Byrd testified that all of the funds deposited at MFM associated with him came from third parties to whom he had given drug proceeds in cash. Specifically, the evidence established that the Defendant received drug proceeds into the MFM attorney escrow account from LOC Marketing, *see, e.g.*, Trial Transcript

Vol. III at 135:19-137:19 and 143:7-145:18, James Bowie, *id.* at 151:21-152:13, two entities, Ares and Repo Productions, both of whom were associated with an attorney in Houston, Texas, David Levine, *id.* at 153:5-154:14, Andrea King Chang, *id.* at 166:3-14, Stacey Allen, Owen Robinson and Patrik Okullo, *id.* at 205:21-209:21. As to funds from LOC Marketing, Byrd testified he used drug proceeds to fund his entertainment businesses and mixed drug proceeds into any revenue they generated. *Id.* at 87:3-89:5. On cross, Byrd testified that LOC Marketing was "never a legitimate business" because while it "did real events" and "made real money," drug proceeds were always added to it. *Id.* at Vol. IV at 77:13-78:1. As to the funds from the other third-parties, the evidence in the record is that all of those funds came from marijuana sales.

Even if, assuming arguendo, some of those third parties could have co-mingled the drug proceeds Byrd provided to them with funds derived from legitimate sources (there was no record evidence of that claim), the full amount of the deposits into MFM, $1.8 million, should be used to calculate the applicable guidelines because pursuant to Section 2S1.1 Application Note 3(B) "the amount of the criminally derived funds is difficult or impracticable to determine." Indeed, the evidence at trial established that Ravenell instructed Byrd to wash and launder his money through various bank accounts of entities, like LOC Marketing, to make it appear to be legitimate and difficult to trace the source.

Further, the Defendant has not "provide[] sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process," such that only the amount of criminal derived funds should be considered. *Id.*

Ravenell also received $350,000 in drug proceeds from Avarietta Bailey. Trial Transcript Vol. IX at 171:11-181:9 (testimony of Leonaldo Harris). Specifically, Harris testified that, "All the monies paid by Ms. Bailey came from drug proceeds." *Id.* at 181:8-9.

**Thus, the Defendant's total base offense level is 24.** *See* PSR ¶ 40.

18

2. <u>Specific Offense Characteristics</u>

*a. Laundered funds involved drug proceeds*

The Defendant's advisory guideline calculation should be increased by **six (6)** levels because "the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance," pursuant to U.S.S.G. § 2S1.1(b)(1).  *See* PSR ¶ 41.

The evidence at trial established that the Defendant knew or believed that the laundered funds were drug proceeds.

*b. The Defendant was in the business of laundering funds*

The Defendant's advisory guideline calculation should be increased by four (4) levels because **four (4)** levels pursuant to U.S.S.G. § 2S1.1(b)(2)(C) because the Defendant was in the business of laundering funds.  *See* PSR ¶ 42.  Application Note 4 to § 2S1.1 provides that:

(A)    In General.—The court shall consider the totality of the circumstances to determine whether a defendant who did not commit the underlying offense was in the business of laundering funds, for purposes of subsection (b)(2)(C).
(B)    Factors to Consider.—The following is a non-exhaustive list of factors that may indicate the defendant was in the business of laundering funds for purposes of subsection (b)(2)(C):
(i)    The defendant regularly engaged in laundering funds.
(ii)    The defendant engaged in laundering funds during an extended period of time.
(iii)    The defendant engaged in laundering funds from multiple sources.
(iv)    The defendant generated a substantial amount of revenue in return for laundering funds.

The evidence at trial showed that the Defendant laundered Byrd's funds during an extended period of time, namely, from 2009 until 2014.  *See, e.g.*, Government Exhibits 14, (Byrd Criminal Matter Ledger); 16 (Byrd Business Ventures Ledger); 18 (Byrd Hotel Matter Ledger); and 20 (Byrd Overtown Reborn Matter Ledge), produced as Attachments 3, 11, 12, and 13, respectively.  The evidence at trial also showed that that he laundered funds from Bailey from 2013 and 2014.  *See e.g.*,

Trial Transcript Vol. IX at 171:11-181:9 (testimony of Leonaldo Harris) and 236:22-241:16 (testimony of Avarietta Bailey).

As summarized above, the evidence at trial also established that the Defendant laundered funds from multiple sources.

Byrd also testified that he gave Ravenell substantial sums of cash in exchange for Ravenell laundering funds for him. *See e.g.,* Trial Transcript Vol. III at 82:5-83:4; 87:25-89:5.

*c.   The offense involved sophisticated laundering*

The Defendant's advisory guideline calculation should be increased by **two (2)** levels because the offense involved "sophisticated laundering" pursuant to U.S.S.G. § 2S1.1(b)(3). *See* PSR ¶ 43. Application Note 5 to § 2S1.1 provides:

> (A)   Sophisticated Laundering under Subsection (b)(3).—For purposes of subsection (b)(3), "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense.
> Sophisticated laundering typically involves the use of–
> (i)   fictitious entities;
> (ii)   shell corporations;
> (iii)   two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or
> (iv)   offshore financial accounts.

The offense involved sophisticated laundering because the laundering involved "two or more levels (i.e. layering) of transactions, transportation, transfers, or transmissions involving criminally derived funds that were intended to appear legitimate." As summarized above, the evidence at trial showed that Byrd gave drug proceeds, in cash, to:

- various individuals associated with LOC Marketing who then deposited those monies into bank accounts associated with LOC Marketing from which they were then wired to MFM, s*ee, e.g.*, Trial Transcript Vol. III at 135:19-137:19; thus, there were at least two layers between the drug proceeds—the individuals to whom Byrd gave the cash and the LOC

20

marketing accounts—and the MFM escrow account;

- Andrea King Chang, who then transferred the funds to MFM from her business account, which meant that these funds were layered through two levels, *id.* at 166:3-14; and

- David Levine, a lawyer in Houston, who then transferred the money to MFM through two corporate entities he controlled, Ares Industrial and Repo Productions, which is another example of layering through two levels, *id.* at 153:5-154:14.

The most highly layered transaction was the Okullo transaction in which the evidence at trial established that Byrd provided drug money to an individual in Jamaica, who then provided it to an attorney in Jamaica, Stacey Allen, who then provided it to a real estate agent in New York Owen Robinson, who then provided it to a Ugandan diplomat at the United Nations who ultimately provided the funds to MFM. *Id.* at 205:21-209:21. The Okullo transaction also involved "offshore financial accounts," because the money came from Allen's account in Jamaica.

Finally, Byrd testified that he discussed all the various individuals and entities that would be used to layer these transactions with Ravenell and that Ravenell had to approve them before he would accept their funds into the MFM escrow account. *Id.* at 138:3-6.

### 3. Adjustments

#### a. *The Defendant Was The Organizer and Leader of the Conspiracy Involving Five or More Participants that Was Otherwise Extensive*

The PSR also correctly applies a four-level enhancement pursuant to § 3B1.1 because Ravenell led and organized the money laundering conspiracy, which involved five or more people and was otherwise extensive. *See* PSR ¶ 45. First, the money laundering conspiracy in this case involved at least five participants. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1 note 1. As shown at trial, the money laundering conspiracy involved, at a minimum, Richard Byrd, Jerome Castle,

Josef Byrd, Harold Byrd, Avarietta Bailey, Leonaldo Harris and Darnell Miller.  While Byrd was the leader or organizer of the drug trafficking organization, he acted on Ravenell's advice to launder proceeds from that operation, including through LOC Marketing. And beginning in 2011 and continuing until 2014, Ravenell himself laundered Byrd's drug proceeds through the MFM attorney trust account.  Even if Byrd is considered also to have led and organized the money laundering conspiracy, Application Note 4 recognizes that, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  The Application Note further counsels that:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.  Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Ravenell exercised total control over whether funds were accepted into and then wired out of MFM. *See, e.g.*, Trial Transcript Vol. VI at 287:1-8; 287:18-288:7 (testimony of Heather Mangus).  Byrd exercised no such control.

Section 3B1.1 Application Note 2 provides:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

Even assuming *arguendo* that Ravenell did not "lead, manage, or supervise another participant," an upward departure is nonetheless warranted because Ravenell "exercised management responsibility over the property, assets, or activities of" Byrd's drug trafficking organization.

*b.  The Defendant abused a position of trust*

22

The Defendant's advisory guideline calculation should be increased by **two (2)** levels because the Defendant abused a position of trust or used a special skill, pursuant to U.S.S.G. § 3B1.3.  *See* PSR ¶ 46.  An abuse of position of trust enhancement is appropriate if the defendant abused a position of public trust in order to conceal the offense.  *United States v. Agyekum*, 846 F.3d 744 (4th Cir. 2017).  By using MFM's attorney escrow account as a mechanism to launder drug proceeds, the Defendant abused the public trust afforded lawyers as professionals and officers of the court.  The "[c]entral purpose" of the sentencing enhancement is to penalize defendants who take advantage of [a] position that provides them with freedom to commit a difficult-to-detect wrong."  *Id.*  U.S.S.G. § 3B1.3.  That is precisely what occurred here.  Section 3B1.3 Application Note 1 provides that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.  This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

As an attorney, Ravenell occupied a "position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  Attorneys are "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  *Id.*  As a partner in the MFM firm, Ravenell was able to move money through the MFM attorney trust account at his own discretion and without having to obtain permission from any other member of the firm.  *See, e.g.,* Trial Transcript Vol. VI at 287:1-8; 287:18-288:7 (testimony of Heather Mangus).  Ravenell's status as an attorney

and a partner at MFM "contributed in [a] significant way to facilitating the commission or concealment of the offense." **Section 3B1.3 Application Note 1**. Indeed, if he had not been a partner at MFM he would not have been able to launder Byrd's money through the firm's attorney trust account. The Application Note specifically recognizes that, "[t]his adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian …" *Id*. Here, Ravenell did not embezzle Byrd's funds but, instead, abused his special access the MFM escrow account to launder drug proceeds from multiple sources.

Further, abuse of trust is not the only mechanism by which the two level enhancement applies. Ravenell also used a "special skill" in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. §3B1.3. Section 3B1.3 provides that the district court should increase the offense level by two if "the defendant ... used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, *lawyers,* doctors, accountants, chemists, and demolition experts." *Id.* § 3B1.3 cmt. 2 (emphasis added). As an attorney with years of experience in criminal defense (particularly representing drug defendants), Ravenell was able to exploit the wide latitude that attorneys are afforded in managing their own financial affairs and the financial affairs of their clients. Using an attorney escrow account in the manner in which Ravenell used it is not a "skill" known by or possessed by members of the public.

### c.  *The Defendant obstructed justice*

The Defendant's advisory guideline calculation should be increased by **two (2)** levels because Ravenell obstructed justice pursuant to U.S.S.G. § 3C1.1. *See* PSR ¶ 47. Section 3C1.1. Application Note 1 provides that:

This adjustment applies if the defendant's obstructive conduct (A) occurred with

respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant.

Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.

Specifically, the evidence at trial showed that Ravenell created false and fictitious accounting and other business records for LOC Marketing in order to thwart an investigation of Byrd and, by extension, Ravenell himself.  Trial Transcript Vol. III at 211:9-212:21.  This occurred even after Ravenell became aware that a federal grand jury subpoena had been served on LOC Marketing.

### B.  Section 3553(a) Factors

Pursuant to the factors set forth in 18 U.S.C. § 3553(a), the government recommends that this Court impose a substantial sentence of imprisonment within the advisory guideline range.

### 1.  Nature and Circumstances of the Offense.

The nature and circumstances of Ravenell's crimes call for a substantial term of imprisonment.  Drug offenses and money-laundering offenses are crimes which "invade distinct societal interests; the distribution of illegal drugs affects the drug user and the community by increasing lawlessness and violence and money laundering disperses capital from lawfully operating economic institutions to criminals in and out of the country." *United States v. Gallo*, 927 F.2d 815, 824 (5th Cir.1991).  The Defendant's crime enabled a large-scale drug trafficking organization to continue to spread drugs throughout our communities, and his conduct seriously threatened the public health and safety of citizens throughout this district.  Indeed, illicit drug trafficking is the cause of much attendant violence in Baltimore, and the drug organization members he protected were known to possess firearms (as is evidence by the assault weapon recovered that belonged to Jerome Castle which defense counsel questioned him about at trial).

Criminal defense work pursuant to the ethical rules of professional responsibility is a bedrock of our system of justice. The Defendant hid behind his role as a criminal defense attorney in order to enrich himself by laundering money for drug trafficking clients. While financial institutions are subject to a sophisticated web of regulations meant to detect and deter money laundering, lawyers are afforded wide latitude to manage their own financial affairs and the financial affairs of their clients.

This Court should hold Ravenell to a higher standard than a non-lawyer regarding his financial affairs with clients and with the government. He has done irreparable harm to the reputation of the legal profession. Instead of upholding the rule of law, he betrayed the criminal justice system and he continues to try to hide behind it, claiming he was acting as an ethical lawyer. His conduct, however, showed a clear disrespect for the law during a time when he was representing himself as an officer of the court in numerous cases over a period of years.

2. Underline History and Characteristics of the Defendant

The government has taken into consideration Ravenell's lack of criminal history. Further, unlike in other cases where a defendant pleads guilty and the Government first learns details of their background and character at the sentencing hearing, here the Defendant called character witnesses in his defense in trial. Thus, the Government's recommendation takes the information provided by those witnesses, which undoubtedly will be repeated in some form during the sentencing hearing, into account. To be clear, the Defendant called a number of noteworthy character witnesses at trial. But what they demonstrate more than anything is the compartmentalized nature of the Defendant's professional life, a successful criminal strategy that allowed him to conceal his criminal activity for years. He was both a lawyer and a criminal at the same time. He not only zealously advocated for his clients, which all the character witnesses noted, but he also committed crimes with his clients and he did that for the same reasons they did—greed.

The Defendant's background, education and professional success are both mitigating and aggravating factors. They are mitigating, as the Defendant will no doubt argue, because they show that he has made positive contributions to society. They are aggravating because the Defendant was highly successful and thus didn't need to commit crimes to enrich himself. In that regard he is unlike many of the defendants who appear before this court and indeed that he used to represent. While poverty and a lack of education and opportunity are not excuses for criminal behavior, they undoubtedly explain it in many circumstances. But they don't here. The only thing that explains the Defendant's conduct is a lack of integrity and a mistaken belief that he was above the law. It is also worth noting that the Defendant's conduct was not a single episode of bad judgment but hundreds of transactions that occurred over the course of at least five years.

### 3.   The Sentence Must Promote General Deterrence.

A significant sentence is also called for in this case to promote general deterrence. Absent a meaningful term of imprisonment, general deterrence —"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976).

Intentional, calculated conduct like the conspiracy led by Ravenell calls for a significant term of incarceration to deter others from making similar decisions. *See United States v. Shortt*, 485 F.3d 243, 251-52 (4th Cir. 2007) ("As a practical matter, extensive efforts to conceal demand greater punishment, because they make it less likely that authorities will detect the scheme."); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). *See also United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (affirming sentence where the "judge stressed the corrosive effect that corruption has on

27

the public trust and expressed his belief that the scandals will not end unless they are treated 'appropriately hard' ").

Moreover, the professional latitude afforded to attorneys made the Defendant's crimes possible and more difficult to unravel, and he is thereby deserving of greater punishment than a money launderer in a different context. *See, e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); see also *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized.").  A lenient sentence against the Defendant would only serve to embolden other corrupt attorneys who commit crimes with their clients and can hide behind the protections and privileges afforded to ethical and law-abiding lawyers.

### 4.  The Sentence Should Promote Respect for the Rule of Law.

The Defendant's crimes doubly offend the rule of law.  On the one hand, our free market economy depends on the integrity of the individuals who operate within it.  The Government cannot police every transaction that touches the financial system to ensure it is not connected to crime.  Therefore, when money laundering is detected, it should be severely punished.  Further, as described above, the legal profession affords attorneys wide latitude to manage their own financial affairs and their client's financial affairs with little of the oversight that other professions are subjected to.  That is unlikely to change.  Therefore, when an attorney is found to be abusing the significant professional freedom afforded to them in order to commit crimes, the law should severely punish them.

### C.  Forfeiture / Criminal Fine

Finally, the government is seeking a forfeiture order in the amount of money laundered and a fine within the guideline range.   The government will provide a proposed forfeiture order at sentencing.   Under the advisory Guidelines, a court may impose a fine "in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a).  The district court must consult the Guidelines' recommendation, the §3553(a) factors, and the 18 U.S.C. § 3572(a) factors to determine the appropriateness of the imposition of a fine and its amount.   Here, as the PSR notes, the Defendant is able to pay a fine and the court should impose one.  The fine suggested here is hugely variant; but large enough to be punitive –punishment is, after all, one of the goals of sentencing.

### III.  CONCLUSION

Based on the foregoing, the government respectfully recommends that the Court impose a sentence of eight (8) years incarceration and a significant fine and order forfeiture.

Respectfully submitted,

Philip Selden
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

By:   _____/s/_____
Leo J. Wise
Zachary H. Ray
Assistant United States Attorneys

Derek E. Hines
Special Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was served on counsel of record via CM/ECF.

_____/s/_____
Zachary H. Ray
Assistant United States Attorneys