## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **v.** | * |
| | *   **CRIMINAL NO. LO-19-0449** |
| **KENNETH WENDELL RAVENELL,** | * |
| | * |
| **Defendant.** | * |
| | * |
| | * |
| | ******* |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL

The United States of America hereby files this response to the Defendant's Rule 33 Motion for New Trial.  ECF No. 542, filed April 1, 2022.  The Defendant's motion is meritless and should be denied.

## REQUEST TO EXCEED PAGE LIMITATIONS

The Defendant's motion for a new trial raises multiple bases for relief, which required the Government to exceed the 35-page limit in Local Rule 105.3.  The Government requests permission to exceed the page limit.

[this space intentionally left blank]

## Table of Contents

I.    PROCEDURAL HISTORY ...................................................................................... 4

II.   FACTUAL BACKGROUND .................................................................................. 4

   **A.   Richard Byrd Operated a Coast-to-Coast Marijuana Distribution Organization** ................... 4

   **B.   From 2009 through 2014 Ravenell Advised Byrd on Laundering the Proceeds of Narcotics Sales, and Starting in 2011 Ravenell Laundered the Money Himself through MFM** ...................... 5

   **C.   All Monies Associated with Byrd were Funneled Through Third Parties at Ravenell's Direction** ............................................................................................................................. 7

   **D.   At Ravenell's Direction, Byrd Acquired an Interest in LOC Marketing and Used it to Move Drug Proceeds to MFM** ....................................................................................................... 8

   **E.   Ravenell Accepted Drug Proceeds in Order to Assist Byrd in Securing the Right to Bid on the Overtown Reborn Development Project** .......................................................................... 9

   **F.   The Use of Offshore Accounts** ................................................................................. 9

   **G.   Ravenell Concealed the Source of Byrd's Funds Even Within MFM** ............................... 10

   **H.   Ravenell Created False Business Records for LOC Marketing In Order to Obstruct Justice** 10

   **I.   Ravenell Solicited Byrd to Invest Drug Money in a Restaurant that Would Then Launder Byrd's Drug Proceeds** ........................................................................................................ 11

   **J.   Ravenell Directed Another Client to Convert Drug Proceeds into Money Orders In Order to Conceal their Source** ....................................................................................................... 11

   **K.   Ravenell Offered to Launder Drug Funds for Darnell Miller in Exchange for $250,000 to $300,000** ............................................................................................................................. 12

III.  LAW .................................................................................................................... 12

IV.  ARGUMENT ....................................................................................................... 13

   **A.   The Defendant Repeatedly Asked the Court to Give a Legally Incorrect Statute of Limitations Instruction That the Court Correctly Declined to Give and the Evidence at Trial Does Not Weigh Heavily Against the Verdict on the Issue of Whether the Conspiracy Continued Past July 2, 2014** ................................................................................................................... 14

      *1.   The Defendant Incorrectly Claimed that the Government Had to Prove an Overt Act Within Limitations Even Though No Overt Act is Required to Prove a Money Laundering Conspiracy* ...... 17

      *2.   The Defendant Then Erroneously Claimed that the Jury Had to Find the Conspiracy Continued During the Limitations Period by a Preponderance of the Evidence* ................................. 21

      *3.   The Defendant Also Incorrectly Asserted that the Statute of Limitations was an Element of the Offense When It Was Not* ................................................................................................ 23

      *4.   The Court Properly Instructed the Jury on the Elements of Money Laundering Conspiracy Consistent with Fourth Circuit Precedent* ................................................................................. 23

      *5.   Any Error Related to Statute of Limitations Was Harmless* ....................................... 24

   **B.   The Court was Required to Instruct the Jury on 18 U.S.C. § 1956(h) and those Instructions were Proper** ....................................................................................................................... 31

*1.* *The Court Was Not Required to Define the "Monetary Transaction" Element of 1957* ............31

*2.* *The Defendant's Conduct Did Not Fall within Section 1957(f)(1)'s Safe Harbor Provision and He Neither Asked for Nor Was Entitled to a Jury Instruction on the Safe Harbor* ............................33

*3.* *Any Error Did Not Affect the Defendant's Substantial Rights* ....................................................36

**C.** **The Court's Conscious Avoidance Instruction was Properly Given** ........................................38

**D.** **None of the Objects of the Conspiracy Were Legally Infirm** ...................................................40

**E.** **It Would Contrary to the Interests of Justice to Vacate the Defendant's Conviction** ............42

**V.** **CONCLUSION** ...................................................................................................................................43

## I.  PROCEDURAL HISTORY

On December 28, 2021, the Defendant was convicted of money laundering conspiracy after a two week trial.  ECF No. 490.  On January 6, 2022, the Defendant filed a motion to extend the 14-day deadline to file post-trial motions proposing that any such motions will be filed by the Defendant by April 1, 2022, with responses by the United States by April 29, 2022.  ECF No. 500. On January 10, 2022, the Court granted the Defendant's motion and adopted the schedule proposed therein.

Sentencing is scheduled for May 13, 2022.

## II.  FACTUAL BACKGROUND

Kenneth Ravenell (Ravenell) was a lawyer licensed to practice in the state of Maryland. His practice focused on criminal defense.

### A.  Richard Byrd Operated a Coast-to-Coast Marijuana Distribution Organization

Ravenell began representing Richard Byrd in the early 1990s when Byrd was charged with firearms and narcotics offenses in state court.  In 1994, Byrd was charged with murder and Ravenell represented him at trial.  Byrd was acquitted.

From 2009 to 2014, the period of the money laundering conspiracy that the jury convicted Ravenell of, Byrd sold thousands of pounds of marijuana generating millions of dollars in cash. The marijuana was purchased on the West Coast from growers in Sinaloa, Mexico, and then shipped to the East Coast where it was sold to wholesale distributors who then retailed it, including in Baltimore.  From 2009 to 2014 alone, Byrd shipped 88,000 pounds through a single freight business, Airport Pak and Ship, from Arizona to Baltimore.  Seventy-five percent of that weight was marijuana, or approximately 66,000 pounds or 30,000 kilograms.   Byrd operated this

4

marijuana distribution operation with Texas attorney James Bowie, Jerome Castle, Josef Byrd, Harold Byrd, Rasan Byrd, Thurston Lindsay, Kimberly Reid, Richard Drummond and others.

**B. From 2009 through 2014 Ravenell Advised Byrd on Laundering the Proceeds of Narcotics Sales, and Starting in 2011 Ravenell Laundered the Money Himself through MFM**

From 2009 through 2014, Ravenell gave Byrd advice on how to launder the millions of dollars of cash that Byrd's marijuana sales generated.  Ravenell advised Byrd to set up businesses that generated cash themselves and make investments in real estate projects, which Byrd did, in order to launder drug proceeds.

Byrd's business activities were mainly in entertainment.  Byrd organized concerts and other events, where drug proceeds were used to pay expenses, like renting venues, hiring entertainers, and purchasing food and alcohol for re-sale.  Attendees to these events largely paid in cash for their tickets, which provided a second opportunity to launder money, namely, by mixing cash generated by marijuana sales with cash generated by ticket sales.  Ravenell and Byrd discussed all aspects of these events and Byrd's entertainment-related activities including the use of drug proceeds to fund the events and the mixing of drug proceeds with ticket sales.  From 2009 until 2011, Byrd's main vehicle for entertainment business was an entity called DB Entertainment.  The "DB" stood for Deandre Byrd, which was one of Byrd's aliases.

In 2011, Byrd was arrested in a reverse-sting operation in Chandler, Arizona.  He was video recorded attempting to buy 500 pounds of marijuana from undercover law enforcement agents.  At the time of his arrest, Byrd had a suitcase with more than $250,000 in cash with him.  It was at that time that Byrd became a formal client of Ravenell and Murphy Falcon & Murphy (MFM), the law firm where Ravenell was a partner at that time.  As a result of this attorney-client relationship, starting in 2011 and continuing until 2014, in addition to advising Byrd on how to launder money,

Ravenell personally laundered Byrd's drug proceeds using MFM's attorney trust account. Ravenell accepted more than $1.8 million in drug proceeds and funds co-mingled with drug proceeds from entities and individuals associated with Byrd. Ravenell also directed the payment of more than $1.2 million of these funds to various projects and third parties to benefit Byrd. Ravenell's purpose in accepting and disbursing these funds was to conceal the source of the funds as drug proceeds and promote Byrd's on-going marijuana distribution activities.

In exchange for Ravenell's advice and for laundering Byrd's funds through the MFM attorney trust account, Byrd paid Ravenell, in cash, using drug proceeds. Byrd personally delivered drug proceeds, in the form of cash, to Ravenell. With Ravenell's approval, other members of Byrd's drug trafficking organization also delivered cash to Ravenell including Jerome Castle, Josef Byrd, Harold Byrd and Rasan Byrd.

Ravenell set up a series of ledgers within MFM, eventually four of them in total, to account for the money that Ravenell was laundering for Byrd. Those ledgers were the "Byrd Criminal Matter," "Byrd Business Ventures," "Byrd Hotel Matter" and "Overtown Reborn." The latter three related to various investments Byrd was making, using drug proceeds, that Ravenell advised and counseled him on. Thus, while the drug proceeds flowed in and out of a single bank account at MFM, Ravenell tracked the funds across four Byrd-related ledgers. Ravenell was assisted in these activities by at least two staff members of MFM, Heather Mangus, the firm's accountant, and Deborah Ness, Ravenell's legal assistant.

Ravenell wired drug proceeds to other law firms, consulting firms and professionals to advance Byrd's various investments and conceal the source of the funds. Ravenell advised Byrd to cycle the drug funds through MFM because, Ravenell believed, these other entities would not have taken the funds directly from Byrd or his entities because Byrd was a drug trafficker.

Ravenell accepted these funds and directed their disbursement while Byrd and members of his drug trafficking organization were arrested and various assets were seized. One month after Byrd's February 2011 arrest in Chandler, Arizona, law enforcement seized approximately $750,000 from a house where Byrd was staying. In April 2013, law enforcement conducted coordinated searches and arrests in both Arizona and Baltimore. Thurston Lindsay was arrested transporting a large quantity of marijuana in Arizona and a significant quantity of marijuana was seized at Airport Pak and Ship. Law enforcement also arrested Jerome Castle, Josef Byrd and Harold Byrd in Baltimore and seized several hundred pounds of marijuana and cash from them.

### C. All Monies Associated with Byrd were Funneled Through Third Parties at Ravenell's Direction

On Ravenell's instructions and in order to conceal the source of the funds, none of the monies that were deposited in the MFM attorney trust account that was associated with Byrd actually came from Byrd himself. Instead, Byrd gave drug proceeds, in the form of cash, to third parties or entities that Byrd partially controlled, who then provided the funds to MFM. Ravenell personally approved these third-parties and would only take funds from individuals and entities that he had authorized Byrd to use. This practice resulted in the creation of multiple layers, including both individuals and corporate entities, between the source of Byrd's funds, narcotics sales, and the ultimate recipients of the funds, including other law firms, professionals and various investment opportunities.

For example, Byrd gave drug proceeds, in cash, to a lawyer in Houston, Texas, named David Levine who then deposited the cash into accounts associated with two business entities he controlled, Repo Productions and Ares Industrial LLC. Levine then wired the funds on to MFM. These wires totaled approximately $155,000. By doing so, Byrd created two layers using two different corporate entities between himself and the source of his funds, drug sales, and MFM.

7

Byrd also provided drug proceeds to his sister, Andrea King Chang, who then wired funds to MFM from her business account, Chang Jewelry, to MFM.  This created two layers, including a corporation, between the source of funds, Byrd's narcotics sales, and MFM.

Jerome Castle, a co-conspirator of Byrd's, provided drug proceeds to Jamila Lyn, a woman who had a child with Byrd.  The drug proceeds were then moved to MFM by way of an American Express credit card in the name of Alana Lowe, Jamila Lyn's mother.  Specifically, Ravenell made approximately $260,000 in charges on the card, which he could do because MFM was set up to take payments via credit cards.

The Lowe credit card, controlled by Lyn, was also used to generate funds to pay criminal defense attorneys to represent Byrd's brothers, Harold and Josef, after they were arrested in Spring 2013.  In order to conceal that Byrd was the source of the funds, Ravenell directed the creation of a fake ledger at MFM that made it appear that the money for Josef and Harold Byrd's defense had come from Rupert Castle, Jerome Castle's father.  Checks to the defense attorneys for Harold and Josef Byrd then falsely identified Rupert Castle as the source of the funds.  None of these funds actually came from Rupert Castle and Rupert Castle was never a client of MFM.

**D.  At Ravenell's Direction, Byrd Acquired an Interest in LOC Marketing and Used it to Move Drug Proceeds to MFM**

At Ravenell's direction, in 2011, Byrd acquired an interest in a new, entertainment-related business called LOC Marketing.  Significant sums of money moved from that entity to MFM.  As with his earlier entertainment-related business, DB Entertainment, Byrd funded events put on by LOC Marketing with drug proceeds and mixed cash generated by drug sales with cash generated at LOC Marketing events.  Approximately $646,000 was received from LOC Marketing and deposited at Ravenell's direction in the MFM attorney trust account from 2011 to 2014.  Kim Reid and Lamont Wanzer were responsible for depositing cash into LOC Marketing's various accounts

and wiring it to MFM.  Ravenell had direct contact with both Reid and Wanzer. The cash that Reid and Wanzer moved through LOC Marketing to MFM came from marijuana sales.

It is impossible to determine precisely what funds were derived from ticket sales or other legitimate sources and what funds were drug proceeds.  Byrd testified during the trial that each of the payments made to MFM that originated from LOC included cash drug proceeds that were mixed in with revenues from the events that had been funded with drug monies.

### E.  Ravenell Accepted Drug Proceeds in Order to Assist Byrd in Securing the Right to Bid on the Overtown Reborn Development Project

In Fall 2012, Byrd attempted to invest drug proceeds in a development project near Miami, Florida, called Overtown Reborn.  Byrd, acting through an intermediary, won the right to bid on this project by demonstrating that he had $200,000 in funds in escrow that could be used on the project.  Ravenell was instrumental in Byrd winning the right to bid on this project.  Ravenell directed that $90,000 in drug proceeds be transferred from the Byrd Hotel Matter Ledger to the Byrd Overtown Reborn ledger.  Ravenell then accepted an incoming wire of $110,000 from LOC Marketing, consisting of drug proceeds co-mingled with funds derived from other sources. Ravenell then provided an account statement from MFM showing that $200,600 was in escrow at MFM to the project's organizer.

### F.  The Use of Offshore Accounts

Offshore accounts were also used to funnel money through MFM.  In August 2013, Byrd had drug money delivered to an attorney in Jamaica named Stacey Allen.  Ravenell advised Byrd that funds that flowed through foreign law firms would draw less scrutiny than funds that came from other sources.  Allen in turn provided approximately $99,000 to a real estate agent in New York named Owen Robinson.  Robinson, in turn, provided $90,000 of those funds to a Ugandan diplomat at the United Nations, Patrick Okullo, with whom he had a professional relationship.

9

Robinson had obtained housing for the Uganda Mission to the UN in the past.  Robinson asked Okullo to wire the $90,000 to Ravenell, falsely telling Okullo that the money was needed for a real estate transaction with Robinson.  Okullo did as Robinson asked.  Ravenell personally accepted receipt of the $90,000 from Okullo.  Ravenell then directed that the $90,000 be wired to Jamila Lyn, to pay off monies that Lyn had advanced to MFM for Byrd using Lyn's mother's American Express Card.  In sum, drug proceeds, in cash, were transported from the United States to Jamaica, those funds were then deposited in the bank account of a Jamaican law firm which in turn wired them to a U.S. based real estate broker who converted them into a cashier's check which was given to a Ugandan diplomat who then wired the funds to MFM which were then wired out to the mother of one of Byrd's children to repay her for money she had advanced to MFM on Byrd's behalf.

A second transaction involving offshore accounts occurred in January 2014.  In January 2014, Jamila Lyn also wired $15,000 from her mother's Jamaican bank account to MFM.  This occurred after Lyn had been given drug proceeds by Jerome Castle in 2013.

### G. Ravenell Concealed the Source of Byrd's Funds Even Within MFM

Ravenell took steps to conceal the source of incoming funds related to Byrd even from MFM.  In September 2012, he instructed MFM's top accountant, Heather Magnus, to white out the source of three inbound wires totaling $122,600, on one of the Byrd-related internal ledgers, the Byrd Hotel Project Matter.

### H. Ravenell Created False Business Records for LOC Marketing In Order to Obstruct Justice

Ravenell also worked with Byrd to create false records for LOC Marketing in an attempt to conceal the fact that drug proceeds were used to fund events and were then co-mingled with any revenue the events generated.  This was done with an intent to obstruct justice and thwart an

investigation into Byrd and LOC Marketing's activities, and, by extension, Ravenell's money laundering for Byrd.

These efforts increased after LOC Marketing received a federal grand jury subpoena in 2014.  Ravenell even went so far as to hire other lawyers and an accountant in an attempt to legitimize LOC Marketing's activities and try to tie cash drug deposits to events.  These efforts were unsuccessful.

**I.   Ravenell Solicited Byrd to Invest Drug Money in a Restaurant that Would Then Launder Byrd's Drug Proceeds**

Ravenell also solicited Byrd to invest drug money in a restaurant called Judy's Island Grill II in April 2013.  The restaurant was owned and operated by Freka Scott, a woman who Ravenell provided financial support to and with whom he was in a long-term romantic relationship.  The purpose of this investment would be to create another vehicle through which Byrd could launder drug money.  Ravenell proposed that Byrd invest $150,000 in the restaurant.  Ultimately, Byrd decided not to invest but Ravenell told Byrd that Ravenell would invest in the restaurant himself, which he did, using cash drug proceeds that Byrd had given Ravenell.  Ravenell also directed Byrd to provide funds to Freka Scott through his  sister, Andrea King Chang, who wrote a $9,000 check to Freka Scott after receiving cash drug proceeds from Byrd deposited in her bank account.  The reason that Ravenell directed Byrd to provide funds to Scott through Byrd's sister was to conceal the fact that Byrd was the source of the funds.

**J.   Ravenell Directed Another Client to Convert Drug Proceeds into Money Orders In Order to Conceal their Source**

In June 2013, Ravenell began representing Leonaldo Harris, who had been charged with federal narcotics offenses.  Harris was not a member of the Byrd drug trafficking organization.  Harris paid Ravenell more than $350,000 in drug proceeds through an associate of Harris's, Avarietta Bailey.  Bailey discussed with Ravenell that she was collecting drug proceeds from

11

customers of Harris in order to pay Ravenell.  Ravenell instructed Bailey to convert the drug proceeds into money orders and other instruments to conceal the source of the funds.

After Ravenell withdrew from his case, Harris learned that Ravenell had only credited $187,000 to Harris's case at MFM, not the more than $350,000 that Harris had paid him.

### K. Ravenell Offered to Launder Drug Funds for Darnell Miller in Exchange for $250,000 to $300,000

In 2014, prior to his arrest, Byrd began discussing entering into a criminal partnership with Darnell Miller.  Eventually, Miller met directly with Ravenell.  The two discussed connecting Miller's source of marijuana supply with Byrd's distribution network with Ravenell acting as an intermediary between the two and collecting his, Ravenell's and Byrd's profits from the operation. During this meeting, Ravenell also offered to launder Miller's drug proceeds, like he had done for Byrd, for a fee of $250,000 to $300,000.  Before Miller could act on Ravenell's offer, he learned that MFM had been searched by law enforcement, in August 2014, and thereafter decided to have no further contact with Ravenell.

### III.   LAW

Federal Rule of Criminal Procedure 33 authorizes a trial court to order a new trial "if the interest of justice so requires."  "[T]the meaning of the phrase in 'the interest of justice' in the context of Rule 33 is not difficult to discern; the phrase's plain meaning makes unmistakably clear that granting a new trial is discretionary, and the cases reflect that this discretion should be exercised where it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt."  *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006), *aff'd*, 496 F.3d 344 (4th Cir. 2007).  "The decision to grant or deny a motion for a new trial is within the broad discretion of the district court." *United States v. Gutierrez*, 963 F.3d 320, 339–40 (4th Cir.), *cert. denied sub nom. Gilmore v. United States*, 141 S. Ct. 419, 208 L. Ed. 2d 121 (2020),

*and cert. denied*, 141 S. Ct. 1112, 208 L. Ed. 2d 555 (2021), *and cert. denied sub nom. Baxton v. United States*, 141 S. Ct. 1431, 209 L. Ed. 2d 152 (2021) (quoting *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004)).  "Such motions should be awarded sparingly, as a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it." *Id*. (*quoting United States v. Wilson*, 624 F.3d 640, 660 (4th Cir. 2010) (internal quotation marks omitted)); *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (same); *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (same).  Because a district court's decision to grant a new trial is discretionary, it is reviewed on appeal for abuse of discretion.  *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006).

## IV.    ARGUMENT

The Defendant cites four bases for his motion for a new trial.  First, the Court declined the Defendant's request to give the jury a legally incorrect statute of limitations instructions.  Mem. at 14.  Second, although the Defendant never requested it, the Defendant now claims that the Court "failed to instruct the jury on an essential element of one of the conspiratorial objects of the charged money laundering conspiracy," specifically the definition of "monetary transaction" set forth in 19 U.S.C. § 1957(f)(1).  *Id.* at 23.  Third, the Court gave an instruction on conscious avoidance that the Defendant claims, was "not supported by the evidence," because, according to the Defendant, the "government's evidence exclusively supported its theory that Mr. Ravenell acted with actual knowledge and intent."  *Id.* at 35, 9. Finally, the Defendant claims that his conviction must be overturned under *Yates v. United States*, 354 U.S. 298 (1957) for two reasons, specifically, the Defendant "*may* have been convicted of knowingly receiving criminally derived legal fees to represent a client (Leonaldo Harris) in his criminal defense, which is not a crime as a matter of law," and, second, "he *may* have been convicted of a money laundering conspiracy that concluded

more than five years before the applicable limitations period." *Id*. at 9–10 (emphasis added).  None of these bases justify the relief requested.

At the outset, the Government notes that the Defendant claims, incorrectly, that "[a]t trial, the government presented evidence of two distinct money laundering conspiracies—one based on drug proceeds Mr. Ravenell received from his client Richard Byrd's drug trafficking organization (the Byrd "DTO"), and another based on drug proceeds Mr. Ravenell's firm received on behalf of another client, Leonaldo Harris, who operated an entirely separate drug trafficking organization from Byrd."  Mem. at 10.  The Second Superseding Indictment charged the Defendant with participating in a single money laundering conspiracy, not "two distinct money laundering conspiracies," as the Defendant inaccurately claims.  *See* Second Superseding Indictment, Count Two (ECF No. 281).  Indeed, the defendant never proposed a multiple conspiracies instruction or argued there were multiple conspiracies because the evidence does not support that there were multiple conspiracies.  Because the jury's verdict cannot be bifurcated in the way in which the Defendant now proposes, his statute of limitations argument, Safe Harbor argument, and *Yates* arguments all fail.

**A.  The Defendant Repeatedly Asked the Court to Give a Legally Incorrect Statute of Limitations Instruction That the Court Correctly Declined to Give and the Evidence at Trial Does Not Weigh Heavily Against the Verdict on the Issue of Whether the Conspiracy Continued Past July 2, 2014**

At the outset it is worth noting that the Defendant asserts that, "[t]he Court erred in failing to instruct the jury on determining whether **either of the two distinct alleged money laundering conspiracies** continued into the applicable limitations period (i.e., beyond July 2, 2014)."  Mem. at 14. (emphasis added).  Again, the Defendant is wrong when he asserts that there were "two distinct alleged money laundering conspiracies."  The Defendant was charged with participating in a single money laundering conspiracy.  More fundamentally, the jury instruction that the

Defendant asked the Court to give on the statute of limitations was wrong as a matter of law. Furthermore, the Court properly instructed the jury on the elements of money laundering conspiracy and the evidence presented at trial showed that the money laundering conspiracy continued past July 2, 2014. July 2, 2014, is the operative date for purposes of calculating limitations because the parties entered into a tolling agreement on that date that extended until October 2, 2019. *See* Attachment 1. The Indictment in this case was returned by the Grand Jury on September 18, 2019. ECF 1.

"As a general matter, a district court has an obligation to give instructions to the jury that "fairly state[ ] the controlling law." *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir.1990). The Defendant claims it was reversible error for the Court to decline to give the statute of limitations instruction the Defendant requested. "A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Hassan*, 742 F.3d 104, 129 (4th Cir. 2014); *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). The Fourth Circuit reviews a district court's refusal to give a jury instruction for abuse of discretion, although it conducts a de novo review of any claim that jury instructions incorrectly stated the law. *United States v. Gutierrez*, 963 F.3d 320, 338 (4th Cir.), *cert. denied sub nom. Gilmore v. United States*, 141 S. Ct. 419, 208 L. Ed. 2d 121 (2020), *and cert. denied*, 141 S. Ct. 1112, 208 L. Ed. 2d 555 (2021), *and cert. denied sub nom. Baxton v. United States*, 141 S. Ct. 1431, 209 L. Ed. 2d 152 (2021); *United States v. Blankenship*, 846 F.3d 663, 670–71 (4th Cir. 2017); *Gentry v. E. W. Ptrs. Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016); *United States v. Mouzone*, 687 F.3d 207, 217 (4th Cir. 2012); *United States*

*v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010); *United States v. Wilkins*, 354 F. App'x 748, 755 (4th Cir. 2009); *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003); *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir.1996).  In conducting a de novo review of a whether a jury instruction incorrectly stated the law, the Fourth Circuit does not "view a single instruction in isolation," rather the court "consider[s] whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Blankenship*, 846 F.3d at 670–71; *United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012).

### A. At No Point Prior to or During Trial Did the Defendant Request a Statute of Limitations Jury Instruction that was Correct as a Matter of Law

At no point prior to or during trial did the Defendant ever ask the Court to give a jury instruction on the statute of limitations that was correct or fairly stated the controlling law.  To begin with, the Defendant did not propose a statute of limitations instruction when he filed his proposed instructions with the Court on November 30, 2021, at all.  The Defendant's proposed jury instructions were lengthy—including 72 individual instructions.  ECF 436.

The first time the issue of statute of limitations came up during the trial was on Friday, December 17, 2021, when Defendant Ravenell made an oral motion for acquittal pursuant to Federal Rule of Criminal Procedure 29 after the Government rested its case.  Counsel for the Defendant, Mr. Outlaw, argued that as a factual matter:

> Just starting with Counts One through Three, we'll simply submit that we don't believe that the Government has established the elements of each offense. Particularly they have a statute of limitations problem.  We don't believe that they've established **an act** that brings the indictment within the statute of limitations.  And we simply submit on that they have not established the elements and have not established **an act** within the statute of limitations, which is a deadly defect to their indictment.

Trial Transcript Volume X at 42:2-10 (emphasis added).  Mr. Outlaw's reference to "an act," as would become clear when the Defendant submitted supplemental proposed jury instructions,

16

meant an overt act, which is not a required element for money laundering conspiracy.  To be clear, at the close of the Government's case, the Defendant asked *the Court* to find the Defendant not guilty because the evidence—"an act within the statute of limitations"—was insufficient to sustain the conspiracy convictions.  Thus, Mr. Outlaw's argument was not an argument that the Court should instruct the jury to make a statute of limitations finding, it was a question of proof, like any other Rule 29 argument.  The Court rightly denied the Defendant's motion.  *Id*. at 58:9-59:4. However, there simply is no request for a statute of limitations jury instruction in Mr. Outlaw's vague and legally incorrect oral motion.

> 1. *The Defendant Incorrectly Claimed that the Government Had to Prove an Overt Act Within Limitations Even Though No Overt Act is Required to Prove a Money Laundering Conspiracy*

The first time the Defendant addressed the issue of the statute of limitations as an issue related to the jury instructions was on Monday, December 21, 2022.  That morning the Defendant emailed chambers a version of the jury instructions proposed by the Government that included, in redline, requests by the Defendant to modify those instructions.  This version was not filed on the docket but a copy of the email to chambers and the proposed defense revisions is Exhibit 1 to this filing.  In an instruction titled "Commission of Overt Acts," the Defendant asked the Court to instruct the jury that:

> There is a limit on how much time the government has to obtain an indictment.  For you to find the defendant guilty of conspiracy as to **Counts Two** and Three only, the government must prove beyond a reasonable doubt that at least **one overt act** in furtherance of the conspiracy was committed after July 2, 2014.

Attachment 2, Defendant's Revisions to Government's Proposed Jury Instructions at 78 (emphasis added).  Later that day when the Defendant renewed his Rule 29 motion, his counsel Mr. White, asserted, again incorrectly:

17

> You'll see in the instructions we include that **they need to have proven an overt act in furtherance of the conspiracies on all three counts during that time period**. I don't believe they have proven an overt act in furtherance of the conspiracy on any of it.

Trial Transcript Volume XII at 29:9-13 (emphasis added). Mr. White's statement and the proposed jury instructions he referenced, quoted above, were incorrect as a matter of law, as the Government argued that same day. There is no overt act requirement for money laundering conspiracies, the count of conviction, so there is no requirement that an overt act occur within limitations. *Whitfield v. United States*, 543 U.S. 209, 219 (2005) ("[W]e hold that conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy."); *United States v. Green*, 599 F.3d 360, 372 (4th Cir. 2010). And the Court found that the Defendant's proposed instruction was incorrect as a matter of law. Trial Transcript Volume XII at 64:16-23.

Despite the fact that blackletter law clearly establishes that proof of an overt act is not an element of money laundering conspiracy, the Defendant continues to maintain that the Court should have instructed the jury that it had to find an overt act occurred within limitations. For that reason, his reliance on *United States v. Head*, 641 F.2d 174 (4th Cir. 1981) is entirely misplaced. In *Head*, the Defendant was charged with conspiracy to commit bribery, in violation of 18 U.S.C. §§ 201(b) & (f) and tax evasion, in violation of 26 U.S.C. §§ 7201 and 7206. While the Fourth Circuit's opinion does not explicitly say what conspiracy statute the Defendant was charged with violating, the only conspiracy statute in federal law that could charge both bribery offenses and tax evasion is the same count is the general conspiracy statute, 18 U.S.C. § 371, which has as one of its elements that the Government prove an overt act in furtherance of the conspiracy. Further evidence that Section 371 was charged in *Head* is the fact that in *Head*, the Fourth Circuit cited a decision of the Fifth Circuit, *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976) for the

proposition that it is the "general rule" that, "in order to avoid the five-year statute of limitations for conspiracies, [the Government] must prove an **overt act** in furtherance of the conspiracy committed within the limitations period." *Id.* at 177 (emphasis).  The Fifth Circuit's opinion in *Davis* makes clear that the charge in that case was a violation of 18 U.S.C. § 371.  *Davis*, 533 F.2d at 926 (the essential elements of the crime of conspiracy under § 371 are an agreement by two or more persons to combine efforts for an illegal purpose and an overt act by one of the members in furtherance of the agreement).  In *Head*, the Fourth Circuit  noted that the conspiracy count alleged

> . . . twenty **overt acts** in furtherance of the conspiracy, only five of which occurred within five years of the indictment … In short, with regard to two of the three objects of the conspiracy, the indictment rested in large part on acts occurring without the limitations period.

*Head*, 641 F.2d  at 177.  The Fourth Circuit then concluded, "[u]nder these circumstances, there can be no doubt that Head was entitled to an instruction requiring the jury to find an overt act committed within the limitations period before it could find him guilty." *Id*.  Obviously, the conspiracy statute at issue here has no such requirement that the Government prove an overt act in furtherance of the conspiracy and none were alleged in the indictment.  Thus, the Fourth Circuit's conclusion is inapposite.  Nonetheless, the Defendant continues to claim, incorrectly, that "[t]he relevant facts here are indistinguishable from *Head*."  Mem. at 18.  Specifically, the Defendant makes the erroneous assertion that, "the indictment and the evidence presented at trial relied on numerous acts occurring outside the statute of limitations period." *Id.*  The Second Superseding Indictment did not allege any overt acts related to Count Two.  *See* ECF No. 281 at 16–17.  Nor did the Government present evidence of overt acts, either occurring within or outside of the limitations period because the elements of money laundering conspiracy do not include the commission of overt acts in furtherance of the conspiracy.

The other cases the Defendant cites also involved erroneous claims that the Government had to prove an overt act within limitations when, like here, it did not.

In *United States v. Fishman*, the defendant appealed the district court's denial of his motion to dismiss on the ground that the statute limitations for the charges in the indictment had expired before the indictment was returned.  645 F.3d 1175, 1191 (10th Cir. 2011).  The Tenth Circuit held that "for conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period."  *Id.* (citation and quotation marks omitted); *United States v. McNair*, 605 F.3d 1152, 1213 (11th Cir. 2010); *United States v. Gonzalez*, 921 F.2d 1530, 1548 (11th Cir. 1991). The Tenth Circuit further held, "[w]hether we look just at the indictment or also consider proof of the conduct of Mr. Fishman, it is clear that the indictment against him was not barred by the statute of limitations."  *Id*.

In *United States v. Green*, the Defendant appealed the district court's denial of his motion for judgment of acquittal pursuant to Rule 29.  599 F.3d at 368(4th Cir. 2010).  The Defendant argued that

> (1) that the Government failed to prove that he committed an overt act in furtherance of the drug conspiracy within the applicable five year period of limitations, *see* 18 U.S.C. § 3282(a), and (2) that the evidence established as a matter of law that he withdrew from the conspiracy more than five years before the grand jury returned the indictment.

*Id*.  The Fourth Circuit called these arguments "simply two ways of saying the same thing," and found both contentions unpersuasive.  In *Green*, the Defendant apparently made an argument similar to the one the Defendant is making here, namely, that "unfortunately, the jury was not adequately instructed regarding the statute of limitations, but he does not assign error to the district

court's jury instructions." *Id*. n. 9 (internal citations and alterations omitted).  Here, of course, the Defendant does claim error but in doing so is no more persuasive than Green.

In *United States v. Portsmouth Paving Corp.*, the defendant argued that the district court committed reversible error when it failed to instruct the jury that "the Government was required to prove that an overt act in furtherance of the conspiracy occurred within the five-year statute of limitations period set out by 18 U.S.C. section 3282." 694 F.2d 312, 324 (4th Cir. 1982).  This is the same argument the Defendant made when he submitted his proposed jury instruction on December 21, 2022.  The Fourth Circuit rejected that claim because "the proposed instruction was an inaccurate statement of the law," since the Sherman Act, which was the charge in that case, like money laundering conspiracy, does not require the commission of any overt act.  *Id*.  Because an overt act is not necessary for money laundering conspiracy, the Defendant's arguments fail.

> 2. *The Defendant Then Erroneously Claimed that the Jury Had to Find the Conspiracy Continued During the Limitations Period by a Preponderance of the Evidence*

After the Court denied the Defendant's renewed Rule 29 motion, Mr. White said:

> Your Honor, I confess, I haven't had a chance to look at the case law in overt acts on Counts One through Three, but I do think -- I do think that we need to have something in Counts One through Three that the jury has to find, that the conspiracy extended into the limitations period.  I think that is an issue that is perfect for the jury.  It's a fact issue here for the jury to decide.  I realize, I think one of the problems you have is is there may be a different standard of proof that's required for that.  If I recall it correctly **I think it might be a preponderance of the evidence on the statute of limitations and not beyond a reasonable doubt**.  But I do think that is an issue, it's a classic factual issue for the jury to decide whether the conspiracy extended into that time period.  So we know that's a little off the topic of what we're talking about here, but it's related.

Trial Transcript Volume XII at 69:17-70:7 (emphasis added).  So, while the Defendant first asserted, incorrectly, that the Government had to prove that an overt act was committed in furtherance of the money laundering conspiracy within limitations, Mr. White compounded the

problem when he asserted that the jury had to make a finding that the conspiracy continued into the limitations period applying a preponderance of the evidence standard. That is incorrect. There is no authority for the proposition that the jury applies a preponderance of the evidence standard to determine the existence of a conspiracy.

The following day, on December 22, 2021, the Defendant tendered a revised statute of limitations instruction to the Court and the Government. The full text of the proposed instruction is below:

---

INSTRUCTION NO. [   ]

There is a limit on how much time the government has to obtain an indictment. For you to find the defendant guilty of conspiracy as to Count Two, the government must prove by a preponderance of the evidence that the alleged conspiracy continued after July 2, 2014.

*See United States v. Fishman*, 645 F.3d 1175, 1191 (10th Cir. 2011) (considering conspiracy to commit money laundering, among other charges, and explaining that "for conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period") (internal quotations citation omitted).

---

Attachment 3, Defendant's Proposed Statute of Limitations Jury Instructions. The Government objected to the fact that the proposed instruction erroneously instructed the jury that it had to find the conspiracy continued into the limitations period by a preponderance of the evidence. Trial Transcript Volume XIII at 4:12-6:13. Juries do not determine whether a conspiracy continues into a limitations period by a preponderance of the evidence. Because the Defendant asked the Court to give the jury a legally incorrect instruction, the Defendant has failed to establish that the Court should order a new trial because "the interest of justice so requires."

3. *The Defendant Also Incorrectly Asserted that the Statute of Limitations was an Element of the Offense When It Was Not*

In addition, Mr. White's claim that the statute of limitations is an element was also incorrect as a matter of law.  And the Defendant repeated that erroneous assertion in his motion for a new trial when he stated, "[t]he statute of limitations is a *required* element of the charged offense that the government must prove beyond a reasonable doubt."  Mem. at 16 (emphasis in original).  To the contrary, as the Supreme Court explained in *Smith v. United States*, that the statute of limitations is not an element of the offense:

> Commission of the crime within the statute-of-limitations period **is not an element of the conspiracy offense**. *See United States v. Cook*, 17 Wall. 168, 180, 21 L.Ed. 538 (1872). **The Government need not allege the time of the offense in the indictment,** *id.***, at 179–180, and it is up to the defendant to raise the limitations defense**, *Biddinger v. Commissioner of Police of City of New York*, 245 U.S. 128, 135, 38 S.Ct. 41, 62 L.Ed. 193 (1917).  A statute-of-limitations defense does not call the criminality of the defendant's conduct into question, but rather reflects a policy judgment by the legislature that the lapse of time may render criminal acts ill suited for prosecution.  *See, e.g.*, *Toussie v. United States*, 397 U.S. 112, 114–115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).

568 U.S. 106, 112 (2013). (emphasis added); *United States v. Williams*, 684 F.2d 296, 299 (4th Cir.1982); *Handy v. United States*, 2010 WL 3086350, at *2 (D. Md. Aug. 6, 2010).  None of the three cases that the Defendant cites, *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 324 (4th Cir. 1982), *United States v. Sampson*, 898 F.3d 270, 276 (2d Cir. 2018), or *United States v. Ciavarella*, No. 3:09-CR-272, 2018 WL 317974, at *8 (M.D. Pa. Jan. 8, 2018), *aff'd*, 765 F. App'x 855 (3d Cir. 2019) stand for the proposition that statute of limitations is an element of the offense.

4. *The Court Properly Instructed the Jury on the Elements of Money Laundering Conspiracy Consistent with Fourth Circuit Precedent*

The Court properly instructed the jury on all the elements of money laundering conspiracy. As the Fourth Circuit has held,

> To obtain a conviction for money laundering conspiracy under 18 U.S.C. § 1956(h), the Government must prove the following essential elements: (1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C § 1956(a) or § 1957; (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy.

*Green*, 599 F.3d at 371; *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008). The Court's

instructions to the jury contained all of these elements. The Court instructed the jury as follows:

> In order to prove the defendant guilty of conspiracy to commit money laundering, the United States must prove three elements beyond a reasonable doubt. First, that there was an agreement between two or more persons to commit money laundering; second, that the defendant knew that the money laundering proceeds had been derived from illegal activity; and third, that the defendant knowingly and voluntarily became a part of the conspiracy. I'll give you further instructions on the type of money laundering activities that defendants have been charged with.

Trial Transcript Vol. XIII at 54:6-15. And the Court subsequently gave additional instructions

related to each element and related to the three objects of the money laundering conspiracy.

### 5. Any Purported "Error" Related to Statute of Limitations Was Harmless

Even if the Court misinstructed the jury on statute of limitations, which it did not, a

harmless error analysis would apply on review. *United States v. McDonnell*, 792 F.3d 478, 504

(4th Cir. 2015), *vacated and remanded*, 579 U.S. 550, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016);

*United States v. Cloud*, 680 F.3d 396, 408 n. 5 (4th Cir. 2012); *United States v. Ramos–Cruz*, 667

F.3d 487, 496 (4th Cir. 2012). An error in instructing the jury is harmless if the court finds that it

is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty

absent the error.'" *Id*. (*quoting Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d

35 (1999)).

The jury by its verdict found that the Government had established each of the elements of

money laundering beyond a reasonable doubt. In *Green*, the Fourth Circuit explained:

> Once a conspiracy is established, however, it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. *Hyde v. United States*, 225 U.S. 347, 369–70, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). A mere cessation of activity in furtherance of the conspiracy is insufficient. *United States v. Goldberg*, 401 F.2d 644, 648 (2d Cir.1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969). The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his coconspirators. *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978). The burden of proving withdrawal rests on the defendant. *United States v. Gillen*, 599 F.2d 541, 548 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979).

*Green*, 599 F.3d at 360, 369–70; *United States v. Wilkins*, 354 F. App'x 748, 756 (4th Cir. 2009) ("Once a conspiracy is established ... it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. A mere cessation of activity in furtherance of the conspiracy is insufficient. The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his co-conspirators. The burden of proving withdrawal rests on the defendant.") (quoting *United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986)); *see also United States v. Bennett*, 984 F.2d 597, 609 (4th Cir.) ("Once it is proven that a defendant was a member of the conspiracy, the defendant's membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action."), *cert. denied*, 508 U.S. 945 (1993) (*quoting United States v. West*, 877 F.2d 281, 289 (4th Cir.1989)).

The Defendant, at trial, and now post-trial, has failed to offer any evidence that he withdrew from the conspiracy.

Further, it is clear that a rational jury would have found the defendant guilty absent the error because the Government presented specific evidence that the money laundering conspiracy continued past July 2, 2014.[1]

The Defendant chose in his motion to focus on evidence related to Leonaldo Harris and Avarietta Bailey and the third object of the conspiracy—18 U.S.C. § 1957. He does so on the erroneous belief that:

> At trial, the government presented evidence of two distinct money laundering conspiracies—one based on drug proceeds Mr. Ravenell received from his client Richard Byrd's drug trafficking organization (the "Byrd DTO"), and another based on drug proceeds Mr. Ravenell's firm received on behalf of another client, Leonaldo Harris, who operated an entirely separate drug trafficking organization from Byrd.

Mem. 10. As stated above, that is obviously incorrect. The Defendant was charged in Count Two with membership in a single money laundering conspiracy, not two separate conspiracies. Thus, the jury was not constrained to only consider evidence that related to Leonaldo Harris. The Defendant also makes much of the fact that undersigned counsel argued to the jury that it could convict the Defendant "solely on the basis of Bailey and Harris." Mem. at 12. Counsel's argument to the jury, as the jury was told by the Court, is neither evidence nor a controlling statement of the law. But, in any event, counsel's argument was not inaccurate precisely because there were not two distinct conspiracies. "Generally, pursuant to the continuing offense doctrine, **only one relevant aspect** of a conspiracy need have occurred during the limitations period for a prosecution

---

[1] The Defendant cites *Portsmouth Paving Corp.* 694 F.2d 312, 324 (4th Cir. 1982) for the unremarkable proposition that "the Government must prove beyond a reasonable doubt that the offending agreement continued into the five-year limitations period." Mot at 16. But that is a question of proof, not legal instructions. Similarly, the other two cases the Defendant cites, both of which are out of Circuit, *United States v. Sampson*, 898 F.3d 270, 276 (2d Cir. 2018) and *United States v. Ciavarella*, No. 3:09-CR-272, 2018 WL 317974, at *8 (M.D. Pa. Jan. 8, 2018), aff'd, 765 F. App'x 855 (3d Cir. 2019) involve questions of proof not of what is or isn't a legally correct jury instruction.

to be timely. *Wilkins*, 354 F. App'x at 756 (*citing Brown v. Elliott*, 225 U.S. 392, 401, 32 S.Ct. 812, 56 L.Ed. 1136 (1912) (emphasis added)).   And the evidence presented at trial showed, contrary to the Defendant's claim, that the aspects of the money laundering conspiracy that related solely to Bailey and Harris did, in fact, continue past July 2, 2014.

The Defendant claims that the money laundering conspiracy ended on April 25, 2014, when the ledger from the Murphy firm for Harris shows its last payment.   The jury heard evidence that Avarietta Bailey gave the Defendant drug proceeds so that the Defendant would represent Leonaldo Harris in his federal drug case, *United States v. Leonaldo Harris*, Cr. No. 13-202.   Trial Transcript Vol. IX at 171:11-181:9 (testimony of Leonaldo Harris) and 236:22-241:16 (testimony of Avarietta Bailey).   For the reasons discussed below, the Defendant's conduct is not covered by the Safe Harbor provision of Section 1957(f)(1).   *See, infra*, Section IV.B.   And the aspect of the money laundering conspiracy that related to Harris and Bailey did not, in fact, terminate on April 25, 2014, or at any time prior to July 2, 2014.

First, there was no evidence that the last payment from Harris to the Defendant was meant to be the last payment.   Just the opposite.   Harris testified that the Defendant came to see him "a few days after" after the grand jury returned a superseding indictment in his case. Trial Transcript Vol. IX at 185:11-186:15.   According to Harris's docket sheet, which was moved in evidence at the trial, that occurred only a month before the April 25, 2014, payment, *see* Government Trial Exhibit 267 at ECF No. 94 (Attachment 4), and Harris only had his initial appearance on the Superseding Indictment on April 9, 2014, ten days before the April 25, 2014, payment, *see id.* at ECF No. 104.   At that meeting, the Defendant demanded more money to keep representing Harris. Trial Transcript Vol. IX at 185:20-22 ("He told me that he would not go forward unless I paid him some more money.   As a matter of fact, he's not doing anything else, no more investigations or

27

anything."); 186:9-12 ("He said that they weren't going to do any more work -- initially he said they weren't going to do any more work. Sean wasn't going to do any more investigation until I paid some more money."); and 186:15 ("He said he would continue, but he needed some more money."). Thus, there is no evidence in the record that the April 25, 2014 payment, was intended to be the final payment, it just happened to be the last one. *See, e.g.*, *United States v. Dodson*, 129 F.3d 118 (4th Cir. 1997) ("Conspiracy is a continuing offense that does not end until its termination is affirmatively established.").

Further, the jury heard testimony from Bailey and Harris that the Defendant continued to represent Harris after July 2, 2014. Harris testified that he attempted to contact the Defendant but then learned from Sean Gordon that the Murphy Firm had been searched and only after that did, he seek other counsel. Trial Transcript Vol. IX at 186:16-187:8. The jury heard testimony that the Murphy Firm was searched in August 2014. *See, e.g.*, Trial Transcript Vol. IX at 7:9-12. Further, the Government introduced a certified copy of the docket in Harris' federal criminal case which showed that the Defendant did not withdraw as Harris' counsel until November 13, 2014, well after July 2, 2014. Government's Trial Exhibit 267 (Attachment 4). Bailey also testified that in November 2014 she received a target letter from the United States Attorney's Office. Trial Transcript Vol. IX at 260:17-22. In response she reached out to the Defendant and also destroyed all the records she had related to the drug proceeds she had given the Defendant for Harris' defense. *Id.* at 260:23-261:7. Bailey also testified that she reached out to the Defendant because she "was wondering where this was coming from and what I needed to do," which is an act that demonstrates the continued existence of the conspiracy. *Id.* at 261:12-15.

The jury was also free to consider evidence of an agreement to violate Section 1957 related to Ravenell's representation of Richard Byrd, another aspect of the single money laundering

conspiracy.   The evidence at trial showed that like with Harris, the Defendant accepted drug proceeds from third parties in order to represent Richard Byrd.   For example, the Defendant received drug proceeds from LOC Marketing, Trial Transcript Vol. III at 135:19-137:19 and 143:7-145:18, James Bowie, *id*. at 151:21-152:13, two entities, Ares and Repo Productions, both of whom were associated with an attorney in Houston, Texas, David Levine, *id.* at 153:5-154:14, Andrea Chang, *id*. at 166:3-14, Stacey Allen, Owen Robinson and Patrik Okullo, id. at 205:21-209:21, 141-144 Harold Byrd, *id*. at Vol. VII at 153:19-156:11 and Josef Byrd, id. at Vol. VIII at 6:13-9:20.   Trial Transcript Vol. VIII at 6:13-9:20.   And for the reasons discussed below, that conduct is not covered by the Safe Harbor provision of Section 1957(f)(1).  *See infra* Section IV.B.

The aspects of the money laundering conspiracy that related to Byrd did not, in fact, terminate on February 26, 2014, or at any time prior to July 2, 2014.   Byrd testified that Ravenell did not withdraw as his lawyer until after the Murphy Firm was searched in August 2014.   Trial Transcript Vol. III at 220:25-221:14.   The docket sheet for Byrd's case was also introduced in evidence and showed that the Defendant did not terminate his representation of Byrd until October 10, 2014.  *See* Government's Trial Exhibit 130 at 1 (Attachment 5).

In addition, the jury heard evidence that the Defendant made a payment on August 1, 2014, to Phoenix Towing Services in the amount of $750.   Trial Transcript Vol. II 44:10- 44:24, December 14, 2021 (testimony of Heather Mangus).   This obviously occurred after July 2, 2014. Byrd testified that his agreement with the Defendant was, among other things, that Byrd would provide the Defendant with drug proceeds in exchange for the Defendant representing him.   As the Defendant concedes this $750 payment was related to the Defendant's representation of Byrd, specifically, it was to pay for the storage of vehicles belonging to Byrd that had been seized by

authorities in Arizona.  Thus, this payment was an act in furtherance of the money laundering conspiracy, and, specifically, in furtherance of the third object—to violate 18 U.S.C. § 1957.

The drug proceeds provided to the Defendant and deposited in the Murphy firms escrow account were tracked, internally at the Murphy firm, on various ledgers associated with Byrd.  Trial Transcript Vol. VI at 282:24-283:8;  284:19-296:22;  Vol. VII at 9:21-31:17;  31:18-44:24 (testimony of Heather Mangus).  These ledgers were entered into evidence.  As of August 28, 2014, the Byrd Criminal Matter ledger showed a balance of $7,046.64.  Government's Trial Exhibit 14 (Attachment 6).  As of that same date, the Byrd Business Ventures Matter ledger showed a balance of $4,135.90.  Government's Trial Exhibit 16 (Attachment 7).  Finally, as of that date, the Byrd Overtown Reborn Matter showed a balance of $600.  Government Exhibit 20 (Attachment 8).  The fact that drug proceeds remained at the Murphy Firm, credited to Byrd, after July 2, 2014, is all evidence that the money laundering conspiracy continued after that date.

The jury also heard evidence that Byrd gave an individual named Alex Gidewon $2 million in drug proceeds which Gidewon, in turn, provided to James Crawford.  Trial Transcript Vol. III at 216:20-219:8.  After Byrd was arrested, the Defendant travelled to Atlanta to try and meet with Gidewon.  *Id.* at 220:16-24.  Byrd's testimony was corroborated with financial records, introduced in evidence, showing that the Defendant flew from Baltimore to Atlanta on July 11, 2014.  Government Exhibit 126 (Attachment 9).

The jury also heard evidence that Byrd only began cooperating with the Government in August 2017.  Trial Transcript Vol. III at 73:2-5.  That is when the conspiracy terminated, not, as the Defendant incorrectly claims, when Byrd was arrested.  The jury also saw a letter, smuggled out of jail, from Byrd to the Defendant that was written after the Defendant no longer represented,

which means after October 2014, him where Byrd asked the Defendant to work with his new lawyers on his defense. *See* Government Exhibit 225 (Attachment 10).

### B. The Court was Required to Instruct the Jury on 18 U.S.C. § 1956(h) and those Instructions were Proper

The Defendant next argues that "The Court's jury instruction regarding 18 U.S.C. § 1957 was fatally deficient because it failed to instruct the jury on the definition of 'monetary transaction' as an element of § 1957, which includes a Safe Harbor exempting transactions made in the exercise of Sixth Amendment rights. See 18 U.S.C. § 1957(f)(1)." Mem. at 23. Ravenell devotes eleven pages of his memorandum incorrectly arguing that the Court failed to instruct the jury regarding the Safe Harbor provision of the 18 U.S.C. § 1957. But Ravenell's arguments fail as a matter of law because the Court is not required to instruct the jury on each definition of 18 U.S.C. § 1957 for a conspiracy to commit money laundering prosecution brought pursuant to 18 U.S.C. § 1956(h). The fundamental flaw in his argument is that Ravenell takes for granted that conspiracy to commit an offense and commission of the offense are two separate and distinct crimes, requiring separate and distinct elements. Even if the elements of 18 U.S.C. § 1956(h) were the same as 18 U.S.C. 1957, which they are not, Section 1957's Safe Harbor provision would still not apply to Ravenell's conduct, and thus would not constitute a reason for a new trial.

### 1. The Court Was Not Required to Define the "Monetary Transaction" Element of 1957

The Second Superseding Indictment makes clear that Ravenell was not charged with substantive structuring money laundering under 18 U.S.C. § 1957. ECF No. 281. Instead, Ravenell was charged (and convicted) of 18 U.S.C. § 1956(h), conspiracy to commit any one of three species of money laundering: (i) promotional money laundering, as described in 18 U.S.C. § 1956(a)(1)(A)(i); (ii) concealment money laundering, as described in 18 U.S.C. § 1956(a)(1)(B)(i); or (iii) structuring money laundering, as described in 18 U.S.C. § 1957. *See* ECF No. 281 at 16–

17.  The distinction between the two charges is critical.  Contrary to Ravenell's arguments, proof of substantiative money laundering pursuant to 18 U.S.C. § 1957 is not required to prove conspiracy to commit money laundering under 18 U.S.C. § 1956(h).

"It is axiomatic that conspiracy to commit an offense and commission of the offense are two separate and distinct crimes[.]"  *United States v. Anderson*, 611 F.2d 504, 510 (4th Cir. 1979). "Proof of a conspiracy does not require proof that the object of the conspiracy was achieved or could have been achieved, only that the parties agreed to achieve it."  *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004) (citation omitted)).

To that end, [t]o obtain a conviction for money laundering conspiracy under 18 U.S.C. § 1956(h), the Government must prove the following essential elements: (1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C § 1956(a) or § 1957; (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy."  *Green*, 599 F.3d at 371 (citation omitted).  Commission of an underlying offense—be it promotional money laundering (18 U.S.C. § 1956(a)(1)(A)(i)), concealment money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), or structuring money laundering (18 U.S.C. § 1957)—are not elements of a money laundering conspiracy.  *See United States v. Amaya*, No. CR 11–4065–MWB, 2012 WL 3288082, at *25 (N.D. Iowa Aug. 10, 2012) ("[P]roof of the commission of a substantive money-laundering offense is not an element of a money-laundering conspiracy offense.").  "Therefore, the district court is not required to instruct the jury on the elements of each of the substantive offenses identified as objects of such a conspiracy."  *Hagen v. United States*, No. 3:08-CR-93-WEB-2, 2014 WL 3895062, at *6 (W.D.N.C. Aug. 8, 2014).

> 2. *The Defendant's Conduct Did Not Fall within Section 1957(f)(1)'s Safe Harbor*
> *Provision and He Neither Asked for Nor Was Entitled to a Jury Instruction on*
> *the Safe Harbor*

Even if a Section 1957 Safe Harbor instruction was proper, the Defendant was not entitled

to the instruction because he didn't ask for the instruction before jury deliberation and because the

Defendant's conduct fell outside of what the Safe Harbor provision was meant to protect.

The Defendant's failure to request a Section 1957 Safe Harbor instruction is fatal to his

claim. As another court in this circuit explained recently:

> When a defendant challenges an allegedly improper jury instruction, the defendant
> must object to the instruction before the jury retires to deliberate. *United States v.*
> *Olano*, 507 U.S. 725, 731-32 (1993). Accordingly, when a defendant fails to timely
> object, plain error review controls the analysis. Fed. R. Crim P. 30(d) ("A party
> who objects to any portion of the instructions ... must inform the court of the
> specific objection and the grounds for the objection before the jury retires to
> deliberate."); Fed. R. Crim. P. 52(b) (setting standard for plain error review); *United*
> *States v. Hastings*, 134 F.3d 235, 239 (4th Cir. 1998). Under plain error review, a
> defendant must show "that an error occurred, that the error was plain, and that the
> error affected his substantial rights." *Id.*

*United States v. Robertson*, No. 4:18CR27 (DJN), 2021 WL 3575834, at *7 (E.D. Va. Aug. 12,

2021). In *Robertson*, the court noted that the defendant jointly requested with the Government the

jury instruction to which he claimed, post-verdict, was the basis for a new trial pursuant to Rule

33. *Id.* at *8. As a result, the court held that the "Defendant has forfeited his challenge to these

instructions under the invited error doctrine." *Id. citing United States v. Simmons*, 999 F.3d 199,

220 (4th Cir. 2021) (declining to vacate the defendants' convictions when the district court gave

an erroneous jury instruction, because the defendants "along with the Government, jointly

proposed this instruction" "and thus invited the error."); *see also United States v. Mathis*, 932 F.3d

242, 257-58 (4th Cir. 2019) (refusing to address merits challenge to jury instructions that the

defendant had proposed). The same conclusion applies here. To the extent there was error in not

providing a Safe Harbor instruction to the jury, the Defendant invited the error. On December 21,

2021, the Defendant emailed chambers joint proposed jury instructions. The Defendant agreed with the Government that to prove the Defendant guilty of money laundering conspiracy, the Government must prove:

> First, that there was an agreement between two or more persons to commit money laundering;
>
> Second, that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and
>
> Third, that the defendant knowingly and voluntarily became part of the conspiracy.

Attachment 2 at 83. This formulation of the Section 1956(h) elements did not contain the Safe Harbor the Defendant now claims is an essential element.

Even more telling, the Defendant agreed with the Government that the elements of Section 1957 were:

> First, that the defendant engaged (or attempted to engage) in a monetary transaction in or affecting interstate commerce.
>
> Second, that the monetary transaction involved criminally derived property of a value greater than $10,000.
> Third, that the property was derived from specified unlawful activity.
>
> Fourth, that the defendant acted knowingly that is, with knowledge that the transaction involved proceeds of a criminal offense.
>
> Fifth, that the transaction took place in the United States (or the defendant is a United States person

Attachment 2 at 89. This formulation of the elements of Section 1957 obviously did not contain the Safe Harbor the Defendant now claims is an essential element. Thus, like the defendant in *Robertson*, Ravenell has forfeited his challenge to this instruction under the doctrine of invited error.

Even if the Defendant's non-preserved objection is not forfeited, the Defendant has not and cannot demonstrate plain error.  "To succeed in obtaining plain-error relief, a defendant must show (1) an error, (2) that is plain, (3) and that affects substantial rights, "which generally means that there must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *United States v. Caldwell*, 7 F.4th 191, 211 (4th Cir. 2021) (*quoting Greer v. United States*, —— U.S. ——, 141 S. Ct. 2090, 2096, 210 L.Ed.2d 121 (2021); *Rosales-Mireles v. United States*, —— U.S. ——, 138 S. Ct. 1897, 1904–05, 201 L.Ed.2d 376 (2018)).  If the defendant satisfies these "three threshold requirements," relief may be granted if the court concludes that "the error had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings." *Caldwell*, 7 F.4th at 211 (quoting *Rosales-Mireles*, 138 S. Ct. at 2096–97. The Fourth Circuit has referred to his final question as "the fourth prong of the plain-error test." *Id.*; *United States v. Simmons*, 999 F.3d 199, 227 (4th Cir. 2021).  "Importantly, it is not enough for [the defendant] to establish that it is impossible to tell whether the verdict returned by the jury rested solely on the misinstruction."  *Robertson*, 2021 WL 3575834, at *7 (*quoting United States v. Hastings*, 134 F.3d 235, 243 (4th Cir. 1998)).  Instead, the court looks at what evidence the jury credited when convicting the defendant under the instructions given.  *Hastings*, 134 F.3d at 242. After ascertaining what evidence the jury credited, the court then asks whether the defendant has met his burden to show entitlement to relief for plain error.  *Id.* at 244.  Plain error review differs from review from harmless error in important ways, as the Fourth Circuit explained in *United States v. Hastings*:

> As the Supreme Court noted in *Olano*, this prejudice inquiry differs from the review for harmlessness required when an error is preserved by timely objection in the district court in that, on plain-error review, "[i]t is the defendant rather than the Government who bears the burden of persuasion."  *Id.*  This difference, moreover, is not an insignificant one.  On harmless-error review, a defendant is entitled to reversal of his conviction unless the Government can establish that "the error 'does

not affect substantial rights.'" *Id*. at 735, 113 S.Ct. at 1778 (quoting Fed. R. Crim. P. 52(a)). In contrast, on plain-error review, a defendant is entitled to reversal only upon a showing that "the error does 'affec[t] substantial rights,'" that is, that the error actually affected the outcome of the proceedings. *Id.* (alteration in original) (quoting Fed. R. Crim. P. 52(b)); *see United States v. Turcks*, 41 F.3d 893, 898 (3d Cir. 1994) (explaining that defendant's burden on plain-error review "is to show that the outcome of [the] trial was actually affected" by the error); *United States v. Miro*, 29 F.3d 194, 200 (5th Cir. 1994) (noting that in order to establish that an error affected substantial rights, the defendant ordinarily must "make a specific showing of actual prejudice"); *see also United States v. McKinney*, 954 F.2d 471, 475-76 (7th Cir. 1992) (describing plain error as "an error so grievous that it caused an actual miscarriage of justice, which implies that the defendant probably would not have been convicted absent the error").

134 F.3d 235, 240 (4th Cir. 1998).

### 3. *Any Error Did Not Affect the Defendant's Substantial Rights*

Even if the failure to give an instruction that included 1957(f)(1)'s Safe Harbor was error that was plain, the Defendant cannot establish that it "affected his substantial rights—that is, that there exists 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Caldwell*, 7 F.4th 191, 211 (4th Cir. 2021) (*quoting Greer*, 141 S. Ct. at 2096). That is because his conduct fell outside the Safe Harbor. The Defendant asserts that, "The payment of legal fees for a criminal representation is not, by definition, a 'monetary transaction' under 18 U.S.C. § 1957(f)(1)." Mem. at 24. That is not what Section 1957(f)(1) says. Section 1957(f)(1) excludes "any transaction necessary to preserve **a person's right to representation as guaranteed by the sixth amendment** to the Constitution" from the statute's definition of "monetary transaction" (referred to as the "Safe Harbor").[2] The Fourth Circuit rejected the very same argument the Defendant makes here in *United States v. Blair*, 661 F.3d 755, 772 (4th Cir.

---

[2] Section 1957(a) provides that "[w]hoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be" guilty of an offense.

2011).  In that case "Blair [made] the broad contention that any drug money that goes to the payment of counsel fees falls within the § 1957(f) Safe Harbor provision." *Id*.  The Fourth Circuit rejected Blair's argument and reasoned it "founder[ed] on several points." *Id*.  Blair's "principal mistake" was that he, like the Defendant here, ignored the language of Section 1957.  Further, in *Blair*, like here, the funds at issue were drug proceeds.  As the Fourth Circuit pointed out, "The drug money, of course, legally belonged to the United States." *See United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 126–27 (1993) (plurality opinion) (title to forfeitable assets vests in the United States at the time the criminal act giving rise to the forfeiture is committed); *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 627 (1989) (same); *United States v. Stowell,* 133 U.S. 1, 16–17 (1890) (same).  Also, in *Blair*, like here, the money paid to the Defendant came from persons and entities other than criminal defendants whom the Defendant represented.  As the Fourth Circuit explained in *Blair*, "Sixth Amendment rights are at bottom *personal* to the accused." 661 F.3d 755, 772 (4th Cir. 2011) *citing Texas v. Cobb,* 532 U.S. 162, 172 n. 2 (2001).

The evidence presented to the jury was that Avarietta Bailey provided drug proceeds to the Defendant.  Trial Transcript Vol. IX at 171:11-181:9 (testimony of Leonaldo Harris).  Specifically, Harris testified that, "All the  monies paid by Ms. Bailey came from drug proceeds." *Id*. at 181:8-9.  None of those funds came from Leonaldo Harris, who was the person that was the Defendant's client.  Avarietta Bailey was not in an attorney-client relationship with the Defendant and thus had no Sixth Amendment rights that put the Defendant's receipt of drug proceeds from her within the Safe Harbor.  These two facts—that the Defendant was paid in drug proceeds by a third party—proved fatal to Blair's claims that his conduct fell within the Safe Harbor and are fatal to the Defendant's claims in this case.

Even though the Defendant only addresses the funds he received from Bailey, the jury was also presented with evidence that the Defendant received drug proceeds from other third parties as well.  For example, the Defendant received drug proceeds from LOC Marketing, Trial Transcript Vol. III at 135:19-137:19 and 143:7-145:18, James Bowie, *id*. at 151:21-152:13, two entities, Ares and Repo Productions, both of whom were associated with an attorney in Houston, Texas, David Levine, *id.* at 153:5-154:14, Andrea King Chang, *id.* at 166:3-14, Stacey Allen, Owen Robinson and Patrick Okullo, *id.* at 205:21-209:21, 141-144, Harold Byrd, *id.* at Vol. VII at 153:19-156:11 and Josef Byrd, id. at Vol. VIII at 6:13-9:20.  None of these entities or individuals had an attorney-client relationship with the Defendant.  Thus, none of the drug proceeds that the Defendant received from them were "necessary to preserve a person's right to representation as guaranteed by the sixth amendment," such that they fell within the Safe Harbor of Section 1957(f)(1).

Thus, because the Safe Harbor provision of Section 1957 cannot apply to Mr. Ravenell, his arguments on this issue fail.

### C.  The Court's Conscious Avoidance Instruction was Properly Given

The Defendant next contends that he is entitled to a new trial because, "the Court improperly instructed the jury on conscious avoidance despite the lack of any evidence at trial supporting such an instruction, resulting in prejudicial error."  Mem. at 33. The Defendant cites no authority for the proposition that he deserves a new trial based on the fact that the Court gave a conscious avoidance instruction.  The Fourth Circuit has held that "where the trial evidence 'supports both actual knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper.'"  *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (*quoting United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996)); *United States v. Hoffler-Riddick*, No. 4:05cr9, 2006 WL 2381859, at *6 (E.D. Va. Aug. 16, 2006), *aff'd in part, revd in*

*part and remanded*, 253 F. Appx. 249 (4th Cir. 2007); *United States v. Schnabel*, 939 F.2d 197, 204 (4th Cir. 1991).[3]

In this case, the evidence presented established both.  For example, Byrd testified that he told the Defendant he was giving him drug proceeds.  But Byrd also testified that the Defendant refused to accept cash from any source into and would only accept funds in the form of wires, checks and credit card payments that came from third parties and not from Byrd.  Trial Transcript Vol. III at 136:1-137:2.  Similarly, Avarietta Bailey testified that she gave the Defendant cash from drug sales but that the Defendant also instructed her not to give him cash and instead to give him checks and money orders, which she did.  Trial Transcript Vol. IX at 240:7-241:10.  From these facts, the jury could infer that the Defendant consciously avoided or deliberately ignored learning the source of the funds he received or at least some of the funds he received.

The only case the defendant cites in support of his argument that "[w]hen a district court mistakenly gives a conscious avoidance instruction, an appellate court must assess whether there is sufficient evidence of the defendant's actual knowledge in the record," is *United States v. Hughes*, 606 F.3d 321, 379 (6th Cir. 2010).  However, that citation appears to be in error because there is no page 379 in the *Hughes* opinion and the *Hughes* opinion does not discuss a conscious avoidance jury instruction.  It addresses a district court's denial of a motion to suppress.

Even if the court erred in giving such an instruction, which it did not, that decision would be subject to a harmless error review on appeal.  *Farrell*, 921 F.3d  at 146; *United States v. Lighty*, 616 F.3d 321, 378 (4th Cir. 2010).  "Such an error is harmless 'where there is sufficient evidence

---

[3] "The knowledge elements of the money laundering conspiracy offense . . . could be proved in two ways — by evidence of [a defendant's] subjective knowledge that the proceeds were derived from an unlawful source, or alternatively, by evidence that he made himself 'deliberately ignorant, of that fact."  *United States v. Farrell*, 921 F.3d 116, 145 (4th Cir. 2019); *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017).

in the record of actual knowledge on the defendant's part.'" *Id.* (*quoting Lighty*, 616 F.3d at 378); *see also United States v. Whittington*, 26 F.3d 456, 464 (4th Cir. 1994) (explaining that assumed error as to willful blindness instruction was harmless "given the overwhelming evidence of [the defendant's] guilt and the minor significance of the single paragraph willful blindness instruction in the context of the entire jury charge"). In *Farrell*, the Fourth Circuit, faced with the same argument that the court erred with it gave a willful blindness instruction, found error, if there was any, was harmless. *Id.* The Fourth Circuit found that, "the evidence proved beyond peradventure Farrell's actual subjective knowledge that he had received and distributed defense fund proceeds from the Nicka Organization's unlawful drug trafficking activities." *Id.* As the facts summarized above make clear, the same conclusion applies here.

**D. None of the Objects of the Conspiracy Were Legally Infirm**

The Defendant argues that the Court should grant a new trial because "[u]nder *Yates v. United States*, 354 U.S. 298 (1957), a verdict upon a count alleging multiple theories of guilt (here, one involving Byrd's money and the other involving Harris's), one of which is legally infirm, cannot survive absent a finding of harmlessness beyond a reasonable doubt." Mem. at 37. This argument confuses the evidence presented at trial with theories of guilt and object of the conspiracy.

In *Yates v. United States*, the Supreme Court held that since one object of a two-object conspiracy was barred by the statute of limitations, the defendant's conviction should be reversed because the Court could not determine which of the two objects the jury based its verdict on. 354 U.S. 298, 312 (1957), *overruled by Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). Under *Yates*, "reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally **(as opposed to factually)** inadequate, the jury returns a

general verdict, and it is impossible to discern the basis on which the jury actually rested its verdict." *United States v. Ellyson*, 326 F.3d 522, 531 (4th Cir. 2003) (emphasis added); *United States v. Hastings,* 134 F.3d 235, 242 (4th Cir.1998).  All of the cases the Defendant cites other than *Yates* were ones where one object of the conspiracy was found to be legally infirm.[4]

Here, payments of drug proceeds from third parties related to Byrd and from third parties related to Harris are not separate objects of the conspiracy or legal theories of guilt.  Rather, this is evidence of the existence of the money laundering conspiracy.  The objects of the conspiracy are violations of (1) promotion money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); (2) concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (3) engaging in

---

[4] In *Bereano v. United States*, the defendant was charged with and convicted of mail fraud.  706 F.3d 568, 570 (4th Cir. 2013).  The mail fraud charges were based on two separate theories of mail fraud, namely pecuniary interest fraud and honest services fraud.  *Id.* .  In *Skilling*, the Supreme Court held that the honest services mail fraud statute was limited to schemes involving bribery and kickbacks.  561 U.S. 358 (2010).  After the *Skilling* decision was announced, Bereano filed a petition for a writ of corum nobis arguing that the honest services fraud theory of mail fraud charged in his case was invalid because it did not involve bribery or kickbacks.  *Id.* at 569-570.

In *United States v. Lawson*, a multi-defendant case, defendants were convicted, of a two-object conspiracy to violate the animal fighting prohibition of the Animal Welfare Act, 7 U.S.C. § 2156(a) (the animal fighting statute) and conspiring to participate in, an illegal gambling business in violation of 18 U.S.C. § 1955 (the illegal gambling statute).  677 F.3d 629, 633 (4th Cir. 2012).  Defendants were also convicted of substantive violations of the animal fighting statute and the illegal gambling statute.  The Fourth Circuit found that a juror's misconduct, researching one of the elements of animal fighting statute, deprived the defendants right to a fair trial and vacated the convictions for violations of the animal fighting statute.  The Fourth Circuit then examined the two-object conspiracy convictions to determine whether the legal infirmity as to the animal fighting statute object required reversal.  *Id.* at 652–53.  *United States v. Pitt*, like *Bereano*, involved a case where a defendant was convicted of a multi-object mail fraud scheme that included both pecuniary and honest services mail fraud.  482 F. App'x. 787 (4th Cir. 2012).  Also like in Bereano, the honest services fraud scheme did not involve bribes or kickbacks and, therefore, was plain error in light of the *Skilling* decision.

In *United States v. Cone*, the defendant was convicted of one count of conspiracy in violation of 18 U.S.C. § 371, with two objects: (1) trafficking in counterfeit goods and labels; and (2) importation and sale of improperly declared goods.  714 F.3d 197, 203 (4th Cir. 2013).  The Fourth Circuit held that the conduct charged as "trafficking in counterfeit goods was not a crime as defined by that statute.  *Id.* at 210.  The Fourth Circuit then examined whether the conspiracy count should be reversed because that object of the conspiracy was legally infirm.  *Id.* at 210–11.

monetary transaction in criminally derived property in excess of $10,000, in violation of 18 U.S.C.

§ 1957.  None of these objects are barred by the statute of limitations.

      Addressing only the evidence related to Harris and Baily, the Defendant argues that

> Mr. Ravenell's receipt of money from Harris (and Bailey) did not violate § 1957 because: (1) it concerned money used solely for criminal defense legal fees and which falls within the "Safe Harbor" language included in the definition of "monetary transaction" under § 1957(f)(1); and (2) the final payment on Mr. Harris's account—which marks the completion of the purpose of the alleged conspiracy to launder Harris's money—occurred outside the limitations period.

Mem. at 37.  His argument as to the Safe Harbor provision, ignores the fact that the Defendant did

not receive any funds from Mr. Harris, as the evidence at trial showed, and, the funds he did receive

were derived from drug proceeds provided by third-parties, including Ms. Bailey.  Therefore, for

the reasons discussed above, the Defendant's conduct is not covered by the Safe Harbor provision

in 18 U.S.C. § 1957(f)(1).  *See, supra* Section IV.B.  Furthermore, as to whether the allegations

involving Harris were time barred, the Defendant argues that they were because "the last of the

Harris payments, however, took place on April 25, 2014—more than two months before July 2,

2014, the start of the applicable statute of limitations period."  Mem. at 37.  For the reasons

described above, that argument fails based on the evidence presented at trial.

### E.  It Would be Contrary to the Interests of Justice to Vacate the Defendant's Conviction

      The Defendant's final argument, that the Court should vacate the Defendant's conviction

in the interests of justice.  Mem. at 42. It rests on a series of speculative inferences about why the

jury convicted the Defendant of money laundering conspiracy but acquitted him of the other

charges.  Mem. at 42.  The Court should disregard them.

      "In deciding a motion for a new trial, the district court is not constrained by the requirement

that it view the evidence in the light most favorable to the government. Thus, it may evaluate the

credibility of the witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985); *in accord, United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992).

The Court saw Richard Byrd testify at trial and describe, in detail how the Defendant laundered money for him, and heard from other witnesses that corroborated Byrd's account including Jerome Castle, Andrea King Chang, Freka Scott, Josef Byrd, Harold Byrd and Patrick Okullo. The Court also saw Leonaldo Harris and Avarietta Bailey testify and describe how they the Defendant engaged in money laundering with them as well. The Government submits all of these witnesses were highly credible. Finally, the Court heard from Darnell Miller, a third large-scale drug dealer who testified that the Defendant offered to launder money for him in exchange for drug proceeds. In light of the fact that the Court very nearly had to hold Miller in contempt because he tried to avoid testifying, and his testimony was consistent with other witnesses, the Government submits he was also highly credibility. The testimony of these witnesses was also corroborated by financial records submitted in evidence through Heather Mangus, the former accounting manager at the Murphy Firm, and Special Agent Joaquin Sequiera of the IRS. As far as the Defendant's speculation about why the jury convicted him of money laundering conspiracy but acquitted him of the other charges, the Government submits that there is one simple explanation—the quantum of evidence supporting that count was the highest and the testimony supporting that count was highly corroborated. The facts presented at trial are a far cry from a situation where "the evidence weighs heavily against the verdict," and therefore a new trial is warranted. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). Just the opposite. The evidence of the money laundering conspiracy was overwhelming.

V.   **CONCLUSION**

For the foregoing reasons, the Defendant's motion for a new trial should be denied.

Respectfully submitted,

Philip Selden
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

By:      _____/s/_____
Leo J. Wise
Zachary H. Ray
Assistant United States Attorneys

Derek E. Hines
Special Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was served on counsel of record via

CM/ECF.

_____/s/_____
Zachary H. Ray
Assistant United States Attorneys