## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. LO-19-0449** |
| **KENNETH WENDELL RAVENELL,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| | ******* | |

## UNITED STATES RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States, by and through undersigned counsel, hereby respectfully submits this response to the Defendant's sentencing memorandum (submitted in the form of a letter). ECF No. 549. The Court's sentencing order provided that responding memorandum be filed by May 6, 2022, or "not less than 7 days before sentencing." ECF No. 493 at 2. Sentencing is now scheduled for May 27, 2022.

The Defendant's sentencing argument both as it relates to the U.S. Sentencing Guidelines and to the sentencing factors contained in 18 U.S.C. § 3553(a) rests in large part on the erroneous assertion that:

> Notably, the jury's acquittals indicate that they **wholly** discredited the testimony of Byrd, Jerome Castle, and all of the other members of Byrd's drug trafficking organization (the "Byrd DTO"). If the jury had believed **any** of these witnesses, they would have convicted Mr. Ravenell of the narcotics conspiracy, at a minimum. In light of how thoroughly discredited Byrd's and Castle's testimonies were at trial, it is clear that the jury agreed with the government's argument that they could convict Mr. Ravenell of Count 2 based solely on the testimony of Leonaldo Harris and Avareitta Bailey, even if they **thoroughly discredited** everything Byrd and his associates said

Def. Sent. Mem., ECF No. 549 at 1 (emphasis added).

At the outset, the Government notes that the Defendant misrepresents what Government counsel actually said in rebuttal. Government counsel never told the jury that they could convict on the basis of Harris and Bailey's testimony "*even if they thoroughly discredited everything Byrd and his associates said.*" *Id.* (emphasis added). What Government counsel actually said in rebuttal was the following:

> Leonaldo Harris and Avareitta Bailey both testified that they gave Ken Ravenell drug proceeds and that Bailey told Ravenell they were drug proceeds. Harris testified that Ravenell himself had told Harris that Bailey had discussed with Ravenell that these were drug proceeds. And Harris gave Ravenell more than $10,000 in drug proceeds. That satisfies Count Two, the money laundering conspiracy and you can convict on the basis of Harris and Bailey **alone**.

Trial Transcript Volume XIII at 81:9–16 (emphasis added). And that is correct based on the law of conspiracy as the Court instructed the jury. *See* Trial Transcript Vol. XIII at 44:2–45:10; 53:12-55:17.

In any event, the Defendant's simplistic claim that the jury had to "wholly" and "thoroughly" discredit Byrd in order to acquit him of certain charges ignores the burden of proof. The jury could have just as plausibly believed Byrd and the other witnesses associated with his drug trafficking but nonetheless concluded that the evidence as to Ravenell's involvement in the narcotics conspiracy did not amount to proof beyond a reasonable doubt.

The Defendant's argument also ignores the fact that there was different kinds of evidence offered in support of the money laundering conspiracy compared to the narcotics conspiracy. Indeed, the majority of the witnesses who testified during the three-week trial related to money laundering and there were thousands of pages of documents that corroborated the testimony of these witnesses. Avareitta Bailey and Leonaldo Harris were two of the individuals who testified that they engaged in money laundering with the Defendant and their testimony corroborated one another. *See* Trial Transcript Vol. IX at 167–87 (testimony of Leonaldo Harris) and 232–62

(testimony of Avareitta Bailey).  Just because the jury *could* convict the Defendant based on the testimony of Harris and Bailey *alone*, which Government counsel properly argued they could, does not mean that the jury *had to* "thoroughly discredit[] everything Byrd and his associates said," as the Defendant incorrectly claims.

Conversely, the jury also could have convicted the Defendant based on the testimony of Richard Byrd and the evidence that corroborated his testimony *alone*.  Richard Byrd testified he provided drug proceeds to the Defendant, which the Defendant laundered.  Josef Byrd, Harold Byrd and Jerome Castle all testified that they provided drug proceeds, at Richard Byrd's direction, to the Defendant, thus corroborating Richard Byrd's testimony.  *See* Trial Transcript Vol. VIII at 4–11 (testimony of Josef Byrd); Vol. VII at 148–57 (Harold Byrd) and Vol. VI at 73–152 (Jerome Castle).  They also corroborated one another, in some instances, and their testimony was corroborated by documentary evidence, in other instances.  For example, a drug ledger seized from Jerome Castle at the time of his arrest showed numerous payments to the Defendant.  Government Exhibit 79-a (Attachment A).  The jury was shown a check written by Andrea King-Chang from her jewelry store account to the Defendant's girlfriend, Freka Scott, a woman whom Andrea King-Chang never met and had no reason to give money to.  Government Exhibit 82 (Attachment B).  Richard Byrd's testimony that he gave drug money to the Defendant that was funneled through a lawyer in Jamaica, *see* Trial Transcript Vol. III at 205:21–209:21, was corroborated by the testimony of Patrick Okullo.  *Id.* at Vol. VIII at 224–235.  Okullo, a Ugandan diplomat at the United Nations in New York testified that he was asked to wire money to the Defendant's law firm at the request of a real estate agent.  *Id.*  That real estate agent had received drug proceeds from the lawyer in Jamaica identified by Richard Byrd.  Okullo had no connection to the Defendant and didn't even know who he was.  *Id.*

The jury also could have convicted the Defendant based on the testimony of Darnell Miller alone. Miller was a drug dealer whom the Defendant offered to launder money for in exchange for $250,000 to $300,000. *Id.* at Vol. VII at 189–230. Miller was neither a member of the Byrd drug trafficking organization nor a member of the Harris drug trafficking organization. Miller initially refused to testify, erroneously claiming a Fifth Amendment privilege against self-incrimination despite the fact that he had waived the privilege and had previously been granted immunity for the subject matter of his testimony. Miller clearly had no incentive to lie and the jury could have based its verdict entirely on his testimony.

The jury could have convicted the Defendant based on the testimony of Jerome Castle corroborated by his ledger and by the testimony of Harold Byrd alone. *See* Trial Transcript Vol. VI at 73–152 (testimony of Jerome Castle) and Vol. VII at 148–57 (testimony of Harold Byrd). Jerome Castle testified that he gave the Defendant drug proceeds at Richard Byrd's direction. When Castle was arrested, a drug ledger was seized that contained numerous entries for "Short Man" and "Johnny Vegas," which Castle and Richard Byrd testified were nicknames for the Defendant. The jury also heard a recording of a jail call between Richard Byrd and his then-wife in which the Defendant was referred to as Short Man, which corroborated that that was one of his nicknames. Government Exhibit 8 (recording) and 9 (transcript of recording) (Attachment C). Further, Castle testified that he gave the Defendant cash at Linwood's restaurant, among other locations, and that Harold Byrd went there with him at times. *See* Trial Transcript Vol. VI at 92:1–11. Harold Byrd corroborated that testimony and testified, specifically, that on one occasion he gave Castle $50,000 in a Louis Vuitton bag and then, later in the day, Harold Byrd saw Castle give a Louis Vuitton bag to the Defendant and, when questioned about what had just happened, Harold

Byrd heard Castle tell Richard Byrd that he had just given the Defendant $50,000. *Id.* at Vol. VII

at 153:1–156:14 (testimony of Harold Byrd).

The jury also could have based their verdict on the testimony of Harold and Josef Byrd

alone, both of whom testified that they had given the Defendant drug proceeds. *See* Trial

Transcript Vol. VIII at 4–11 (testimony of Josef Byrd) and Vol. VII at 148–57 (Harold Byrd).

Neither Harold or Josef Byrd were incarcerated when they testified and, therefore, they stood to

gain no benefit from their testimony. They also testified that neither one of them was close to their

half-brother, Richard Byrd, and they both testified they were not testifying in order to benefit

Richard Byrd. As was evident from their demeanor and testimony, neither wanted to testify during

the trial.

In sum, in this case, like in any other criminal case, we do not know why the jury acquitted

the Defendant of certain charges. And the fact that the jury did acquit him of some charges does

not illuminate why they convicted him of the money laundering conspiracy charge. All we know,

in fact all we ever know after any jury trial, is what evidence was presented to the jury and what

their ultimate decision was. That is because juries, unlike a court in a bench trial, do not make

factual findings. Therefore, the Defendant's arguments on this score are nothing but speculation.

In any event, the factual basis for the jury's conviction is separate and apart from the factual

basis for the Court's sentence. And importantly, for the purposes of sentencing, the Court applies

a lower evidentiary standard than the one applied by a trial jury. While a trial jury must conclude

that the evidence establishes a defendant's guilt beyond a reasonable doubt in order to convict him,

a convicted defendant's sentence is based on factual findings by the court to a preponderance of

the evidence. *United States v. Johnson*, 248 F. App'x 488, 490 (4th Cir. 2007) ("After *Booker*, a

sentencing court continues to make factual findings concerning sentencing factors by a

preponderance of the evidence.").  Moreover, long-standing authority has permitted the sentencing court to consider any evidence at sentencing that "has sufficient indicia of reliability," *see* U.S.S.G. § 6A1.3(a); *United States v. Watts*, 519 U.S. 148 (1997) (per curiam); *United States v. Morris*, 429 F.3d 65, 72 (4th Cir. 2005), *cert. denied*, 549 U.S. 852, 127 S.Ct. 121, 166 L.Ed.2d 91 (2006); *United States v. Montgomery*, 262 F.3d 233, 249 (4th Cir. 2001).  The Government asks the Court to make the factual findings, by a preponderance of the evidence, it outlined in its sentencing memorandum.  As the Court saw firsthand during the trial, the evidence summarized in the Government's Sentencing Memorandum offered in support of its sentencing recommendation "has sufficient indicia of reliability."

It is worth noting that the Government has not asked the Court to sentence the Defendant based on any of the conduct covered by any of the counts where there were acquittals, although the law would have allowed the Government to do so.  *Watts*, 519 U.S. at 156, ("[A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof."); *Dowling v. United States,* 493 U.S. 342, 349, 110 S.Ct. 668, 672, 107 L.Ed.2d 708 (1990); *United States v. Grubbs*, 585 F.3d 793, 799 (4th Cir. 2009) (the defendant's argument is "nullified by clear Supreme Court and Fourth Circuit precedent holding that a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence"); *United States v. Jones,* 31 F.3d 1304, 1316 (4th Cir. 1994) (holding that a "defendant need not be convicted of the charges constituting relevant conduct for him still to be held accountable for them" when a sentencing court determines the defendant's sentence, as long as the government "establish[es] the existence of these other incidents by a preponderance of the evidence").  The Defendant's arguments seem more attuned to a scenario where the Government had asked the

Court to consider acquitted conduct, although even in that context, the Defendant's arguments would fail as a matter of law.

The Government will next address the specific claims that the Defendant makes in regard to the calculation of the advisory sentencing guidelines.

### A. PSR Base Offense Level Calculation Based on the Value of Laundered Funds.

The Defendant argues that the amounts from the Byrd escrow ledgers from his former law firm (hereafter "the Murphy Firm" or "MFM"), which were entered in evidence at trial, "cannot support a loss amount calculation under U.S.S.G. § 2S1.1 because the witnesses testified that legitimate funds were commingled with any drug proceeds *before* they were deposited into the Murphy Firm." Def. Sent. Mem. at 8–9. In support of that argument he cites a single, unpublished, out-of-circuit case, *United States v. Chao Fan Xu*, 673 F. App'x. 616, 619 (9th Cir. 2016), which he misunderstands. The Defendant claims that *Chao Fan Xu* stands for the proposition that

> Application Note 3(B)—which allows the court to considered [sic.] total commingled funds for purposes of calculating a loss amount—"only applies where a transaction . . . *results in* the commingling of legitimately derived funds with criminally derived funds," not when the amounts were "previously commingled."

Def. Sent. Mem. at 9–10 (emphasis added). It does not. The *Chao Fan Xu* opinion the Defendant cites addressed a second appeal of a sentence in a racketeering and money laundering case. 673 F. App'x at 617–18. At resentencing, after the first sentence it handed down was vacated, the district court increased the defendant's base offense level using $20 million in funds transferred to Las Vegas from a foreign location. *Id.* at 618. The Ninth Circuit found that was error because the government could not trace any of the $20 million to fraudulent activity that occurred within the United States and 18 U.S.C. § 1957 only applied extraterritorially when the violation was committed by a U.S. person, which the defendant was not. The Ninth Circuit then explained that U.S.S.G. § 2S1.1 cmt. n.3(B) did not apply because

7

> The $20 million transferred to Las Vegas was previously commingled.  On remand, the government did not show that any of the transactions were accomplished by U.S. persons.  Therefore, the government did not show that the transactions that resulted in commingled funds were within the jurisdictional reach of the United States.

*Id.* at 619.  Thus, the issue in *Chao Fan Xu* was jurisdictional and went to whether a crime had been committed that generated criminal proceeds.  If the $20 million did not constitute a violation of Section 1957 because the fraudulent activity that generated the funds occurred outside the United States, then it couldn't be used to calculate the defendant's sentence.

The Defendant's reading of the case, in addition to being wrong, is absurd.  Under his view, if Ravenell had commingled legitimate funds with illegitimate ones in his escrow account then the total amount in the escrow account could be considered laundered funds but if the commingling occurred before the money was deposited into the escrow account, it couldn't be.  That distinction makes no sense.  If the co-mingling occurred at the firm, then the exact amounts of legitimate and illegitimate funds would be known.  It is the very fact that the comingling of cash occurred before the funds went into the Murphy firm's account that makes separating them out impossible.

The Defendant also falsely asserts that Richard Byrd testified that 90 percent of the funds deposited into LOC Marketing were legitimate.  Def. Sent. Mem. at 10.  He did not.  Richard Byrd made comments to that effect in the recording at Towers Jail but that recording was part of a law enforcement operation in which Richard Byrd said numerous things that were untrue.  Defense counsel repeatedly asked Richard Byrd when he was on the stand in this trial whether 90 percent of LOC Marketing's deposits were legitimate and each time he refused to testify to that fact.  The topic came up fairly early in the cross-examination of Byrd:

> Q. And I think you said that something around 90 percent of the money that went through Lok Marketing was legitimate money, right?
> A. If you have somewhere where I said that, could you show that to me?

Q. I think you said it on the tape just yesterday, but I'll take a look and find it. Is
that accurate, though?
A. I would have to see that. I'm not certain that that's accurate.
Q. Well, you don't have to see it. How much of the money was legitimate?
A. It depends on what day, what event. Every entity depends on what event, what
city, what bills need to get paid. It depends.
Q. Well, you would agree with me that you told the Government at one point that
up to 90 percent of the money that went through Lok Marketing was legitimate
money, would you agree with that?
A. I would have to see that, Mr. White, to agree to that.
Q. Let me come back to that. Let me take something a little easier to start with.

Trial Transcript Vol. IV at 78:13–79:8.  When defense counsel returned to the topic the following

day, he was similarly unsuccessful in getting Byrd to adopt that percentage:

Q. I think you said yesterday -- well, I know you testified yesterday the majority of
it, 80 to 90 percent was legitimate?
A. I don't recall saying that.
Q. I'll show it to you if you like.
A. Yeah, maybe to a specific event.
Q. Can you bring up the transcript from yesterday at 8924?
MR. HINES: This is for ID?
MR. WHITE: No, it's a transcript. It's going on the screen.
MR. WISE: Your Honor, I think we should be able to look at it first.
THE COURT: If it's a prior statement -- I'm going to allow it to be done this way.
If there's problems with it, we'll straighten it out.
MR. WISE: Thank you, Your Honor.
MR. WHITE: I'm sorry, Your Honor. This is the first time we've tried to bring one
of these up. It may take a second. Apologies to the jury. I'll come back to it, Your
Honor, when we resolve it. I don't want to waste the Court's time. Actually, my
information is wrong. It actually is a transcript from the U.S. Government Exhibit
161. It's not a transcript from yesterday's testimony, although that was included in
yesterday's testimony.
THE COURT: He was asked several times about the percentage of the money
generated that was legitimate or illegitimate, so --
MR. WHITE: Okay, I'll move on.

Trial Transcript Vol. V at 22:5–21:6.  Government Exhibit 161, which defense counsel refers to,

is a transcript from the Towers Jail meeting.  And defense counsel never returned to the topic.

Thus, Richard Byrd's testimony under oath was not that 90 percent of the funds into LOC

Marketing was legitimate.  His testimony under oath was that the amount of legitimate funds that

went into LOC Marketing was "event specific" and could not be quantified. This is precisely the scenario where co-mingled funds cannot be separated into legitimate and illegitimate ones and, therefore, the total amount of funds deposited into the Murphy firm escrow account should be considered laundered funds. Simply put, a lawyer cannot defeat the clear language of U.S.S.G. § 2S1.1 cmt. n.3(B) by advising his conspirators to mix cash drug proceeds with legitimate cash business earnings before it hits his law firm's bank account.

## B. Knowledge that Laundered Funds Were Drug Proceeds.

The Defendant next argues against a 6-level increase for knowledge that the laundered funds were drug proceeds pursuant to § 2S1.1(b)(1)(i). Def. Sent. Mem. at 11. The Defendant argues "the only evidence credited by the jury at trial was that Mr. Ravenell was aware of the illicit source of funds he received for representing Harris in his criminal legal defense" and "any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution," and therefore cannot support a money laundering conviction. *Id.* For the reasons offered in the Government's opposition to the Defendant's Motion for a New Trial, which are incorporated herein by reference, the Defendant's position is at odds with 18 U.S.C. § 1957(f)(1) (hereafter the "Safe Harbor"). *See* Gov. Opp. to Def. Mot. for New Trial at 36–38, ECF No. 553. In sum, the Safe Harbor protects an individual's Sixth Amendment's rights. Since funds provided to him by Bailey were drug proceeds and she was not in an attorney-client relationship with him, the Safe Harbor doesn't apply, as this Court has already ruled in its Order denying the defendant's motion for new trial. *See* Amended Order Denying Def. Mot. for New Trial, ECF No. 559, at 8.

## C. Business of Laundering Funds.

The Defendant's argument that the Court should not apply a 4-level increase per § 2S1.1(b)(2)(C) because "the defendant regularly engaged in laundering funds during an extended period of time (2009 to 2014) from multiple sources and generated a substantial amount of revenue in return for laundering funds," rests on the same erroneous argument he makes elsewhere in his memorandum that the jury convicted him based solely on the funds he received from Avarietta Bailey.  For the reasons outlined above, that position is untenable.

## D. Sophisticated Laundering.

The Defendant argues against a 2-level increase per § 2S1.1(b)(3) for sophisticated laundering.  Def. Sent. Mem. at 14.  However, the Defendant's argument focuses only on the Okullo transaction and ignores the other evidence of sophisticated laundering presented at trial. Further, the Defendant makes the incredible claim that, "Byrd, whose testimony was rejected by the jury, was the only witness to testify to Mr. Ravenell's knowledge of and involvement in this transaction." *Id.*  Yet, the Defendant's claim that the evidence did not establish his "knowledge of and involvement in this transaction" is belied by an email from the Defendant where the Defendant *personally approved* receiving funds from Mr. Okullo.  Government Exhibit 100 (Attachment D). The Defendant's claim that, "[t]the government presented no additional evidence at trial that Mr. Ravenell was involved in or aware of any of the supposed 'layering' of transactions," is equally astonishing.  As summarized in the Government's Sentencing Memorandum, the evidence at trial showed that Byrd gave drug proceeds, in cash, to:

- various individuals associated with LOC Marketing who then deposited those monies into bank accounts associated with LOC Marketing from which they were then wired to MFM, s*ee, e.g.*, Trial Transcript Vol. III at 135:19–137:19; thus, there were at least two layers

between the drug proceeds—the individuals to whom Byrd gave the cash and the LOC

marketing accounts—and the MFM escrow account;

- Andrea King Chang, who then transferred the funds to her business account before wiring

  them to MFM, which meant that these funds were layered through two levels, *id.* at 166:3-

  14; and

- David Levine, a lawyer in Houston, who then transferred the money to two corporate

  entities he controlled, Ares Industrial and Repo Productions, before ultimately wiring it to

  MFM, which is another example of layering through two levels, *id.* at 153:5–154:14.

In sum, the evidence at trial established that the defendant and his conspirators used more

than two levels of layering in dozens of transactions, and this enhancement plainly applies.

**E.  Aggravating Role as Organizer or Leader of Criminal Activity.**

The Defendant argues that a leader/organizer enhancement pursuant to § 3B1.1(a) is not

warranted because "Mr. Ravenell did not exercise any decision-making authority in either **the**

**Byrd or Harris DTOs**."  Def. Sent. Mem.  at 15. (emphasis added).  This argument confuses

leadership of the Byrd or Harris DTO's with leadership of the money laundering conspiracy.  It

also wrongly suggests that there can only be one leader or organizer of a criminal activity.  Based

on the facts presented at trial, he was undoubtedly a leader and organizer of the money laundering

conspiracy for the reasons outlined in the Government's Sentencing Memorandum.

**F.  Abuse of Position of Trust or Use of Special Skill.**

The Defendant argues that an enhancement for abuse of a position of trust or use of a

special skill pursuant to § 3B1.3 should not apply.  Def. Sent. Mem. at 18.  In support of his

argument, the Defendant tries to shift the blame for his conduct to the accounting manager at the

Murphy Firm, Heather Mangus, who testified at trial.  The Defendant even goes so far as to make

the claim that paragraph 46 in the PSR is a "clear misrepresentation of the facts." Paragraph 46

provides that:

> The defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. The defendant used his specialized skill as an attorney at his law firm, where he was able to move the drug trafficking money through the firm's attorney trust account at his own discretion **and without having to obtain permission** from any other member of the firm. The defendant's status as an attorney and a partner at the firm is a specialized skill that is ordinarily subject to significantly less supervision; therefore, increase by two levels. USSG §3B1.3 and Application Notes 1 and 4.

PSR ¶ 46 (emphasis added). There is nothing in paragraph 46 that misrepresents the facts. Ms.

Mangus was an accountant, as she testified who worked at the direction of the partners at MFM,

including the Defendant. When asked how deposits and withdrawals from the ledgers associated

with Byrd were handled, she testified:

> Q. How are deposits handled?
> A. Um, **they are received through the attorney** and then given to me or the firm administrator to deposit **into whatever account was deemed by the attorney**.
> Q. How would you know what account or ledger if there were multiple ledgers associated with a client, to credit a deposit to?
> A. **The attorney would inform you of where it should go**.
> Q. And how was cash handled?
> A. Um, it was received, **counted by the attorney**, counted by me, and then counted by the firm administrator, deposited into the bank account and then the form was submitted to the IRS if it was over the cash balance or the cash amount for the limit of the deposit.
> Q. And would the ledger specifically reflect that it was a cash deposit?
> A. Yes, it should.
> Q. Okay. And then on the flipside, how did you handle expenses being paid out of or I guess debited against a particular ledger?
> A. Um, I would receive a bill or a request **from the attorney** to write a check out. And **as long as the attorney approved**, I would cut the check and Beth Wybolt, the firm administrator would sign and then the check would go out in the mail.
> Q. **Would you ever send money out of the account without talking to the attorney**?
> A. **No.**
> Q. **And I guess would you ever credit money to a ledger without getting approval from that attorney?**
> A. **No.**

13

Q. **And did that include Mr. Ravenell?**
A. **Right.**

Trial Transcript Vol. VI 287:1-288:7. (emphasis added).

The Defendant also incorrectly claims that the government presented no evidence at trial that he used his skills as an attorney to help facilitate any money laundering. Def. Sent. Mem. at 18. The Defendant's role in facilitating the Overtown Reborn transaction is just one example of how he played a central role in laundering Byrd's drug proceeds. *See* Government Sentencing Memorandum at 10–11. As that transaction makes clear, the Defendant wasn't merely parking money in his escrow account like the defendant in *United States v. Weisberg*, 297 F. App'x. 513 (6th Cir. 2008), the case the Defendant cites in his memorandum. Instead, he was actively using the Murphy firm's escrow account to promote Byrd's criminal conduct and he advised Byrd how to wash and layer his drug proceeds to avoid detection by law enforcement. Defense lawyers are afforded certain protections and privileges as they are entrusted to follow the law, however, the defendant clearly abused his position as a member of the bar and this enhancement applies.

**G. Obstructing or Impeding the Administration of Justice.**

The Defendant argues that the Court should decline to give an enhancement for obstruction of justice pursuant to § 3C1.1. Def. Sent. Mem. at 19. The Defendant argues that "the jury acquitted Mr. Ravenell of the obstruction-related allegations charged here, *see* Verdict Form (Dkt. No. 490), expressly rejecting the allegations asserted in Paragraph 47." Def. Sent. Mem. at 20. Paragraph 47 of the PSR provides that:

> The defendant created false records for LOC Marketing in an attempt to conceal drug proceed transactions. After LOC Marketing received a federal grand jury subpoena in 2014, the defendant continued to obstruct justice by hiring other attorneys and an accountant in an attempt to legitimize the activities by tying cash drug deposits to events …

14

PSR ¶ 47.  The Defendant is incorrect.  The conduct described in paragraph 47 of the PSR was not

alleged in Count Four, the obstruction count, of the Second Superseding Indictment.  Furthermore,

Richard Byrd testified that the Defendant engaged in the conduct described in paragraph 47.

Specifically, he testified:

> Q. You've testified about LOC Marketing. At some point in August -- in 2014, did
> LOC Marketing get a subpoena?
> A. What date was that?
> Q. In 2014 did LOC Marketing get a subpoena?
> A. Yes.
> Q. How did you learn that?
> A. Um, Mr. Wanzer.
> Q. And who was Mr. Wanzer again?
> A. He was the partner in LOC Marketing.
> Q. And where is Mr. Wanzer now?
> A. He's deceased.
> Q. What, if anything, did you do when you learned that LOC Marketing had
> gotten a subpoena?
> A. I told him to call Johnny Vegas.
> Q. Who is that?
> A. Mr. Ravenell.
> Q. Okay. Did you talk to him over the phone? Is that you used that name?
> A. Yes.
> Q. Where was Mr. Wanzer located?
> A. Laurel, Maryland.
> Q. And what happened next?
> A. Um, he spoke to Johnny Vegas and then we scheduled to have a face-to-face
> because we didn't want to be on the phone.
> Q. And what happened in that face-to-face?
> A. Um, Johnny Vegas kind of was trying to figure out, you know, how to deal
> with the subpoena and what are the necessary moves that we needed to make to
> deal with the subpoena.
> Q. What did you understand that to mean?
> A. That we needed to double down on our efforts to make sure all the records that
> we were putting together, we needed to speed that plan up.
> Q. And when you say, "putting together," what do you mean?
> A. Um, like I said, we had some semblance of a frame there, but we needed to add
> meat to the bone, to take a term from him.
> Q. And were these real records?
> A. Some were, some weren't.

Trial Transcript Vol. III at 211:9–212:21.  The Defendant also asserts, mistakenly, that "critically, the jury's verdict is limited to allegations pertaining to the money paid on behalf of Harris for his criminal defense legal fees."  Def. Sent. Mem.  at 20.  As argued above, even if that were true, and it is not, the Court is not so limited.

In sum, the Defendant's objections to nearly every single calculation by the United States Probation Office should be overruled because none of them are supported by the facts or the law. The Defendant's sentencing recommendation of probation is based in large part on the same problematic, misguided arguments.  For the reasons explained in the United States' Sentencing Memorandum, a sentence of 8 years' incarceration is the sentence that is sufficient but not greater than necessary to satisfy the purposes of 18 U.S.C. § 3553(a).

Respectfully submitted,

Philip Selden
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

By:      _____/s/_____
Leo J. Wise
Zachary H. Ray
Assistant United States Attorneys

Derek E. Hines
Special Assistant United States Attorney

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was served on counsel of record via CM/ECF.

_____/s/_____
Leo J. Wise
Assistant United States Attorney

16