**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-4369**

———————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

KENNETH WENDELL RAVENELL,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Liam O'Grady, Senior District Judge. (1:19−cr−00449−LO−1)

———————

Argued: January 11, 2023                Decided: April 25, 2023

———————

Before GREGORY, Chief Judge, and WILKINSON and HEYTENS, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson announced the judgment of the court and wrote an opinion, in which Judge Heytens joined as to Parts I, II, IV, V, and VI. Judge Heytens wrote an opinion, in which Chief Judge Gregory joined. Chief Judge Gregory wrote a dissenting opinion.

———————

**ARGUED:** David M. Zornow, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, for Appellant. Leo Joseph Wise, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Peter H. White, SCHULTE ROTH & ZABEL LLP, Washington, D.C., for Appellant. Philip Selden, Acting United States Attorney, Baltimore, Maryland, Zachary H. Ray, Assistant United

States Attorney, Alexandria, Virginia, Derek E. Hines, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Philadelphia, Pennsylvania, for Appellee.

————————————

WILKINSON, Circuit Judge:

After a jury trial, Kenneth Ravenell was convicted of one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). He now appeals, arguing that the district court made four errors warranting reversal. First, the district court erred in failing to instruct the jury on the applicable statute of limitations. Second, the court erred in failing to instruct the jury on the definition of "monetary transaction" in 18 U.S.C. § 1957. Third, the court erred by instructing the jury on conscious avoidance. And fourth, the conviction must be vacated under *Yates v. United States*, 354 U.S. 298 (1957), because there is no way to determine whether he was convicted on a legally valid theory. We disagree with these contentions. For the reasons that follow, we affirm the district court.

I.

A federal grand jury charged Ravenell with one count of Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy in violation of 18 U.S.C. § 1962(d), one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h), one count of narcotics conspiracy in violation of 21 U.S.C. § 846, one count of conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371, one count of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), and two counts of falsification of records in violation of 18 U.S.C. § 1519.

A.

Relevant to this appeal, the money laundering charge alleged that between 2009 and 2017, Ravenell was knowingly and intentionally involved in a single conspiracy to commit any one of three species of money laundering: (1) money laundering to promote an

unlawful activity, specifically narcotics sales, as described in 18 U.S.C. § l956(a)(l)(A)(i) (promotional money laundering); (2) money laundering to conceal the source of funds from narcotics sales, as described in 18 U.S.C. § 1956(a)(l)(B)(i) (concealment money laundering); or (3) engaging in monetary transactions of $10,000 or more using the proceeds of unlawful activity, in this case narcotics sales, as described in 18 U.S.C. § 1957 (transactional money laundering). The government put forth evidence at trial attempting to show that Ravenell, a criminal defense attorney, used his position as a partner at his law firm, Murphy, Falcon, Murphy, Ravenell & Koch (MFM), to launder money in tandem with the illegal drug activities of his clients.

The government presented evidence of Ravenell's involvement in a single money laundering conspiracy relating to two drug organizations—one led by Richard Byrd and the other led by Leonaldo Harris. The majority of the evidence at trial focused on Byrd's marijuana distribution organization. Byrd was the head of a drug trafficking organization that bought thousands of pounds of marijuana in Arizona and California from growers in Mexico, shipped it across the country to the East Coast, and sold it wholesale to other drug distributors. This criminal enterprise generated millions of dollars in proceeds. Byrd had known Ravenell since the 1990s and was previously one of Ravenell's clients before Ravenell joined MFM. Byrd was arrested and pled guilty to money laundering and drug charges.

According to Byrd and his associates, Ravenell gave Byrd's drug ring valuable advice. Ravenell told them how to evade law enforcement detection, how to launder drug proceeds through businesses and real estate investments, and how to then mix drug profits

with the money generated from these other ventures to conceal their illicit source. Ravenell advised Byrd to run cash-focused businesses, such as a concert promotion business known as LOC Marketing, which served as a front for the money laundering. On Ravenell's advice, Byrd used drug proceeds to put on concerts and then charge people in cash at the door. This allowed Byrd to mix drug cash with cash generated at the event, helping conceal and promote Byrd's narcotics venture. Byrd and others testified that Byrd's drug ring provided Ravenell with stacks of cash in payment for his services in evading law enforcement.

Byrd also testified that Ravenell used his law firm to launder Byrd's money directly. Prior to February 2011, at which point Byrd was arrested in Arizona in a reverse-sting operation for attempting to buy hundreds of pounds of marijuana from federal agents, he was not a formal client of Ravenell's firm. Following Byrd's arrest, however, Byrd began sending money to Ravenell's firm via third parties like LOC Marketing. Byrd testified that all the money sent came from drug proceeds, businesses funded with drug proceeds, or drug money mixed with legitimate business revenue. Byrd and others testified that Ravenell knew of the source of these funds.

The record showed that MFM's bank accounts accepted $1.8 million of drug funds and co-mingled drug funds from entities and individuals associated with Byrd. Evidence presented in the form of bank account information and ledgers also showed that Ravenell directed around $1.1 million of these funds to various projects and third parties to benefit Byrd. Ravenell then kept around $600,000 for legal fees, in addition to the alleged cash payments.

5

The government presented other evidence of money laundering conspiracy involving Ravenell's representation of Leonaldo Harris. Like Byrd, Harris shipped large quantities of marijuana from California to Maryland for distribution and sale, but Harris was not connected to Byrd's drug trafficking operations. Ravenell began representing Harris after Harris was arrested in April 2013 for federal narcotics offenses. According to Harris, Ravenell received more than $350,000 in drug proceeds via an associate of Harris, Avarietta Bailey. The ledger associated with Harris's case at MFM, however, only showed $187,000 credited to his case. Harris testified that Bailey gathered money owed to the Harris drug ring for its marijuana sales, then provided those illicit proceeds to Ravenell as payment for Harris's criminal defense. Bailey testified that the money paid to Ravenell came from the drug proceeds she collected, and that she explained to Ravenell exactly where the money was coming from and the method by which she was collecting it.

Ravenell's defense, on the other hand, told a different story, arguing that he had no knowledge about either drug organization. During cross-examination of the government's witnesses, Ravenell argued that Byrd continuously lied to Ravenell about LOC Marketing to make Ravenell believe that it was a legitimate and profitable business. Moreover, Ravenell asserted that LOC Marketing was actually putting on well-attended and high-profile concerts, which further undermined Ravenell's guilty knowledge as it seemed to him to be a legitimate business.

Ravenell also argued that Byrd and those close to him all had something to gain by testifying against Ravenell: shorter sentences for them or their loved ones. According to Ravenell, this was reason enough to doubt their credibility. Ravenell also presented

6

character testimony showing that he was an upstanding defense attorney, in stark contrast to the government's cooperators.

Finally, Ravenell sought to highlight the dearth of evidence as to the alleged cash payments made by the Byrd organization to Ravenell. Throughout trial, Ravenell pointed out that the evidence of cash payments relied solely on testimony. There was no physical evidence of such payments despite testimony that they numbered in the millions.

As to Harris, Ravenell argued that there was no evidence he knew that the money received from Bailey was drug money. Moreover, he highlighted the discrepancy between Harris testifying that he gave Ravenell over $350,000 in drug proceeds and Bailey testifying that she paid Ravenell between $175,000 and $200,000.

Following a three-week jury trial, Ravenell was convicted of money laundering conspiracy under § 1956(h) and acquitted on all other charges.

B.

Because Ravenell takes exception to various jury instructions during trial, we must explain the facts underlying the operative issues on appeal.

1.

After the government rested, Ravenell moved for a judgment of acquittal pursuant to Federal Rules of Criminal Procedure 29(a), arguing, *inter alia*, that the government had not proven that the money laundering conspiracy lasted into the applicable statute of limitations period. Per a pre-indictment tolling agreement, any conspiracy must have existed past July 2, 2014, to comply with the five-year statute of limitations period set forth in 18 U.S.C. § 3282(a). The district court denied the motion for acquittal, noting that the

7

government had alleged and shown evidence of acts associated with the conspiracy past July 2, 2014, and that there was no evidence of withdrawal from the conspiracy on Ravenell's behalf.

After the defense presented evidence, Ravenell renewed his Rule 29 motion, again arguing that the government had not proven any overt acts past July 2, 2014. The court again denied the motion, finding that there was no evidence of Ravenell's withdrawal from the conspiracy and thus the "the conspiracy continued" past July 2, 2014. J.A. 2768.

Ravenell again renewed this issue in connection with the jury instructions. Ravenell's counsel submitted two proposed jury instructions on the statute of limitations issue. The first was requested on December 21, 2021. It read:

> There is a limit on how much time the government has to obtain an indictment. For you to find the defendant guilty of conspiracy as to **Counts Two** and Three only, the government must prove beyond a reasonable doubt that at least **one overt act** in furtherance of the conspiracy was committed after July 2, 2014.

J.A. 3730 (emphasis in original). The district court declined to include this instruction, reasoning that no overt act was required. The next day, Ravenell offered a revised statute of limitations instruction. It read:

> There is a limit on how much time the government has to obtain an indictment. For you to find the defendant guilty of conspiracy as to Count Two, the government must prove by a *preponderance of the evidence* that the alleged conspiracy continued after July 2, 2014.

Suppl. App'x 2 (emphasis added). The district court declined to give the jury instruction, noting that it raised several "issues like withdrawal." J.A. 2880. The court reasoned that statute of limitations issues had not "been properly framed for the jury" and would thus

"clearly confuse the jury," but they could "be dealt with as a matter of law . . . post-verdict, if necessary." *Id.* The court thus gave no jury instruction regarding the statute of limitations.

2.

During the jury instruction conference, the government proposed a "conscious avoidance," or willful blindness, instruction, which read in relevant part:

> Only with respect to Count Two [the money laundering conspiracy], in determining whether the defendant acted knowingly, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that the defendant acted with (or that the defendant's ignorance was solely and entirely the result of) a conscious purpose to avoid learning the truth (e.g., that the statement was false), then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken.

J.A. 3374. Ravenell timely objected to this instruction, arguing that the only evidence in this case was that of "knowing and intentional conduct," where Ravenell "knew he was accepting drug proceeds." J.A. 2776. The district court declined to accept Ravenell's argument and proceeded to give the government's requested instruction.

3.

Under the conspiracy to commit money laundering charge, the parties agreed on a set of proposed jury instructions which set out the required elements of the 18 U.S.C. § 1956(h) conspiracy. The jury was instructed that a conviction for money laundering conspiracy required proving beyond a reasonable doubt (1) "an agreement between two or more persons to commit money laundering;" (2) "that the defendant knew that the money laundering proceeds had been derived from an illegal activity;" and (3) "that the defendant knowingly and voluntarily became part of the conspiracy." J.A. 3414.

Additionally, because Ravenell was charged with conspiracy to commit any of three species of money laundering found in 18 U.S.C. § 1956 and § 1957, the district court gave three additional jointly agreed upon instructions on the elements of promotional money laundering under 18 U.S.C. § 1956(a)(1)(A), concealment money laundering under 18 U.S.C. § 1956(a)(1)(B), and transactional money laundering under 18 U.S.C. § 1957. Importantly, on the instructions for the third conspiratorial object under § 1957, the parties agreed that the first element for this conspiratorial object was that "the defendant engaged (or attempted to engage) in a monetary transaction in or affecting interstate commerce." J.A. 3422. The jury instructions did not define the term "monetary transaction." However, Ravenell failed to timely object to this omission from the mutually agreed-upon jury charge.

Ravenell now appeals his conviction for money laundering conspiracy, raising four objections which he argues warrant reversal. Chief among these errors, Ravenell asserts, is that the district court erred by denying his request for a jury instruction on the statute of limitations. Ravenell also argues that the district court plainly erred in failing to instruct the jury on the definition of "monetary transaction" in 18 U.S.C. § 1957. Ravenell further claims that the district court erred in providing the government's proposed conscious avoidance instruction. Ravenell last insists that because there is no way to determine whether he was convicted on a legally valid theory, his conviction must be reversed under *Yates v. United States*, 354 U.S. 298 (1957). We shall address the issues in turn.

II.

Ravenell's chief argument is that the district court erred in not instructing the jury on the statute of limitations. Per the pre-indictment tolling agreement, the five-year statute of limitations period applicable to the 18 U.S.C. § 1956(h) money laundering charge ran back to July 2, 2014. According to Ravenell, any conspiracy involving Harris or Byrd terminated prior to that date. Ravenell claims that Byrd's last payment to Ravenell's law firm was in January of 2014, and Byrd was arrested in April 2014, after which Byrd testified that he ceased his illegal activity. Ravenell also asserts that Harris's last payment to Ravenell's law firm was likewise in April 2014. Therefore, he contends, it was error for the district court not to instruct the jury on the statute of limitations, as the government had not proven that the alleged conspiracy continued past July 2, 2014, into the limitations period.

We review a district court's rulings on jury instructions for abuse of discretion. *United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003). While a district court must instruct the jury on all elements of a crime, *see United States v. Muse*, 83 F.3d 672, 679 (4th Cir. 1996), the Supreme Court has held that "[c]omission of the crime *within the statute-of-limitations* period is not an element of [a] conspiracy offense," *Smith v. United States*, 568 U.S. 106, 112 (2013). It is instead an affirmative defense that a defendant must raise at trial. *Id.* The "party challenging the jury instructions faces a heavy burden, for we accord the district court much discretion to fashion the charge." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (internal quotations omitted). Given the district judge's "superior

position . . . to evaluate evidence and formulate the jury instruction," we "normally defer to a district court's decision." *United States v. Gray*, 47 F.3d 1359, 1368 (4th Cir. 1995).

A.

We find no reversible error in the district court's decision not to give a statute of limitations instruction from the jury. As an initial matter, neither of Ravenell's proffered jury instructions on the statute of limitations were legally correct. We have previously held that a district court commits reversible error in declining to provide a proffered jury instruction only when "the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Hassan*, 742 F.3d 104, 129 (4th Cir. 2014) (internal quotations omitted). On the record before us, Ravenell falters at step one.

Ravenell's first statute of limitations instruction would have asked the jury to find that the government had proven "beyond a reasonable doubt that at least **one overt act** in furtherance of the conspiracy was committed after July 2, 2014." J.A. 3730. The Supreme Court, however, has clearly held that "conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy." *Whitfield v. United States*, 543 U.S. 209, 219 (2005); *see also United States v. Green*, 599 F.3d 360, 372 (4th Cir. 2010). Had the district court given Ravenell's proposed instruction on the statute of limitations, it would have committed legal error.

Ravenell's second statute of limitations instruction was similarly erroneous. Ravenell asked the district court to instruct the jury that it had to find the conspiracy continued during the limitations period by a "preponderance of the evidence." Supp'l App'x 2. This instruction is legally incorrect on its own terms. If Ravenell were correct that the statute of limitations is an element of a § 1956(h) conspiracy—which we note it is not, *see Green*, 599 F.3d at 371—then the government would need to prove the continuation of the conspiracy beyond a reasonable doubt, not by a preponderance of the evidence, *see Smith*, 568 U.S. at 110. Ravenell even admits that the suggested burden of proof was error. *See* Appellant Br. at 9–10; Reply Br. at 3. The proffered jury instruction was thus legally deficient. Had the district court instructed the jury using Ravenell's preponderance of the evidence standard, it again would have committed legal error, rendering its decision potentially reversible by this court. *See United States v. Lindberg*, 39 F.4th 151, 162–63 (4th Cir. 2022).

Judges are never obligated to give legally improper instructions. When a party's "proposed instruction [is] incorrect," the district court does not "reversibly err in refusing to provide it." *United States v. Hill*, 927 F.3d 188, 210 (4th Cir. 2019). The district court properly declined to give the erroneous instructions tendered here.

## B.

Despite acknowledging his own failure to furnish legally correct jury instructions, Ravenell still argues that the district court erred in refusing to provide any statute of limitations instruction after he requested one. According to Ravenell, "[w]hen a conspiracy charge relies on acts outside of the limitations period and there is a legitimate question

13

whether it continued into the limitations period, the jury must be instructed to determine whether the prosecution was timely." Appellant Br. at 18. We disagree. Such a rule once again misunderstands the difference between an overt act conspiracy and a non-overt act conspiracy.

### 1.

Money laundering conspiracy under 18 U.S.C. § 1956(h) is a non-overt act conspiracy. *Whitfield*, 543 U.S. at 219; *Bolden*, 325 F.3d at 491. This means that "§ 1956(h) conspiracy offenses require nothing more than an agreement to launder money," and thus "it follows that the agreement is necessarily the 'conduct' making up the offense." *United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021). In other words, non-overt act conspiracies "do[] not make the doing of any act other than the act of conspiring a condition of liability." *United States v. Shabani*, 513 U.S. 10, 13–14 (1994) (internal quotations omitted).

A non-overt act conspiracy is presumed to continue "as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated." *United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009) (internal quotations omitted). The "dispositive consideration" for a statute of limitations defense in a non-overt act conspiracy "is whether [Ravenell] withdrew from the conspiracy or the conspiracy ended outside the five-year limitations period." *United States v. Wilkins*, 354 Fed. App'x 748, 756 n.10 (4th Cir. 2009). Therefore, while overt act conspiracies require a showing "that at least one overt act in furtherance of the conspiratorial agreement was performed" within the applicable statute of limitations period, *Grunewald v.*

*United States*, 353 U.S. 391, 396–97 (1957), non-overt act conspiracies are presumed to continue absent evidence to the contrary.

In terms of the statute of limitations for a non-overt act conspiracy, the burden shifts. The government must allege and prove an agreement to enter into a conspiracy, but a conspiracy continues unless a defendant can show affirmative withdrawal or termination. We have previously held that once a conspiracy is established, "it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it." *United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986). A "mere cessation of activity in furtherance of the conspiracy is insufficient." *Id.* Rather the "defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his co-conspirators." *Id.* This places the burden on the defendant to show that a non-overt act conspiracy ended prior to the statute of limitations, rather than placing the burden on the government to show that the same conspiracy continued. *See Smith*, 568 U.S. at 110.

Any other requirement would contravene the nature of a non-overt act conspiracy. If a defendant need not prove withdrawal or termination to assert a statute of limitations defense, then a burden would be on the government to produce evidence that the conspiracy did not end. Such a requirement would essentially shift the burden to the government to show an overt act demonstrating the conspiracy's continuation. This would eviscerate the line between non-overt act and overt act conspiracies, as both would require the government to show an overt act, contradicting the text Congress enacted. *Whitfield*, 543 U.S. at 214 ("Because the text of § 1956(h) does not expressly make the commission of an

15

overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction.").

In this case, Ravenell offered no affirmative evidence showing that the conspiracy was terminated or that he affirmatively withdrew from the conspiracy prior to the operative July 2, 2014, limitations date. Rather than making that required showing, he simply insists that since the last payments received from Byrd and Harris were in January and April 2014 respectively, and that Byrd was arrested in April 2014, then the "central purpose" of the money laundering conspiracy was accomplished. Appellant Br. at 24. But a "mere cessation of activity in furtherance of the conspiracy is insufficient" to establish that the conspiracy ended. *Walker*, 796 F.2d at 49. Instead of highlighting the ways in which the conspiracy affirmatively ended, Ravenell attempts to flip the burden back to the government to show continuation via overt acts. That is not what the law requires.

2.

Ravenell relies on our decision in *United States v. Head*, 641 F.2d 174 (4th Cir. 1981), to argue that his conviction for money laundering conspiracy "relied heavily on *conduct* that occurred outside the limitations period," which "necessitate[ed] an instruction" on the statute of limitations. Appellant Br. at 19 (emphasis added). *Head*, however, is inapplicable. The appellants in that case were charged under the general criminal conspiracy statute, 18 U.S.C. § 371, which requires proof of an overt act. *Head*, 641 F.2d at 176. We held that the district court erred in not providing a statute of limitations instruction when requested as "the indictment rested in large part on *acts* occurring without the limitations period." *Id.* at 177 (emphasis added). Where a mere agreement is the

16

relevant conduct, however, the temporal nature of certain overt acts has much less bearing on a conspiracy's continuation into the statute of limitations without evidence of termination or withdrawal.

Indeed, *Head* "did not conclude" that a jury instruction on the statute of limitations "was necessary in every case or that the statute of limitations had become an essential element of conspiracy." *United States v. Matzkin*, 14 F.3d 1014, 1018 (4th Cir. 1994). Instead, it announced a "general rule" that "the prosecution must prove an overt act in furtherance of the conspiracy committed within the limitations period" for the general criminal conspiracy statute. *Id.* at 1017. In short, it said nothing about non-overt act conspiracies. Simply because some conspiratorial acts in Ravenell's case occurred before the July 2, 2014 limitations date did not mean that the district judge was required to provide a statute of limitations instruction. Declining to give one was therefore not an abuse of the substantial discretion we afford district judges in fashioning jury instructions.

C.

If this were not enough, the government did in fact present evidence of conduct undertaken in furtherance of the money laundering conspiracy past July 2, 2014, even though it was not needed for a non-overt act conspiracy. Though not required, "proof of overt acts can be useful for . . . showing that a conspiracy . . . continued into a period within the statute of limitations." *Green*, 599 F.3d at 372. Ravenell was charged with participation in a single money laundering conspiracy involving both Harris and Byrd. The record is full of evidence that the money laundering conspiracy relating to both men did not terminate before the applicable statute of limitations deadline.

17

First, Ravenell remained Byrd's lawyer until October 10, 2014, more than three months beyond the July 2 cutoff. Byrd testified that he paid Ravenell with drug proceeds to both represent Byrd and launder the proceeds through his law firm. Evidence presented at trial showed that Ravenell's personal money laundering of Byrd's drug proceeds began when Byrd became a client of Ravenell's law firm. Ravenell accepted about $1.8 million in drug proceeds, directed around $1.1 million out of the firm to various projects and third parties to benefit Byrd, and kept the remaining money for legal fees. As the money laundering conspiracy was part and parcel of Ravenell's representation of Byrd, the fact that the attorney-client relationship continued into the limitations period undercuts any assertion that the conspiracy ended before then.

Second, money credited to Byrd's drug ring remained at Ravenell's law firm past July 2, 2014. The drug proceeds provided to Ravenell and deposited into his law firm's escrow account were tracked on internal ledgers associated with Byrd. These ledgers were entered into evidence at trial, and they showed that as of August 28, 2014, there was a remaining balance of roughly $12,000 credited to Byrd. As the object of the conspiracy was to launder drug proceeds via Ravenell's law firm, the fact that these drug proceeds remained at the law firm is probative.

Third, jurors heard testimony regarding a proposed partnership between Byrd, Ravenell, and another distributor named Darnell Miller. In 2014, prior to Byrd's arrest in April, Byrd and Miller discussed connecting their marijuana drug networks with Ravenell acting as an intermediary between the two and collecting the profits from the operation. Byrd testified that after he was arrested on April 29, 2014, he gave Miller's number to

Ravenell "so they could continue on the operation" without Byrd. J.A. 440. Miller and Ravenell met in May 2014, during which Ravenell offered to "wash" Miller's money in the same way that he did Byrd's. J.A. 1466, 1494–96. Miller testified that he decided not to move forward with this partnership only when he found out that the FBI had raided Ravenell's law office, which did not happen until August 2014.

Fourth, the government presented uncontroverted evidence that Ravenell made a $750 payment on August 1, 2014, to Phoenix Towing Services on Byrd's behalf. As Ravenell concedes, this was directly related to his representation of Byrd, as it was to pay for the storage of Byrd's vehicles that were seized following an earlier arrest in Arizona in 2011. Evidence presented at trial shows continuous payments from Ravenell's law firm to Phoenix Towing both before and after the applicable limitations date.

Ravenell points to two pieces of evidence related to Byrd which he believes shows termination of the conspiracy: (1) the last payment from Byrd to the law firm was made on January 6, 2014, and (2) Byrd was arrested by federal authorities on April 29, 2014, after which, Byrd testified, he no longer engaged in drug trafficking activities. According to Ravenell, "[w]ith Byrd out of the conspiracy—whose central purpose was laundering money *for Byrd*—. . . the alleged conspiracy as it pertains to Byrd concluded outside the applicable limitations period." Appellant Br. at 25 (emphasis in original). "Arrest of some co-conspirators," however, "does not, as a matter of law, terminate a conspiracy." *United States v. Grubb*, 527 F.2d 1107, 1109 (4th Cir. 1975). And, moreover, "[a]cts in furtherance of a criminal conspiracy include exploits large and small, dealings that represent turning points in the conspiracy and those that merely enable it to continue its

operations." *United States v. Smith*, 452 F.3d 323, 335 (4th Cir. 2006). Thus, the mere fact that these acts happened before the statute of limitations period does not rebut the presumption, nor negate the evidence, of continuation.

Ravenell likewise claims that the portion of the conspiracy involving Harris ended on April 25, 2014, the date of the last payment from Harris to Ravenell's law firm. According to Ravenell, no "further payment was due or contemplated" after that time. Appellant Br. at 24. This is controverted, however, by testimony at trial as no evidence showed that the last payment ended the agreement to launder drug proceeds. Harris testified that Ravenell demanded more money from him to continue his representation and stated that he would continue with that representation should he receive the money. Ravenell then did not withdraw as Harris' counsel until November 17, 2014, well within the limitations period. Bailey further testified that her efforts to collect drug proceeds to pay Ravenell were ongoing. She also stated that she received a target letter in November 2014 from the United States Attorney's Office, after which she destroyed records about her collection of drug money and attempted to contact Ravenell.

All told, there was ample evidence that the conspiracy continued past the July 2, 2014 limitations date. Given that evidence, and the issues with Ravenell's theory on the statute of limitations, the district court did not abuse its discretion in withholding a statute of limitations instruction.

III.

As to Part III, Judge Heytens wrote the opinion, in which Chief Judge Gregory joined. For the following reasons, I agree that plain error is the applicable standard, and that Ravenell has failed to satisfy its elements.

Ravenell next asserts that the district court erred by failing to instruct the jury on the definition of "monetary transaction" under 18 U.S.C. § 1957(f)(1). Because Ravenell "fail[ed] to preserve his objection, our review on direct appeal is for plain error." *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022). To prevail under plain error review, Ravenell must show that "the court's jury instructions included an error that was clear and obvious, and that the error affected his substantial rights, meaning that it affected the outcome of the district court proceedings." *Id.* (internal quotations and alterations omitted). Even then, a court will "not correct the error unless it seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Ali*, 991 F.3d 561, 572 (4th Cir. 2021) (internal quotations omitted); *United States v. Olano*, 507 U.S. 725, 732 (1993).

18 U.S.C. § 1957(a) prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000" with funds that are "derived from specified unlawful activity." 18 U.S.C. § 1957(f)(1), in turn, defines "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." The definition of monetary transaction, however, contains a safe harbor provision, which excepts "any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution."

21

18 U.S.C. § 1957(f)(1). Ravenell claims the district judge erred in failing to instruct the jury on the definition of "monetary transaction" in § 1957(f)(1) because his actions with Harris are protected by the safe harbor provision.

Ravenell's argument fails in multiple respects. First, Ravenell confuses a conspiracy with a substantive offense, mistakenly treating a substantive § 1957 violation as a necessary element to a § 1956(h) conspiracy conviction. *See Green*, 599 F.3d at 371. Second, Ravenell invokes § 1957's safe harbor in vain because the statute does not protect his actions in this case. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989); *United States v. Blair*, 661 F.3d 755, 771–72 (4th Cir. 2011). And third, even accepting *arguendo* there was an error, Ravenell cannot avail himself of an error that his counsel invited by agreeing to the jury instructions without the definition of "monetary transaction." *United States v. Lespier*, 725 F.3d 437, 450 (4th Cir. 2013). I consider each point in turn.

### A.

First, Ravenell conflates the elements of a money laundering conspiracy under 18 U.S.C. § 1956(h) with the elements of a substantive 18 U.S.C. § 1957 offense.

The charged offense at issue here is not one of engaging in monetary transactions involving criminally derived property in violation of 18 U.S.C. § 1957. Rather, it is conspiracy to commit money laundering under 18 U.S.C. § 1956(h), which states that "[a]ny person who conspires to commit" money laundering "shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). For a conviction under § 1956(h), the government "must

22

prove the following essential elements: (1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C § 1956(a) or § 1957; (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy." *Green*, 599 F.3d at 371.

The elements of a § 1956(h) violation do not require the government to prove a violation of § 1957. Indeed, the text of the statute contemplates "conspir[ing] to commit any offense defined in this section *or* section 1957." 18 U.S.C. § 1956(h) (emphasis added). This language indicates that an individual can be guilty of money laundering conspiracy by conspiring to commit one of the three forms of substantive money laundering detailed in § 1956 and § 1957: promotional money laundering under 18 U.S.C. § l956(a)(l)(A)(i), concealment money laundering under 18 U.S.C. § 1956(a)(l)(B)(i), *or* transactional money laundering under 18 U.S.C. § 1957. Because "liability under § 1956(h) can be established by showing a conspiracy to commit" any one of the object crimes listed in § 1956(a) and § 1957, the government need not include a § 1957 object in the first place. *United States v. Miller*, 41 F.4th 302, 314 (4th Cir. 2022).

The government charged Ravenell with conspiracy to commit promotional, concealment, and transactional money laundering, and the judge instructed the jury on the elements of these three objects under 18 U.S.C. §§ l956(a)(l)(A)(i)–(B)(i), 1957. The jury only needed to find an *agreement* to commit one or more of these three substantive offenses to find Ravenell guilty of conspiracy to commit money laundering. *Green*, 599 F.3d at 371; *see also United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004) ("Proof of a conspiracy

does not require proof that the object of the conspiracy was achieved or could have been achieved, only that the parties agreed to achieve it.").

It thus makes sense why this circuit has declined to read the text of § 1956(h) to require proof of the substantive offenses defined in § 1956 or § 1957 as an essential element of the conspiracy. *See, e.g., United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008); *United States v. Alerre*, 430 F.3d 681, 693–94 (4th Cir. 2005). It therefore follows that because this court has never held that § 1957 is an element of money laundering conspiracy, then the definition of "monetary transaction" found in § 1957(f) is *a fortiori* not an essential element of a § 1956(h) money laundering conspiracy. Ravenell's view that the definition of "monetary transaction" under § 1957 is a necessary element of § 1956(h) thus conflates two different crimes. It attempts to sneak the elements of § 1957 into the elements of § 1956(h) listed in *Green*, 599 F.3d at 371.

This court has held that only three elements are "essential" to a money laundering conspiracy conviction under § 1956(h). A district court must instruct the jury on each of them. *Muse*, 83 F.3d at 679. The district court did so. It therefore did not err, much less clearly or obviously, by omitting the definition of "monetary transaction" in § 1957.

B.

Second, the Supreme Court and the Fourth Circuit have both made clear that Ravenell's actions fall outside the protections of 18 U.S.C. § 1957(f)(1)'s safe harbor.

1.

To reiterate, the statute's safe harbor provision excepts "any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the

Constitution." 18 U.S.C. § 1957(f)(1). This circuit previously considered the full scope of § 1957(f)(1)'s safe harbor in *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011). The *Blair* court emphasized the importance of the statute's text when mapping the contours of the safe harbor, underscoring that if "Congress wanted to create a broad exception," similar to the one Ravenell advances now, Congress "could have employed unqualified language exempting transactions 'for payment of counsel.'" *Blair*, 661 F.3d at 771. The fact that it did not reveals that "the scope of the safe harbor provision is shaped by the Supreme Court's ongoing interpretation of the Sixth Amendment." *Id.* "[A]nyone seeking to benefit from § 1957(f)," therefore, "must tie his conduct to the Sixth Amendment right to counsel." *Id.* If conduct falls outside the recognized ambit of the Sixth Amendment, then that conduct finds no sanctuary in § 1957(f)(1)'s safe harbor.

The Supreme Court's interpretation of the Sixth Amendment establishes that "'no one has a *constitutional* right to use . . . criminally derived proceeds to retain a defense attorney.'" *Id.* at 773 (quoting *Caplin & Drysdale,* 491 U.S. at 626). In other words, a "defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney." *Caplin & Drysdale*, 491 U.S. at 626. The Court has underscored that "[w]hatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond the individual's right to spend his own money to obtain the advice and assistance of counsel." *Id.* (internal quotations and alterations omitted).

This court has acknowledged such a general principle, explaining that "if the defendant owns the property, he is entitled to use it for his defense; if he does not own the

property, he may not," *United States v. Marshall*, 872 F.3d 213, 220 (4th Cir. 2017), because "Sixth Amendment rights are at bottom *personal* to the accused," *Blair*, 661 F.3d at 772. This personal right could become attenuated by criminals acting through others to secure counsel: "Congress did not . . . intend for § 1957(f) to empower a drug lord to sprinkle money around to hire counsel for his underlings," for this would "undermine the attorney-client relationship." *Id.* Conversely, a drug lord may not rely on his underlings to gather drug money from the streets to pay an attorney on his behalf lest the court condone the same attenuation of the attorney-client relationship.

The upshot of the Supreme Court's Sixth Amendment doctrine here is that "a criminal defendant has no Sixth Amendment right to use illegally obtained funds to hire an attorney." *United States v. Farmer*, 274 F.3d 800, 802 (4th Cir. 2001). The Supreme Court has thus drawn a bright line between actions that implicate the Sixth Amendment's guarantee of counsel and actions that do not properly warrant Sixth Amendment protection. No lawyer has the "right" to accept illegally procured gains "in payment of a fee." *Caplin & Drysdale*, 491 U.S. at 626 (internal quotations omitted). The boundaries of § 1957(f)(1)'s safe harbor are correspondingly demarcated by this well-established doctrine.

2.

With these principles underlying § 1957(f)(1) in mind, the analysis of Ravenell's conduct is straightforward. I note at the outset that Ravenell never once argues that his monetary transactions with *both* Harris *and* Byrd are protected by the safe harbor. He asserts that his "exoneration on every other count related to Byrd" demonstrates that only

26

his monetary transactions with Harris could be the basis for his conspiracy conviction, and the transactions with Harris are protected by § 1957(f)(1). Appellant Br. at 30.

This is too strong an inference to draw from the jury's verdict, for "the jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty." *United States v. Watts*, 519 U.S. 148, 155 (1997) (internal quotations omitted). Ravenell was not therefore exonerated on all conduct relating to Byrd, for an "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984). Ravenell's assertion that his conduct with Harris is protected by the safe harbor thus makes the fatal misstep of ignoring his conduct with Byrd.

Even assuming for the sake of argument, however, that only Ravenell's actions with Harris are at issue, the above principles demonstrate that he still cannot invoke the protections of § 1957(f)(1). Both Bailey and Harris testified that Bailey was collecting money from Harris's drug dealing enterprise to pay directly to Ravenell, and that Ravenell knew of the source of the money. This plain fact reveals two things: First, the payments did not come to Ravenell from some untainted channel. *See, e.g., Luis v. United States*, 578 U.S. 5, 12–13 (2016); *Marshall*, 872 F.3d at 219–20. They did not come from Harris to secure Ravenell as Harris' counsel. They came from an arrangement through which Bailey would collect drug money owed to Harris and deliver it to Ravenell. This third-party payment system thus attenuated the "personal" nature of the Sixth Amendment right. *Blair*, 661 F.3d at 772. Second, as both Harris and Bailey testified, all the money paid to Ravenell

27

was the product of drug dealing profits. Accordingly, the money Harris used to pay Ravenell was not, by law, his to spend. *Id.* at 771–72.

No tenable argument can be made that Ravenell's actions brought him under the statute's safe harbor. The district court, therefore, did not plainly err by not instructing the jury about § 1957(f)(1)'s definition of "monetary transaction" and its corresponding safe harbor provision. Well-established Supreme Court doctrine and on-point precedent from this circuit compel the conclusion that Ravenell's actions do not warrant the safe harbor's protection.

C.

Finally, Ravenell invited any error of which he now complains by affirmatively agreeing to the final jury instructions. "In the context of plain error review, an error that was invited by the appellant cannot be viewed as one that affected the fairness, integrity, or public reputation of judicial proceedings." *Lespier*, 725 F.3d at 450 (internal quotations omitted). In other words, a "criminal defendant is often not entitled to reversal of his conviction where he invites the error he complains of on appeal." *United States v. Simmons*, 11 F.4th 239, 266 n.18 (4th Cir. 2021).

Ravenell and the government jointly submitted jury instructions that included the parties agreed upon elements of conspiracy to commit money laundering under § 1956(h). These instructions did not include a definition of "monetary transaction" or a reference to the safe harbor provision. In fact, the record shows that the defense suggested edits to the relevant instruction but did not make any remarks about needing a definition of "monetary transaction" or the safe harbor under § 1957. *United States v. Day*, 700 F.3d 713, 727 n.1

28

(4th Cir. 2012) (invited error analysis applies where a defendant and the government "jointly proffer[] . . . jury instruction[s] that [the defendant] now objects to on appeal"). Ravenell cannot now claim that it was reversible error to omit such instructions that his own attorneys never proffered to the district court.

In short, Ravenell's claim for instructional error falters for multiple reasons. First, the district court did not err, as it did not fail to instruct on an element of what was a conspiracy offense. Moreover, the district court did not plainly err in failing to give a safe harbor instruction as to acts which were flatly precluded from its protection by Supreme Court and circuit precedent. Finally, the error of which Ravenell complains was not only subject to plain error analysis, but was also invited when the attorneys agreed upon the relevant instructions in the case.

IV.

Ravenell next argues that the district court erred in giving the government's proposed conscious avoidance instruction. He contends the government showed no evidence that he "consciously avoided knowing he was laundering drug proceeds." Appellant Br. at 42. We review a court's decision to offer such an instruction for abuse of discretion. *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017).

As explained above, to prove conspiracy to commit money laundering under 18 U.S.C. § 1956(h), the government must prove "(1) the existence of an agreement between two or more persons to commit" substantive money laundering, "(2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy."

29

*Green*, 599 F.3d at 371. The knowledge element of the second prong can be satisfied in two ways: by evidence of "subjective knowledge that the proceeds were derived from an unlawful source," or "by evidence that [a defendant] made himself deliberately ignorant of that fact." *United States v. Farrell*, 921 F.3d 116, 145 (4th Cir. 2019) (internal quotations omitted).

Regarding the second method of proof, the government may "prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances." *Vinson*, 852 F.3d at 357 (internal quotations omitted). In other words, the government may prove that the defendant consciously avoided learning where the money came from, which is also referred to as "willful blindness." *United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir. 1994). Where trial evidence "supports both actual knowledge on the part of the defendant and deliberate ignorance [*i.e.*, conscious avoidance], a willful blindness instruction is proper." *Vinson*, 852 F.3d at 357 (internal quotations omitted). Further, a "willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996) (internal quotations omitted). The government here produced sufficient evidence of both Ravenell's actual knowledge and willful blindness to support such an instruction.

First, the record is replete with evidence of actual knowledge. To summarize: Harris and Byrd testified at trial that Ravenell knew he was receiving drug money. *See* J.A. 306–07 (Byrd testifying that Ravenell advised him to "set up a legitimate business" to disguise

drug proceeds "in order to facilitate and move around without running into the law enforcement traps"); J.A. 544 (Byrd testifying that "Ravenell knew of everything and was involved with everything"); J.A. 2117 (Harris testifying that the "only money that Ms. Bailey paid Mr. Ravenell was the money she received from the streets. So in my knowledge it's kind of understood that Mr. Ravenell knew it was drug money"); J.A. 2149–50 (Bailey testifying that she "was able to explain to [Ravenell] exactly . . . where the monies were coming from" and the nature of her collecting drug proceeds on Harris' behalf). MFM employees also testified that Ravenell maintained control over how money was moved in and out of the accounts associated with the Byrd ledgers. Moreover, according to Miller and mentioned above, Ravenell offered to launder Miller's money via the law firm just like he had for Byrd.

Second, the centerpiece of Ravenell's defense was that he lacked knowledge about his role in the money laundering conspiracy. For example, Ravenell asserted that Byrd and his associates duped Ravenell into taking drug proceeds by faking legitimate businesses. Further, Ravenell insisted that all he knew about LOC Marketing was that "there was this lucrative events business and that's what he was told he was paid out of." J.A. 3059. Therefore, because Ravenell's actual, subjective knowledge was contested at trial, the government also sought to put forth evidence of Ravenell's conscious avoidance. "Evidence supports an inference of [conscious avoidance] if it tends to show that (1) the defendant subjectively believes that there is a high probability that a fact exists and (2) the defendant took deliberate actions to avoid learning of that fact." *Miller*, 41 F.4th at 314

31

(internal quotations and alterations omitted). There is ample evidence in the record of Ravenell's conscious avoidance.

The so-called "Okullo transaction" is illustrative on this point. In August 2013, Byrd used offshore accounts and a chain of contacts to funnel drug money through MFM to Jamila Lyn, the mother of Byrd's youngest child. Byrd sent around $90,000 to an attorney in Jamaica, who then wired it to a realtor in New York City, who then sent it to a Ugandan diplomat named Patrick Okullo, who wired the money to Ravenell via MFM. Ravenell then directed that money be taken out of MFM and sent to Lyn. The record shows that Ravenell and Okullo did not know each other nor did they have any prior interactions. Despite this, Ravenell knew to wire the money received to Lyn. This shows that Ravenell "intuitively" understood that Byrd was shifting drug proceeds through MFM, and that he needed to get those proceeds to third-parties for Byrd's benefit. *See Miller*, 41 F.4th at 314.

Other testimony further demonstrated that Ravenell at a minimum "took deliberate actions to avoid learning the specifics of the money-laundering scheme." *Id.* Byrd and Bailey both testified that Ravenell was strict about the source and form of the funds received. Byrd stated that Ravenell refused to accept funds going into the law firm from Byrd himself, instead directing money to be sent via approved third parties. Bailey testified that Ravenell instructed her at times not to give him cash from drug proceeds and instead to give him checks and money orders. Evidence of Ravenell's machinations to maintain plausible deniability support the inclusion of a conscious avoidance jury instruction. The classic trope of avoiding accountability by saying "I don't want to know where the money comes from" does not form the basis of a legally tenable defense.

Finally, any error in giving a willful blindness instruction is harmless "where there is sufficient evidence in the record of actual knowledge on the defendant's part." *Farrell*, 921 F.3d at 146 (internal quotations omitted). Even assuming, therefore, that the district court erred in giving the conscious avoidance instruction as to the money laundering conspiracy charge, that error is harmless in light of the substantial evidence of actual knowledge on Ravenell's behalf. Accordingly, we affirm the district court's decision to give a conscious avoidance instruction.

V.

Last, Ravenell claims his conviction cannot stand because he may have been convicted under a legally infirm theory. Under *Yates v. United States*, 354 U.S. 298 (1957), "when a general verdict on a single criminal charge rests on alternative theories, one valid and the other invalid, the verdict must be set aside if it is impossible to tell which ground the jury selected." *United States v. Jefferson*, 674 F.3d 332, 361 (4th Cir. 2012) (internal quotations omitted).

A "*Yates* alternative-theory error is subject to ordinary harmlessness review, and the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt." *Id.* Where a *Yates* error may have occurred, "the reviewing court must attempt to ascertain what evidence the jury necessarily credited in order to convict the defendant under the instructions given," and if the "evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed." *Bereano v. United States*, 706 F.3d 568, 577–78 (4th Cir. 2013) (quoting *United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998)).

33

We thus consider which theories the jury necessarily credited to find Ravenell guilty of conspiracy to commit money laundering. Ravenell advances two possible *Yates* errors. First, he believes he may have been convicted for conduct that was time-barred by the relevant statute of limitations. Second, he claims that he may have been convicted of conduct that is lawful under 18 U.S.C. § 1957. Both of these arguments fail, however. We have discussed at length each of Ravenell's theories earlier, and for the reasons detailed above, there is no reason to conclude that Ravenell's conviction rests on an invalid legal ground.

## VI.

The criminal defense bar is a crucial component of our criminal justice system. Without capable defense attorneys, those accused of crime are left defenseless against the legal machinery that state and federal governments bring to bear against them. Lawyers "to prosecute are everywhere deemed essential to protect the public's interest in an orderly society," and defense counsel are likewise "necessities, not luxuries" in criminal courts. *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

Our legal system only works, however, if society maintains its faith in the integrity and independence of those who champion the accused. If counsel is deemed complicit in criminal schemes and conspiracies, trust in the adversary process will diminish, and a vital safeguard of those sacred rights etched in our Constitution will be lost. This sad case of an attorney using his special knowledge of our laws to criminal advantage is an isolated occurrence, so fortunately distant from the standards held high by those who undertake the public service of criminal defense. They deserve our gratitude, and may it always be so.

34

The judgment is affirmed.

*AFFIRMED*

HEYTENS, Circuit Judge:[1]

As Ravenell admits, he neither sought a jury instruction about 18 U.S.C. § 1957(f)'s safe harbor provision nor objected to the district court's failure to give one. For that reason, Ravenell's argument is at least forfeited (if not waived) and reviewed at most (if at all) for plain error. See *United States v. Olano*, 507 U.S. 725, 733–34 (1993). To obtain relief on a forfeited claim, Ravenell "must satisfy three threshold requirements": (1) there was "error"; (2) which was "plain"; and (3) "affect[ed] substantial rights." *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (quotation marks omitted). We hold Ravenell cannot satisfy the second requirement—*i.e.*, that the alleged "legal error" is "clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Even had Ravenell been charged with violating 18 U.S.C. § 1957, it is not clear or obvious he would have had a plausible safe harbor defense. To be sure, some language in this Court's decision in *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011), tends to support Ravenell's position. Although the defendant in that case was also a lawyer, the Court emphasized he was not being prosecuted for anything done while "serving in a representative capacity" and it disclaimed any suggestion that people who had acted as attorneys "should come in for sanction." *Id.* at 773. The Court also repeatedly referenced "Blair's conduct"—which included taking "nearly $10,000 for himself" despite not being

---

[1] Judge Heytens joins all but Part III of Judge Wilkinson's opinion. Chief Judge Gregory joins this opinion.

licensed in the relevant jurisdiction—in concluding his actions were "far beyond the scope of the Sixth Amendment." *Id.* at 772–73 & n.3.

But other language in *Blair* tilts sharply against Ravenell. This Court noted "Congress expressly tied the § 1957(f) exception to the Sixth Amendment," and it held "anyone seeking to benefit from § 1957(f) must tie his conduct to the Sixth Amendment right to counsel." 661 F.3d at 771. The Court emphasized "Sixth Amendment rights are at bottom personal *to the accused*," *id.* at 772 (emphasis altered), and that "'no one has a constitutional right to use . . . criminally derived proceeds to retain a defense attorney,'" *id.* at 773 (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) (emphasis omitted)); accord *United States v. Farmer*, 274 F.3d 800, 802 (4th Cir. 2001) ("[A] criminal defendant has no Sixth Amendment right to use illegally obtained funds to hire an attorney."). And rather than dispute Blair's assertion that its interpretation risked "render[ing] § 1957(f)(1) a dead letter," the Court reasoned "Congress itself was well aware of that possibility when it drafted the exception." *Blair*, 661 F.3d at 772; see *id.* (explaining "[a]t the time of [Section 1957(f)(1)'s] enactment, there was considerable division within the courts over whether the Sixth Amendment encompassed the right to use drug proceeds to secure legal representation").

We think it is a hard call which side has the better argument under *Blair*. And that, by itself, defeats Ravenell's appeal on this point because "the burden of establishing each"

37

requirement for plain error relief rests with "the defendant." *Greer*, 141 S. Ct. at 2097.[2]

What is more, unlike the defendant in *Blair*, Ravenell was not prosecuted under Section 1957. Rather, Ravenell was charged with violating 18 U.S.C. § 1956(h) by conspiring to commit three types of money laundering, only one of which was a Section 1957 offense. This Court has identified three—and only three—"essential elements" of a Section 1956(h) violation:

(1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C § 1956(a) or § 1957;

(2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and

(3) the defendant knowingly and voluntarily became part of the conspiracy.

*United States v. Green*, 599 F.3d 360, 371 (4th Cir. 2010). The Court also has rejected efforts to require proof of the substantive offenses to convict a defendant of conspiracy under Section 1956(h). See *United States v. Alerre*, 430 F.3d 681, 694 (4th Cir. 2005) ("[T]he prosecution was not required to prove that the defendants had committed promotion money laundering in order to convict them of conspiring to do so.").

Ravenell responds by citing an unpublished, out-of-circuit decision for the proposition that "[i]n a conspiracy case, the jury instructions must define the elements . . . for the underlying offense that is the object of the conspiracy." Ravenell Br. 28 (quoting

---

[2] Ravenell also relies heavily on the Eleventh Circuit's pre-*Blair* decision in *United States v. Velez*, 586 F.3d 875 (11th Cir. 2009). But that decision's approach seems—at best—hard to square with *Blair*'s, and Ravenell makes little effort to reconcile *Velez* with the rule that we "cannot overrule a decision issued by another panel." *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc).

*United States v. Bairamis*, 522 Fed. Appx. 379, 379 (9th Cir. 2013) (per curiam)); see *id.* at 31 (again citing *Bairamis*). But Ravenell cites no authority from the Supreme Court or this one for that assertion, and, at any rate, *Bairamis* and the precedential opinions on which it relies both involved a different conspiracy statute, 21 U.S.C. § 846. See *Bairamis*, 522 Fed. Appx. at 379 (citing *United States v. McCaleb*, 552 F.3d 1053, 1058–59 (9th Cir. 2009), and *United States v. Ching Tang Lo*, 447 F.3d 1212, 1232 (9th Cir. 2006)). Ravenell's need to place so much weight on such a thin reed only clinches the point under the plain error standard. For this reason, too, Ravenell has failed to carry his burden of showing the district court committed "clear or obvious" error in not giving an instruction neither side requested. *Puckett*, 556 U.S. at 135.

GREGORY, Chief Judge, dissenting:

Codified at 18 U.S.C. § 3282, Congress enacted a five-year statute of limitations "for any offense, not capital," "[e]xcept as otherwise expressly provided by law." 18 U.S.C. § 3282(a). Pursuant to this statute of limitations, Kenneth Ravenell could be convicted of a conspiracy only if it continued beyond July 2, 2014. Yet the majority holds, with little to no limiting principles, that the district court was not required to instruct the jury on the relevant limitations period because Ravenell was charged and convicted of a non-overt act conspiracy. Worse yet, the majority grounds its affirmance of Ravenell's conviction in a supposed concern for "those accused of crime," all while undermining the rights of the very individual "accused of crime" in this case. *Ante* at 34.

I do not intend to debate my colleagues about the policy concerns that drive their opinion. The only question here is whether the district court properly instructed the jury. Because the answer to that question is no, I am compelled to dissent as to Part II of the majority's opinion and the judgment.

## I.

A district court abuses its discretion by refusing to grant a requested jury instruction only where that "instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Hill*, 927 F.3d 188, 209 (4th Cir. 2019) (quoting *United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998)). The majority relies on numerous factual and legal errors to conclude that Ravenell's requested statute of limitations instruction does

not meet certain aspects of this test. Properly assessing the law and the record in this case, I conclude that all three prongs of this test are satisfied and, in turn, that the district court abused its discretion by refusing to instruct the jury on the statute of limitations.[1] Moreover, because there is "no way of knowing whether [Ravenell] was convicted for an offense barred by limitations," I would vacate Ravenell's conviction and remand. *United States v. Head*, 641 F.2d 174, 179 (4th Cir. 1981).

### A.

Ravenell requested the district court to instruct the jury that the Government had to prove "by a preponderance of the evidence that the alleged [money laundering] conspiracy continued after July 2, 2014." Suppl. App'x 2. According to the majority, because Ravenell misstated the burden of proof, this instruction was "legally deficient" and therefore incorrect. *Ante* at 13. I disagree with my colleagues' formalistic analysis.

As a preliminary matter, the majority's recitation of the facts omitted the crucial colloquy which followed Ravenell's proposed jury instruction. After Ravenell proffered the above statute of limitations instruction, the Government responded that there is no "authority for the proposition that this is actually something the jury finds by a preponderance of the evidence." J.A. 2879. Ravenell, in turn, offered to correct the burden of proof: "Fixing the preponderance, obviously that's very easy, that's easy to explain."

---

[1] To the extent a harmless error analysis is required, the error here would not be harmless for the same reasons that Ravenell satisfies part three of the abuse of discretion test. As this Court has noted, "it would be anomalous to conclude that a district court's failure to give a defendant's proposed instruction which substantially impaired his ability to present his defense can be harmless." *United States v. Lewis*, 53 F.3d 29, 35 (4th Cir. 1995).

J.A. 2880.[2]  The district court nevertheless declined to give the instruction, not because it was incorrect, but because it raised "issues" and "qualifiers" that had not "been properly framed for the jury." *Id.*

Considering this exchange, I am not convinced that Ravenell's proffered instruction was, in fact, "legally deficient."  Of course, as a general matter, a district court does not abuse its discretion by declining to provide an incorrect jury instruction.  For example, this Court has held that a district court properly declined to instruct the jury that the Government had to prove that the defendant's "violence caused a relatively significant disruption to commerce," when controlling law made clear that "Congress may regulate interference with commerce, even if the effect of the interference on interstate commerce in an individual case is 'minimal.'"  *Hill*, 927 F.3d at 209.  This Court has also affirmed a district court's refusal to instruct the jury that it needed to find the defendant was "actively involved in a drug trafficking act at the time of the murder," which would have "misstate[d] the law." *United States v. Hager*, 721 F.3d 167, 184 (4th Cir. 2013).

But in those cases, the defendant appealed the district court's refusal to provide the legally erroneous aspect of the jury instruction.  By contrast, Ravenell does not appeal the district court's failure to instruct the jury on the "preponderance of the evidence" burden of proof.  Rather, Ravenell appeals the district court's wholesale failure to instruct the jury

---

[2]  The Government asks us to interpret this statement as Ravenell offering to "explain" but not "correct" the preponderance standard.  Response Br. 16.  This interpretation strikes me as implausible; after the Government suggested that a *higher* burden of proof was appropriate, it defies logic that Ravenell would have insisted on a *lower* burden of proof.

about the existence of the statute of limitations, which nobody disputes is legally "correct." In other words, the heart of Ravenell's proffered jury instruction—the statute of limitations—was correct. The "preponderance of the evidence" language was a peripheral misstatement that, upon learning of the error, Ravenell immediately offered to fix. Tellingly, the majority does not cite to any cases where this Court has found that such a minor and transitory error prevents an entire jury instruction from being "correct" under the abuse of discretion test. To characterize Ravenell's proffered instruction as incorrect thus puts form over function in a manner that promotes injustice and is unsupported by precedent.

The Fourth Circuit adopted the requirement that the proposed jury instruction be "correct" from an Eleventh Circuit case, *United States v. Camejo*, 929 F.2d 610, 614 (11th Cir. 1991). *See United States v. Lewis*, 53 F.3d 29, 32 & n.7 (4th Cir. 1995). And the Eleventh Circuit, like the First, Fifth, and Sixth Circuits, has stated that the proposed instruction need only be "substantially correct" to support a finding of reversible error. *United States v. Morales*, 978 F.2d 650, 652 (11th Cir. 1992); *see also United States v. Gabriele*, 63 F.3d 61, 68 (1st Cir. 1995); *United States v. Pursley*, 22 F.4th 586, 591 (5th Cir. 2022); *United States v. Henderson*, 626 F.3d 326, 342 (6th Cir. 2010).

Applying this standard, the Fifth Circuit held in an analogous case that a district court reversibly erred by failing to instruct the jury on the relevant statute of limitations. *Pursley*, 22 F.4th at 592–93. While the defendant's requested instruction had improperly "failed to account for any suspension of the statute of limitations," the *Pursley* court held that the instruction was nevertheless "substantially correct," in part because the defendant

43

"offered to modify the instruction with a suspension" "at the charge conference." *Id.* at 592. So too, here. Ravenell offered to modify his proposed statute of limitations instruction to "[f]ix[] the preponderance" language, J.A. 2880, thereby proffering a "correct" instruction for purposes of the abuse of discretion inquiry.

### B.

Next, the statute of limitations instruction was not "substantially covered by the court's charge to the jury." *Hill*, 927 F.3d at 209. The majority does not address this prong of the test, but the Government attempts to overcome this conclusion by arguing that the indictment alleged the conspiracy occurred within the statute of limitations period, and the district court instructed the jury that it "must find the facts alleged occurred substantially on the dates alleged in the indictment." Response Br. 31. The full context of the district court's instruction belies the Government's argument. The district court instructed the jury that:

> it does not matter if the indictment charges that a specific act occurred on or about a certain date and the evidence indicates, in fact, it was on another date. The law only requires a substantial similarity between the dates alleged in the indictment and the date established by testimony or exhibits.

J.A. 2897. Simply put, this instruction—which gave the jury latitude to depart from the dates in the indictment—cannot be read as "substantially cover[ing]" the instruction that the jury could not convict Ravenell of a conspiracy that did not continue past July 2, 2014.

### C.

Finally, the statute of limitations instruction was "so important, that [the] failure to give the requested instruction seriously impaired [Ravenell's] ability to conduct his defense." *Hill*, 927 F.3d at 209. While the majority does not directly address this standard,

it appears to conclude that the statute of limitations instruction was not required in this case for two reasons: because Ravenell was charged with a non-overt act conspiracy, and because the trial evidence indicated that the money laundering conspiracy continued beyond July 2, 2014. Its reasoning on both scores suffers from fundamental flaws.

## 1.

It is true that Ravenell was charged with a non-overt act conspiracy that, once established, is "presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it." *United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986). In other words, "[s]ince no overt acts are required to sustain" Ravenell's money laundering conspiracy conviction, "the dispositive consideration for [Ravenell's] limitations claim is whether he withdrew from the conspiracy or the conspiracy ended outside the five-year limitations period." *United States v. Wilkins*, 354 F. App'x 748, 756 n.10 (4th Cir. 2009). Contrary to the majority's suggestion, however, this nuance does not render the statute of limitations for a non-overt act conspiracy a nullity. *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 324 (4th Cir. 1982) (holding, in a non-overt act conspiracy case, that "the district court correctly instructed the jury simply that the offense charged 'requires the government to prove beyond a reasonable doubt that the conspiracy existed'" within the limitations period). Rather, statutes of limitations—which are "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past," *Toussie v. United*

*States*, 397 U.S. 112, 114–15 (1970)—should protect defendants charged with non-overt act and overt act conspiracies alike.

The majority's attempts to distinguish *Head*, 641 F.2d at 174, are thus unavailing. In that case, this Court reversed a defendant's conspiracy conviction because the district court declined to instruct the jury on the relevant statute of limitations. *Id.* at 177, 179. It is true that, in *Head*, the defendant was convicted of an overt act conspiracy. *See id.* at 177. But that difference only affects *how* continuation into the limitations period is proven (that is, whether the Government must prove an overt act in furtherance of the conspiracy occurred within the limitations period). Importantly, however, the *Head* Court's fundamental concern that, in the absence of a statute of limitations instruction, it "ha[d] no way of knowing whether [the defendant] was convicted for an offense barred by limitations," applies with equal force here. *Id.* at 179. Therefore, to the extent that the statute of limitations in a non-overt act conspiracy raises legal complexities not present in an overt act case, the district court should have instructed the jury on the statute of limitations *and* those additional complexities.

The district court appeared to recognize as much when it declined to instruct the jury on the statute of limitations; it concluded that "qualifiers as to the statute of limitations, as well as the burden of proof and issues like withdrawal," had not "been properly framed for the jury." J.A. 2880. With this statement, the district court correctly intimated that, had it instructed the jury on the statute of limitations, it also would have been proper to instruct the jury that, once established, the conspiracy is "presumed to continue unless or

until [Ravenell] shows that it was terminated or he withdrew from it," *Walker*, 796 F.2d at 49, and on the ways in which Ravenell could show withdrawal or termination.

However, the district court's ultimate refusal to provide the statute of limitations instruction because the issues had not been framed for the jury was in error. Contrary to the Government's characterization, Ravenell did not introduce the statute of limitations issue at the eleventh hour. In fact, having agreed on July 2, 2019, to toll the statute of limitations until October 2, 2019, the parties (and, perhaps, the court) were long aware of the relevance of the statute of limitations in this case. Moreover, regardless of when the court learned of the statute of limitations, it could—and should—have framed the statute of limitations and the corresponding legal issues *when it instructed the jury*. "[T]he complexity of the issues involved [thus] d[id] not justify denying [Ravenell's] requested instruction." *Pursley*, 22 F.4th at 592.

2.

The district court's failure to so instruct the jury "seriously impaired [Ravenell's] ability to conduct his defense." *Hill*, 927 F.3d at 209. At trial, the Government's evidence of the money laundering conspiracy related primarily to Ravenell's conduct with respect to two individuals: Leonaldo Harris and Richard Byrd. Contrary to the majority's assertion, there is ample evidence in the record that would have allowed the jury to conclude that the alleged money laundering conspiracy as to both Harris and Byrd terminated prior to July 2, 2014.

To start, this Court has held that "[a] conspiracy ends when its central purpose has been accomplished." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d

47

1390, 1399 (4th Cir. 1993) (internal quotation marks omitted).  Had the district court instructed the jury on the statute of limitations, the jury could have been persuaded by the evidence indicating that the "central purpose" of Ravenell's alleged conspiracy with Harris—the payment of Harris's legal defense fees through illegally obtained money—was "accomplished" prior to July 2, 2014.

While Ravenell continued to represent Harris into the limitations period, there is significant evidence indicating that Harris completed the payment of his legal fees when his final payment was made to Ravenell's law firm ("MFM") on April 25, 2014.  For example, Avarietta Bailey testified that Ravenell's fees were "somewhere around $175,000 to $200,000."  J.A. 2149.  Harris's case matter form at MFM similarly reflected that the firm charged Harris a "fixed fee" of $200,000.  J.A. 1191–92; *see also* J.A. 1334 (former MFM accounting management employee testifying that Ravenell typically charged criminal clients a "fixed fee").  Moreover, evidence at trial showed that approximately $187,000 was credited to Harris's ledger at MFM, suggesting that Harris paid the entire fixed fee that he owed for his criminal representation prior to July 2, 2014, and, in turn, that the central purpose of the conspiracy between Ravenell and Harris had been accomplished by that date.

The jury could also have been persuaded by evidence showing that Ravenell's alleged conspiracy with Byrd terminated prior to July 2, 2014.  While it is true as a general matter that the arrest of a co-conspirator "does not terminate the conspiracy as to fellow-conspirators remaining at large and continuing their illegal activities," this Court has also found that a conspiracy "ceased" when all of a defendant's co-conspirators were arrested

"because [the defendant] could not conspire with himself, and there was no other person with whom he could conspire." *United States v. Chase*, 372 F.2d 453, 459 (4th Cir. 1967); *see also United States v. Ammar*, 714 F.2d 238, 253–54 (3d Cir. 1983) ("[D]efendants [can] show that the conspiracy terminated . . . by demonstrating that its ends had been so frustrated or its means so impaired that its continuation was no longer plausible."). Because Byrd was the key player in the alleged conspiracy, it follows that his arrest in April 2014, his corresponding testimony that he did not engage in conduct relating to the drug organization after that point, and the April 2013 arrests of other members of the conspiracy, including Jerome Castle, Harold Byrd, and Josef Byrd, could have precluded Ravenell from continuing the conspiracy beyond July 2, 2014. The absence of payments into Byrd's escrow account at MFM after January 2014 and the cessation of non-court-required payments out of the escrow account after February 2014 would have further supported a jury finding that the conspiracy to launder Byrd's money ceased prior to the limitations period.[3]

It follows from this evidence that "for [Ravenell] to present his theory of defense, it was incumbent on the district court to instruct the jury that [Ravenell] could not be convicted of" a conspiracy that did not continue beyond July 2, 2014. *Lewis*, 53 F.3d at 35. If the district court had properly instructed the jury, Ravenell could have highlighted this evidence

---

[3] The Byrd escrow ledger shows that after February 26, 2014, the only payments made from the Byrd escrow account were to Phoenix Towing Services which, according to Ravenell, were made to comply with an Arizona Court of Appeals order precluding Byrd from removing vehicles from its jurisdiction during the pendency of the State's appeal in a separate case.

of the conspiracy's termination in his closing argument, which could have led to his acquittal. However, because the jurors were kept in the dark about this crucial limitation on Ravenell's prosecution, they were not informed of their duty to make factual determinations regarding the temporal evidence before them. Instead, the jurors were left to view the trial evidence through the exclusive lens of culpability which, in their eyes, was an inquiry unconstrained by the passage of time. The court's failure to instruct the jury on the statute of limitations thus "seriously impaired" Ravenell's defense. *Hill*, 927 F.3d at 209.

While the majority highlights circumstantial evidence that casts doubt on this theory of termination—such as Harris's conflicting testimony regarding Ravenell's legal fees and Ravenell's continued status as counsel of record for Byrd and Harris—that evidence, at best, creates a factual question regarding termination of the alleged conspiracy that should have been determined by the jury.[4] Indeed, as the Supreme Court has explained, "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question . . . is time barred,"

---

[4] My colleagues in the majority also overstate the persuasive value of this evidence. For example, they contend that a conspiracy between Ravenell and Darnell Miller existed because in May 2014, "Ravenell offered to 'wash' Miller's money in the same way he did Byrd's," and "Miller . . . decided not to move forward with this partnership only when he found out that the FBI had raided Ravenell's law office . . . [in] August 2014." *Ante* at 19. But in fact, Miller's trial testimony indicated that he and Ravenell never had an agreement to begin with; when the Government asked Miller how he responded to Ravenell's alleged offer to launder his money, Miller stated "I told him I'd get back to him," but never did. J.A. 1496–97.

Additionally, the majority relies on the fact that Bailey reached out to Ravenell after she received a target letter from the United States Attorney's Office in November 2014. However, the majority does not explain how this constitutes evidence of the money laundering conspiracy's continuation.

50

but "jurors *are* well equipped to analyze the evidence." *Griffin v. United States*, 502 U.S. 46, 59 (1991). For that very reason, "issues of fact bearing on the application of a statute of limitations are submitted, as are other issues of fact, for determination by the jury." *Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 162 (4th Cir. 1992).

## II.

The majority culminates its decision by opining that the conviction of Kenneth Ravenell, a criminal defense attorney, stands to serve all criminal defendants' best interests by maintaining society's faith in the integrity of the criminal defense bar. One might imagine that we would more effectively protect the rights of the accused by ensuring that a jury is properly informed about the limitations on a defendant's punishable conduct. Nevertheless, while the majority's position might serve as fodder for a rich philosophical discussion, it is not an appropriate basis in which to ground the affirmance of a criminal conviction.

In enacting the applicable statute of limitations, Congress did not distinguish between defendants based on the reprehensibility of their alleged crime or the strength of the Government's case against them. To the contrary, the statute of limitations applies to all "person[s]" being prosecuted for "any offense, not capital," "[e]xcept as otherwise expressly provided by law." 18 U.S.C. § 3282(a). The statute of limitations, therefore, protects all defendants, regardless of their potential culpability. *See United States v. Podde*, 105 F.3d 813, 819 (2d Cir. 1997). And because we must "follow the law as written by Congress," *Garcia v. Texas*, 564 U.S. 940, 942 (2011), we cannot overlook the district court's critical instructional error simply because Ravenell's alleged conduct may reflect poorly on the criminal defense bar.

51

To do so would risk not only judicial overreach, but the desecration of our Constitution's guarantees.  In my view, "instruct[ing] the jury clearly regarding the law to be applied in the case," *Lewis*, 53 F.3d at 34, is a prerequisite to fulfilling the Sixth Amendment's promise of "trial[] by an impartial jury," U.S. Const. amend. VI.  Indeed, without proper "instructions as to the law, the jury becomes mired in a factual morass, unable to draw the appropriate legal conclusions based on those facts." *Lewis*, 53 F.3d at 34.  The district court's instructional error thus strikes at the heart of Ravenell's "fundamental constitutional right" to a jury trial. *Horner v. Nines*, 995 F.3d 185, 198 (4th Cir. 2021).

Accordingly, we must set aside any extrajudicial assumptions and conduct a rigorous review to ensure that Ravenell's conviction comports with the statutory and constitutional guardrails from which we all benefit.  After conducting such a review in this case, I conclude that Ravenell's conviction does not.  I would therefore vacate his conviction and remand for a new trial.